071306

**From:** Phil Kaprow
**Sent:** Jul 13, 2006
**To:** Dan Myers; hbeyer@wans.net
**Cc:** Richard E. Berman
**Bcc:**
**Subject:** Berkowitz Letter w/ Richard's Comments

Attached please find the Berkowitz letter both redlined and clean with Richard Berman's comments incorporated.

Please review and comment.

Phil

2 Attachments



071306

Dear Ms. Berkowitz:

This letter is in response to your questions in your June 15, 2006 email to Dan Myers. Our responses below track your questions item by item.

**Question 1**: What happened to the $25M in precious metals that were part of the contract in 2003?

Answer: The precious metal is currently held by Presidion Corporation which is different and distinct from the Taxpayer and the Taxpayer's parent, Presidion Solutions, Inc.

The metals are currently being held by Titanium Technologies, Inc. of El Paso, Texas for processing, which it is planning to commence in September, after which a final determination will be made as to whether such funds these assets will be converted to Presidion Corporation preferred stock, which is to some extent dependent on the criteria of which is whether PSDI is, at that time, ready for relisting as a publicly traded stock.

**Question 2: Where did the money go that 3 TPs collected from their customers?**

Answer: The Taxpayer's distribution by vendors is provided separately, however, an aggregated calculation indicates that the Taxpayers have lost as much as $184,000,000 since 2003 in addition to expending and spent $50,000,000 to acquiring acquire the business from prior owners; moreover, added to the foregoing that is the insurance collateral requirements of $40,000,000. Further, we now believe that the Taxpayer computer systems may have resulted in either the overreporting or underbilling of clients. This has presented itself as a $60,000,000 discrepancy in a six month period of time.

**Question 3**: Who is Titanium Technologies, Inc. and why are they cutting the check for $600,000?

Answer: Titanium is the idemnitor for the insurance coverage which is necessary for contracts to have going concern value. Titanium was going to act as Trustee under the original proposal. Now Titanium will serve as the real party at risk for insurance claims.

**Question 4: Why can't IRS get paid in full for all three companies when $300M is received for the book of business? When shares are sold, why can't IRS get the full amount?**

Answer: The Service can be paid in full upon sale of the assets; however, the majority of the purchase price will be paid by to us in a note; thereafter, if as is expected the book assets are resold by the purchaser, it is likely to be paid in publicly traded stock, which will be subject to statutory SEC restrictions and certain private restrictions to avoid flooding the market and depressing the price. Upon subsequent sale of the stock the Service will be entitled to proceeds which, absent unforeseen circumstances, will pay the Service in full.

**Question 5: How did the book of business appreciate from $12M to $300M?**

Answer: The book of business is generating about $7,500,000 a year as distributable

profit; we think it is fair to allocate this amount to the installment agreement while the book is sold and the consideration is converted to cash.

Also, during the past year and under our direction, the taxpayers have reduced expenses by as much as $20,000,000 annually. In addition, a number of unprofitable customers were culled from the book, eliminating a significant drain on overall profitability, combined with the new purchaser's existing customer base and infrastructure yielding an increased profitability.

Additionally, we discovered that during the last <u>aborted</u> attempt to have AEM, Inc. take control of the book of business (May 1, 2006), prior management had created a separate database known as Alpha 5. Prior to May 2006, we had no access to this database. We discovered that most of the existing "good" contracts were under priced (some since the early 1990's) just to generate business and sales commissions. It appears that the Alpha 5 database was maintained in parallel to the main system to obfuscate this fact.

These realizations lead to one final revision of the July 28, 2005 acquisition agreements. Instead of relying on computer data, we have had each paper contract reviewed. This permitted AEM to convert to new, "non-tailored" off the shelf software, plus permitted us to re-price the contracts. With an accurate and marketable book, we were now in a position to sell some of the contracts to a public entity, which will generate a much larger multiple in the value of the book.

The bottom line is that our turnaround efforts have greatly increased the profitability of the assets while stemming cash losses. Unmarketable assets have now become marketable, and as such, command a very high multiple to a potential acquirer.

<u>Question 6</u>: **If you must have an IA, IRS needs to have a collateral agreement. We need a "Letter of Credit" (from a reputable bank) on which we can collect if the IA defaults.**

<u>Answer</u>: A collateral agreement and a note with security agreement are viable in support of the installment agreement; a letter of credit would be very difficult to obtain. We certainly can look at obtaining one based upon our ability to collateralize the publicly traded stock recieved.

