110206

## BERMAN, KEAN & RIGUERA, P.A.

## C O N F I D E N T I A L   M E M O R A N D U M

Date: November 2, 2006

To: Mirabilis Ventures, Inc.

From: Elena Wildermuth

Re: Evaluation of the "Original Obligations" included in the Debt Refinancing Agreement[1]

> The goal is to show that the transactions were the products of arm's length negotiations between a seller in desperate need of funds and a purchaser willing to risk money in an extremely speculative venture.

## I.   DEBT REFINANCING AGREEMENT BACKGROUND.

On August 30, 2006, Mirabilis Ventures, Inc. ("MVI") and Presidion Solutions, Inc. ("Solutions") entered into a debt refinancing agreement ("Refinancing Agreement"). The purpose of the Refinancing Agreement was to restructure the outstanding debt owed[2] by Solutions and several of its subsidiaries to MVI and its affiliates. Solutions and its various subsidiaries are PEOs and have been in the business of employee leasing for over five years. By the end of 2004, several of Solutions subsidiaries were on the verge of bankruptcy as a result of underpayment of employment related taxes for certain months from 2002 through 2004. In attempt to preserve shareholder's value in the business, Solutions negotiated with MVI and one of its affiliates, Nexia Strategy Corporation ("Nexia"), to extend financial and

---

[1] The evaluation of the "Original Obligations" was based: (1) on the documents provided by the client, which consisted of the binder containing the Debt Refinancing Agreement together with the Exhibits thereto and (2) partially on the information available in public records together with the documents that I remember seeing on file in the firm.

This memorandum is presented in the following way: The plain text of the memo describes the intended goal of MVI's actions, based solely on the client's representation, and transactions that MVI presumably took in achieving that goal, presented in the light most favorable to the client. The text in the shaded boxes poses various inquiries relating to the documents presented and discusses other possible interpretation of the client's actions, based upon review of the documents.

[2] The amount of outstanding debt owed ($12,133,917.00) has been provided by the client and has not been verified by an independent accounting firm.



PLAINTIFF'S EXHIBIT K

consulting help to Solutions and its subsidiaries. Nexia is a business consulting firm, specializing in providing debt restructuring services to PEOs in financially distressed situations. Solutions and its affiliates were in desperate need of funds and MVI was willing to risk money in an extremely speculative venture that, if successful, would yield a high rate of return. Over a period of approximately fifteen (15) months, MVI directly and through its subsidiaries assumed or purchased liabilities of and extended credit to Solutions and its subsidiaries; and, the Refinancing Agreement is a final step in recovering the remaining balance due to MVI.

> **GENERAL INQUIRIES RE: REFINANCING AGREEMENT**
>
> 1. Which entities were referred to as "subsidiaries and affiliates" of Solutions (mentioned in the Background, Part A of the Refinancing Agreement)? Weren't some of them dissolved? What assets do they have?
>
> 2. The Refinancing Agreement was signed only by Solutions as a Borrower, even though the definition of the Borrower includes subsidiaries and affiliates of Solutions (see Section 1.2 of the Refinancing Agreement). Therefore, there is no authority to bind remaining entities. What are the entities that MVI intended to be bound by the Refinancing Agreement?
>
> 3. The attached Security Agreement (as defined in Section 1.9 of the Refinancing Agreement) is only binding on Solutions, as the only debtor party to it. Also, it refers to a certain Line of Credit Agreement executed contemporaneously therewith and based on it. I was not able to locate it in the package presented to me. The Line of Credit amount (as stated in the Security Agreement) was up to $5,000,000.00? Has it been paid off? In the best case scenario, MVI is secured only to the extent of $5,000,000.00.
>
> 4. The Security Agreement was dated January 31, 2005. What assets did Solutions have then? And what assets does Solutions have now? I thought it was just a holding company for Sunshine Entities and Paradyme, Inc. If that's so, the only security they can provide are shares of their subsidiaries. In that case, shareholders of Solutions have to agree to it. If Presidion Corporation is the only (100%) shareholder of Solutions, than Presidion Corporation has to authorize it.
>
> 5. The "Promissory Note" (as defined in Section 1.6 of the Refinancing Agreement and attached as Exhibit "J" thereto) is unsigned.

