122804.2

## MEMORANDUM

TO: RICHARD BERMAN, ESQ.

FROM: FRANK AMODEO

SUBJECT: SUNSHINE COMPANIES

DATE: 1/4/2005

PRIVILEGED TO: LAURIE HOLTZ, MATTHEW DRUCKMAN, A. KENNETH LEVINE, SHARMILA
KHANORKAR, MORRIS HOLLANDER, DAVID APPEL, HANS BEYER, ESQ., EDIE
BROADHEAD, ESQ., CHARLES RAHN

### Sunshine Matter Timetable

I. Acquisition of Sunshine Companies - twelve midnight, Friday, December 31, 2004.

II. 1. Meeting of shareholders and directors of Sunshine Companies Monday, January 3, 2005 in Orlando, Florida.

- Elect new officers and directors
- Authorize employment of professionals
- Ratify Presidion/Wellington transactions

2. Meet with Rahn to plan logistics of obtaining and preserving Sunshine books and records.

III. 1. Meeting with Hans Beyer, Chris O'Connor and Shane Williams on January 6, 2005 at Miami Gardens office to prepare bankruptcy schedules – emergency petition prepared and primed for filing. Plus, first day motions and brief in support of "stay-expansion".

2. Richard Berman to contact U.S. Attorney's office to schedule a meeting with appropriate persons in Miami and Detroit for myself and Edie.

3. Jose Marrero to contact IRS: Criminal Investigation Division and inform them of change of ownership at Sunshine Cos. and change of control at Presidion and schedule meeting with myself and Edie.

4. Ken Levine to contact Florida Department of Insurance and notify them of Sunshine change of ownership and Presidion change of control; schedule meeting if needed.



PLAINTIFF'S
EXHIBIT

122804.2

5. Matt Druckman, Sharmila Khanorkar, and RCH forensic team to plan schedule of reviewing all Sunshine transactions and corporate governance documents to comply with bankruptcy disclosure issues and identify avoidable conveyances.

6. David Appel to review Sunshine Tax Returns for accuracy and compliance - make recommendations.

7. Morris Hollander to review SEC filings by Presidion to insure accuracy, especially of Sunshine transactions.

8. Morris Hollander and Matt Druckman to review financial statements of Sunshine for issues and amendments.

IV. Laurie/Richard, please select someone to contact IRS civil enforcement level who can get us to a high enough ranked individual to have a serious discussion about receiving an expeditious final assessment and can talk intelligently about the advantages of a confidential offer-in-compromise; mutually agreed upon as opposed to an imposed resolution in bankruptcy court. This meeting should be after CID and US Attorney, but otherwise in late January or early February.

Frank Amodeo
[Dictated but not reviewed]

Craig:

—the final payroll period for Sunshine, I assume, is going to be through 12/31/04. Confirm these will be included on the current year's W2, but only so long as the checks are issued by Friday; otherwise they will be included on either Paradigm or PBS for next year.

122804.2

From:  Druckman, Matthew E. (x2110) [MDruckman@rachlin.com]
Sent:  Wednesday, December 29, 2004 9:54 AM
To:  Richard Berman
Cc:  Ken Levine; Holtz, Laurie S. (x1007); Hollander, Morrie I. (x1019); Khanorkar, Sharmila R. (x1142); Hans Christian Beyer; ediebroadhead; Appel, David S. (x1031); Charles Rahn; shane
Subject: RE: Sunshine Companies

Richard:

I will await instructions from you (or Shane, Charles Rahn, or Edie Broadhead) regarding when and where the books and records will be available for the forensic review. Please let me know as soon as possible after the meeting of January 3. If Charles needs any IT support, please advise as soon as possible.

I am out of the office, but will continue to check emails during the remainder of this week.

Matt Druckman

From: Charles Rahn [mailto:charles@averyprivateeye.com]
Sent: Tuesday, December 28, 2004 5:39 PM
To: shane; Richard Berman
Cc: Ken Levine; Holtz, Laurie S. (x1007); Druckman, Matthew E. (x2110); Hollander, Morrie I. (x1019); Khanorkar, Sharmila R. (x1142); Hans Christian Beyer; 'ediebroadhead'; Appel, David S. (x1031)
Subject: Re: Sunshine Companies

Got it.

What time will the meeting commence on Monday?

Thanks,

Charles

—— Original Message ——
From: shane
To: Richard Berman
Cc: Ken Levine ; Laurie S. Holtz ; Matthew E. Druckman ; Morris I. Hollander ; Sharmila Khanorkar ; Hans Christian Beyer ; 'ediebroadhead' ; Charles Rahn ; dappel@rachlin.com
Sent: Tuesday, December 28, 2004 5:27 PM
Subject: Sunshine Companies

Please find Sunshine matter timetable memo from Frank Amodeo attached.

Thanks,
Shane Williams
AQMI Strategy Corporation

No virus found in this incoming message.
Checked by AVG Anti-Virus.
Version: 7.0.298 / Virus Database: 265.6.5 - Release Date: 12/26/2004

122804.2

From:   Richard E. Berman [reb@bermankean.com]
Sent:   Wednesday, December 29, 2004 11:14 AM
To:     shane
Subject: FW: Sunshine Companies

Please advise Frank of the attached.  Thanks.

Richard


Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd, Ste. 2800
Fort Lauderdale, Florida 33309
Telephone: (954) 735-0000
Fax: (954) 735-3636
Email: REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all copies of the original message, and do not disseminate it further.  If you are the intended recipient, but do not wish to receive communications through this medium, please advise the sender immediately.

---

From: Druckman, Matthew E. (x2110) [mailto:MDruckman@rachlin.com]
Sent: Wednesday, December 29, 2004 9:54 AM
To: Richard E. Berman
Cc: Ken Levine; Holtz, Laurie S. (x1007); Hollander, Morrie I. (x1019); Khanorkar, Sharmila R. (x1142); Hans Christian Beyer; ediebroadhead; Appel, David S. (x1031); Charles Rahn; shane
Subject: RE: Sunshine Companies

Richard:

I will await instructions from you (or Shane, Charles Rahn, or Edie Broadhead) regarding when and where the books and records will be available for the forensic review.  Please let me know as soon as possible after the meeting of January 3.  If Charles needs any IT support, please advise as soon as possible.

I am out of the office, but will continue to check emails during the remainder of this week.

Matt Druckman

---

From: Charles Rahn [mailto:charles@averyprivateeye.com]
Sent: Tuesday, December 28, 2004 5:39 PM
To: shane; Richard Berman
Cc: Ken Levine; Holtz, Laurie S. (x1007); Druckman, Matthew E. (x2110); Hollander, Morrie I. (x1019); Khanorkar, Sharmila R. (x1142); Hans Christian Beyer; 'ediebroadhead'; Appel, David S. (x1031)
Subject: Re: Sunshine Companies

Got it.

What time will the meeting commence on Monday?

8/9/2007

122804.2

Thanks,

Charles

——— Original Message ———
From: shane
To: Richard Berman
Cc: Ken Levine ; Laurie S. Holtz ; Matthew E. Druckman ; Morris J. Hollander ; Sharmila Khanorkar ; Hans Christian Beyer ; 'edjebroadhead' ; Charles Rahn ; dappel@rachlin.com
Sent: Tuesday, December 28, 2004 5:27 PM
Subject: Sunshine Companies

Please find Sunshine matter timetable memo from Frank Amodeo attached.

Thanks,
Shane Williams
AQMI Strategy Corporation

No virus found in this incoming message.
Checked by AVG Anti-Virus.
Version: 7.0.298 / Virus Database: 265.6.5 - Release Date: 12/26/2004

122804.2

| | |
|---|---|
| **From:** | shane [shane@matrixnetwork.net] |
| **Sent:** | Wednesday, December 29, 2004 11:34 AM |
| **To:** | 'Druckman, Matthew E. (x2110)' |
| **Cc:** | Laurie S. Holtz (lholtz@rachlin.com) |
| **Subject:** | RE: Sunshine Companies |

Hi Matt,

Frank said not to worry about it this week.  We will let you know as soon as we finish with the meeting on Jan. 3rd.

Also, Frank would like you and Laurie to take a look at the e-mails you should be receiving from Dan Myers and Tessah Ivey.

Thanks,
Shane
(321) 947-9797

> -----Original Message-----
> **From:** Druckman, Matthew E. (x2110) [mailto:MDruckman@rachlin.com]
> **Sent:** Wednesday, December 29, 2004 9:54 AM
> **To:** Richard Berman
> **Cc:** Ken Levine; Holtz, Laurie S. (x1007); Hollander, Morrie I. (x1019); Khanorkar, Sharmila R. (x1142); Hans Christian Beyer; ediebroadhead; Appel, David S. (x1031); Charles Rahn; shane
> **Subject:** RE: Sunshine Companies
>
> Richard:
>
> I will await instructions from you (or Shane, Charles Rahn, or Edie Broadhead) regarding when and where the books and records will be available for the forensic review.  Please let me know as soon as possible after the meeting of January 3.  If Charles needs any IT support, please advise as soon as possible.
>
> I am out of the office, but will continue to check emails during the remainder of this week.
>
> Matt Druckman

> **From:** Charles Rahn [mailto:charles@averyprivateeye.com]
> **Sent:** Tuesday, December 28, 2004 5:39 PM
> **To:** shane; Richard Berman
> **Cc:** Ken Levine; Holtz, Laurie S. (x1007); Druckman, Matthew E. (x2110); Hollander, Morrie I. (x1019); Khanorkar, Sharmila R. (x1142); Hans Christian Beyer; 'ediebroadhead'; Appel, David S. (x1031)
> **Subject:** Re: Sunshine Companies
>
> Got it.
>
> What time will the meeting commence on Monday?
>
> Thanks,
>
> Charles
>
> ----- Original Message -----

122804.2

From: shane
To: Richard Berman
Cc: Ken Levine ; Laurie S. Holtz ; Matthew E. Druckman ; Morris J. Hollander ; Sharmila Khanorkar ;
Hans Christian Beyer ; 'ediebroadhead' ; Charles Rahn ; dappel@rachlin.com
Sent: Tuesday, December 28, 2004 5:27 PM
Subject: Sunshine Companies

Please find Sunshine matter timetable memo from Frank Amodeo attached.

Thanks,
Shane Williams
AQMI Strategy Corporation

No virus found in this incoming message.
Checked by AVG Anti-Virus.
Version: 7.0.298 / Virus Database: 265.6.5 - Release Date: 12/26/2004

8/9/2007

020905

suggesting they'd do anything illegal. well, let me rethink that!

----Original Message----
From: Richard E. Berman [mailto:reb@bermankean.com]
Sent: Monday, February 07, 2005 6:39 PM
To: ediecurry@comcast.net
Subject: RE: Scan of Original Stock Certificate

Discussed with Frank. He is going to get them to sign a resolution.

From: Edie Curry [mailto:ediecurry@comcast.net]
Sent: Monday, February 07, 2005 5:47 PM
To: Richard E. Berman
Subject: RE: Scan of Original Stock Certificate
I don't mean to be a hemorrhoid, but who signed the scribbled stock certificate as President and
Secretary? Crag and Jim signed this one as President and Secretary respectively, but are they
authorized under the articles and bylaws and has there been a board meeting to ratify this?

----Original Message----
From: Richard E. Berman [mailto:reb@bermankean.com]
Sent: Monday, February 07, 2005 5:06 PM
To: tessah ; ediecurry@comcast.net; Jason Carlson
Cc: Frank Amodeo
Subject: FW: Scan of Original Stock Certificate

Attached is scan of documents reflecting new stock certificate issues to Mirabilis Ventures, Inc.
in Presidion. As you know, its prior holder will be here with bells on looking for $360,000. We
should discuss as soon as possible the appropriate course of action to follow.
Richard
Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd, Ste. 2800
Fort Lauderdale, Florida 33309
Telephone: (954) 735-0000
Fax: (954) 735-3636
Email: REB@BermanKean.com
This e-mail message, including attachments, if any, is intended only for the person to whom, or
entity to which, it is addressed and may contain confidential and/or privileged material. Any
unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail, destroy all copies of the original message,
and do not disseminate it further. If you are the intended recipient, but do not wish to receive
communications through this medium, please advise the sender immediately.

From: Lydia Dellatto



PLAINTIFF'S
EXHIBIT
B

020905

Sent: Monday, February 07, 2005 4:57 PM
To: Richard E. Berman
Subject: docs
<<0207164830.pdf>> <<0207164836.pdf>> <<0207164930.pdf>>
Lydia Dellatto
Assistant to Richard E. Berman/Michael I. Kean/Jose R. Riguera
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd.
Suite 2800
Fort Lauderdale, FL 33309
Telephone (954) 735-0000
Facsimile (954) 735-3636
Email: LydiaD@BermanKean.com
CONFIDENTIALITY NOTICE: This email message including attachments, if any, is intended
only for the person or entity to which it is addressed and may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you
are not the intended recipient, please contact the sender by reply e-mail, destroy all copies of the
original message, and do not disseminate it further. If you are the intended recipient but do not
wish to receive communications through this medium, please advise the sender immediately.

04/13/2005   14:01   2482695500                                              031305

PAGE   02/04

04/12/2005   11:50 FAX                                                      ☑003

On December 31, 2004, Presidion sold all of the common stock in the Sunshine Entities to Wellington Capital Partners, Inc. ("Wellington"). Wellington does not have ownership interest in Presidion and it did not have any ownership interest in the Sunshine Entities prior to December 31, 2004.

The Internal Revenue Services has alleged that the Sunshine Entities have a balance due for federal employment taxes for 2003 and 2004.

The issue presented is whether the IRS may impose responsible party liability under I.R.C. § 6672 on Presidion as Wellington for the alleged tax deficiencies of the Sunshine Entities.

## II.    BRIEF ANSWER

Corporate and individual liabilities for nonpayment of employment taxes are separate and distinct. The language of Section 6672(a) imposes liability only on responsible individuals, not entities. Nevertheless, the Courts are split on whether the term "person" encompasses entities or solely individuals. However, cases in which the term "person" has been held to include entities can be distinguished from our situation.

## III.    RELEVANT STATUTORY AUTHORITY

26 U.S.C. § 6672 (a)   - FAILURE TO COLLECT AND PAY OVER TAX OR ATTEMPT TO EVADE OR DEFEAT TAX.
(a)    Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over...

26 U.S.C. § 6671(b)   - PERSON DEFINED- The term "person" as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership who as such officer, employee, or member is under duty to perform the act in respect of which the violation occurs.