<u>Question 7</u>: **What other companies are there that are part of Presidion Corporation?**

<u>Answer</u>: The entities previously involved with Presidion Corporation are the same ones we inquired about in January. Here is the list with EINs:

|  |  | EIN |
|---|---|---|
| Presidion Solutions, Inc. | f/k/a Affinity Business Services, Inc. | 38-3547703 |
| Amfinity Business Solutions, Inc. | n/k/a ABS IV, Inc. | 39-1979503 |
|  |  | 59- |

071306

| | | |
|---|---|---|
| Sunshine Staff Leasing, Inc. | d/b/a Presidion Solutions I, Inc. | 2280930 |
| Sunshine Companies, Inc. | d/b/a Presidion Solutions II, Inc. | 59-2844403 |
| Sunshine Companies II, Inc. | d/b/a Presidion Solutions III, Inc. | 59-2718595 |
| Sunshine Companies III, Inc. | d/b/a Presidion Solutions IV, Inc. | 59-2720548 |
| Sunshine Companies IV, Inc. | d/b/a Presidion Solutions V, Inc. | 59-2662862 |
| Presidion Solutions VII, Inc. | n/k/a Professional Business Solutions, Inc. | 65-0991757 |
| Presidion Administrative Solutions, Inc. | | 65-1087098 |
| Creative Insurance Concepts, Inc. | | 65-1426663 |

    We are locating the contracts and the documents you have requested in Questions 8, 9, and 10. A partially collected set of the documents is attached hereto.

    Please note Mr. Amar has not yet officially acted on the July 28, 2005 acquisition agreements as a result of the record and data problems. It is my understanding that he will not be an officer at the time of the transfer. In the meantime, for your information, AEM employs experienced PEO management to handle its business. This business is likely to grow to be twice the size of the contracts AEM will acquire under the July 28, 2005 acquisition agreements.

071306

Dear Ms. Berkowitz:

This letter is in response to your questions in your June 15, 2006 email to Dan Myers. Our responses below track your questions item by item.

**Question 1**: What happened to the $25M in precious metals that were part of the contract in 2003?

Answer: The precious metal is currently held by Presidion Corporation which is different and distinct from the Taxpayer and the Taxpayer's parent, Presidion Solutions, Inc.

The metals are currently being held by Titanium Technologies, Inc. of El Paso, Texas for processing, which it is planning to commence in September, after which a final determination will be made as to whether these assets will be converted to Presidion Corporation preferred stock, which is to some extent dependent on whether PSDI is, at that time, ready for relisting as a publicly traded stock.

**Question 2**: Where did the money go that 3 TPs collected from their customers?

Answer: The Taxpayer's distribution by vendors is provided separately, however, an aggregated calculation indicates that the Taxpayers have lost as much as $184,000,000 since 2003 in addition to expending $50,000,000 to acquire the business from prior owners; moreover, added to the foregoing is the insurance collateral requirements of $40,000,000. Further, we now believe that the Taxpayer computer systems may have resulted in either the overreporting or underbilling of clients. This has presented itself as a $60,000,000 discrepancy in a six month period of time.

**Question 3**: Who is Titanium Technologies, Inc. and why are they cutting the check for $600,000?

Answer: Titanium is the idemnitor for the insurance coverage which is necessary for contracts to have going concern value. Titanium was going to act as Trustee under the original proposal. Now Titanium will serve as the real party at risk for insurance claims.

**Question 4**: Why can't IRS get paid in full for all three companies when $300M is received for the book of business? When shares are sold, why can't IRS get the full amount?

Answer: The Service can be paid in full upon sale of the assets; however, the majority of the purchase price will be paid by a note; thereafter, if as is expected the book assets are resold by the purchaser, it is likely to be paid in publicly traded stock, which will be subject to statutory SEC restrictions and certain private restrictions to avoid flooding the market and depressing the price. Upon subsequent sale of the stock the Service will be entitled to proceeds which, absent unforeseen circumstances, will pay the Service in full.

**Question 5**: How did the book of business appreciate from $12M to $300M?

Answer: The book of business is generating about $7,500,000 a year as distributable

071306

profit; we think it is fair to allocate this amount to the installment agreement while the book is sold and the consideration is converted to cash.

Also, during the past year and under our direction, the taxpayers have reduced expenses by as much as $20,000,000 annually. In addition, a number of unprofitable customers were culled from the book, eliminating a significant drain on overall profitability, combined with the new purchaser's existing customer base and infrastructure yielding an increased profitability.

Additionally, we discovered that during the last <u>aborted</u> attempt to have AEM, Inc. take control of the book of business (May 1, 2006), prior management had created a separate database known as Alpha 5. Prior to May 2006, we had no access to this database. We discovered that most of the existing "good" contracts were under priced (some since the early 1990's) just to generate business and sales commissions. It appears that the Alpha 5 database was maintained in parallel to the main system to obfuscate this fact.