---

[1] After the sale of Sunshine Entities, Solutions has the following subsidiaries remaining: (1) Paradyme, Inc., (2) Presidion Administrative Solutions, Inc.; (3) Presidion Solutions, VII (f/k/a Professional Benefit Solutions). **Is it true? Anything else? Please confirm and clarify. What other entities and/or assets remain?**

- 2 -

> 6. There are several Notices of Federal Tax Lien:
>
>    (1) re: Presidion Solutions, Inc.,        filed on May 5, 2005 for $2,120,287.84;
>    (2) re: Presidion Solutions, Inc.,        filed on May 25, 2005 for $22,482,278.78;
>    (3) re: Presidion Corporation;            filed on Sep. 26, 2006 for $272,856.72;
>    (4) re: Paradyme, Inc.;                   filed on Sep. 26, 2006 for $813,828.44;
>    (5) re: Presidion Solutions VII, Inc.[4]  filed on June 26, 2006 for $97,070,415.00;
>
>    Therefore, even if the Security Agreement above (UCC relating to it was filed on July 13, 2005) was valid, it would not protect against the IRS notices of federal tax lien; some of which had been filed earlier.
>
> 7. Pursuant to the documents provided, disbursements from Solutions' bank accounts as of August 2, 2006 were in the total amount of $93,441,436.36, with $64,414,868.33 that had gone to MVI and its affiliates. Is there a reason why Solutions, having access to this amount of cash, was not able to pay its creditors? What amount of debt did they have prior to MVI's involvement? What creditors did they have, other than the IRS?

## II.   HISTORY OF PRE- EXISTING OBLIGATIONS

As a part of the overall plan to stabilize financial health of Solutions, by the end of 2004, Solutions made a decision to sell all of the issued and outstanding capital stock of five of its subsidiaries: Sunshine Staff Leasing Inc.; Sunshine Companies, Inc.; Sunshine Companies II, Inc.; Sunshine Companies III, Inc. and Sunshine Companies IV, Inc. (collectively the "Sunshine Entities") to Wellington Capital Group, Inc.[5] ("Wellington"), a Nevada corporation,[6] in exchange for $500,000.00 that went directly to Presidion Corporation ("Presidion"),[7] a parent company of Solutions.

---

[4]  F/k/a Professional Benefit Solutions.

[5]  Pursuant to Form 8-K filed on January 11, 2005 by Presidion Corp. (PSDI.OB), the Sunshine Entities were sold to MVL (See Item 2.01 Disposition of Assets.) <u>Need to clarify this information! Which company was the Buyer?</u>

[6]  This entity is controlled by Frank Amodeo, who is a main shareholder (100% shareholder, <u>please confirm</u>) and Chairman of the Board.

[7]  Pursuant to the same filing, Form 8-K filed on January 11, 2005 by Presidion Corp. (PSDI.OB), Presidion Corporation, not Solutions, received $500,000.00 in cash in lieu of the sale. No contracts for sale or purchase of stock of the Sunshine Entities were provided.

- 3 -

110206

A.   Exhibit "A"– The "Paradyme Note".

Prior to the sale of stock of the Sunshine Entities, the Sunshine Entities assigned[8] all of their client service agreements, subscriber agreements, accounts and notes receivables, bank accounts, insurance contracts, furniture, fixture and equipment to Paradyme, Inc. ("Paradyme").[9] In exchange, Paradyme issued a promissory note in favor of three of the Sunshine Entities in the principal amount of $12,241,475.65 payable on December 31, 2009 (the "Paradyme Note").

The Sunshine Entities, now owned by Wellington, were in desperate need of cash in order to pay its debt to the IRS and to continue its day-to-day business operations. Paradyme was in default of its obligations under the Paradyme Note.[10] The IRS was aware of the Paradyme's default. However, since Paradyme did not have any liquid assets, the IRS was not interested in enforcing the Paradyme Note.[11] Based upon the IRS' representation that it prefers cash over Paradyme's or Sunshine Entities' assets, MVI purchased the Paradyme Note from three of the Sunshine Entities in exchange for payment of $1,224,147.56 directly to the IRS,[12] pursuant to the terms of that certain assignment and acceptance agreement executed on May 31, 2005 by and between MVI, as assignee, and three of the Sunshine Entities, as assignors, (the "MVI Assignment").[13]

As a result of all of the foregoing transactions, Paradyme, a subsidiary of Solutions, became a current debtor of MVI and, as such, became a "Borrower" under the Refinancing Agreement; and, $12,241,475.65 became a part of the "Borrower's" "Original Obligations" under the Refinancing Agreement.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "A"**
>
> 1.   Why did the consideration for the shares of the Sunshine Entities go to Presidion, a parent of the entity that was a sole shareholder of the Sunshine Entities, and not to Solutions, an actual shareholder? What was the accounting entry?