26 U.S.C. § 7701(a)(1)- When used in this title [26], where not otherwise distinctly expressed or manifestly incompatible with the intent thereof.

- the term PERSON shall be construed as to mean and include an individual, a trust, estate, partnership, association, company or corporation.

-2-



PLAINTIFF'S
EXHIBIT

tabbies

04/13/2005   14:01   2482695500                                                    PAGE   03/04

031305

04/12/2005 14:52 FAX                                                              ☒010

*Taylor v. I.R.S., 69 F.3d 411 (Okla. 1995); Pitts v. US,* 2001-1 USTC P 50,419 (Not reported in FSupp.2d); *U.S. v. Carrigan,* 31 F.3d 130 (N.J. 1994). (there are many more cases, citations to which are omitted in the interest of time and which are available upon request).

2.    *Legal authority in support of imposing liability on entities pursuant to Section 6672 in specific situations.*

There is a body of case law that implies that the definition of a "person" pursuant to Section 6672 encompasses entities. *See, Pacific Nat Ins. Co. v. US.,* 422 F. 2d 26 (5ᵗʰ Cir. 1970); *Adams v. US., 504* F. 2d 73 (7th Cir, 1974); *US. v. North side Deposit Bank,* 569 F. Supp. 948, 960 (D. Pa 1983); *In ma Quattrone Accountants, Inc.,* 100 B.R. 235 (W.D. Pen. 1989)

However, the foregoing cases can be distinguished from our situation for several reasons:

First, in *Pacific Nat. Ins. Co. V. US.,* 422 F. 2d 26 (8ᵗʰ Cir. 1970), the entity (Pacific) that was found liable under Section 6672 was a surety which wrote payment and performance bonds on government contracts awarded to the defaulting corporation. Since Pacific would be liable for the amount of the payroll taxes under Section 3505 (as surety) anyway, the Court did not see any problems with finding liability under 6672. *(See also, US. v. North side Deposit Bank,* 569 F. Supp. 948, 960 (D. Pa 1983) where the Court also established the liability under Section 3505). In the instant situation, Presidion was not a surety of the Sunshine Entities. Presidion was just a sole shareholder of the Sunshine Entities and did not guaranty any contracts entered into by the Sunshine Entities.

Second, in *In ma Quattrone Accountants, Inc.,* 100 B.R. 235 (W.D. Pen. 1989), the court found an entity liable under Section 6672 because such entity was hired for purpose of performing the payroll functions of the delinquent corporation, which prepared and filed and signed all of the delinquent corporation's returns. Since that entity was charged with the responsibility to collect, account for and pay over taxes, the Court applied the broad definition of Section 6672. Presidion never performed such services for the Sunshine Entities or on their behalf.

On the other hand, in *SCDF Investment Corp. v. US.,* 901 P. Supp. 1164 (W.D. La 1995), even though the Court agreed that a bank can be "responsible person" within the broad definition of Section 6672, the Court also stated that the status of "responsible person" is affixed to only those parties that involve themselves to such a degree of control as to merit such an imposition. *Id.* at 1169. The Court has to look at the actual supervision applied by the bank versus the supposed level of control regarding the loan and paper relationship between the parties. *Id.* In the *SCDF Investment* case, the Court held that the bank was not "responsible party" under Section 6672 because even though the bank had the authority to sign company's checks, the bank did not have the requisite authority to make decisions as to the disbursement of funds and payment of creditors as required for purposes of Section 6672.

Accordingly, even though the clear language of the Code provides that liability pursuant to Section 6672 can only be attached to individuals, some courts extended these definition; and, as a result we have to take this into account. 

- 9 -

04/13/2005  14:01    2482695500                                        PAGE  04/04        031305

04/12/2005  11:52 FAX                                                    ☑ 011

V.    CONCLUSION

Accordingly, from the facts provided, it would be ~~very~~ unlikely for the IRS to impose liability on Presidion ~~and/or Wellington~~ for payroll taxes of the Sunshine Entities pursuant to Section 6672.

*v remote and*

P.S.

The cited documents are in the file and available upon request.

BERMAN, KEAN & RIGUERA, P.A.
2101 West Commercial Boulevard, Suite 2800
Fort Lauderdale, Florida 33309
Telephone: (954) 735-0000
Facsimile:(954) 735-3636

*Elena Wildermuth*

Elena Wildermuth

042105.3

Presidion (Bd) ~~Chat~~. 04/21/05

_Attendees_

JASON W. CARLSON.

Mick Music

Bob Pollack

Chris O'Connor

Richard Berman, counsel for Mirabili

JAMES E. BAIERS

CRAIG A. VANDERBURG

Lynda Goudreau, Mexia

Mitchell M Music@Comcast.net

248.672.2000

PLAINTIFF'S
EXHIBIT

O

tabbies

042105.1

# Nexia Strategy Corporation

20 North Orange Avenue, Suite 1400
Orlando, Florida 32801
321.293.9300 (telephone) / 321.293.9342 (facsimile)

---

## <u>MEETING MINUTES</u>



**DATE:**          April 21, 2005 @ 1:00 PM

**RE:**            <u>OPEN STRATEGIC PLANNING</u>

**ATTENDEES:**     Craig A. Vanderburg, Presidion
                   Fred J. Sandlin
                   James E. Baiers, Presidion
                   Karl Leo, for Hendricks
                   Kurt Benjamin, MAG Capital
                   Larry Childres
                   Larry Habers, Esq., General Counsel for Nexia
                   Lauran Gaines
                   Lynda Goudreau, Nexia
                   Mick Musial
                   Patrick McGee, Esq., for Gaines
                   Richard Berman, Esq., Counsel for Mirabilis
                   Robert Gaines
                   Robert Pollack, M.D., Nexia
                   Todd Buehl, Amfinity Capital
                   Woody Johnson, Nexia
                   Yaniv Amar

**MINUTES:**

Frank Amodeo opened meeting by stating that there were to be no discussion of this beyond the room, but notified everyone since each has some stake in the matter. Frank gave instructions to the IRS to close the corporate case so Presidion is off the hook, he will conduct a 4180 interview meeting, which he will do the first week of June, which is a formal _____. The IRS letter will be circulated to everyone (we want to get to the market in a discrete manner) that will tell everyone that the IRS collection from the primary taxpayer is no longer viable and they will begin to pursue collateral obligations. Primarily indications to them is that the responsible person consists of Vanderburg, Baiers and Burcham, and inquiry will be to them only. They will be given appropriate

---

042105.1

# Presidion Meeting - 04/21/2005

## ATTENDEES

| | |
|---|---|
| Lynda Goudreau | AQMT Strategy |
| Todd Buchl | Amthinity Capital |
| Karl Leo | Hendricks |
| Robert Gaines | BGaines @ Strato.Net |
| Lauran Gaines | |
| Patrick McGee | |
| Kurt Benjamin | MAG-Capital |
| Mik Misral | |
| Yann Amar | |
| Larry Childers | |
| Larry Haber | Nexia |
| Fred J. Sandlir | |
| Woody Johnson | Nexia |
| Richard Berman | Counsel for Minhtis |
| Rw Paulick | |
| Jim Baiers | PRESIDION |
| CRAIG VANDERBURG | PRESIDION |

050405

Page 1 of 3

*Jim Baiers*

**From:**  Richard E. Berman [reb@bermankean.com]
**Sent:**  Wednesday, May 04, 2005 9:49 AM
**To:**  Craig Vanderburg; Tessah Ivey
**Cc:**  Jim Baiers
**Subject:** RE: tax memo

We are making changes, discussed with Frank to accurately reflect the transaction.  It is being done now and will be faxed or scanned and emailed to Frank at his office.

---

**From:** Craig Vanderburg [mailto:cvanderburg@presidionsolutions.com]
**Sent:** Wednesday, May 04, 2005 9:49 AM
**To:** Richard E. Berman; Craig Vanderburg; Tessah Ivey
**Cc:** Jim Baiers
**Subject:** RE: tax memo

Richard,

Thanks for the response.  Certainly no one is suggesting that you are responsible for the delayed filing, that said I am confident that the auditors will not release the 10-K without the additional true fact added to the letter that ALL client service agreements were moved to another PSDI owned sub prior to the transaction with Wellington. This is indeed a fact of the transaction and known by all on this email.  Any assistance with this would be appreciated for both PSDI and your clients investment.

> -----Original Message-----
> **From:** Richard E. Berman [mailto:reb@bermankean.com]
> **Sent:** Wednesday, May 04, 2005 9:42 AM
> **To:** Craig Vanderburg; Tessah Ivey
> **Cc:** Jim Baiers
> **Subject:** RE: tax memo
> **Importance:** High
>
> In response to your email I must say that the "memo" in question was provided to our client some time ago.  Jim has requested various changes including "audit" language which is not appropriate. After speaking with him he understood why I could not include that information. However, he asked that I include other information. After my telephone call with Jim, I checked the documents to see whether I could include this other language. However, upon document review I determined that the information that is requested for insertion is not correct.  For example, we have been asked to state that "all other assets and state licenses remained with the Sunshine Entities."  This is not accurate in some respects, and unknown to us in others.  Pursuant to the Assignment and Assumption Agreement of December 30, 2004 Sunshine assigned all client service agreements, subscriber agreements, notes and accounts receivable, insurance contracts, furniture, fixtures and equipment to Paradyme, Inc.  Thus "all other assets" did not remain with the Sunshine Entities.  We are not certain as to the status of the "licenses" and whether all are in compliance with state regulatory requirements.  Thus, we cannot make a representation about the licenses. Neither of these areas has anything to do with the subject of our memorandum.  I am concerned with regard to the request for inclusion in a memorandum that is unrelated to the requested additions. What is the purpose?  And, how can we make representations to our client (which is not Presidion Corporation) that we know to be incorrect?  Nonetheless, we have forwarded by Fedex to Orlando an original signed memorandum which accurately reflects our opinion for use of our client.

I am traveling today. I will be reachable on my cell phone, at times, (954) 873-1464.  As to "holding up" any securities filing, we have nothing to do with any delayed filing or issues with regard thereto.  Our opinion is not provided to your auditors.  And, the opinion that we provided to our client relates solely to the liability of

*5/4/2005*



PLAINTIFF'S
EXHIBIT
E

an entity with which it has some relationship and as to whether that entity has any liability for unpaid withholding obligations of the Sunshine entities. Our opinion is clear and complete. I do not understand why anything further is necessary.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd, Ste. 2800
Fort Lauderdale, FL 33309
(954) 735-0000  Fax: (954) 735-3636

---

**From:** Craig Vanderburg [mailto:cvanderburg@presidionsolutions.com]
**Sent:** Wednesday, May 04, 2005 8:53 AM
**To:** Craig Vanderburg; 'Tessah Ivey'; Richard E. Berman
**Cc:** Jim Baiers
**Subject:** RE: tax memo

Folks,

Hate to sound like the same broken record that has been preaching for almost 4 months, but we still do not have the memo? Our first quarter 10-Q is due on the 15th of May and we have not even been able to start that work since the 10-K is not completed. We absolutely must have that memo with changes immediately.

Thank you

> ————Original Message————
> **From:** Craig Vanderburg
> **Sent:** Tuesday, May 03, 2005 4:34 PM
> **To:** 'Tessah Ivey'; Richard E. Berman
> **Cc:** Craig Vanderburg; Jim Baiers
> **Subject:** RE: tax memo
>
> Richard,
>
> Please email if possible, as I understand it you had only the one change to address within the memo.
>
> Thank you
>
> > ————Original Message————
> > **From:** Tessah Ivey [mailto:tessah.ivey@aqmistrategy.com]
> > **Sent:** Tuesday, May 03, 2005 4:28 PM
> > **To:** Richard E. Berman
> > **Cc:** Craig Vanderburg; Jim Baiers
> > **Subject:** tax memo
> >
> > Hello,
> >
> > Mr. Vanderburg has emailed me that he or Mr. Baiers has not received the updated tax memo yet from your office. Please forward the document to them as soon as you are able.
> >
> > Thanks,
> > Tessah Ivey
> >
> > Tessah Ivey

5/4/2005

050405

Page 3 of 3

AQMI Strategy Corporation
20 North Orange Avenue
Suite 1400
Orlando, FL 32801
407-426-9502 Telephone
407-426-9191 FAX

This e-mail contains PRIVILEGED AND CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail and delete this e-mail from your records. Thank you for your cooperation.

5/4/2005

051205

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Richard E. Berman, Esq.                    (954) 735-0000

B. SEND ACKNOWLEDGEMENT TO:
Name    Richard Berman, Esq.
Address Berman, Kean & Riguera, P.A.
Address 2101 W. Commercial Blvd., Suite 2800
City/State/Zip  Ft. Lauderdale      FL    33309

**FLORIDA SECURED TRANSACTION REGISTRY**

**FILED**

2005 May 12 AM 12:00
***** 200509662569 *****

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

1a. ORGANIZATION'S NAME
Presidion Solutions VII, Inc. f/k/a Professional Benefit Solutions, Inc.

| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|---|
| 1c. MAILING ADDRESS 765 W. Big Beaver Rd., Suite 1700 | | CITY Troy | | STATE MI | POSTAL CODE 48084 | COUNTRY USA |
| 1d. TAX ID# 650991757 | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION Florida | | 1g. ORGANIZATIONAL ID# P000000033562 ☐ NONE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

2a. ORGANIZATION'S NAME

| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|---|
| 2c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | | 2g. ORGANIZATIONAL ID# | |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

3a. ORGANIZATION'S NAME
Mirabilis Ventures, Inc.                                        ☐ NONE

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|
| 3c. MAILING ADDRESS 5838 Rayment Drive, Suite 3 | CITY Las Vegas | | STATE Nevada | POSTAL CODE 89123 | COUNTRY USA |

**4. This FINANCING STATEMENT covers the following collateral:**

Items attached on Schedule "A"

**5. ALTERNATE DESIGNATION (if applicable)** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG. LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM – FORM UCC-1 (REV.12/2001)

Filing Officer Copy                         Approved by the Secretary of State, State of Florida

**PLAINTIFF'S EXHIBIT**
E

051205

Schedule A

Re: UCC 1 Financing Statement

All furniture, furnishings, fixtures, machinery, equipment, inventory and materials on site, and personal property of every nature whatsoever now or hereafter owned by the Debtor and located in or used in conjunction with or with the construction or operation of said property, buildings, structures or other improvements, including all extensions, additions, improvements, betterments, renewals and replacements to any of the foregoing, and all of the right title and interest of the Debtor in any such personal property or fixtures subject to a conditional sales contract, chattel mortgage or similar lien or claim together with the benefits of any deposits or payments now or hereafter made by the Debtor or on it's behalf with regard to the collateral. The collateral herein shall include, without limitation, the following:

Accounts, general intangibles, personal property, which includes (but is not limited to) the following property: 

All of Debtors contract rights, general intangibles, personal property, accounts receivable, inventory, furniture and fixtures, and equipment, both now owned and hereafter acquired, and all additions, replacements, accessions and insurance of the foregoing, and all books, records and warranties related thereto.