These realizations lead to one final revision of the July 28, 2005 acquisition agreements. Instead of relying on computer data, we have had each paper contract reviewed. This permitted AEM to convert to new, "non-tailored" off the shelf software, plus permitted us to re-price the contracts. With an accurate and marketable book, we were now in a position to sell some of the contracts to a public entity, which will generate a much larger multiple in the value of the book.

The bottom line is that our turnaround efforts have greatly increased the profitability of the assets while stemming cash losses. Unmarketable assets have now become marketable, and as such, command a very high multiple to a potential acquirer.

**Question 6: If you must have an IA, IRS needs to have a collateral agreement. We need a "Letter of Credit" (from a reputable bank) on which we can collect if the IA defaults.**

<u>Answer</u>: A collateral agreement and a note with security agreement are viable in support of the installment agreement; a letter of credit would be very difficult to obtain. We certainly can look at obtaining one based upon our ability to collateralize the publicly traded stock recieved.

**Question 7: What other companies are there that are part of Presidion Corporation?**

<u>Answer</u>: The entities previously involved with Presidion Corporation are the same ones we inquired about in January. Here is the list with EINs:

|  |  | EIN |
|---|---|---|
| Presidion Solutions, Inc. | f/k/a Affinity Business Services, Inc. | 38-3547703 |
| Amfinity Business Solutions, Inc. | n/k/a ABS IV, Inc. | 39-1979503 |
|  |  | 59- |

071306

| | | |
|---|---|---|
| Sunshine Staff Leasing, Inc. | d/b/a Presidion Solutions I, Inc. | 2280930 |
| Sunshine Companies, Inc. | d/b/a Presidion Solutions II, Inc. | 59-2844403 |
| Sunshine Companies II, Inc. | d/b/a Presidion Solutions III, Inc. | 59-2718595 |
| Sunshine Companies III, Inc. | d/b/a Presidion Solutions IV, Inc. | 59-2720548 |
| Sunshine Companies IV, Inc. | d/b/a Presidion Solutions V, Inc. | 59-2662862 |
| Presidion Solutions VII, Inc. | n/k/a Professional Business Solutions, Inc. | 65-0991757 |
| Presidion Administrative Solutions, Inc. | | 65-1087098 |
| Creative Insurance Concepts, Inc. | | 65-1426663 |

We are locating the contracts and the documents you have requested in Questions 8, 9, and 10. A partially collected set of the documents is attached hereto.

Please note Mr. Amar has not yet officially acted on the July 28, 2005 acquisition agreements as a result of the record and data problems. It is my understanding that he will not be an officer at the time of the transfer. In the meantime, for your information, AEM employs experienced PEO management to handle its business. This business is likely to grow to be twice the size of the contracts AEM will acquire under the July 28, 2005 acquisition agreements.

052306.1

Page 1 of 3

Mike Stanley

From: Larry Haber
Sent: Wednesday, May 24, 2006 5:18 PM
To: Fernando Simo; Pete Anderson; Yaniv Amar; Paul Glover; Mike Stanley; Jim Beesley; Jim Balers; Jim Waldvogel
Subject: FW: ESAC

FYI

LAWRENCE HABER
SI-P
*Strategic Initiatives*
Mirabilis Ventures, Inc.
111 N. Orange Avenue, 20th Floor, Orlando, FL. 32801
Tel: 407-517-7779
Toll Free: 1-800-704-2080
Fax: 407-426-9191



This e-mail contains PRIVILEDGED AND CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail and delete this e-mail from your records. Thank you for your cooperation.

From: Richard E. Berman [mailto:reb@bermankean.com]
Sent: Wednesday, May 24, 2006 4:58 PM
To: Rufus Wolff
Cc: Jane A. McCoggins; Rex Eley
Subject: RE: ESAC

Please accept this response on behalf of Mirabilis Ventures Inc. to Mr. Wolff's letter that was attached to his email sent earlier today. Mirabilis elects to accept the first alternative offered in your letter since it does indeed wish to seek accreditation of all of its PEO entities with ESAC. Allstaff will voluntarily relinquish its accreditation while it is in good standing to allow Mirabilis to apply for accreditation for all of its PEOs and avoid any adverse action that could result with respect to the accreditation of Allstaff. We agree to do this prior to a mediation hearing and are prepared to complete these details with you tomorrow. It is the understanding of Mirabilis that by Allstaff voluntarily relinquishing its accreditation, pending application by all Mirabilis PEOs, Allstaff and Mirabilis will be permitted to announce to the Allstaff clients that such action was taken in preparation of application of all such PEOs to ESAC and not as a result of any adverse action taken by ESAC. We understand that ESAC is also required to notify Allstaff's clients of such relinquishment, but since Allstaff will have withdrawn prior to a mediation hearing, ESAC will be able to state that such action by Allstaff was voluntary. Moreover, ESAC will not include information about its finding of probable cause. We thank you for your consideration and assure that that we will

5/24/2006