---

[8]   According to a copy of the certain Assignment and Assumption Agreement that was executed December 30, 2004 and effective at 11:59 p.m. on December 31, 2004.

[9]   Paradyme was one of the remaining subsidiaries of Solutions.

[10]   According to the client's representation.

[11]   According to the client's representation.

[12]   Pursuant to that certain Memorandum dated June 27 from Frank Amodeo, as President of all three Sunshine Entities, addressed to MVI, regarding direction of payments directly to the IRS.

[13]   Based upon the documents provided, MVI did not assume Paradyme's obligations under the Paradyme Note, MVI purchase the right from three of the Sunshine Entities to receive future payments from Paradyme under the Paradyme Note.

2. What assets were remaining in the Sunshine Entities as a result of that certain assignment and assumption agreement dated December 30, 2004 and executed by Craig Vanderburg on behalf of the Assignee and the Assignors (the "Assignment Agreement")?

3. Where did the principal amount of the Paradyme Note ($12,241,475.65) come from? That certain amendment to assignment and assumption agreement ("Amendment to Assignment Agreement"), that was deemed effective *nunc pro tunc* to December 31, 2004, was executed much later, on May 19, 2005.

4. Even though the Amendment to Assignment Agreement and the underlying Assignment Agreement were between all of the Sunshine Entities and Paradyme, the Paradyme Note was executed in favor of only three of the five Sunshine Entities: (1) Sunshine Staff Leasing, Inc., (2) Sunshine Companies II, Inc., and (3) Sunshine Companies III, Inc. What were specific reasons for that? Were there any assets transferred to Paradyme from the other two of the Sunshine Entities? The Amendment to Assignment Agreement (especially the date of its execution) gives an impression that it was done to justify the existence of the Paradyme Note, which is fine in principle (the original is lost or by mistake was never executed), however it makes it even more confusing under these circumstances.

5. Therefore, since the Assignment Agreement, on its own face, was done pursuant to that certain "Securities Purchase Agreement" of December 8, 2004, it would be difficult to comment on the validity of the Paradyme Note, without knowing the terms of such agreement. (I have not seen any stock purchase agreements.) There are two possible explanations for the Paradyme Note. First, it was executed pursuant to the expressed terms and in consideration of that certain "Securities Purchase Agreement" of December 8, 2004, OR second, it was executed in lieu of and as a consideration of a separate transaction which was outside the scope of the original Assignment Agreement. However, in order to justify any of the two theories, MVH would need more agreements and/or accounting records to back it up.

6. Thus, the key issue is: What did Paradyme get in exchange from the three Sunshine entities? I am not sure where and how the amount of Net Assets came about, judging by the face of the Exhibit attached to the Amendment to Assignment Agreement.

---

[14] The Amendment to Assignment Agreement has typos that could potentially change the meaning of the entire assignment. (Ex. Assignor and Assignee are switched).

7. It was previously represented to me that Wellington, a Nevada corporation, acquired all shares of the Sunshine Entities. At the same time, pursuant to Presidion's SEC filings dated January 11, 2005, Form 8-K, the Sunshine Entities were sold to MVI, not Wellington. (See Item 2.01 Disposition of Assets). Also, pursuant to the same filing, Presidion, not Solutions, received $500,000.00 in cash in lieu of the sale. Which entity was an actual buyer of the Sunshine Entities' shares and where can we locate the subject stock purchase agreement? It is very crucial for purpose of tracing the pre-existing debt referred to in Exhibit A to the Refinancing Agreement. From what I know, none of these documents came from our firm.