The term "Collateral" further includes, but is not limited to, the following property, whether now owned or hereafter acquired, and whether or not held by bailee for the benefit of the Debtor or owner, all: accessions, accessories, additions, cash, fittings, increases, insurance benefits and proceeds, parts, products, profits, renewals, rents, replacements, special tools and substitutions, together with all books and records pertaining to the Collateral and access to the equipment containing said books and records, including computer stored information and all software relating thereto, plus all cash and non-cash proceeds and all proceeds of proceeds arising from the types (items) of property listed above.

Pertaining to the accounts (Accounts) portion of the Collateral, the term Collateral, shall include, but not limited to, all:

A.  Accounts generally, accounts receivable and hedging accounts;
B.  Contracts, real estate contracts, futures contracts, contract rights to obtain payment, for deeds or property sold, leased or exchanged and for services rendered, whether or not performance has been completed;
C.  Things in action;
D.  Rights to receive any payments in money or in kind;
E.  Guaranties of Accounts and the security therefore;
F.  Rights of Debtor in the goods, services or other property which gave rise to or secure, the Accounts;
G.  Rights of Debtor as an unpaid seller of goods or services, including but not limited to stoppage in transit, replevin, reclamation and resale;
H.  Instruments and chattel paper; and
I.  Proceeds thereof and proceeds of proceeds thereof.

Pertaining to the general intangibles portion of Collateral, the term "Collateral" shall include, but not limited to, instruments and chattel paper, all goodwill, tax refunds, trademarks, trade names, patents, copyrights, and all proceeds thereof and proceeds of proceeds thereof.

Proceeds: All proceeds of proceeds referred to herein shall include, but not limited to, wherever located, accounts, chattel paper, documents, equipment, farm products, general intangibles, instruments, inventory, and all other goods.

102705

From:          Richard E. Berman [reb@bermankean.com]
Sent:          Saturday, September 03, 2005 4:53 PM
To:            Tessah Ivey; Druckman, Matthew E. (x2110)
Subject:       RE: Extremely Confidential


I think we should discuss


Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000   Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to
whom, or entity to which, it is addressed and may contain confidential and/or privileged
material. Any unauthorized review, use, disclosure or distribution is prohibited. If you
are not the intended recipient, please contact the sender by reply e-mail, destroy all
copies of the original message, and do not disseminate it further. If you are the intended
recipient, but do not wish to receive communications through this medium, please advise
the sender immediately.


-----Original Message-----
From: Tessah Ivey [mailto:tivey@nexiastrategy.com]
Sent: Tuesday, August 30, 2005 1:25 PM
o: Druckman, Matthew E. (x2110); Richard E. Berman
Subject: FW:Extremely Confidential
Importance: High


The below is for your information only.

Thank you.

Tessah Ivey


Tessah Ivey
Executive Assistant to Frank Amodeo
Nexia Strategy Corporation
20 North Orange Avenue
Suite 1400
Orlando, FL 32801
407-318-8000 Telephone
407-426-9191 FAX

This e-mail contains PRIVILEGED AND CONFIDENTIAL information intended
only for the use of the addressee(s) named above.  If you are not the
intended recipient of this e-mail, or the employee or agent responsible
for delivering it to the intended recipient, you are hereby notified
that any dissemination or copying of this e-mail is strictly prohibited.
If you have received this e-mail in error, please notify us by reply
e-mail and delete this e-mail from your records.  Thank you for your
cooperation.


---Original Message-----
From: Jim Baiers [mailto:JBaiers@presidionsolutions.com]
Sent: Tuesday, August 30, 2005 11:08 AM
To: Craig Vanderburg; Tessah Ivey; reb@bermankean.com



PLAINTIFF'S
EXHIBIT
G

102705

Subject: RE: Burcham

Here is a transcription of a voicemail I received from Burcham today at
10:20 a.m. on my cell phone:

"Hey Jim that FBI agent called again. I asked if we were targets or if I
was a target and he said "no we are not even subjects we were just
witnesses". He wanted to get the background, he actually saw us as
victims and said he would affirm that to you in however you need that
done. He would like to meet possibly both of us on the 8th or 9th in Ft.
Lauderdale. So give me a call if you want to do this or if you think you
should or whatever. He seemed like a nice enough guy. It sounds like he
just wants to get to the bottom of it, he's got a bunch of files
doesn't't have everything but maybe we could shed some light or give him
some things. Give me a call on my cell thanks, bye."


> -----Original Message-----
> From:     Craig Vanderburg
> Sent:     Tuesday, August 30, 2005 9:55 AM
> To: Jim Baiers; 'tivey@nexiastrategy.com'; 'reb@bermankean.com'
> Subject:  RE: Burcham
>
> Jim,
>
> Based upon the agreements in place between Bucham, Presidion and
Mirabilis it seems to me that a legal representative from Mirabilis
would need to be present for this meeting.
>
>         -----Original Message-----
>         From:        Jim Baiers
>         Sent: Tuesday, August 30, 2005 9:53 AM
>         To:     Craig Vanderburg; 'tivey@nexiastrategy.com';
'reb@bermankean.com'
>         Subject:    RE: Burcham
>
>         The agent did not give John any specifics on the letters or any
names of people being investigated.  According to John all the agent
said was something to the effect of: "Kaufman and Leyton have pleaded
guilty and we would like to talk to you about letters of credit"
>
>                 -----Original Message-----
>                 From:        Craig Vanderburg
>                 Sent: Tuesday, August 30, 2005 9:49 AM
>                 To:     Jim Baiers; 'tivey@nexiastrategy.com';
'reb@bermankean.com'
>                 Subject:    RE: Burcham
>
>                 Jim,   which LOC's did John reference?
>
>                         -----Original Message-----
>                         From:        Jim Baiers
>                         Sent: Tuesday, August 30, 2005 9:30 AM
>                         To:     'tivey@nexiastrategy.com';
'reb@bermankean.com'
>                         Cc:     Craig Vanderburg
>                         Subject:    Burcham
>
>                         Frank, Richard and Craig: Got a call late
yesterday from Burcham who said he received a call from an FBI Agent
named Joe Turto (John's not sure of the spelling) in the Ft. Lauderdale
office who told him Kaufman and Leyton had pleaded guilty and the agent
wanted to meet with John to discuss the Letters of Credit.  John agreed
to meet with him today, but after his conversation with me John decided
to call the agent and postpone the meeting until we see if we can get
some idea of the targets and subject of this investigation.

2

102705

```
>
>              I called Bill Leyton and he has never heard of
this FBI agent but he would do some checking around.  Leyton's best
guess is that since Burcham was so involved with Huff and McCartha they
want John to help with the cases against those guys.
>
>              We all know how John loves to talk and I am
concerned about letting him meet with the agent without some there who
knows the facts as they relate to Presidion.  On the other hand we don't
want to interject Presidion into the investigation.
>
>              Your thoughts.
>
>              Presidion Solutions, Inc.
>              755 W. Big Beaver Road
>              Suite 1700
>              Troy, MI 48084
>              248-269-9600
>              248-269-5500 fax
>              413-208-2135 e-fax
>              JBaiers@presidion.com
>
>              NOTICE: The information contained in this email
is attorney-client privileged and confidential information intended only
for the use of the individual or entity named herein. If the reader of
this message is not the intended recipient, you are hereby notified that
any dissemination, distribution or copying of this communication is
strictly prohibited. If you receive this communication by error, please
contact us immediately. Thank you.
>
```

3

122005

Page 1 of 1

**From:** Richard E. Berman [reb@bermankean.com]
**Sent:** Tuesday, December 20, 2005 11:38 AM
**To:** Peter Mottek
**Subject:** Mirabilis

Peter:  Is it possible for a "nicer" termination letter to be written to Mirabilis indicating that the relationship is being terminated due to their significant increase in size and your recommendation that their needs are better served by a larger multi-national bank. The letter(s) as written are being perceived in a very negative light. In fact, a full audit is underway of Mirabilis and of Mr. Amodeo individually to end once and for all any concerns relative to his business. I think you know Frank and that he is a nice man. The audits will be available, as required, in conjunction with any banking relationships and accounting and business relationships.  I believe you are aware that Laurie Holtz is fully familiar with Frank's operations and he is one of the leading forensic accountants in the country with 50 years of experience as the senior member of Rachlin, Cohen and Holtz.  One of Laurie's professionals will have a "RCH" office in Frank's space in Orlando for consultation on all transactions.  I certainly would never do anything inappropriate and your letter is being perceived by some as a suggestion that Mirabilis has issues which neither I nor Laurie would countenance.  Your assistance in this matter would be appreciated. Thanks.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
**Supreme Court Certified Mediator**
(954) 735-0000   Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all copies of the original message, and do not disseminate it further. If you are the intended recipient, but do not wish to receive communications through this medium, please advise the sender immediately.


PLAINTIFF'S
EXHIBIT
H

042206

| | |
|---|---|
| From: | Richard E. Berman [reb@bermankean.com] |
| Sent: | Saturday, April 22, 2006 12:38 PM |
| To: | Paul Glover; Frank Hailstones (M); Fernando Simo |
| Subject: | RE: Trust Fund Taxes |

Light reading Paul.

Richard E. Berman, Esq.
BERMAN, KEAN & RIGUERA, P.A.
2101 W. Commercial Blvd, Ste 2800
Fort Lauderdale, FL 33309
(954) 735-0000 Fax: (954) 735-3636
SUPREME COURT CERTIFIED MEDIATOR
REB@BermanKean.com

-----
From: Paul Glover [mailto:pglover@nexiastrategy.com]
Sent: Wednesday, April 19, 2006 5:35 PM
To: Frank Hailstones (M); Fernando Simo; Richard E. Berman
Subject: Trust Fund Taxes

I just read a Memorandum prepared by Elena Wildermuth of Berman, Kean & Riguera which concludes with, "Accordingly, from the facts provided, it would be very unlikely for the IRS to impose liability on Presidion for the payroll taxes of the Sunshine entities pursuant to Section 6672."

AEM, Inc., is at least a full arm's length away under the Contract for Management Services Agreement. Add to that the fact that AEM has not, nor has any of its officers, directors, shareholders nor employees, been responsible for authorizing which creditors to pay, to sign and file Forms 940 nor 941s, nor make federal tax deposits, nor collect trust fund taxes, nor sign checks on behalf of the owner of the book of business for which trust fund taxes would otherwise be due from, and the result is further insulation from a liability for the payroll taxes of the Sunshine entities.

*Paul S. Glover*
Executive VP Finance, CFO
Mirabilis Ventures, Inc.
111 North Orange Ave., 20th Floor
Orlando, FL 32801
Phone 407-517-7779
Fax 407-426-9191
www.mirabilisventures.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all copies of the original message, and do not disseminate it further. If you are the intended recipient, but do not wish to receive communications through this medium, please advise the sender immediately.



PLAINTIFF'S
EXHIBIT

071306

**From:** Phil Kaprow
**Sent:** Jul 13, 2006
**To:** Dan Myers; hbeyer@wans.net
**Cc:** Richard E. Berman
**Bcc:**
**Subject:** Berkowitz Letter w/ Richard's Comments

Attached please find the Berkowitz letter both redlined and clean with Richard Berman's comments incorporated.

Please review and comment.

Phil

2 Attachments



PLAINTIFF'S
EXHIBIT
J

071306

Dear Ms. Berkowitz:

This letter is in response to your questions in your June 15, 2006 email to Dan Myers. Our responses below track your questions item by item.

**Question 1:**   **What happened to the $25M in precious metals that were part of the contract in 2003?**

Answer: The precious metal is currently held by Presidion Corporation which is different and distinct from the Taxpayer and the Taxpayer's parent, Presidion Solutions, Inc.

The metals are currently being held by Titanium Technologies, Inc. of El Paso, Texas for processing, which it is planning to commence in September, after which a final determination will be made as to whether ~~such funds~~these assets will be converted to Presidion Corporation preferred stock, which is to some extent dependent on ~~the criteria of which is~~ whether PSDI is, at that time, ready for relisting as a publicly traded stock.

**Question 2: Where did the money go that 3 TPs collected from their customers?**

Answer: The Taxpayer's distribution by vendors is provided separately, however, an aggregated calculation indicates that the Taxpayers have lost as much as $184,000,000 since 2003 in addition to expending ~~and spent~~ $50,000,000 to ~~acquiring~~ acquire the business from prior owners; moreover, added to the foregoing ~~that is~~ the insurance collateral requirements of $40,000,000. Further, we now believe that the Taxpayer computer systems may have resulted in either the overreporting or underbilling of clients. This has presented itself as a $60,000,000 discrepancy in a six month period of time.

**Question 3: Who is Titanium Technologies, Inc. and why are they cutting the check for $600,000?**

Answer:   Titanium is the idemnitor for the insurance coverage which is necessary for contracts to have going concern value. Titanium was going to act as Trustee under the original proposal. Now Titanium will serve as the real party at risk for insurance claims.

**Question 4: Why can't IRS get paid in full for all three companies when $300M is received for the book of business? When shares are sold, why can't IRS get the full amount?**

Answer:   The Service can be paid in full upon sale of the assets; however, the majority of the purchase price will be paid by ~~to us in~~ a note; thereafter, if as is expected the book assets are resold by the purchaser, it is likely to be paid in publicly traded stock, which will be subject to statutory SEC restrictions and certain private restrictions to avoid flooding the market and depressing the price. Upon subsequent sale of the stock the Service will be entitled to proceeds which, absent unforeseen circumstances, will pay the Service in full.

**Question 5: How did the book of business appreciate from $12M to $300M?**

Answer: The book of business is generating about $7,500,000 a year as distributable

071306

profit; we think it is fair to allocate this amount to the installment agreement while the book is sold and the consideration is converted to cash.

Also, during the past year and under our direction, the taxpayers have reduced expenses by as much as $20,000,000 annually. In addition, a number of unprofitable customers were culled from the book, eliminating a significant drain on overall profitability, combined with the new purchaser's existing customer base and infrastructure yielding an increased profitability.