8. It is possible to look at the transaction as follows – Paradyme had free benefit of acquiring assets without ever paying for it. Three of the Sunshine Entities, the IRS's debtors, were stripped out of the assets in the alleged amount of $12,241,475.65. And now MVI wants to collect from Solutions, prior to other creditors, especially the IRS.

9. Moreover, see Section III B 8 below, also relating to the Paradyme Note. Pursuant to documents that we have on file, Paradyme's assets were transferred to one of the MVI's subsidiary, AEM Inc.[13] So the debts, in theory, can be offset.

10. Unless, the assignment of the Paradyme Note from the three of the Sunshine Entities were approved and consented to by the IRS (upon full disclosure), the IRS may have a claim against MVI, as a transferee of the debtors' assets (note payable), for fraudulent transfer, which would resulted in bringing the asset back to the Sunshine Entities.

11. Is Paradyme still a subsidiary of Solutions?

12. Is Solutions still a subsidiary of Presidion?

13. When did MVI acquire any equity interest in Presidion? For how long? When and if and how did MVI dispose of its interest in Presidion? Do you have relevant Stock Purchase and Sale agreements?

---

[13] If the assets transferred from Paradyme to AEM, Inc. included, at least partially, the assets that were transferred from the Sunshine Entities to Paradyme according to the Assignment Agreement.

110206

B.  **Exhibit "B" – MVI Insurance Collateral Agreement**

On August 15, 2005, MVI and Solutions entered into an agreement pursuant to which, MVI would assume liabilities of Solutions in the estimated amount of $19,800,000 under that certain workers compensation program in exchange for Solutions' promise to pay $17,820,000.00 in the future (the "MVI Insurance Collateral Agreement"). While MVI performed its obligations under the MVI Insurance Collateral Agreement, Solutions failed to pay amount due thereunder and, as a result defaulted on their obligations to MVI.[16]

Consequently, MVI agreed to waive its remedies under the MVI Insurance Collateral Agreement in exchange for Solutions entering into the Debt Refinancing Agreement. As such, $17,820,000.00 became a part of the "Borrower's" "Original Obligations" under the Refinancing Agreement.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "B"**
>
> 1. The MVI Insurance Collateral Agreement makes references to insurance and collateral agreements with First Commercial Insurance Company ("FCIC") and Aldrostar S.A. ("Aldrostar"). Also, it is stated that the insurance programs have terminated resulting in Solutions incurring a liability for the payment of open claims in accordance with the provisions of the insurance and collateral agreements with FCIC and Aldrostar. However, the only agreement attached to the Exhibit "B" is the workers compensation deductible reimbursement reinsurance agreement with Aldrostar. Is there a copy of a prior terminated and current policy between Solutions and FCIC which expressly provided for the loss fund (re: workers compensation insurance)?
>
> 2. It is also stated in the MVI Insurance Collateral Agreement that MVI has entered into agreements with FCIC and Aldrostar to discharge Solution's liability for the reserve of open claims under the insurance programs. I could not locate that agreement between MVI and FCIC and Aldrostar in the folder. Is there a copy of this agreement? That would give us an idea of what kind of liabilities Solutions had incurred and MVI had assumed.
>
> 3. Which subsidiaries of Solutions are we talking about? After December 31, 2004, the Sunshine Entities are not Solutions' problem, they were sold. Is it Paradyme and other remaining subsidiaries? I also see references to AEM, Inc. which is not Solutions' subsidiary. Please clarify.

---

[16] According to the client's representation. **Please confirm.**

> 4. How was the amount of debt to MVI ($17,820,000) determined? Is it an actual amount that MVI paid to FCIC and/or Aldrostar? Which entities were covered under the FCIC and Aldrostar insurance program? Was this a prorated amount for Solutions' entities only?
>
> 5. Is this issue somewhat connected to Exhibit "H" - Lighthouse Insurance quotes? It has to be connected to Exhibit "A", in terms of transferring insured assets (client service agreements) to Paradyme? Please clarify.
>
> 6. Is there a copy of agreement between MVI and FCIC? Is there a release in favor of Solutions for the losses incurred prior to that date, mentioned in the explanation to Exhibit "B" and related to the item II-B-2 herein above?
>
> 7. Is there a copy of the Security Agreement dated March 4, 2005 between Solutions and MVI, referred to in the MVI Insurance Collateral Agreement?
>
> 8. What are you referring to as the "Risk Arbitrage Agreement"? Is it the Stock Purchase Agreement dated December 15, 2004 between MVI and Burcham for shares of Presidion (attached to Exhibit "C")? If not, is there a copy of what is called the "Risk Arbitrage Agreement"?