Additionally, we discovered that during the last <u>aborted</u> attempt to have AEM, Inc. take control of the book of business (May 1, 2006), prior management had created a separate database known as Alpha 5. Prior to May 2006, we had no access to this database. We discovered that most of the existing "good" contracts were under priced (some since the early 1990's) just to generate business and sales commissions. It appears that the Alpha 5 database was maintained in parallel to the main system to obfuscate this fact.

These realizations lead to one final revision of the July 28, 2005 acquisition agreements. Instead of relying on computer data, we have had each paper contract reviewed. This permitted AEM to convert to new, "non-tailored" off the shelf software, plus permitted us to re-price the contracts. With an accurate and marketable book, we were now in a position to sell some of the contracts to a public entity, which will generate a much larger multiple in the value of the book.

The bottom line is that our turnaround efforts have greatly increased the profitability of the assets while stemming cash losses. Unmarketable assets have now become marketable, and as such, command a very high multiple to a potential acquirer.

**Question 6: If you must have an IA, IRS needs to have a collateral agreement. We need a "Letter of Credit" (from a reputable bank) on which we can collect if the IA defaults.**

<u>Answer</u>: A collateral agreement and a note with security agreement are viable in support of the installment agreement; a letter of credit would be very difficult to obtain. We certainly can look at obtaining one based upon our ability to collateralize the publicly traded stock recieved.

**Question 7: What other companies are there that are part of Presidion Corporation?**

<u>Answer</u>: The entities previously involved with Presidion Corporation are the same ones we inquired about in January. Here is the list with EINs:

|  |  | EIN |
|---|---|---|
| Presidion Solutions, Inc. | f/k/a Affinity Business Services, Inc. | 38-3547703 |
| Amfinity Business Solutions, Inc. | n/k/a ABS IV, Inc. | 39-1979503 |
|  |  | 59- |

071306

| Sunshine Staff Leasing, Inc. | d/b/a Presidion Solutions I, Inc. | 2280930 |
| Sunshine Companies, Inc. | d/b/a Presidion Solutions II, Inc. | 59-2844403 |
| Sunshine Companies II, Inc. | d/b/a Presidion Solutions III, Inc. | 59-2718595 |
| Sunshine Companies III, Inc. | d/b/a Presidion Solutions IV, Inc. | 59-2720548 |
| Sunshine Companies IV, Inc. | d/b/a Presidion Solutions V, Inc. | 59-2662862 |
| Presidion Solutions VII, Inc. | n/k/a Professional Business Solutions, Inc. | 65-0991757 |
| Presidion Administrative Solutions, Inc. | | 65-1087098 |
| Creative Insurance Concepts, Inc. | | 65-1426663 |

We are locating the contracts and the documents you have requested in Questions 8, 9, and 10. A partially collected set of the documents is attached hereto.

Please note Mr. Amar has not yet officially acted on the July 28, 2005 acquisition agreements as a result of the record and data problems. It is my understanding that he will not be an officer at the time of the transfer. In the meantime, for your information, AEM employs experienced PEO management to handle its business. This business is likely to grow to be twice the size of the contracts AEM will acquire under the July 28, 2005 acquisition agreements.

071306

Dear Ms. Berkowitz:

This letter is in response to your questions in your June 15, 2006 email to Dan Myers. Our responses below track your questions item by item.

### Question 1:   What happened to the $25M in precious metals that were part of the contract in 2003?

Answer: The precious metal is currently held by Presidion Corporation which is different and distinct from the Taxpayer and the Taxpayer's parent, Presidion Solutions, Inc.

The metals are currently being held by Titanium Technologies, Inc. of El Paso, Texas for processing, which it is planning to commence in September, after which a final determination will be made as to whether these assets will be converted to Presidion Corporation preferred stock, which is to some extent dependent on whether PSDI is, at that time, ready for relisting as a publicly traded stock.

### Question 2: Where did the money go that 3 TPs collected from their customers?

Answer: The Taxpayer's distribution by vendors is provided separately, however, an aggregated calculation indicates that the Taxpayers have lost as much as $184,000,000 since 2003 in addition to expending $50,000,000 to acquire the business from prior owners; moreover, added to the foregoing is the insurance collateral requirements of $40,000,000. Further, we now believe that the Taxpayer computer systems may have resulted in either the overreporting or underbilling of clients. This has presented itself as a $60,000,000 discrepancy in a six month period of time.

### Question 3: Who is Titanium Technologies, Inc. and why are they cutting the check for $600,000?

Answer:   Titanium is the idemnitor for the insurance coverage which is necessary for contracts to have going concern value. Titanium was going to act as Trustee under the original proposal. Now Titanium will serve as the real party at risk for insurance claims.

### Question 4: Why can't IRS get paid in full for all three companies when $300M is received for the book of business?  When shares are sold, why can't IRS get the full amount?

Answer:   The Service can be paid in full upon sale of the assets; however, the majority of the purchase price will be paid by a note; thereafter, if as is expected the book assets are resold by the purchaser, it is likely to be paid in publicly traded stock, which will be subject to statutory SEC restrictions and certain private restrictions to avoid flooding the market and depressing the price. Upon subsequent sale of the stock the Service will be entitled to proceeds which, absent unforeseen circumstances, will pay the Service in full.

### Question 5: How did the book of business appreciate from $12M to $300M?

Answer:   The book of business is generating about $7,500,000 a year as distributable

profit; we think it is fair to allocate this amount to the installment agreement while the book is sold and the consideration is converted to cash.

Also, during the past year and under our direction, the taxpayers have reduced expenses by as much as $20,000,000 annually. In addition, a number of unprofitable customers were culled from the book, eliminating a significant drain on overall profitability, combined with the new purchaser's existing customer base and infrastructure yielding an increased profitability.

Additionally, we discovered that during the last aborted attempt to have AEM, Inc. take control of the book of business (May 1, 2006), prior management had created a separate database known as Alpha 5. Prior to May 2006, we had no access to this database. We discovered that most of the existing "good" contracts were under priced (some since the early 1990's) just to generate business and sales commissions. It appears that the Alpha 5 database was maintained in parallel to the main system to obfuscate this fact.

These realizations lead to one final revision of the July 28, 2005 acquisition agreements. Instead of relying on computer data, we have had each paper contract reviewed. This permitted AEM to convert to new, "non-tailored" off the shelf software, plus permitted us to re-price the contracts. With an accurate and marketable book, we were now in a position to sell some of the contracts to a public entity, which will generate a much larger multiple in the value of the book.

The bottom line is that our turnaround efforts have greatly increased the profitability of the assets while stemming cash losses. Unmarketable assets have now become marketable, and as such, command a very high multiple to a potential acquirer.

**Question 6**: If you must have an IA, IRS needs to have a collateral agreement. We need a "Letter of Credit" (from a reputable bank) on which we can collect if the IA defaults.

Answer: A collateral agreement and a note with security agreement are viable in support of the installment agreement; a letter of credit would be very difficult to obtain. We certainly can look at obtaining one based upon our ability to collateralize the publicly traded stock recieved.

**Question 7**: What other companies are there that are part of Presidion Corporation?

Answer: The entities previously involved with Presidion Corporation are the same ones we inquired about in January. Here is the list with EINs:

|  |  | EIN |
|---|---|---|
| Presidion Solutions, Inc. | f/k/a Affinity Business Services, Inc. | 38-3547703 |
| Amfinity Business Solutions, Inc. | n/k/a ABS IV, Inc. | 39-1979503 |
|  |  | 59- |

071306

| Sunshine Staff Leasing, Inc. | d/b/a Presidion Solutions I, Inc. | 2280930 |
|---|---|---|
| Sunshine Companies, Inc. | d/b/a Presidion Solutions II, Inc. | 59-2844403 |
| Sunshine Companies II, Inc. | d/b/a Presidion Solutions III, Inc. | 59-2718595 |
| Sunshine Companies III, Inc. | d/b/a Presidion Solutions IV, Inc. | 59-2720548 |
| Sunshine Companies IV, Inc. | d/b/a Presidion Solutions V, Inc. | 59-2662862 |
| Presidion Solutions VII, Inc. | n/k/a Professional Business Solutions, Inc. | 65-0991757 |
| Presidion Administrative Solutions, Inc. | | 65-1087098 |
| Creative Insurance Concepts, Inc. | | 65-1426663 |

We are locating the contracts and the documents you have requested in Questions 8, 9, and 10. A partially collected set of the documents is attached hereto.

Please note Mr. Amar has not yet officially acted on the July 28, 2005 acquisition agreements as a result of the record and data problems. It is my understanding that he will not be an officer at the time of the transfer. In the meantime, for your information, AEM employs experienced PEO management to handle its business. This business is likely to grow to be twice the size of the contracts AEM will acquire under the July 28, 2005 acquisition agreements.

052306.1

### Mike Stanley

| | |
|---|---|
| **From:** | Larry Haber |
| **Sent:** | Wednesday, May 24, 2006 5:18 PM |
| **To:** | Fernando Simo; Pete Anderson; Yaniv Amar; Paul Glover; Mike Stanley; Jim Beesley; Jim Balers; Jim Waldvogel |
| **Subject:** | FW: ESAC |

FYI

LAWRENCE HABER
SVP
*Strategic Initiatives*
**Mirabilis Ventures, Inc.**
111 N. Orange Avenue, 20th Floor, Orlando, FL. 32801
Tel: 407-517-7779
Toll Free: 1-800-704-2080
Fax: 407-426-9191



This e-mail contains PRIVILEDGED AND CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail and delete this e-mail from your records. Thank you for your cooperation.

**From:** Richard E. Berman [mailto:reb@bermankean.com]
**Sent:** Wednesday, May 24, 2006 4:58 PM
**To:** Rufus Wolff
**Cc:** Jane A. McCoggins; Rex Eley
**Subject:** RE: ESAC

Please accept this response on behalf of Mirabilis Ventures Inc. to Mr. Wolff's letter that was attached to his email sent earlier today.  Mirabilis elects to accept the first alternative offered in your letter since it does indeed wish to seek accreditation of all of its PEO entities with ESAC. Allstaff will voluntarily relinquish its accreditation while it is in good standing to allow Mirabilis to apply for accreditation for all of its PEOs and avoid any adverse action that could result with respect to the accreditation of Allstaff.  We agree to do this prior to a mediation hearing and are prepared to complete these details with you tomorrow. It is the understanding of Mirabilis that by Allstaff voluntarily relinquishing its accreditation, pending application by all Mirabilis PEOs, Allstaff will be permitted to announce to the Allstaff clients that such action was taken in preparation of application of all such PEOs to ESAC and not as a result of any adverse action taken by ESAC.  We understand that ESAC is also required to notify Allstaff's clients of such relinquishment, but since Allstaff will have withdrawn prior to a mediation hearing, ESAC will be able to state that such action by Allstaff was voluntary.  Moreover, ESAC will not include information about its finding of probable cause.  We thank you for your consideration and assure that that we will

110206

BERMAN, KEAN & RIGUERA, P.A.

C O N F I D E N T I A L   M E M O R A N D U M

Date:        November 2, 2006

To:          Mirabilis Ventures, Inc.

From:        Elena Wildermuth

Re:          Evaluation of the "Original Obligations" included in the Debt
             Refinancing Agreement[1]

---

> The goal is to show that the transactions were the products of arm's length negotiations
> between a seller in desperate need of funds and a purchaser willing to risk money in an extremely
> speculative venture.

## I.   DEBT REFINANCING AGREEMENT BACKGROUND.

On August 30, 2006, Mirabilis Ventures, Inc. ("MVI") and Presidion Solutions, Inc. ("Solutions") entered into a debt refinancing agreement ("Refinancing Agreement"). The purpose of the Refinancing Agreement was to restructure the outstanding debt owed[2] by Solutions and several of its subsidiaries to MVI and its affiliates. Solutions and its various subsidiaries are PEOs and have been in the business of employee leasing for over five years. By the end of 2004, several of Solutions subsidiaries were on the verge of bankruptcy as a result of underpayment of employment related taxes for certain months from 2002 through 2004. In attempt to preserve shareholder's value in the business, Solutions negotiated with MVI and one of its affiliates, Nexia Strategy Corporation ("Nexia"), to extend financial and

---

[1]    The evaluation of the "Original Obligations" was based: (1) on the documents provided by the client, which consisted of the binder containing the Debt Refinancing Agreement together with the Exhibits thereto and (2) partially on the information available in public records together with the documents that I remember seeing on file in the firm.

This memorandum is presented in the following way: The plain text of the memo describes the intended goal of MVI's actions, based solely on the client's representation, and transactions that MVI presumably took in achieving that goal, presented in the light most favorable to the client. The text in the shaded boxes poses various inquiries relating to the documents presented and discusses other possible interpretation of the client's actions, based upon review of the documents.

[2]    The amount of outstanding debt owed ($12,133,917.00) has been provided by the client and has not been verified by an independent accounting firm.



PLAINTIFF'S
EXHIBIT
K

110206

consulting help to Solutions and its subsidiaries. Nexia is a business consulting firm, specializing in providing debt restructuring services to PEOs in financially distressed situations. Solutions and its affiliates were in desperate need of funds and MVI was willing to risk money in an extremely speculative venture that, if successful, would yield a high rate of return. Over a period of approximately fifteen (15) months, MVI directly and through its subsidiaries assumed or purchased liabilities of and extended credit to Solutions and its subsidiaries; and, the Refinancing Agreement is a final step in recovering the remaining balance due to MVI.

## GENERAL INQUIRIES RE: REFINANCING AGREEMENT

1.  Which entities were referred to as "subsidiaries" and "affiliates" of Solutions (mentioned in the Background, Part A of the Refinancing Agreement)? Weren't some of them dissolved? What assets do they have?

2.  The Refinancing Agreement was signed only by Solutions, as a Borrower, even though the definition of the Borrower includes subsidiaries and affiliates of Solutions (see Section 1.2 of the Refinancing Agreement). Therefore, there is no authority to bind remaining entities. What are the entities that MVI intended to be bound by the Refinancing Agreement?

3.  The attached Security Agreement (as defined in Section 1.9 of the Refinancing Agreement) is only binding on Solutions, as the only debtor party to it. Also it refers to a certain Line of Credit Agreement executed contemporaneously therewith and based on it. I was not able to locate it in the package presented to me. The amount of Credit amount (as stated in the Security Agreement) was up to $5,000,000.00? Has it been paid off? In the best case scenario MVI is secured only to the extent of $5,000,000.00.