C. **Exhibit "C" – "Sellers Financing Note Obligations"**

On or about December 31, 2004, MVI assumed or purchased all of the prior liabilities of Solutions to the following secured creditors: Fred J. Sandlin ("Sandlin"), Robert A. Gains and the Robert A. Gaines Trust (collectively "Gaines") and Kenneth A. Hendricks and Diane M. Hendricks (collectively "Hendrickses").

Consequently, as a result of the foregoing debt consolidation transactions, Solutions became a current debtor of MVI and, as such, became a "Borrower" under the Refinancing Agreement; and, the amounts equal to the assumed and/or purchased liabilities became a part of the "Borrower's" "Original Obligations" under the Refinancing Agreement.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "C"**
>
> 1. With respect to that certain agreement dated December 31, 2004 entered by and between Presidion, Solutions, Sunshine Entities and Sandlin ("Sandlin Settlement Agreement"), I was not able to locate any documents in support of assumption (or purchase) by MVI of any alleged Solutions' liabilities asserted by Sandlin against Presidion, Solutions and Sunshine Entities.

- 8 -

2. Moreover, under the terms of the Sandlin Settlement Agreement, the amount of the Solutions'[17] cash obligations did not exceed $280,000.00, not alleged $3,920,000.00. At the time of entering into the Refinancing Agreement, what were amounts due to Sandlin under the Sandlin Settlement Agreement? Please, clarify.

3. With respect to that certain agreement dated December 31, 2004 entered by and between Presidion Solutions, Sunshine Entities, John W. Burcham, II and Craig A. Vanderburg[18] and Gaines ("Gaines Settlement Agreement"), I was not able to locate any documents in support of assumption or purchase by MVI of any alleged Solutions' liabilities asserted by Gaines against Solutions related entities.

4. Moreover, under the terms of Gaines Settlement Agreement, Solutions[19] did not have to pay out any cash, let alone alleged $2,442,610.00. At the time of entering into the Refinancing Agreement, what were amounts due to Gaines[20] under the Gaines Settlement Agreement? Please, clarify.

5. With respect to the obligations to Hendrickses, it looks like MVI substituted itself for Solutions as a debtor of Hendrickses as a result of that certain purchase agreement by and between MVI and Hendrickses dated February 16, 2006 ("Hendrickses Purchase Agreement"), pursuant to which MVI purchased from Hendrickses the right to collect the alleged debt from Solutions and the right to collect that certain judgment in favor of Hendrickses in Federal Court for the Central District of California against Strategic Capital Investments, LLC and William J. Leyton in the amount of $2,998,382.65 (the "Strategic Capital Judgment").

6. In consideration of the MVI substitution for Solutions and pursuant to the Hendrickses Purchase Agreement, MVI was obligated to pay, at closing $500,000.00 to Hendrickses and to deliver a promissory note in the amount of $2,347,196.39. Pursuant to the documents provided, MVI did execute that certain note and loan agreement dated February 16, 2006 in favor of Hendrickses in the amount of $2,347,196.39 (the "MVI to Hendrickses Note"), which was personally guaranteed by James Baiers and Craig Vanderburg, together with a security agreement in the collateral, which included the purchased obligations of Solutions to Hendrickses and the Strategic Capital Judgment.

---

[17] Under the terms of the Sandlin Settlement Agreement, Presidion should have issued 14,700,606 shares of common stock.

[18] Burcham and Vanderburg were also personal guarantors.

[19] Under the terms of the Gaines Settlement Agreement, Presidion should have issued 6,145,302 shares of common stock.

[20] Or to Wellington Capital Group, Inc., a buyer of the Sunshine Entities, that was substituted for the Plaintiff, Gaines, when Gaines initiated an action to collect on a prior promissory note, relating to his sale of Sunshine Entities to Solutions in 2001, against Craig Vanderburg, as a guarantor.