4.  The Security Agreement was dated January 31, 2005. What assets did Solutions have then? And what assets does Solutions have now? I thought it was just a holding company for Sunshine Entities and Paradyme, Inc. If that, so, the only security they can provide are shares of their subsidiaries. In that case, shareholders of Solutions have to agree to it. If Presidion Corporation is the only (100%) shareholder of Solutions, than Presidion Corporation has to authorize it.

5.  The Promissory Note (as defined in Section 1.6 of the Refinancing Agreement and attached as Exhibit "J" thereto) is unsigned.

---

[3]  After the sale of Sunshine Entities, Solutions has the following subsidiaries remaining: (1) Paradyme, Inc., (2) Presidion Administrative Solutions, Inc.; (3) Presidion Solutions, VI? (f/k/a Professional Benefit Solutions). **Is it true? Anything else? Please confirm and clarify. What other entities and/or assets remain?**

110206

6.    There are several Notices of Federal Tax Lien:

(1) re: Presidion Solutions, Inc.,          filed on May 5, 2005 for $2,120,287.84;
(2) re: Presidion Solutions, Inc.,          filed on May 25, 2005 for $22,482,278.78;
(3) re: Presidion Corporation,              filed on Sep. 26, 2006 for $272,856.72;
(4) re: Paradyme, Inc.,                     filed on Sep. 26, 2006 for $813,828.44;
(5) re: Presidion Solutions VII, Inc.       filed on June 26, 2006 for $97,070,415.00;

Therefore, even if the Security Agreement above (UCC relating to it was filed on July 13, 2005) was valid, it would not protect against the IRS notices of federal tax lien, some of which had been filed earlier.

7.    Pursuant to the documents provided, disbursements from Solutions' bank accounts as of August 25, 2006 were in the total amount of $93,441,436.36, with $64,414,868.33 that had gone to MVI and its affiliates. Is there a reason why Solutions' having access to this amount of cash was not able to pay its creditors? What amount of debt did they have prior to MVI's involvement? What creditors did they have other than the IRS?

## II.    HISTORY OF PRE- EXISTING OBLIGATIONS

As a part of the overall plan to stabilize financial health of Solutions, by the end of 2004, Solutions made a decision to sell all of the issued and outstanding capital stock of five of its subsidiaries: Sunshine Staff Leasing Inc.; Sunshine Companies, Inc.; Sunshine Companies II, Inc.; Sunshine Companies III, Inc. and Sunshine Companies IV, Inc. (collectively the "Sunshine Entities") to Wellington Capital Group, Inc.[5] ("Wellington"), a Nevada corporation,[6] in exchange for $500,000.00 that went directly to Presidion Corporation ("Presidion"),[7] a parent company of Solutions.

---

[4]        F/k/a Professional Benefit Solutions.
[5]        Pursuant to Form 8-K filed on January 11, 2005 by Presidion Corp. (PSDI.OB), the Sunshine Entities were sold to MVI (See Item 2.01 Disposition of Assets.) **Need to clarify this information! Which company was the Buyer?**
[6]        This entity is controlled by Frank Amodeo, who is a main shareholder (100% shareholder, **please confirm**) and Chairman of the Board.
[7]        Pursuant to the same filing, Form 8-K filed on January 11, 2005 by Presidion Corp. (PSDI.OB), Presidion Corporation, not Solutions, received $500,000.00 in cash in lieu of the sale.  No contracts for sale or purchase of stock of the Sunshine Entities were provided.

A.    <u>Exhibit "A"– The "Paradyme Note".</u>

Prior to the sale of stock of the Sunshine Entities, the Sunshine Entities assigned[8] all of their client service agreements, subscriber agreements, accounts and notes receivables, bank accounts, insurance contracts, furniture, fixture and equipment to Paradyme, Inc. ("Paradyme").[9]  In exchange, Paradyme issued a promissory note in favor of three of the Sunshine Entities in the principal amount of $12,241,475.65 payable on December 31, 2009 (the "Paradyme Note").

The Sunshine Entities, now owned by Wellington, were in desperate need of cash in order to pay its debt to the IRS and to continue its day-to-day business operations.  Paradyme was in default of its obligations under the Paradyme Note.[10]  The IRS was aware of the Paradyme's default.  However, since Paradyme did not have any liquid assets, the IRS was not interested in enforcing the Paradyme Note.[11]  Based upon the IRS' representation that it prefers cash over Paradyme's or Sunshine Entities' assets, MVI purchased the Paradyme Note from three of the Sunshine Entities in exchange for payment of $1,224,147.56 directly to the IRS,[12] pursuant to the terms of that certain assignment and acceptance agreement executed on May 31, 2005 by and between MVI, as assignee, and three of the Sunshine Entities, as assignors, (the "MVI Assignment"). [13]

As a result of all of the foregoing transactions, Paradyme, a subsidiary of Solutions, became a current debtor of MVI and, as such, became a "Borrower" under the Refinancing Agreement; and, $12,241,475.65 became a part of the "Borrower's" "Original Obligations" under the Refinancing Agreement.

> INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "A"
>   1.    Why did the consideration for the shares of the Sunshine Entities go to President, a parent of the entity that was a sole shareholder of the Sunshine Entities; and not to Solutions, an actual shareholder? What was the accounting entry?

---

[8]    According to a copy of the certain Assignment and Assumption Agreement that was executed December 30, 2004 and effective at 11:59 p.m. on December 31, 2004.
[9]    Paradyme was one of the remaining subsidiaries of Solutions.
[10]    According to the client's representation.
[11]    According to the client's representation.
[12]    Pursuant to that certain Memorandum dated June 27 from Frank Amodeo, as President of all three Sunshine Entities, addressed to MVI, regarding direction of payments directly to the IRS.
[13]    Based upon the documents provided, MVI did not assume Paradyme's obligations under the Paradyme Note, MVI purchase the right from three of the Sunshine Entities to receive future payments from Paradyme under the Paradyme Note.

2.  What assets were remaining in the Sunshine Entities as a result of that certain assignment and assumption agreement dated December 30, 2004 and executed by Craig Vanderburg on behalf of the Assignee and the Assignors. (the "Assignment Agreement")?

3.  Where did the principal amount of the Paradyme Note ($12,241,475.65) come from? That certain amendment to assignment and assumption agreement ("Amendment to Assignment Agreement"), that was deemed effective *nunc pro tunc* to December 31, 2004, was executed much later, on May 19, 2005.

4.  Even though the Amendment to Assignment Agreement, and the underlying Assignment Agreement were between all of the Sunshine Entities and Paradyme, if the Paradyme Note was executed in favor of only three of the five Sunshine Entities: (1) Sunshine Staff Leasing, Inc.; (2) Sunshine Companies III, Inc.; and (3) Sunshine Companies III, Inc. — What were specific reasons for that? Were there any assets transferred to Paradyme from the other two of the Sunshine notes? The Amendment to Assignment Agreement (especially the date of its execution) gives an impression that it was done to justify the existence of the Paradyme Note, which is fine in principle (the original is lost or by mistake was never executed), however makes it even more confusing under these circumstances.

5.  ...therefore, since the Assignment Agreement, on its own face, was done pursuant to that certain Securities Purchase Agreement of December 8, 2004... it would be difficult to comment on the validity of the Paradyme Note, without knowing the terms of such agreement (I have not seen any stock purchase agreements). There are two possible explanations for the Paradyme Note. First, it was executed pursuant to (for the expressed terms and in consideration of) that certain Securities Purchase Agreement of December 8, 2004 ... OR, second, it was executed in lieu of (and, as a consideration of a separate transaction which was outside the scope of the original Assignment Agreement). However, in order to justify any of the two theories, MVH would need more agreements and/or accounting records to back it up.

6.  Thus, the key issue is: What did Paradyme get in exchange from the three Sunshine entities? I am not sure where and how the amount of "Net Assets" came about, judging by the face of the Exhibit attached to the Amendment to Assignment Agreement.

---

[14]  The Amendment to Assignment Agreement has typos that could potentially change the meaning of the entire assignment. (Ex. Assignor and Assignee are switched).

110206

7. It was previously represented to me that Wellington, a Nevada corporation, acquired all shares of the Sunshine Entities. At the same time, pursuant to Presidion's SEC filings dated January 11, 2005, Form 8-K, the Sunshine Entities were sold to MVI, not Wellington. (See Item 2.01 Disposition of Assets). Also, pursuant to the same filing, Presidion, not Solutions, received $500,000.00 in cash in lieu of the sale. Which entity was an actual buyer of the Sunshine Entities' shares and where can we locate the subject stock purchase agreement? It is very crucial for purpose of tracing the pre-existing debt referred to in Exhibit A to the Refinancing Agreement. From what I know, none of these documents came from our firm.

8. It is possible to look at the transaction as follows. Paradyme had free benefit of acquiring assets without ever paying for it. Three of the Sunshine Entities, the IRS's debtors, were stripped out of the assets in the alleged amount of $12,241,475.65. And now, MVI wants to collect from Solutions, prior to other creditors, especially the IRS.

9. Moreover, see Section III.D.8 below, also relating to the Paradyme Note. Pursuant to documents that we have on file, Paradyme's assets were transferred to one of the MVI's subsidiary, AEM, Inc. So the debts [15] in theory can be offset.

10. Unless, the assignment of the Paradyme Note, from the three of the Sunshine Entities were approved and consented to by the IRS (upon full disclosure), the IRS may have a claim against MVI, as a transferee of the debtors' assets (note payable) for fraudulent transfer, which would result in bringing the asset back to the Sunshine Entities.

11. Is Paradyme still a subsidiary of Solutions?

12. Is Solutions still a subsidiary of Presidion?

13. When did MVI acquire any equity interest in Presidion? For how long? When and if and how did MVI dispose of its interest in Presidion? Do you have relevant Stock Purchase and Sale agreements?

---

[15] If the assets transferred from Paradyme to AEM, Inc. included, at least partially, the assets that were transferred from the Sunshine Entities to Paradyme according to the Assignment Agreement.

- 6 -

B.    Exhibit "B" – MVI Insurance Collateral Agreement

On August 15, 2005, MVI and Solutions entered into an agreement pursuant to which, MVI would assume liabilities of Solutions in the estimated amount of $19,800,000 under that certain workers compensation program in exchange for Solutions' promise to pay $17,820,000.00 in the future (the "MVI Insurance Collateral Agreement"). While MVI performed its obligations under the MVI Insurance Collateral Agreement, Solutions failed to pay amount due thereunder and, as a result defaulted on their obligations to MVI.[16]

Consequently, MVI agreed to waive its remedies under the MVI Insurance Collateral Agreement in exchange for Solutions entering into the Debt Refinancing Agreement. As such, $17,820,000.00 became a part of the "Borrower's" "Original Obligations" under the Refinancing Agreement.

INQUIRES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "B"

1.    The MVI Insurance Collateral Agreement makes references to insurance and collateral agreements with First Commercial Insurance Company (FCIC) and Aldrostar SVA ("Aldrostar"). Also, it is stated that the insurance programs have terminated resulting in Solutions incurring a liability for the payment of open claims in accordance with the provisions of the insurance and collateral agreements with FCIC and Aldrostar. However, the only agreement attached to the Exhibit "B" is the "workers compensation deductible" reimbursement reinsurance agreement with Aldrostar. Is there a copy of any prior terminated and current policy between Solutions and FCIC which expressly provided for the "loss fund" (re: workers compensation insurance)?

2.    It is also stated in the MVI Insurance Collateral Agreement that MVI has entered into agreements with FCIC and Aldrostar to discharge Solution's liability for the reserve of open claims under the insurance programs. I could not locate that agreement between MVI and FCIC and/or Aldrostar in the folder. Is there a copy of this agreement? That would give us an idea of what kind of liabilities Solutions had incurred and MVI had assumed.

3.    Which subsidiaries of Solutions are we talking about? After December 31, 2004, the Sunshine Entities are not Solutions' problem, they were sold. Is it Paradyme and other remaining subsidiaries? I also see references to AEM, Inc. which is not Solutions' subsidiary. Please clarify.

[16]    According to the client's representation. Please confirm.

110206

4.  How was the amount of debt to MVI ($17,820,000) determined? Is it an actual amount that MVI paid to FCIC and/or Aldrostar? Which entities were covered under the FCIC and Aldrostar insurance program? Was this a prorated amount for Solutions' entities only?

5.  Is this issue somewhat connected to Exhibit H: Lighthouse Insurance quotes? It has to be connected to Exhibit "A", in terms of transferring insured assets (client service agreements) to Paradyme? Please clarify.

6.  Is there a copy of agreement between MVI and FCIC? Is there a release in favor of Solutions for the losses incurred prior to that date, mentioned in the explanation to Exhibit "B" and related to the item II-B-2 herein above?

7.  Is there a copy of the Security Agreement dated March 4, 2005 between Solutions and MVI, referred to in the MVI Insurance Collateral Agreement?

8.  What are you referring to as the "Risk Arbitrage Agreement"? Is it the Stock Purchase Agreement dated December 15, 2004 between MVI and Burchams for shares of Presidion (attached to Exhibit "C")? If not, is there a copy of what is called the "Risk Arbitrage Agreement"?

## C.   Exhibit "C" – "Sellers Financing Note Obligations"

On or about December 31, 2004, MVI assumed or purchased all of the prior liabilities of Solutions to the following secured creditors: Fred J. Sandlin ("Sandlin"), Robert A. Gaines and the Robert A. Gaines Trust (collectively "Gaines") and Kenneth A. Hendricks and Diane M. Hendricks (collectively "Hendrickses").

Consequently, as a result of the foregoing debt consolidation transactions, Solutions became a current debtor of MVI and, as such, became a "Borrower" under the Refinancing Agreement; and, the amounts equal to the assumed and/or purchased liabilities became a part of the "Borrower's" "Original Obligations" under the Refinancing Agreement.

INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "C"

1.  With respect to that certain agreement dated December 31, 2004 entered by and between Presidion, Solutions, Sunshine Entities and Sandlin ("Sandlin Settlement Agreement"), I was not able to locate any documents in support of assumption (or purchase) by MVI of any alleged Solutions' liabilities asserted by Sandlin against Presidion, Solutions and Sunshine Entities.

2.   Moreover, under the terms of the Sandlin Settlement Agreement, the amount of the Solutions'[17] cash obligations did not exceed $280,000.00, not alleged $3,920,000.00. At the time of entering into the Refinancing Agreement, what were amounts due to Sandlin under the Sandlin Settlement Agreement? Please, clarify.