- 9 -

110206

> 7. However, according to a copy of the check #97407, dated February 16, 2006, Paradyme, a subsidiary of Solutions, and not MVI, paid $500,000.00 to Hendrickses. And as a result, the MVI's purchased obligations of Solutions would be offset by that amount and would be equal to $2,347,196.39.
>
> 8. Since MVI bought the right to collect money from Solutions, Solutions may have all kinds of defenses to payment under those notes. Moreover, from that certain registration rights agreement by and between Amfinity Capital LLC, Hendrickses and Presidion, dated February 16, 2006 ("Registration Rights Agreement"), it looks like Hendrickses[21] still own 10,135,549 shares of the parent corporation, Presidion. I thought that the prior Solutions obligations were in lieu of the sale of shares of some of the Solutions related company (which company/ies? – please clarify). Also the prior notes were guaranteed personally. Why would Presidion provide Hendrickses with the registration rights? Especially, on the same date as all of the foregoing transactions, February 16, 2006? Please clarify.
>
> 9. In theory, based upon the documents provided, the maximum amount of Solutions liabilities that was assumed or purchased by MVI (covered by Exhibit "C" – liabilities to Sandlin, Gaines and Hendrickses) would be not more than $2,627,196.39[22] – not the amount of $8,709,806.00 stated in the Exhibit "C."

D. **Exhibit "D" – MVI Obligations to John Burcham under the Stock Purchase Agreement.**

> FROM THE DOCUMENTS PROVIDED, THIS MVI OBLIGATION IS A DIRECT OBLIGATION OF MVI AND WAS NOT A RESULT OF ASSUMPTION OR PURCHASE OF ANY OF THE SOLUTIONS OR RELATED COMPANIES OBLIGATIONS TO OTHER CREDITORS AND ON ITS FACE CANNOT BE A PART OF THE ORIGINAL OBLIGATIONS UNDER THE REFINANCING AGREEMENT.

Based upon the documents provided, it looks like the following took place: On or about December 15, 2004, John Burcham ("Burcham"), as a seller, and MVI, as a buyer, entered into a certain stock purchase agreement ("Stock Purchase Agreement") for purchase of all of the Burcham's shares in Presidion[23] by MVI for the amount of $2,837,106.28.

---

[21] Together with Amfinity Capital LLC, which, to the best of my knowledge, was Hendrickses' company.
[22] $280,000.00 of Sandlin liability and $2,347,196.39 of Hendrickses liability.
[23] It is assumed that at that time Burcham owned 35,476,341 shares of Presidion stock.

- 10 -

On or about December 21, 2004, Burcham, individually and on behalf of his company, and Frank Amodeo, on behalf of MVI and Presidion, entered into a subsequent handwritten agreement modifying and supplementing certain provisions of the Stock Purchase Agreement (the "Handwritten Agreement"). Pursuant to the terms of the Handwritten Agreement, all obligations that existed as of that date between Presidion and Burcham (including Burcham owned companies) were released and offset with the "pledged preferred shares."[24]

Between December 27, 2004 and February, 9, 2005, MVI made payments to Burcham under the terms of the Stock Purchase Agreement and Handwritten Agreement totaling $660,000.00.[25] After that, MVI failed making any payments under the stated agreements.[26] On or about April 25, 2005, Burcham filed a complaint against MVI and Frank Amodeo, individually, alleging several causes of action based on breach of contract and tort ("Burcham Complaint"). On or about March of 2005, MVI filed a separate cause of action against Burcham alleging fraud in inducement with respect to the Stock Purchase Agreement ("MVI Complaint"). Soon thereafter, both actions were consolidated.

On or about July 14, 2005, MVI, Frank Amodeo and Burcham entered into a certain confidential settlement agreement ("Settlement Agreement") pursuant to which, all parties agreed to dismiss their respective complaints and counterclaims; and, the parties released each other from all of the prior mutual obligations.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "D":**
>
> 1. Please clarify, how did MVI's obligations under the terms of the Confidential Settlement Agreement become an obligation of Solutions to MVI?
>
> 2. Pursuant to the terms of the Handwritten Agreement, definitive agreements to be completed by Tuesday, December 28, 2004. Was it done? Is there a copy of such agreements?