3.   With respect to that certain agreement dated December 31, 2004 entered by and between Presidion, Solutions, Sunshine Entities, John W. Burcham, II, and Craig A. Vanderburg, and Gaines ("Gaines Settlement Agreement"), I was not able to locate any documents in support of assumption or purchase by MVI of any alleged Solutions' liabilities asserted by Gaines against Solutions related entities.

4.   Moreover, under the terms of Gaines Settlement Agreement, Solutions did not have to pay out any cash, let alone alleged $2,442,610.00. At the time of entering into the Refinancing Agreement, what were amounts due to Gaines under the Gaines Settlement Agreement? Please clarify.

5.   With respect to the obligations to Hendrickses, it looks like MVI substituted itself for Solutions as a debtor of Hendrickses as a result of that certain purchase agreement by and between MVI and Hendrickses dated February 16, 2006 ("Hendrickses Purchase Agreement"), pursuant to which MVI purchased from Hendrickses the right to collect the alleged debt from Solutions and the right to collect that certain judgment in favor of Hendrickses in a Federal Court for the Central District of California against Strategic Capital Investments, LLC and William J. Beyton in the amount of $2,998,382.65 (the "Strategic Capital Judgment.")

6.   In consideration of the MVI substitution for Solutions and, pursuant to the Hendrickses Purchase Agreement, MVI was obligated to pay at closing $500,000.00 to Hendrickses and to deliver a promissory note in the amount of $2,347,196.39. Pursuant to the documents provided, MVI did execute that certain note and loan agreement dated February 16, 2006, in favor of Hendrickses in the amount of $2,347,196.39 (the "MVI to Hendrickses Note"), which was personally guaranteed by James Baiers and Craig Vanderburg, together with a security agreement in the collateral, which included the purchased obligations of Solutions to Hendrickses and the Strategic Capital Judgment.

---

[17]   Under the terms of the Sandlin Settlement Agreement, Presidion should have issued 14,700,606 shares of common stock.

[18]   Burcham and Vanderburg were also personal guarantors.

[19]   Under the terms of the Gaines Settlement Agreement, Presidion should have issued 6,145,302 shares of common stock.

[20]   Or to Wellington Capital Group, Inc., a buyer of the Sunshine Entities, that was substituted for the Plaintiff, Gaines, when Gaines initiated an action to collect on a prior promissory note, relating to his sale of Sunshine Entities to Solutions in 2001, against Craig Vanderburg, as a guarantor.

110206

7.   However, according to a copy of the check #97407, dated February 16, 2006, Paradyne, a subsidiary of Solutions, and not MVI, paid $500,000.00 to Hendrickses. And as a result, the MVI's purchased obligations of Solutions would be offset by that amount and would be equal to: $2,347,196.39.

8.   Since MVI bought the right to collect money from Solutions, Solutions may have all kinds of defenses to payment under those notes. Moreover, from that certain registration rights agreement by and between Amfinity Capital LLC, Hendrickses and Presidion, dated February 16, 2006 ("Registration Rights Agreement"), it looks like Hendrickses' still own 10,135,549 shares of the parent corporation, Presidion. I thought that the prior Solutions obligations were in lieu of the sale of shares of some of the Solutions related company (which company/ies? please clarify). Also the prior notes were guaranteed personally. Why would Presidion provide Hendrickses with the registration rights? Especially, on the same date as all of the foregoing transactions, February 16, 2006? Please clarify?

9.   In theory, based upon the documents provided, the maximum amount of Solutions liabilities that was assumed or purchased by MVI (covered by Exhibit "C" - liabilities to Sandlin, Gaines and Hendrickses) would be not more than $2,627,196.39 - not the amount of $8,209,806.00 stated in the Exhibit "C".

**D.   Exhibit "D" – MVI Obligations to John Burcham under the Stock Purchase Agreement.**

FROM THE DOCUMENTS PROVIDED, THIS MVI OBLIGATION IS A DIRECT OBLIGATION OF MVI AND WAS NOT A RESULT OF ASSUMPTION OR PURCHASE OF ANY OF THE SOLUTIONS' OR RELATED COMPANIES' OBLIGATIONS TO OTHER CREDITORS, AND ON THIS FACT CANNOT BE A PART OF THE "ORIGINAL OBLIGATIONS" UNDER THE REFINANCING AGREEMENT.

Based upon the documents provided, it looks like the following took place:  On or about December 15, 2004, John Burcham ("Burcham"), as a seller, and MVI, as a buyer, entered into a certain stock purchase agreement ("Stock Purchase Agreement") for purchase of all of the Burcham's shares in Presidion[23] by MVI for the amount of $2,837,106.28.

---

[21]   Together with Amfinity Capital LLC, which, to the best of my knowledge, was Hendrickses' company.

[22]   $280,000.00 of Sandlin liability and $2,347,196.39 of Hendrickses liability.

[23]   It is assumed that at that time Burcham owned 35,476,341 shares of Presidion stock.

110206

On or about December 21, 2004, Burcham, individually and on behalf of his company, and Frank Amodeo, on behalf of MVI and Presidion, entered into a subsequent handwritten agreement modifying and supplementing certain provisions of the Stock Purchase Agreement (the "Handwritten Agreement"). Pursuant to the terms of the Handwritten Agreement, all obligations that existed as of that date between Presidion and Burcham (including Burcham owned companies) were released and offset with the "pledged preferred shares."[24]

Between December 27, 2004 and February, 9, 2005, MVI made payments to Burcham under the terms of the Stock Purchase Agreement and Handwritten Agreement totaling $660,000.00.[25] After that, MVI failed making any payments under the stated agreements.[26] On or about April 25, 2005, Burcham filed a complaint against MVI and Frank Amodeo, individually, alleging several causes of action based on breach of contract and tort ("Burcham Complaint"). On or about March of 2005, MVI filed a separate cause of action against Burcham alleging fraud in inducement with respect to the Stock Purchase Agreement ("MVI Complaint"). Soon thereafter, both actions were consolidated.

On or about July 14, 2005, MVI, Frank Amodeo and Burcham entered into a certain confidential settlement agreement ("Settlement Agreement") pursuant to which, all parties agreed to dismiss their respective complaints and counterclaims; and, the parties released each other from all of the prior mutual obligations.

> INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "D"
>
> 1.  Please clarify, how did MVI's obligations under the terms of the Confidential Settlement Agreement become an obligation of Solutions to MVI?
>
> 2.  Pursuant to the terms of the Handwritten Agreement, definitive agreements to be completed by Tuesday, December 28, 2004. Was it done? Is there a copy of such agreements?

## III.   HISTORY OF OBLIGATIONS FOR SERVICES EXTENDED BY MVI

As a part of the overall plan of improving financial stability of Solutions, MVI and several of its affiliates performed various services for the benefit of Solutions and its subsidiaries. MVI was compensated only partially for such services; and, the outstanding balance became part of the "Original Obligations" under the Refinancing Agreement.

---

[24]   It is not clear from the Handwritten Agreement, how many shares and of which corporation were going to be owned by Burcham.

[25]   Based upon Burcham's representation.

[26]   Based upon Burcham's representation.

110206

A. **Exhibit "E" – "Insurance Deposits/ Prepaid Collateral" on behalf of Solutions.**

During the summer of 2005, Solutions and its subsidiaries were not able to obtain workers' compensation insurance coverage for their customers. MVI offered to solve this potentially devastating problem by obtaining an umbrella insurance coverage in the name of one of its subsidiary, AEM, Inc., which would include customers covered by Solutions subsidiaries' contracts. As part of that arrangement, Sunz Insurance Company required for MVI to prepay insurance premiums and deposits, for which Solutions and its subsidiaries were to reimburse MVI on an as incurred basis.

Consequently, as a result of the foregoing extended credit by MVI in obtaining necessary insurance coverage for Solutions' subsidiaries, Solutions became a current debtor of MVI[27] and, as such, became a "Borrower" under the Refinancing Agreement.

> **INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "E"**
>
> 1. I have difficulties following this Exhibit "E" and explanation thereto. How was the amount of $13,125,982.00 calculated? Did n't this amount cover AEM, Inc.'s contracts also? Was it a prorated amount of Solutions customers only?
>
> 2. Did Solutions reimburse MVI for this amount already on an as incurred basis? (As stated in the explanation provided to this Exhibit "E"). From which of Solutions or its subsidiaries' accounts were the reimbursements paid? How often? From when to when? In what amounts?
>
> 3. From the documents provided, it looks like on February 15, 2006, Solutions paid directly to Sunz Insurance Company. Please confirm.
>
> 4. Wasn't this type of contract covered under the contract that was discussed in Exhibit "B"? And what about Exhibit "F"? Why are they covered by different insurance companies? By different contracts?

B. **Exhibit "F" – Consultant Agreement between Nexia and Presidion**

As a part of the overall financial rehabilitation of Solutions, MVI brought help of one of its affiliate, Nexia, which has been providing a variety of business consulting and restructuring services under several consultant agreements. Thus, the total amount of the invoices billed to

---

[27] To the extent of unpaid balance of the credit provided.

- 12 -

110206

Solutions in the amount of $19,500,000.00 became part of the "Original Obligations" under the Refinancing Agreement.

## INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "F"

1. To what "book of business" sale on July 17, 2006, was the explanation to the Exhibit "F" was referring?

2. Technically, the consulting fees were not owed to MVI, but to Nexia, which is a separate entity. Therefore, treating indebtedness to one corporation as the indebtedness to the other in such informal manner could cause to disregard existence of separate corporate entities (piercing of corporate veil), in case of any issues that might be litigated in the future.[28] That certain consultant agreement, dated May 1, 2005, was entered by and between Nexia (not MVI) and Presidion (not Solutions) (the "Consultant Agreement").

3. There appears to be two addendums to the Consultant Agreement. (1) First addendum, which was executed on the same day by and between the same parties (the "First Addendum") provided for a fee structure. (2) The other unsigned agreement titled "Second addendum to consultant agreement" dated May 16, 2005, was entered by and between Solutions (not Presidion) and Nexia (the "Second Addendum").[29] Therefore, it is not technically an addendum since different parties involved, it is a separate agreement. Such Agreement provided for a fee of $10,000,000.00, if Nexia would cause sale of certain assets from Professional Business Solutions, Inc. and Paradyme to APM, Inc., subsidiary of MVI.

4. A copy of one of the two invoices attached indicates that Solutions paid $7,000,000.00 as per the Second Addendum.

5. Notably, a copy of invoice attached under the Consultant Agreement, in the amount of $9,500,000.00, is to Solutions, not Presidion.

6. The invoice stated that it was pursuant to "Additional Fee resulting from debt/cost reduction strategy." What was the base reference for each number in the attached Asset Reorganization Plan, which was used for calculation of the fee amount payable to Nexia? What was it compared with? Please clarify.

---

[28] This caution can be applied throughout the entire transaction, since parties' liabilities seem to be substituted for the liabilities of its affiliates or subsidiaries in a very informal manner.
[29] Even though the Consultant Agreement was with Presidion, not Solutions.

7.   Are there any assets (client contracts for PEO services) left in Solutions and its subsidiaries after the sale of the "book of business" referred in the explanation to Exhibit "F"?

8.   In our files here, I was able to locate an unsigned copy of the Asset Purchase Agreement dated May 16, 2005 from Paradyme to AEM, Inc. in the amount of $2,800,000.00 together with the Indemnity Agreement and promissory note in the amount of $1,800,000.00 from AEM, Inc., a subsidiary of MVI to Paradyme Inc., a subsidiary of Solutions. Was this amount taking in computation of the outstanding amount of debt for purposes of the Refinancing Agreement? The same logic would apply to the sale of assets from Professional Business Solutions to AEM, Inc. if it was done similarly.

9.   In our files here, I was able to locate an unsigned copy (or a draft) of the Memorandum of understanding between MVI and Avant Services, relating to consolidation of certain PEO entities. It specifically referred to certain indebtedness of BCA Professional Services (now subsidiary of MVI) to Paradyme in the amount of $132,000,000.00. Is it a correct number or typo? If this is correct, it may have an impact on the Refinancing Agreement. How did this indebtedness arise?

10.  The amount of fees ($10,000.00) for arranging a sale between 2 related companies seem excessive and raises red flags all over it. It can be even considered as the part of the purchase price, taking in consideration affiliation of the parties involved. However, since we are not familiar with the nature of the "services" provided, we are not in a position to make a determination of fair consideration or allocating the amount to the purchase price.

## C.   Exhibit "G" – IT Services provided to Solutions by Information Services, Inc.

As a part of the overall financial rehabilitation of Solutions, MVI also brought help of one of its affiliate, Information Services, Inc., which provided IT management services from August 1, 2005 at the discounted market rate of $300,000.00 per month.[30] Therefore the total amount of the invoices billed to Solutions in the amount of $3,600,000.00 became part of the "Original Obligations" under the Refinancing Agreement.

---

[30]   Based upon client's representation.

- 14 -

110206

---

**INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "G"**

1. There is no agreement attached to this Exhibit "G." The explanation states that "as a part of Nexia consulting agreement, Nexia provided IT support services to Presidion trough its affiliate, Information Services, Inc." Was this obligation a part of the Consultant Agreement? If yes, then was it included in the $10,000,000.00 fee?

2. If not, and it is a separate obligation, then, is there a separate Agreement between Information Services Inc. and Solutions? Is there a copy of it? Where did the rate of amount $300,000.00 per month come from?

3. Were any of the bills paid? Who paid it?

---

D.   **Exhibit "H" – Claims Management Services provided to Solutions.**

As a part of the overall financial rehabilitation of Solutions, MVI also brought help of one of its affiliate, Creative Insurance Corporation, which provided insurance and claims management services from August 1, 2005 at the rate of 10.5% of the standard premium.[31] Thus, the total amount of the invoices billed to Solutions in the amount of $3,075,615.00 became part of the "Original Obligations" under the Refinancing Agreement.

---

**INQUIRIES RELATED TO TRANSACTIONS LEADING TO EXHIBIT "H"**

1. The amount of the alleged indebtedness is $3,075,615.00, which is the amount of annual insurance premium provided to AEM Inc. How is this connected to Solutions' debt to MVI?

2. Is this is the umbrella insurance coverage that was part of the Exhibit "F?" If yes, then it appears to duplicate same expenses that are presented in Exhibit "F." Please clarify.

---

## CONCLUSION

In sum, from the documents provided, it appears that the amount of the "Original Obligations" under the Refinancing Agreement could not exceed $71,990,269.04[32] taken in the light most favorable to MVI.