## III. HISTORY OF OBLIGATIONS FOR SERVICES EXTENDED BY MVI

As a part of the overall plan of improving financial stability of Solutions, MVI and several of its affiliates performed various services for the benefit of Solutions and its subsidiaries. MVI was compensated only partially for such services; and, the outstanding balance became part of the "Original Obligations" under the Refinancing Agreement.

---

[24] It is not clear from the Handwritten Agreement, how many shares and of which corporation were going to be owned by Burcham.
[25] Based upon Burcham's representation.
[26] Based upon Burcham's representation.

- 11 -

110206

A.   <u>Exhibit "E" – "Insurance Deposits/ Prepaid Collateral" on behalf of Solutions.</u>

During the summer of 2005, Solutions and its subsidiaries were not able to obtain workers' compensation insurance coverage for their customers. MVI offered to solve this potentially devastating problem by obtaining an umbrella insurance coverage in the name of one of its subsidiary, AEM, Inc., which would include customers covered by Solutions subsidiaries' contracts. As part of that arrangement, Sunz Insurance Company required for MVI to prepay insurance premiums and deposits, for which Solutions and its subsidiaries were to reimburse MVI on an as incurred basis.

Consequently, as a result of the foregoing extended credit by MVI in obtaining necessary insurance coverage for Solutions' subsidiaries, Solutions became a current debtor of MVI[27] and, as such, became a "Borrower" under the Refinancing Agreement.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "E"**
>
> 1. I have difficulties following this Exhibit "E" and explanation thereto. How was the amount of $13,125,982.00 calculated? Didn't this amount cover AEM, Inc.'s contracts also? Was it a prorated amount of Solutions customers only?
>
> 2. Did Solutions reimburse MVI for this amount already, on an as incurred basis (As stated in the explanation provided to this Exhibit "E")? From which of Solutions or its subsidiaries' accounts, were the reimbursements paid? How often? From when to when? In what amounts?
>
> 3. From the documents provided, it looks like on February 15, 2006, Solutions paid directly to Sunz Insurance Company. Please confirm.
>
> 4. Wasn't this type of contract covered under the contract that was discussed in Exhibit "B"? And what about Exhibit "H"? Why are they covered by different insurance companies? By different contracts?

B.   <u>Exhibit "F" – Consultant Agreement between Nexia and Presidion</u>

As a part of the overall financial rehabilitation of Solutions, MVI brought help of one of its affiliate, Nexia, which has been providing a variety of business consulting and restructuring services under several consultant agreements. Thus, the total amount of the invoices billed to

---

[27]   To the extent of unpaid balance of the credit provided.

- 12 -

110206

Solutions in the amount of $19,500,000.00 became part of the "Original Obligations" under the Refinancing Agreement.

---

**INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "F"**

1. To what "book of business" sale on July 17, 2006, was the explanation to the Exhibit "F" was referring?

2. Technically, the consulting fees were not owed to MVI, but to Nexia, which is a separate entity. Therefore, treating indebtedness to one corporation as the indebtedness to the other in such informal manner could cause to disregard existence of separate corporate entities (piercing of corporate veil), in cases of any issues that might be litigated in the future.[28] That certain consultant agreement dated May 1, 2005, was entered by and between Nexia (not MVI) and Presidion (not Solutions) (the "Consultant Agreement").

3. There appears to be two "addendums" to the Consultant Agreement. (1) First addendum, which was executed on the same day by and between the same parties (the "First Addendum"), provided for a fee structure. (2) The other unsigned agreement titled "Second addendum to consultant agreement dated May 16, 2005" was entered by and between Solutions (not Presidion) and Nexia (the "Second Addendum").[29] Therefore, it is not technically an addendum since different parties involved, it is a separate agreement. Such Agreement provided for a fee of $10,000,000.00, if Nexia would cause sale of certain assets from Professional Business Solutions, Inc. and Paradym to APM, Inc., subsidiary of MVI.

4. A copy of one of the two invoices attached indicates that Solutions paid $7,000,000.00 as per the Second Addendum.

5. Notably, a copy of invoice attached under the Consultant Agreement, in the amount of $9,500,000.00, is to Solutions, not Presidion.