---

[31]   Reduced by the amount of payroll expense that was provided by Solutions.

[32]   This amount was computed based solely on the information provided by the client and has not been verified by an independent accounting firm.

**Shane Williams**

| | |
|---|---|
| **From:** | Diana Jimenez [dianaj@bermankean.com] |
| **Sent:** | Monday, December 11, 2006 2:08 PM |
| **To:** | Kevin Leonard |
| **Cc:** | Richard E. Berman; Jay Stollenwerk |

**Subject:** 1211142234.pdf

A check was issued from the Trust Acct to Berman, Kean on 11/30/06 in the amount of $250,000.00 for fees & costs. The check was deposited into our operating account on 12/01/06. Attached is an a/r report for Mirabilis. The payment was applied towards the invoices with a check mark next to the dollar amount. Please let me know if you have any questions re same. Thank you.



PLAINTIFF'S
EXHIBIT

# Matter Trust Balances Detail

Client Sort contains 'Mirabilis'
Period: January 20, 2006 - September 30, 2006

**1011: 1stSouthernBankTrust**
**1310-033:**    Mirabilis Ventures / Paradyme d/b/a Presidion Solutions    Beginning Balance:    0.00

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|-------------|--------|
| 9/25/2006 | 9261 | | Deposit | WI: Wire rec'd from AEM Inc re:Presidion Corp | 50,000.00 |
| | | | | **Ending Balance:** | **50,000.00** |

**1310-070:**    Mirabilis Ventures / General Acquisitions    Beginning Balance:    2,642,984.11

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|-------------|--------|
| 1/20/2006 | 6752 | | Deposit | WO: Wire to Amegy Bank/Strategic Capital Corp | -10,000.00 |
| 1/20/2006 | 6753 | | Deposit | WO: Wire to Wachovia Bank, Greenberg Traurig | -20,000.00 |
| 1/23/2006 | 6755 | | Deposit | MS: Transfer from 1310-070 to 1310-081 | -210,000.00 |
| 1/31/2006 | 6840 | 9999 | Berman, Kean & Riguera, | Reverse Check No. 9999 | 750,000.00 |
| 2/9/2006 | 6895 | | Deposit | MS: Trnsf from 1310-070 to 1310-081 | -216,853.56 |
| 2/9/2006 | 6897 | | Deposit | MS: Trnsf from 1310-070 to 1310-082 | -1,000,000.00 |
| 2/16/2006 | 6997 | | Deposit | WO: Wire to SunTrust Bank re Mirabilis | -1,000,000.00 |
| 2/21/2006 | 7046 | | Deposit | MS: Transfer from 1310-070 to 1310-094 | -750,000.00 |
| 3/8/2006 | 7254 | 1081 | Berman, Kean & Riguera, | Litigation - Fees & Costs | -25,696.29 |
| 3/9/2006 | 7261 | 1082 | Berman, Kean & Riguera, | Litigation - Fees & Costs - Feb06 Stmts | -39,253.72 |
| 3/10/2006 | 7311 | | Deposit | WI: Wire rec'd from Hayes Reid Dev. | 7,226.18 |
| 3/10/2006 | 7312 | | Deposit | WO: Wire to SunTrust Bank,ABA#061000104 re: | -14,452.36 |
| 4/13/2006 | 7608 | 1108 | Gisella Corporation | Engineering & Environmental Report, Appraisal | -2,625.00 |
| 5/26/2006 | 8021 | | Deposit | MS: Transfer from 1310-070 to 1310-119 | -5,500.00 |
| 6/6/2006 | 8101 | | Deposit | MS: Transfer from 1310-070 to 1310-105 | -60,000.00 |
| 6/6/2006 | 8116 | | Deposit | WI: Wire Rec'd per First Southern Bank | 1,000,000.00 |
| 6/8/2006 | 8117 | 1136 | Berman, Kean & Riguera, | Fees & Costs | -200,000.00 |
| 6/8/2006 | 8118 | | Deposit | WO: Wire to Bankers Bank, ABA#061003415, | -100,000.00 |
| 6/8/2006 | 8119 | | Deposit | MS: Transfer from 1310-070 to 1310-081 | -66,304.44 |
| 6/23/2006 | 8283 | | Deposit | MS: Purch. Cashier's CK to CBP/EG&G Tech | -250,000.00 |
| 6/23/2006 | 8284 | | Deposit | MS: Void Cashier's CK to CBP/EG&G | 250,000.00 |
| 7/6/2006 | 8509 | | Deposit | MS: Transfer from 1310-070 to 1310-112 | -20,000.00 |
| 7/14/2006 | 8525 | | Deposit | MS: Transfer from 1310-070 to 1310-095 re: | -518,250.00 |
| 7/14/2006 | 8528 | | Deposit | MS: Transfer from 1310-071 to 1310-070 | 5,116.37 |
| 7/14/2006 | 8557 | | Deposit | WI: Wire rec'd per First Southern Bank from AEM | 500,000.00 |
| 7/18/2006 | 8559 | | Deposit | MS: Transfer from 1310-075 to 1310-070 | 154,000.00 |
| 7/18/2006 | 8561 | 1151 | Sycamore Investments, | Solution Funding, Inc. Purchase Price Disb. | -500,000.00 |
| 7/18/2006 | 8562 | 1152 | James Plate | Solution Funding, Inc. Purchase Price Disb. | -46,224.00 |

11/2/2006 3:35:40

# Matter Trust Balances Detail

Client Sort contains 'Mirabilis'
Period: January 20, 2006 - September 30, 2006

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|--------------|--------|
| 7/18/2006 | 8563 | 1153 | Banner Country Bank as | Solution Funding, Inc. Purchase Price Disbs. | -46,224.00 |
| 7/18/2006 | 8564 | 1154 | David Sanderson | Solution Funding, Inc. Purchase Price Disbs. | -46,224.00 |
| 7/18/2006 | 8565 | 1155 | Bradley Sanderson | Solution Funding, Inc. Purchase Price Disbs. | -23,112.00 |
| 7/18/2006 | 8566 | 1156 | Adam Rieke | Solution Funding, Inc. Purchase Price Disbs | -23,112.00 |
| 7/18/2006 | 8567 | 1157 | Minvest, LLC | Solution Funding, Inc. Purchase Price Disbs. | -115,104.00 |
| 7/18/2006 | 8615 | | Deposit | WI: wire rec'd per First Southern Bank from AEM | 157,000.00 |
| 7/19/2006 | 8616 | | Deposit | MS: Transfer from 1310-070 to 1310-075 | -154,000.00 |
| 7/26/2006 | 8686 | | Deposit | MS: Transfer from 1310-015 to 1310-070 | 24,761.50 |
| 7/26/2006 | 8687 | 1168 | Sea Wave Diamonds Inc. | Adv.Pymt-Prototype White Gold Nexia Strat. Mens | -3,500.00 |
| 8/31/2006 | 9057 | | Deposit | WI: Wire rec'd per FSB from Worker's Temp. | 10,000.00 |
| 9/1/2006 | 9071 | | Deposit | WO: Wire to Harwell, Plant & Williams, Escrow re | -31,416.66 |
| 9/27/2006 | 9582 | | Deposit | MS: Trnsf to 1310-078 re:AEM wire shortage | -50.00 |

Ending Balance: **3,186.13**

**1310-071:** Mirabilis Ventures / Dagaba Limited Partnership   Beginning Balance: 2,005,116.37

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|--------------|--------|
| 2/16/2006 | 6996 | | Deposit | WO: Wire to Mercantile Bank re: Acquisition of | -2,000,000.00 |
| 7/14/2006 | 8527 | | Deposit | MS: Transfer from 1310-071 to 1310-070 | -5,116.37 |

Ending Balance: **0.00**

**1310-075:** Mirabilis Ventures / Diamond Jaxx Baseball   Beginning Balance: 0.00

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|--------------|--------|
| 4/26/2006 | 7714 | | Deposit | WI: Wire rec'd per FSB | 500,000.00 |
| 6/2/2006 | 8106 | | Deposit | WI: Wire rec'd per First Southern Bank | 500,000.00 |
| 6/7/2006 | 8108 | | Deposit | MM: Transfer from Trust to MM#3059016906, | -1,000,000.00 |
| 7/18/2006 | 8560 | | Deposit | MS: Transfer from 1310-075 to 1310-070 | -154,000.00 |
| 7/18/2006 | 8619 | | Deposit | CI: Transfer from MM#3059016906 to Trust | 154,000.00 |
| 7/19/2006 | 8617 | | Deposit | MS: Transfer from 1310-070 to 1310-075 | 154,000.00 |
| 7/20/2006 | 8620 | | Deposit | MM: Transfer from Trust to MM#3059016906 | -154,000.00 |
| 9/27/2006 | 9296 | | Deposit | CK: BKR-CLCO; reimb MM interest from July | 33.41 |

Ending Balance: **33.41**

**1310-146:** Mirabilis Ventures / Canada Corporations   Beginning Balance: 0.00

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|--------------|--------|
| 9/29/2006 | 9420 | | Deposit | WI: Wire rec'd from Common Paymaster Corp | 3,000.00 |

Ending Balance: **3,000.00**

**1062: Mirabilis Baseball, LLC - Money Market**
**1310-075:** Mirabilis Ventures / Diamond Jaxx Baseball   Beginning Balance: 0.00

# Matter Trust Balances Detail

Client Sort contains 'Mirabilis'
Period: January 20, 2006 - September 30, 2006

| Date | Entry | Check | Payee | Journal Desc | Amount |
|------|-------|-------|-------|--------------|--------|
| 6/7/2006 | 8109 | | Deposit | MM:  Transfer from Trust to MM#3059016906, | 1,000,000.00 |
| 6/30/2006 | 8665 | | Deposit | INT:  Interest Earned in June 2006 | 2,603.84 |
| 7/18/2006 | 8558 | | Deposit | CI:  Transfer from MM#3059016906 to Trust Acct | -154,000.00 |
| 7/20/2006 | 8621 | | Deposit | MM:  Transfer from Trust to MM#3059016906 | 154,000.00 |
| 7/31/2006 | 9254 | | Deposit | July Interest | 3,338.63 |
| 8/31/2006 | 9253 | | Deposit | August Interest | 3,383.27 |
| 9/29/2006 | 9466 | | Deposit | September interest earned | 3,175.64 |
| | | | | **Ending  Balance:** | **1,012,501.38** |

11/2/2006 3:35:41

# A/R Aging Client Level with Statement Detail

**Client Sort contains 'mirabilis'**
As of November 30, 2006

| Stmn Date | Stmn No | Current | Over 30 | Over 60 | Over 90 | Total |
|-----------|---------|---------|---------|---------|---------|-------|
| **Client Sort: Mirabilis Ventures** | | | | | | |
| 7/17/2006 | | 0.00 | 0.00 | 0.00 | -45,237.40 ✓ | -45,237.40 |
| 8/22/2006 | 5655 | 0.00 | 0.00 | 0.00 | 262.28 ✓ | 262.28 |
| 8/22/2006 | 5656 | 0.00 | 0.00 | 0.00 | 1,018.36 ✓ | 1,018.36 |
| 8/22/2006 | 5657 | 0.00 | 0.00 | 0.00 | 2,729.81 ✓ | 2,729.81 |
| 8/22/2006 | 5658 | 0.00 | 0.00 | 0.00 | 3,409.85 ✓ | 3,409.85 |
| 8/22/2006 | 5659 | 0.00 | 0.00 | 0.00 | 4,279.24 ✓ | 4,279.24 |
| 8/22/2006 | 5660 | 0.00 | 0.00 | 0.00 | 4,654.31 ✓ | 4,654.31 |
| 8/22/2006 | 5661 | 0.00 | 0.00 | 0.00 | 227.65 ✓ | 227.65 |
| 8/22/2006 | 5662 | 0.00 | 0.00 | 0.00 | 4,830.00 ✓ | 4,830.00 |
| 8/22/2006 | 5663 | 0.00 | 0.00 | 0.00 | 5,215.23 ✓ | 5,215.23 |
| 8/22/2006 | 5664 | 0.00 | 0.00 | 0.00 | 942.00 ✓ | 942.00 |
| 8/22/2006 | 5665 | 0.00 | 0.00 | 0.00 | 20,010.04 ✓ | 20,010.04 |
| 8/22/2006 | 5666 | 0.00 | 0.00 | 0.00 | 15,632.04 ✓ | 15,632.04 |
| 8/22/2006 | 5667 | 0.00 | 0.00 | 0.00 | 4,763.19 ✓ | 4,763.19 |
| 8/22/2006 | 5668 | 0.00 | 0.00 | 0.00 | 868.67 ✓ | 868.67 |
| 8/22/2006 | 5669 | 0.00 | 0.00 | 0.00 | 1,213.99 ✓ | 1,213.99 |
| 8/22/2006 | 5670 | 0.00 | 0.00 | 0.00 | 2,937.88 ✓ | 2,937.88 |
| 8/22/2006 | 5671 | 0.00 | 0.00 | 0.00 | 1,569.86 ✓ | 1,569.86 |
| 8/22/2006 | 5672 | 0.00 | 0.00 | 0.00 | 2,515.47 ✓ | 2,515.47 |
| 8/22/2006 | 5673 | 0.00 | 0.00 | 0.00 | 205.00 ✓ | 205.00 |
| 8/22/2006 | 5674 | 0.00 | 0.00 | 0.00 | 3,957.61 ✓ | 3,957.61 |
| 8/22/2006 | 5675 | 0.00 | 0.00 | 0.00 | 179.88 ✓ | 179.88 |
| 9/18/2006 | 5869 | 0.00 | 0.00 | 8,995.00 | 0.00 | 8,995.00 |
| 9/18/2006 | 5870 | 0.00 | 0.00 | 71,127.54 ✓ | 0.00 | 71,127.54 |
| 9/18/2006 | 5871 | 0.00 | 0.00 | 194.64 ✓ | 0.00 | 194.64 |
| 9/18/2006 | 5872 | 0.00 | 0.00 | 82.50 ✓ | 0.00 | 82.50 |
| 9/18/2006 | 5873 | 0.00 | 0.00 | 3,024.50 ✓ | 0.00 | 3,024.50 |
| 9/18/2006 | 5874 | 0.00 | 0.00 | 6,827.50 ✓ | 0.00 | 6,827.50 |
| 9/18/2006 | 5875 | 0.00 | 0.00 | 27,842.91 ✓ | 0.00 | 27,842.91 |
| 9/18/2006 | 5876 | 0.00 | 0.00 | 1,663.06 ✓ | 0.00 | 1,663.06 |
| 9/18/2006 | 5877 | 0.00 | 0.00 | 6,533.05 ✓ | 0.00 | 6,533.05 |
| 9/18/2006 | 5878 | 0.00 | 0.00 | 280.00 ✓ | 0.00 | 280.00 |
| 9/18/2006 | 5879 | 0.00 | 0.00 | 525.00 ✓ | 0.00 | 525.00 |
| 9/18/2006 | 5880 | 0.00 | 0.00 | 70.00 ✓ | 0.00 | 70.00 |