6. The invoice stated that it was pursuant to "Additional Fee resulting from debt/cost reduction strategy." What was the base reference for each number in the attached Asset Reorganization Plan which was used for calculation of the fee amount payable to Nexia? What was it compared with? Please clarify.

---

[28] This caution can be applied throughout the entire transaction, since parties' liabilities seem to be substituted for the liabilities of its affiliates or subsidiaries in a very informal manner.
[29] Even though the Consultant Agreement was with Presidion, not Solutions.

110206

> 7.  Are there any assets (client contracts for PEO services) left in Solutions and its subsidiaries after the sale of the "book of business" referred in the explanation to Exhibit "F"?
>
> 8.  In our files here, I was able to locate an unsigned copy of the Asset Purchase Agreement dated May 16, 2005 from Paradyme to AEM, Inc. in the amount of $2,800,000.00 together with the Indemnity Agreement and promissory note in the amount of $1,800,000.00 from AEM, Inc., a subsidiary of MVI to Paradyme, Inc., a subsidiary of Solutions. Was this amount taking in computation of the outstanding amount of debt for purposes of the Refinancing Agreement? The same logic would apply to the sale of assets from Professional Business Solutions to AEM, Inc. if it was done similarly.
>
> 9.  In our files here, I was able to locate an unsigned copy (or a draft) of the Memorandum of understanding between MVI and Avant Services, relating to consolidation of certain PEO entities. It specifically referred to certain indebtedness of BCA Professional Services (now subsidiary of MVI) to Paradyme in the amount of $132,000,000.00. Is it a correct number or typo? If this is correct, it may have an impact on the Refinancing Agreement. How did this indebtedness arise?
>
> 10. The amount of fees ($10,000,000) for arranging a sale between 2 related companies seem excessive and raises red flags all over it. It can be even considered as the part of the purchase price, taking in consideration affiliation of the parties involved. However, since we are not familiar with the nature of the services provided, we are not in a position to make a determination of fair consideration or allocating the amount to the purchase price.

C. **Exhibit "G" – IT Services provided to Solutions by Information Services, Inc.**

As a part of the overall financial rehabilitation of Solutions, MVI also brought help of one of its affiliate, Information Services, Inc., which provided IT management services from August 1, 2005 at the discounted market rate of $300,000.00 per month.[30] Therefore the total amount of the invoices billed to Solutions in the amount of $3,600,000.00 became part of the "Original Obligations" under the Refinancing Agreement.

---

[30] Based upon client's representation.

- 14 -

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "G"**
>
> 1. There is no agreement attached to this Exhibit "G." The explanation states that "as a part of Nexia consulting agreement, Nexia provided IT support services to Presidion trough its affiliate, Information Services, Inc." Was this obligation a part of the Consultant Agreement? If yes, then was it included in the $10,000,000.00 fee?
>
> 2. If not, and it is a separate obligation, then, is there a separate Agreement between Information Services Inc. and Solutions? Is there a copy of it? Where did the rate of amount $300,000.00 per month come from?
>
> 3. Were any of the bills paid? Who paid it?

D. <u>Exhibit "H" – Claims Management Services provided to Solutions.</u>

As a part of the overall financial rehabilitation of Solutions, MVI also brought help of one of its affiliate, Creative Insurance Corporation, which provided insurance and claims management services from August 1, 2005 at the rate of 10.5% of the standard premium.[31] Thus, the total amount of the invoices billed to Solutions in the amount of $3,075,615.00 became part of the "Original Obligations" under the Refinancing Agreement.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "H"**
>
> 1. The amount of the alleged indebtedness is $3,075,615.00, which is the amount of annual insurance premium provided to AEM, Inc. How is this connected to Solutions' debt to MVI?
>
> 2. Is this is the umbrella insurance coverage that was part of the Exhibit "E"? If yes, then it appears to duplicate same expenses that are presented in Exhibit "E." Please clarify.

## CONCLUSION

In sum, from the documents provided, it appears that the amount of the "Original Obligations" under the Refinancing Agreement could not exceed $71,990,269.04[32] taken in the light most favorable to MVI.

---

[31] Reduced by the amount of payroll expense that was provided by Solutions.

[32] This amount was computed based solely on the information provided by the client and has not been verified by an independent accounting firm.