# A/R Aging Client Level with Statement Detail

**Client Sort contains 'mirabilis'**
As of November 30, 2006

| Stmn Date | Stmn No | Current | Over 30 | Over 60 | Over 90 | Total |
|---|---|---|---|---|---|---|
| 9/18/2006 | 5881 | 0.00 | 0.00 | 202.83 | 0.00 | 202.83 |
| 9/18/2006 | 5883 | 0.00 | 0.00 | 274.89 | 0.00 | 274.89 |
| 9/18/2006 | 5886 | 0.00 | 0.00 | 3,153.67 | 0.00 | 3,153.67 |
| 9/18/2006 | 5887 | 0.00 | 0.00 | 18,877.55 *207.66* | 0.00 | 18,877.55 |
| 9/18/2006 | 5888 | 0.00 | 0.00 | 24,786.52 | 0.00 | 24,786.52 |
| 9/18/2006 | 5889 | 0.00 | 0.00 | 6,175.90 | 0.00 | 6,175.90 |
| 9/18/2006 | 5891 | 0.00 | 0.00 | 513.05 | 0.00 | 513.05 |
| 9/18/2006 | 5892 | 0.00 | 0.00 | 4,659.00 | 0.00 | 4,659.00 |
| 9/18/2006 | 5893 | 0.00 | 0.00 | 1,983.74 | 0.00 | 1,983.74 |
| 9/18/2006 | 5894 | 0.00 | 0.00 | 8,537.11 | 0.00 | 8,537.11 |
| 9/18/2006 | 5895 | 0.00 | 0.00 | 6,432.34 | 0.00 | 6,432.34 |
| 9/18/2006 | 5897 | 0.00 | 0.00 | 27.50 | 0.00 | 27.50 |
| 9/18/2006 | 5898 | 0.00 | 0.00 | 18,182.08 | 0.00 | 18,182.08 |
| 9/18/2006 | 5899 | 0.00 | 0.00 | 1,455.59 | 0.00 | 1,455.59 |
| 9/18/2006 | 5900 | 0.00 | 0.00 | 650.25 | 0.00 | 650.25 |
| 9/18/2006 | 5901 | 0.00 | 0.00 | 3,453.46 | 0.00 | 3,453.46 |
| 9/18/2006 | 5902 | 0.00 | 0.00 | 3,921.86 | 0.00 | 3,921.86 |
| 9/18/2006 | 5903 | 0.00 | 0.00 | 54.39 | 0.00 | 54.39 |
| 10/12/2006 | 6021 | 0.00 | 3,088.04 | 0.00 | 0.00 | 3,088.04 |
| 10/12/2006 | 6022 | 0.00 | 2,907.50 | 0.00 | 0.00 | 2,907.50 |
| 10/12/2006 | 6023 | 0.00 | 831.98 | 0.00 | 0.00 | 831.98 |
| 10/12/2006 | 6024 | 0.00 | 1,840.43 | 0.00 | 0.00 | 1,840.43 |
| 10/12/2006 | 6025 | 0.00 | 550.00 | 0.00 | 0.00 | 550.00 |
| 10/12/2006 | 6026 | 0.00 | 3,180.42 | 0.00 | 0.00 | 3,180.42 |
| 10/12/2006 | 6028 | 0.00 | 7,608.55 | 0.00 | 0.00 | 7,608.55 |
| 10/12/2006 | 6030 | 0.00 | 8,210.44 | 0.00 | 0.00 | 8,210.44 |
| 10/12/2006 | 6086 | 0.00 | 57.00 | 0.00 | 0.00 | 57.00 |
| 10/12/2006 | 6087 | 0.00 | 94.08 | 0.00 | 0.00 | 94.08 |
| 10/12/2006 | 6091 | 0.00 | 2,942.94 | 0.00 | 0.00 | 2,942.94 |
| 10/12/2006 | 6093 | 0.00 | 2,434.23 | 0.00 | 0.00 | 2,434.23 |
| 10/12/2006 | 6094 | 0.00 | 264.62 | 0.00 | 0.00 | 264.62 |
| 10/12/2006 | 6095 | 0.00 | 809.30 | 0.00 | 0.00 | 809.30 |
| 10/12/2006 | 6096 | 0.00 | 758.68 | 0.00 | 0.00 | 758.68 |
| 10/12/2006 | 6097 | 0.00 | 3,249.41 | 0.00 | 0.00 | 3,249.41 |
| 10/12/2006 | 6098 | 0.00 | 146.60 | 0.00 | 0.00 | 146.60 |

# A/R Aging Client Level with Statement Detail

**Client Sort contains 'mirabilis'**
**As of November 30, 2006**

| Stmn Date | Stmn No | Current | Over 30 | Over 60 | Over 90 | Total |
|---|---|---|---|---|---|---|
| 10/12/2006 | 6102 | 0.00 | 87,777.64 | 0.00 | 0.00 | 87,777.64 |
| 10/12/2006 | 6103 | 0.00 | 385.00 | 0.00 | 0.00 | 385.00 |
| 10/12/2006 | 6104 | 0.00 | 280.00 | 0.00 | 0.00 | 280.00 |
| 10/12/2006 | 6105 | 0.00 | 315.00 | 0.00 | 0.00 | 315.00 |
| 10/12/2006 | 6107 | 0.00 | 450.26 | 0.00 | 0.00 | 450.26 |
| 10/12/2006 | 6108 | 0.00 | 8,392.50 | 0.00 | 0.00 | 8,392.50 |
| 10/12/2006 | 6109 | 0.00 | 22,202.75 | 0.00 | 0.00 | 22,202.75 |
| 10/12/2006 | 6110 | 0.00 | 875.00 | 0.00 | 0.00 | 875.00 |
| 10/12/2006 | 6112 | 0.00 | 1,952.50 | 0.00 | 0.00 | 1,952.50 |
| 10/12/2006 | 6113 | 0.00 | 1,589.25 | 0.00 | 0.00 | 1,589.25 |
| 10/12/2006 | 6114 | 0.00 | 2,800.00 | 0.00 | 0.00 | 2,800.00 |
| 11/13/2006 | 6237 | 152.71 | 0.00 | 0.00 | 0.00 | 152.71 |
| 11/13/2006 | 6238 | 714.64 | 0.00 | 0.00 | 0.00 | 714.64 |
| 11/13/2006 | 6239 | 2,450.18 | 0.00 | 0.00 | 0.00 | 2,450.18 |
| 11/13/2006 | 6240 | 455.75 | 0.00 | 0.00 | 0.00 | 455.75 |
| 11/13/2006 | 6241 | 175.00 | 0.00 | 0.00 | 0.00 | 175.00 |
| 11/13/2006 | 6242 | 8,811.65 | 0.00 | 0.00 | 0.00 | 8,811.65 |
| 11/13/2006 | 6244 | 4,240.68 | 0.00 | 0.00 | 0.00 | 4,240.68 |
| 11/25/2006 | 6339 | 437.50 | 0.00 | 0.00 | 0.00 | 437.50 |
| 11/25/2006 | 6340 | 247.76 | 0.00 | 0.00 | 0.00 | 247.76 |
| 11/25/2006 | 6341 | 249.36 | 0.00 | 0.00 | 0.00 | 249.36 |
| 11/25/2006 | 6342 | 90.00 | 0.00 | 0.00 | 0.00 | 90.00 |
| 11/25/2006 | 6343 | 8,450.79 | 0.00 | 0.00 | 0.00 | 8,450.79 |
| 11/25/2006 | 6349 | 85.50 | 0.00 | 0.00 | 0.00 | 85.50 |
| 11/25/2006 | 6351 | 7,061.91 | 0.00 | 0.00 | 0.00 | 7,061.91 |
| 11/25/2006 | 6352 | 601.80 | 0.00 | 0.00 | 0.00 | 601.80 |
| 11/25/2006 | 6354 | 508.24 | 0.00 | 0.00 | 0.00 | 508.24 |
| 11/25/2006 | 6355 | 2,784.74 | 0.00 | 0.00 | 0.00 | 2,784.74 |
| 11/25/2006 | 6356 | 3,057.73 | 0.00 | 0.00 | 0.00 | 3,057.73 |
| 11/25/2006 | 6357 | 653.28 | 0.00 | 0.00 | 0.00 | 653.28 |
| 11/25/2006 | 6362 | 4,312.50 | 0.00 | 0.00 | 0.00 | 4,312.50 |
| 11/30/2006 | 6364 | 29,883.60 | 0.00 | 0.00 | 0.00 | 29,883.60 |
| 11/30/2006 | 6365 | 175.00 | 0.00 | 0.00 | 0.00 | 175.00 |
| 11/30/2006 | 6366 | 25,460.82 | 0.00 | 0.00 | 0.00 | 25,460.82 |
| 11/30/2006 | 6367 | 302.50 | 0.00 | 0.00 | 0.00 | 302.50 |

# A/R Aging Client Level with Statement Detail

**Client Sort contains 'mirabilis'**
**As of November 30, 2006**

| Stmn Date | Stmn No | Current | Over 30 | Over 60 | Over 90 | Total |
|---|---|---|---|---|---|---|
| 11/30/2006 | 6368 | 3,084.20 | 0.00 | 0.00 | 0.00 | 3,084.20 |
| 11/30/2006 | 6369 | 30.81 | 0.00 | 0.00 | 0.00 | 30.81 |
| 11/30/2006 | 6370 | 1,025.00 | 0.00 | 0.00 | 0.00 | 1,025.00 |
| 11/30/2006 | 6371 | 55.00 | 0.00 | 0.00 | 0.00 | 55.00 |
| 11/30/2006 | 6372 | 288.33 | 0.00 | 0.00 | 0.00 | 288.33 |
| 11/30/2006 | 6373 | 10,611.91 | 0.00 | 0.00 | 0.00 | 10,611.91 |
| 11/30/2006 | 6374 | 907.24 | 0.00 | 0.00 | 0.00 | 907.24 |
| 11/30/2006 | 6375 | 70.00 | 0.00 | 0.00 | 0.00 | 70.00 |
| 11/30/2006 | 6376 | 687.50 | 0.00 | 0.00 | 0.00 | 687.50 |
| 11/30/2006 | 6377 | 4,467.50 | 0.00 | 0.00 | 0.00 | 4,467.50 |
| 11/30/2006 | 6378 | 902.50 | 0.00 | 0.00 | 0.00 | 902.50 |
| 11/30/2006 | 6379 | 792.50 | 0.00 | 0.00 | 0.00 | 792.50 |
| 11/30/2006 | 6380 | 13,827.75 | 0.00 | 0.00 | 0.00 | 13,827.75 |
| 11/30/2006 | 6381 | 1,195.00 | 0.00 | 0.00 | 0.00 | 1,195.00 |
| 11/30/2006 | 6382 | 1,224.70 | 0.00 | 0.00 | 0.00 | 1,224.70 |
| 11/30/2006 | 6383 | 6,080.00 | 0.00 | 0.00 | 0.00 | 6,080.00 |
| | | 146,613.58 | 165,994.12 | 230,507.43 | 36,184.96 | 579,300.09 |

**Client Sort: Mirabilis Ventures, Inc.**

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/12/2006 | 5754 | 0.00 | 0.00 | 438.50 ✓ | 0.00 | 438.50 |
| 9/18/2006 | 5904 | 0.00 | 0.00 | 1,539.00 ✓ | 0.00 | 1,539.00 |
| 10/12/2006 | 6029 | 0.00 | 2,409.56 | 0.00 | 0.00 | 2,409.56 |
| 10/12/2006 | 6100 | 0.00 | 1,052.34 | 0.00 | 0.00 | 1,052.34 |
| 10/12/2006 | 6101 | 0.00 | 700.00 | 0.00 | 0.00 | 700.00 |
| 11/13/2006 | 6245 | 526.44 | 0.00 | 0.00 | 0.00 | 526.44 |
| 11/25/2006 | 6359 | 1,784.49 | 0.00 | 0.00 | 0.00 | 1,784.49 |
| 11/25/2006 | 6360 | 1,516.98 | 0.00 | 0.00 | 0.00 | 1,516.98 |
| 11/25/2006 | 6363 | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| 11/30/2006 | 6384 | 440.00 | 0.00 | 0.00 | 0.00 | 440.00 |
| 11/30/2006 | 6385 | 5,922.50 | 0.00 | 0.00 | 0.00 | 5,922.50 |
| 11/30/2006 | 6386 | 5,537.50 | 0.00 | 0.00 | 0.00 | 5,537.50 |
| 11/30/2006 | 6387 | 8,190.00 | 0.00 | 0.00 | 0.00 | 8,190.00 |
| 11/30/2006 | 6388 | 350.00 | 0.00 | 0.00 | 0.00 | 350.00 |
| 11/30/2006 | 6389 | 4,538.00 | 0.00 | 0.00 | 0.00 | 4,538.00 |
| 11/30/2006 | 6390 | 242.50 | 0.00 | 0.00 | 0.00 | 242.50 |

# A/R Aging Client Level with Statement Detail

**Client Sort contains 'mirabilis'**
**As of November 30, 2006**

| Stmn Date | Stmn No | Current | Over 30 | Over 60 | Over 90 | Total |
|---|---|---|---|---|---|---|
| 11/30/2006 | 6391 | 110.00 | 0.00 | 0.00 | 0.00 | 110.00 |
| 11/30/2006 | 6392 | 770.00 | 0.00 | 0.00 | 0.00 | 770.00 |
| 11/30/2006 | 6393 | 2,440.00 | 0.00 | 0.00 | 0.00 | 2,440.00 |
| | | 32,468.41 | 4,161.90 | 1,977.50 | 0.00 | 38,607.81 |
| | | 179,081.99 | 170,156.02 | 232,484.93 | 36,184.96 | 617,907.90 |

000  *Bad debt #5687*
*or In #*        0·00 ⁕

                36›184·96 +
               232›484·93 ⁕
               230 000 00 ⁕
003
                18›669·89 ⁕