## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

MIRABILIS VENTURES, INC.

—————————————————————/

MIRABILIS VENTURES, INC.,

      Plaintiff,

v.

RICHARD E. BERMAN, BERMAN, KEAN &
RIGUERA, P.A., ELENA WILDERMUTH,

      Defendants.

———————————————————————/

Bankruptcy Case No. 6:08-bk-04327-KSJ
Adversary Proceeding No. 6:08-ap-222-KSJ

CASE NO. 6:09-cv-175-Orl-31DAB

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Mirabilis Ventures, Inc. ("Mirabilis") files this response to *Defendants' Motion for Summary Judgment* (Doc. 80, "*Motion*"), filed November 12, 2010. The *Motion* should be denied because there are disputed material facts, and the legal doctrines asserted by Defendants are without merit.

## I. FACTS

### A. Disputed Facts[1]

The following material facts are disputed:

(1)   Frank Amodeo ("Amodeo") had no legal control of Mirabilis, was not a majority shareholder of Mirabilis, did not have voting rights with respect to Mirabilis, and was not an

---

[1]   In the Motion, Defendants specify facts that they assert are undisputed. Plaintiff disagrees with Defendants' categorization of several facts as undisputed. Plaintiff specifies here those facts that directly contradict those on which Defendants apparently rely, and adds a description of facts that establish exceptions to the legal doctrines on which Defendants rely.

officer, director, or employee of Mirabilis. *See Affidavit of R.W. Cuthill* ("*Cuthill Affidavit*") (Exhibit 1)[2]; *Articles of Incorporation of Mirabilis* (Exhibit 2); *Mirabilis Ventures, Inc. and Subsidiaries Consolidated Financial Statements and Independent Auditors' Report for the Years Ended December 31, 2005 and 2004* ("*2005 Auditors' Report*") (Exhibit 3); *Shareholders' Agreement* (Exhibit 4).[3]

(2) Amodeo was not in control of Mirabilis.[4]   *October 5, 2004 Deposition of Yaniv Amar* ("*10/5/10 Amar Depo.*") (Exhibit 9) at 62, lines 7 -19; 275, lines 6-13; *October 14, 2010 Deposition of Yaniv Amar* ("*10/14/10 Amar Depo.*") (Exhibit 10) at 335, lines 1-5.

(3) Richard Berman ("Berman"), who is an agent of and partner with the law firm of Berman, Kean & Riguera, P.A. ("BKR"), was on the Board of Mirabilis and served as General Counsel for Mirabilis, and he was aware of the payroll tax fraud at Mirabilis and participated in it. *Board Minutes*; *10/5/10 Amar Depo.* at 105, lines 18-25; pages 17-18; *September 27, 2010 Deposition of Martin C. Flynn ("Flynn Depo.")* (Exhibit 12) at 17-18.

**B. Evidence of Defendants' Role in Amodeo's Scheme**

---

[2] For ease of reference and convenience to the Court, the Exhibits referenced herein are being filed separately as an appendix. *See Notice of Filing Exhibits.*

[3] *See also Minutes of the January 3, 2005 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*1/3/05 Board Meeting*") (Exhibit 5); *Minutes of the January 25, 2006 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*1/25/06 Board Meeting*") (Exhibit 6); *Minutes of the March 23, 2006 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*3/23/06 Board Meeting*") (Exhibit 7); *Minutes of the May 19, 2006 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*5/19/06 Board Meeting*") (Exhibit 8) (collectively, "*Board Minutes*").  The complete minutes from all of the meetings of the Mirabilis Board of Directors are attached to the *Cuthill Affidavit.*

[4] In the *Motion*, Defendants rely on misinterpreted quotes from Amodeo's Change of Plea Hearing on September 23, 2008. *See Motion*, pages 5 and 6. Specifically, Defendants cite the following specific Amodeo testimony: "I was the owner of a company, which owned a PEO, that allowed a third party to collect the payroll taxes . . ." Defendants contend that the company owned by Amodeo was "Mirabilis". *See Motion*, page 6. However, this is a complete misrepresentation of the quote. In order for the quote to make sense, it is apparent that Amodeo is referring to Wellington, as the company he owned, which in turn owned Presidion. The third party referenced is AEM, which collected the payroll taxes. *See December 10, 2010 Deposition of Daniel Myers* ("Myers Depo") (Exhibit 11), at 410, lines 14-19; 22-23. As shown below, Amodeo did not own Mirabilis, and Mirabilis did not run a PEO that allowed a third party to collect payroll taxes. Accordingly, to the extent that Defendants, in the *Motion*, rely on this misunderstood quote and assert that their interpretation of the quote is the basis for any purported "undisputed" fact, Plaintiff points out the inconsistency and inaccuracy in such reliance and assertion.

In early 2006, Martin Flynn, a Human Resources specialist at Mirabilis Ventures, Inc., walked into the office of Amodeo. *Flynn Depo.*, page 103, lines 13-16[5].   Amodeo was just finishing a meeting with Mirabilis' General Counsel, Berman, and it's Chairman of the Board, Mr. Holtz.  *Flynn Depo.*, page 260, lines 17-24.  Berman had been counsel for Mirabilis related to its involvement in the PEO industry since at least 2004. *10/5/10 Amar Depo.* at pages 17-18. Berman's involvement was to oversee all legal issues for Mirabilis.  *Flynn Depo.* at pages 107-108.  He was appointed General Counsel of Mirabilis by it's Board. *Board Minutes*.  During his tenure with Mirabilis, Berman's firm, BKR, received fees in excess of $3 million.  *10/14/10 Amar Depo.* at Ex. 55.

Mr. Flynn had come by to talk about other matters but, while he had them in the room, he asked Berman and Mr. Holtz about a new part of Mirabilis' business, the "Presidion Plan".  *Flynn Depo.*, at page 103, lines 21-23.  Presidion was a PEO - an entity that handled payroll for employees - which Mirabilis had acquired at the beginning of 2006.  Mr. Flynn asked them "How is the Presidion Plan going?"  *Flynn Depo.*, at page 103, lines 2-10.  Instead of getting a straight answer, the pair asked Mr. Flynn "what do you mean?", which Mr. Flynn took to mean that they didn't know if it was okay to talk to him about it.  *Flynn Depo.*, at page 154, lines 4-5.  To put them at ease, Mr. Flynn said, "the plan not to pay the payroll taxes."  *Flynn Depo.*, page 154, lines 6-8.  The two looked at Amodeo, apparently stunned that Mr. Flynn knew of this plan.  *Flynn Depo.*, at page 103, lines 2-10.  Amodeo made a motion, indicating the two could tell Mr. Flynn about the plan.  *Flynn Depo.*, at page 103, lines 2-10.  Mr. Holtz assured

---

[5]   Deposition testimony may be used at a hearing or proceeding at which evidence in affidavit form is also admissible. *Gulf USA Corp. v. Fed. Inc. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) (determining that a deposition in an unrelated case can be used on summary judgment); *Tormo v. Yomark*, 398 F. Supp. 1159, 1168-69 (D.N.J. 1975); *United States v. Fox*, 211 F. Supp. 25 (E.D. La. 1962) (stating that "[t]he depositions were taken under oath and we hold that they are at least as good as affidavits"), *aff'd* 334 F. 2d 449 (5th Cir. 1964).

Mr. Flynn there was nothing to worry about. *Flynn Depo.*, at pages 102-103, lines 24-1. They said that they've got it covered. *Flynn Depo.*, at pages 102-103, lines 24-1. They said it was their responsibility. *Flynn Depo.*, at page 103, lines 2-10.

At almost the same time as Mr. Flynn's discussion with Berman, Berman was also having discussions regarding this subject with Yaniv Amar. Mr. Amar was the person responsible at the PEO manager, AEM, Inc., to insure that the payroll taxes were paid over to the United States government. *See State of Florida Department of Business and Professional Regulation Quarterly Report Form (Quarter Ending March 31, 2006 )*Ex. 59 *to 10/14/10 Amar Depo.* (Exhibit 14) (showing Mr. Amar as the CEO and "controlling person" of AEM, Inc.). Mr. Amar had been kept "blind" related to the finances of the PEO. *10/14/10 Amar Depo.*, page 94, lines 4-25. Worse, he had made a troubling discovery. He saw Mirabilis spending over $8 million per month, but he saw no apparent stream of income to finance such a large "burn rate". *Id.* at 97, lines 14-25. Instead, he had realized that the PEO business passed through about $10 million in monthly payroll tax trust funds. *Id.* at 100, lines 7-13. The possible relation of those amounts gave him grave concern. He discussed these concerns frequently with Berman. *Id.* at 105, lines 24-25; 106, lines 1-13, 16-25; 107, lines 1-20.

Mr. Amar's discussions with Berman began with the Sunshine company plans and negotiations over a year before Mr. Flynn's meeting with Berman. *Id.* at 22, lines 9-22. But by March, 2006, they had reached the point Mr. Amar had to confront Berman with his concerns. In March, 2006, the two men met at Amura, a restaurant in downtown Orlando. *Id.* at 104, lines 5-25; 105, lines 1, 19-21. Mr. Amar challenged Berman to explain to him how Mirabilis was generating sufficient revenue to pay for this huge burn rate. *Id.* at 105, lines 24-25; 106, lines 1-13, 16-25. Berman stated it was generated by Mr. Amar's business, the PEO activity. *Id.* at 106,

lines 9-10.  Mr. Amar corrected him, explaining that at best the PEO would receive 1% of the $600 million it managed, thus it could account for no more than $6 million annually.  *Id.* at 106, lines 11-25; 107, line 1.  Thus, Mr. Amar pointedly asked Berman "AEM is covering the first three weeks of 2006.  Explain to me how in the heck the other 49 weeks are funded."  *Id.* at 107, lines 1-3.

Over the next few months, Mr. Amar shared with Berman his concerns of the correlation of this burn rate at Mirabilis and the payroll taxes.  *Id.* at 107, lines 14-25; 108, lines 1-19.  Not being satisfied, Mr. Amar directly discussed with Berman his concern that the payroll taxes were not being paid.  *Id.* at 108, lines 16-17; 109, lines 8-17.  Mr. Amar went so far as to insist that he be provided documentation from the Treasury Department indicating the taxes had been paid. *Id.* at 113, lines 10-21.  Berman couldn't give and never did give Mr. Amar the assurance he was seeking.[6]

In his Unsworn Statement, Daniel Myers, the CFO of Mirabilis, also attests to the fact that Berman was well aware of the Presidion Plan, and he even notes that Berman and Amodeo "were at multiple meetings where we discussed payroll taxes", that they "sat in meetings where they would document the [Presidion] [P]lan, what the [Presidion] [P]lan was", and that "[t]hey would review memos, sign off on memos that were going out."  *See* July 20, 2009 Unsworn Statement of Daniel Myers *("Myers Statement")* (Exhibit 13) at 9, Section 0022, lines 3-8.[7]  Mr.

---

[6] Berman had full knowledge of the plan not to pay the payroll taxes and was actively involved in that plan.  *See Myers Statement*, at 6, Section 0013, lines 24-25; Section 0015, lines 1-17.  He had told Mr. Flynn as much by admitting to the "plan not to pay the payroll taxes" in their meeting.  Berman and his firm, including attorney Elena Wildermuth ("Wildermuth"), continued to represent Mirabilis related to the payroll taxes while $26 million in stolen payroll trust funds flowed through the BKR trust account.  *See Id.* at 10, Section 0023, lines 3-7; 12, Section 0028, lines 14-25; Section 0029, lines 1-2;  *Steven L. Yoakum, CPA's August 2, 2010 "Evaluation and Analysis of Berman Trust Transactions" ("Yoakum Analysis")* (Exhibit 15)  Berman took fees from those funds.  *See Yoakum Analysis.*

[7] On December 10, 2010, Plaintiff's counsel attended the deposition of Daniel Myers.  The day before the deposition, Plaintiff was first informed of a transcript of the Myers Statement.  The transcript is admissible in the instant matter as a statement against the interest of Mr. Myers pursuant to Rule 804(b)(3) of the Federal Rules of

Myers states that Berman "absolutely" had knowledge of the Presidion Plan and the actual non-payment of payroll taxes. *Id.* at 14, Section 0032, lines 7-9. Mr. Myers also provides that Berman handled a trust account in which payroll taxes were transferred. Id. at 12, Section 0028, lines 10-21.

### C. Mirabilis and Its Corporate Structure

Mirabilis (formerly known as Stellar Industries, Inc.) was incorporated under the laws of Nevada in November 2003. *See Articles of Incorporation.* According to the *2005 Auditors' Report*, as of December 31, 2005, Mirabilis had issued stock as follows: (A) 100 shares of Class A Common Stock (Black Shares) in total; (B) 156,750 shares of Class B Standard Preferred Stock (Green Shares) in total; and (C) 6,000 shares of Class Z Special Preferred Stock (Blue Shares) in total.[8] *2005 Auditors' Report* at 20-21. The voting rights of these shares differed.[9]

The evidence shows that all of the voting stock, specifically the Black Shares, were issued to

---

Evidence. By refusing to testify as to the contents of the statement, Mr. Myers is "unavailable" under Rule 804(a). Rule 804(b)(3) allows for the admission of hearsay evidence if a declarant is unavailable when a statement is one that:

> a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability statement.

> In the instant matter, the Transcript contains multiple admissions that would subject Mr. Myers to criminal prosecution. Therefore, the statements are against his interest pursuant to Rule 804(b)(3). See *United States v. Saget,* 377 F.3d 223 (2nd C.A. 2004).

[8] Although Mirabilis was authorized to issue additional shares, these were the only shares that were actually issued.

[9] Pursuant to a September 22, 2005 *Shareholders' Agreement*, and by operation of section 78.196 of the Nevada Statutes, the Black Shares were vested with all voting rights, as well as the ability to veto any decision by other classes of shareholders. *See Shareholders' Agreement* at 2; N.R.S. § 78.196 (requiring one or more classes or series of shares to have unlimited voting rights); *2005 Auditors' Report* at 21. Green Shares had "limited voting rights" and could vote only on the approval of an additional distribution, or any vote that state law requires the approval of each class of shares. *Shareholders' Agreement* at 4; *2005 Auditors' Report* at 21. Blue Shares had no voting rights. *Shareholders' Agreement* at 11; *2005 Auditors' Report* at 21.

Yaniv Amar.  On October 28, 2004, the Board authorized the issuance of 1,000[10] shares of common stock, of which 100 were issued to Yaniv Amar.  *10/28/04 Board Meeting*; *October 28, 2004 Written Action of the Directors of Mirabilis Ventures, Inc.* ("*10/28/04 Written Action of Board*")(Exhibit 16).  According to minutes from the 2006 Annual Meeting of Shareholders, Mr. Amar was identified as the "sole Class A shareholder."[11]  *See Minutes of the 2006 Meeting of Shareholders of Mirabilis Ventures, Inc.* ("*2006 Shareholders' Meeting*")(Exhibit 17)(emphasis added).  The *2005 Auditors' Report* confirms that only 100 shares of Black Stock were issued. *See 2005 Auditors' Report* at 21.  Mr. Cuthill, who reviewed the corporate records, states in an Affidavit that Black Shares were issued only to Mr. Amar.  *Cuthill Affidavit*.  Given the documentary and testimonial evidence, it is clear that Mr. Amar was the only holder of voting shares and therefore had all voting control over Mirabilis.[12]

### D.  Control of Mirabilis

---

[10]  Although the issuance of 1,000 shares was authorized, only 100 shares were actually issued.  *See Minutes from October 28, 2004 Board Meeting*.

[11]  Defendants may attempt to assert that the Black Shares were "bearer" shares, as it appears even Mr. Amar (a non-lawyer) believed he could hand them in.  However, the documentary evidence, including the *10/28/04 Board Meeting Minutes*, indicates that the shares were issued to Mr. Amar, personally, not as a "bearer."  In addition, on October 1, 2005, Mirabilis adopted bylaws providing in pertinent part that "[e]very certificate representing shares issued by the Corporation shall state the following: . . . (b) the name of the person to whom the stock certificate is issued."  *Bylaws of Mirabilis Ventures, Inc.* ("Bylaws") (Exhibit 18) at §5.02(b).  Thus, bearer shares were not permitted by the bylaws.  Moreover, minutes from the 2006 *Shareholders' Meeting* state that Mr. Amar remained the "sole Class A shareholder," 2006 *Shareholders' Meeting Minutes* at 1, even after he believed he had "handed them in."

[12]  Defendants may attempt to assert that Mr. Amar issued a proxy to Mr. Amodeo.  However, Plaintiff has not produced a signed copy of any proxy, and Mr. Amar does not recall signing one.  *10/5/10 Amar Depo.* at 149, lines 17-18; 150, lines 11-13; 152, lines 20-21; *10/14/10 Amar Depo.* at 273, line 25; 274, lines 15-23.  Thus, the only evidence of record indicates that there was no valid proxy issued by Mr. Amar to Mr. Amodeo.  Even if the proxies had been signed, they would be valid for only six months under Nevada law.  *See* NRS § 78.355 (providing that a proxy is valid for only six months, unless the proxy was deemed irrevocable and coupled with an interest sufficient in law to support an irrevocable power).  A review of the minutes from board meetings reveals that Mr. Amodeo never used a proxy to enact any of the wrongdoing that is asserted to have occurred.  *See Board Minutes*. Furthermore, the minutes reveal that only the following individuals were ever appointed as directors: Jason Carlson; Eddie Curry; Robert Pollack; Frank Hailstones; James V. Sadrianna; Bruce Walko; Laurie Holtz; Richard A. Berman; Thomas Broadhead; Jay Stollenwerk; Shane Williams; Michael Moecker; and Yaniv Amar.  *See Board Minutes*; *10/28/04 Written Action of Board.*

Not only did Amodeo lack voting control over Mirabilis; he was never, at any point in time, an employee, officer, or director of Mirabilis. *Cuthill Affidavit*. A review of the minutes from Board meetings confirms that Amodeo was never an officer or director of Mirabilis. *See Board Minutes*. In addition, pursuant to the *Shareholders' Agreement,* no one held veto power because no one held at least 25,000 Black Shares. *See Shareholders' Agreement* at 2; *2005 Auditors' Report* at 21.

According to the bylaws of Mirabilis, control rests solely with the Board. *See Bylaws* at § 3.01. Only Mr. Amar, as the sole shareholder of voting shares, could overrule the Board. A review of the minutes from Board meetings reveals that Mr. Amodeo was never on the Board. *See supra* n. 7. Berman was on the Board from March 23, 2006**.** *See 3/23/3006 Board Minutes*. Simply put, Mr. Amodeo had no legal ability to control Mirabilis.

Testimony of witnesses with knowledge confirms that Amodeo did not control Mirabilis. For instance, director and controlling shareholder Yaniv Amar testified that the Board controlled the significant decisions of Mirabilis. *10/14/10 Amar Depo.* at 142, lines 17-20; *10/15/10 Amar Depo.* at 62, lines 7-11. Despite the above facts, which establish with legal certainty that Mr. Amodeo did not enjoy legal authority to control Mirabilis, several persons have described Mr. Amodeo as exercising "control" without defining that term. Admittedly, Amodeo signed two documents as sole director and shareholder of Mirabilis during its infancy. These statements were made only by Amodeo, not third parties. One such statement was made to a lender. However, the records of Mirabilis and third parties contradict Amodeo's assertions. *See 10/28/04 Board Meeting*; *2005 Auditors' Report*; *Mirabilis Stock Book*; *Minutes from 2006 Shareholder Meeting*; *Cuthill Affidavit*. The issue of legal control of Mirabilis is a disputed fact.

**E.  The Presidion Plan**

Mr. Flynn testified that Mr. Holtz and Berman knew about the "Presidion Plan". *Flynn Depo.* at 103-104, lines 21-10.  This was not called "The Mirabilis Plan" for good reason - there is no allegation in the Government's Statement of Facts, binding upon Mirabilis, that Mirabilis itself misdirected payroll taxes.  *United States' Notice of Statement of Facts Which the United States Contends It Would Prove at Trial* (Doc. 146 in Case No. 6:08-cr-231-JA-KRS, ("*Government's Statement of Facts*") (Exhibit 19).  Instead, the allegations in the *Government's Statement of Facts* are that a Mirabilis subsidiary (AEM) managed the Presidion/PBS book of business, which included payroll taxes.  *Id.* at 11.  All of those payroll taxes were deposited into an account managed by Presidion's CFO, Sue Shoemacher, not a Mirabilis employee.  *Id.* at 10.  It is alleged that Amodeo and one of his co-conspirators, Mr. Vanderberg, directed funds be paid out of that account for the benefit of Presidion, Amodeo, and others.  *Id.* at 10.  Mirabilis's alleged liability arises from funds moving through Mirabilis and it's subsidiaries, not for affirmative acts of Mirabilis to misdirect the funds.[13]

### F.  Board Members and Decision Makers Who Did Not Know of the Fraud

Mr. Amar was CEO of AEM, Inc., the subsidiary of Mirabilis handling payroll taxes. 10/14/10 Amar Depo. at 9, lines 21-22.  Mr. Amar was also a director of Mirabilis.  "*10/28/04 Written Action of Board*") (signed by "Yaniv Amar, Director").  Mr. Amar spoke to Mirabilis's professionals, including Berman, to insure that payroll taxes were being properly remitted. *10/5/10 Amar Depo.* at 105, lines 24-25; 106, lines 1-13, 16-25; 107, lines 1-20.  Mr. Amar was assured that that payroll tax issues were being dealt with, and Berman assured him that Mr. Holtz

---

[13] Thus, Defendants' repeated allegation that Amodeo "controlled" Mirabilis misses the point that control of Mirabilis could not have misdirected these funds from the account managed by Presidion.  Instead, it is Amodeo's ownership of Presidion, through Amodeo's company, Wellington, that allowed the misdirection of funds from an account managed by Sue Shoemacher of Presidion.  *See Cuthill Affidavit* at Ex. F.

was coming on as chairman of the board and that he would make sure everything is "fiscally responsible." *See 10/14/10 Amar Depo.* at 107, lines 7-9. Mr. Amar testified that he would have taken action, had he known that the payroll taxes were not being paid. *10/14/10 Amar Depo.* at 387-88, lines 24-5. Mr. Amar was a decision maker unaware of the fraud.

Edie Curry was appointed to the Board of Mirabilis on January 3, 2005. *See 1/3/05 Board Meeting*. Ms. Curry was the Board's Secretary and Treasurer. *Id.* Ms. Curry was misled as to Mirabilis' plan for resolving its payroll tax problems. Ms. Curry testified that the strategy of not paying payroll taxes and instead using them for other purposes was never communicated to her, and her understanding was that Mirabilis was going to figure out other ways, such as reducing expenses and improving sales, to resolve the payroll tax problem. *5/14/09 Sentencing Hearing* at 119-120, lines 20-3. Ms. Curry was a decision make unaware of the fraud.[14]

## G. Ousting of the Corrupt Management

Amodeo and any corrupt corporate management were ousted from Mirabilis prior to the filing of the bankruptcy petition. In an *Order* which resolved consolidated appeals challenging the Bankruptcy Court's refusal to dismiss Mirabilis' bankruptcy case in *Rachlin Cohen & Holtz, LLP v. Mirabilis Ventures, Inc. (In re Mirabilis Ventures, Inc.)* (Doc. 30 in Case No. 6:09-cv-1658-Orl-31) ("*Order Affirming Denial of Dismissal*"), this Court affirmed the Bankruptcy Court's finding that "Moecker was properly appointed [as a director], making Moecker's appointment of Cuthill legal, and therefore Cuthill's decision to have Mirabilis file for bankruptcy protection was not an ultra vires act." *Order Affirming Denial of Dismissal* at 5-6. The District Court also found that "the decision to file [a bankruptcy petition] was not made by Amodeo, and there was no evidence presented that Cuthill (or Moecker for that matter) intended

---

[14] While Myers, in *Myers Statement* provides that Ms. Curry had knowledge of the Plan, there is plenty of other testimony/evidence to the contrary. At best, Ms. Curry's knowledge of the Plan is a relevant disputed issue of fact.

to aid Amodeo by doing so." *Id.* at 11.  Thus, Mr. Cuthill was legally installed as President of Mirabilis prior to the filing of the bankruptcy petition.  Mr. Cuthill was brought in for the purpose of removing the taint of corruption from Mirabilis.  *See April 21, 2010 Deposition of R.W. Cuthill ("Cuthill Depo.")* (Exhibit 20) at 95, lines 7-15.

### H.  Allegations in this Lawsuit

The instant lawsuit was filed against Berman, BKR, and Wildermuth.  *See Fourth Amended Complaint* (Doc. 67).  In the *Fourth Amended Complaint*, Plaintiffs seek compensatory damages stemming from Defendants' involvement with and representation of Mirabilis and AEM, Inc.  *Id.* at 1.  Plaintiff alleges that Defendants Berman and Wildermuth, as attorneys/agents of BKR, provided legal advice and otherwise consulted with Mirabilis regarding payroll tax funds, and BKR failed to properly supervise Berman and Wildermuth.  *Id.* at 1-2.[15]

### I.  Damages to Mirabilis

On November 25, 2008, Mirabilis filed a *Motion for Approval of Compromise of Controversy by and between Debtors and the United States of America* (Doc. 101 in Case No. 6:08-bk-04327-KSJ, "*Motion to Approve Settlement*") (Exhibit 21) wherein Mirabilis had to consent to an unsecured forfeiture claim against it in favor of the United States of America in the amount of $200,000,000.00 ("Unsecured Claim").  In the *Fourth Amended Complaint* (Doc. 67), Mirabilis alleges that Mirabilis suffered damage to its business, property, the Unsecured Claim, adverse tax consequences, including interest and penalties, and legal and expert fees and costs. When asked to breakdown the Unsecured Claim, Mr. Cuthill testified that the Unsecured Claim included $61,000,000.00 of interest and penalties, $120,000,000.00 in unpaid payroll taxes, and

---

[15] Plaintiff has brought claims of professional negligence against each of the Defendants; breach of fiduciary duty against all Defendants; negligent supervision against BKR; accounting against all Defendants; and conversion against BKR.  *Id.* at 10-18.

$19,000,000.00 of miscellaneous that the United States government claimed.  *Cuthill Depo.* at

299-300, lines 18-15.  Furthermore, it must be noted that approximately $26 Million in the stolen

payroll taxes flowed through the BKR trust fund account.  *See Yoakum Analysis.*

## II.  ARGUMENT AND MEMORANDUM OF LAW

### A.  SUMMARY JUDGMENT STANDARD

The burden is on the moving party to demonstrate that it is entitled to summary judgment.

*Info. Sys. And Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002).  This

Court has found that summary judgment is inappropriate for defendants regarding an *in pari*

*delicto* defense when there are disputes of fact.  *See Moecker v. Honewell Int'l, Inc.,* 144

F.Supp.2d 1291 (M.D. Fla. 2001).

### B.  LEGAL COUNTER ARGUMENTS

#### 1.  No Requirement for Exoneration of Mirabilis Prior to Filing this Litigation

Defendants argue that they are entitled to summary judgment because Mirabilis was not

exonerated prior to filing the present malpractice suit against Defendants.  *See Motion*, page 8.

Defendants' argue that: 1) Mirabilis's plea of *nolo contendere,* 2) the resulting Forfeiture Money

Judgment[16], and 3) the resulting Criminal Judgment, each determined the criminal liability of

Mirabilis.  *See Id.*  Furthermore, Defendants cite *Steele v. Kehoe*, 747 So. 2d 931 (Fla. 1999) as

the "landmark Florida case on legal malpractice claims by convicted criminal defendants", and

as the main legal support for their argument that Mirabilis must have obtained appellate or post-

conviction relief as a precondition to maintaining the current legal malpractice action.  *See Id*.

Defendants' reliance on the *Steele* case is wholly inappropriate.  The facts of said case are

---

[16] In the Criminal Proceeding, the Court entered the forfeiture money judgment on July 2, 2010 after entry of the nolo contendere plea and without objection by Mirabilis (Doc. 153, Case 6:08-cr-231-Orl-28KRS)(Exhibit 22).  The forfeiture judgment contains no findings of fact binding upon any parties to the judgment.

completely distinguishable from the present facts.[17]   In reviewing the facts in *Steele* and

determining that "exoneration is a prerequisite to a legal malpractice action arising from a

criminal prosecution", the Florida Supreme Court agreed with the following policy arguments

supporting the appellate or post-conviction relief prerequisite:

> (1) without obtaining relief from the conviction or sentence, the criminal defendant's
> own actions must be presumed to be the proximate cause of the injury, (2) monetary
> remedies are inadequate to redress the harm to incarcerated criminal defendants; (3)
> appellate, postconviction, and habeas corpus remedies are available to address
> ineffective assistance of counsel; (4) requiring appellate or postconviction relief
> prerequisite to a malpractice claim will preserve judicial economy by avoiding the
> relitigation of supposedly settled matters; and (5) relief from the conviction or sentence
> provides a bright line for determining when the statute of limitations runs on the
> malpractice action.

*See Id.* at 933.

Defendants' statement that the fact that *Steele* involves a criminal defense attorney and the

present case involves civil attorneys is a "distinction without a difference", is a complete

misunderstanding of the *Steele* decision.  *See Motion*, page 9.  As provided above, the specific

policy considerations that the Florida Supreme Court agreed with in determining that exoneration

is a prerequisite to a legal malpractice action arising from a criminal prosecution are based on the

implications of and the alternative means of addressing ineffective assistance of counsel resulting

in criminal convictions.  It is evident that *Steele* does not apply to the present case, which is a

legal malpractice case against civil attorneys who knew of and actually engaged in fraudulent

activity and who went to great lengths to hide that fraudulent activity from innocent members of

the Board.  This is a completely different factual scenario from cases involving legal malpractice

---

[17] In *Steele*, the legal malpractice claim was brought against a criminal defense attorney and specifically arose from a criminal prosecution and conviction.  *See Steele*, 747 So. 2d at 932.  The individual was convicted of first-degree murder and sentenced to life in prison and later claimed that his criminal appellate attorney had agreed to file a motion for post-conviction relief, had failed to file said motion, and accordingly had committed legal malpractice. *See Id.*

claims brought against a criminal defense attorney specifically arising from a criminal prosecution and conviction resulting from the criminal defense attorney's alleged negligent representation of the criminal defendant in the prosecution.   Since there is no Florida law requiring exoneration of a criminal defendant prior to bringing a legal malpractice action against civil attorneys[18], Defendants' arguments are without merit and are not proper grounds for the granting of summary judgment.

### 2.   Inapplicability of In Pari Delicto Defense

Next, Defendants seek the entry of summary judgment is the common-law defense of *in pari delicto*.[19]   "The defense of *in pari delicto* 'is both an affirmative defense and an equitable defense.   Broadly speaking, the defense prohibits plaintiffs from recovering damages resulting from their own wrongdoing.'"   *O'Halloran v. Pricewaterhouse Coopers*, 969 So.2d 1039, 1044 (Fla. 4th DCA 2007) (quoting *Nisselson, Trustee of the Dictaphone Litigation Trust v. Lernout*, 469 F.3d 143, 151 (1st Cir. 2006)).   "'In its classic formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore <u>at least substantially equal</u> responsibility for his injury, because in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt.'"   *O'Halloran*, 969 So.2d at 1044 (emphasis added) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307, 314 (1985) ("[t]here

---

[18] There is no Florida case law addressing the issue of exoneration prior to filing legal malpractice actions against civil attorneys.  While Defendants' cite two cases, one from Maine and the other from Colorado[18], in arguing that "courts in other states have applied the reasoning of *Steele* to professional liability claims against civil attorneys", Defendants' reliance on these cases is wholly misplaced.  First, both the *Butler* case and the *Allen* case cited by Defendants deal with underlying guilty pleas, which, as discussed later in this memorandum, are significantly different from the plea of *nolo contendere* entered by Mirabilis.  Secondly, these cases have nothing to do with the failure to be exonerated prior to filing legal malpractice suits.

[19] In the *Motion*, Defendants assert that Mirabilis's claims are barred by the doctrine of *in pari delicto*.  See *Motion*, page 12.

was certainly no basis for concluding <u>at this stage of the litigation</u> that the [plaintiffs] were *in pari delicto* with [the defendants]") (emphasis added).

The fundamental prerequisite for application of the *in pari delicto* defense is lacking here: Plaintiff is not at equal or greater than Defendants.[20]  The evidence in this case shows that Mirabilis bears much less fault than Defendants.  A review of the allegations in the *Government's Statement of Facts* shows that there were relatively limited allegations against Mirabilis:  only two of the allegations were related to Mirabilis, those relating to Mirabilis being a conduit for one real estate purchase and having used payroll taxes for Mirabilis' last payroll.  The evidence shows that Berman was one of the key co-conspirators who actively kept the fraud from key members of Mirabilis management to insure Mirabilis could not stop it.  Defendants bear much greater fault that Plaintiff.[21]

### a.    Imputation

Defendants also assert that the imputation defense bars the claims asserted by Mirabilis.[22]  The *in pari delicto* defense can be asserted against a corporation only if misconduct can be imputed to the corporation.  *See Liquidation Comm. Of Banco Intercontinental, S.A. v. Renta*,

---

[20] The evidence of record and inferences there from show that Defendants were aware of and participated in Amodeo's overarching payroll tax fraud. Mr. Flynn and Mr. Amar both testified Berman kept this payroll tax scheme secret and thwarted their efforts to ensure payroll tax fraud was not occurring at Mirabilis.

[21] *See Cf. Freeman v. BDO Seidman, LLP (In re Bankest, L.C.)*, 2010 WL 1417732 at *7 (Bankr. S.D. Fla. 2010) (indicating that, when one has a duty to detect fraud, it cannot benefit from the fraud it failed to detect by asserting claims or defenses based on that fraud); *Moecker v. Honeywell Int'l, Inc.*, 144 F.Supp.2d 1291, 1314-15 (M.D. Fla. 2001) (denying summary judgment due to "significant disputes of material fact, and inferences of facts from the record" as to *in pari delicto* defense).

[22] In the *Motion*, Defendants' attempt to argue that a corporation's claims against a third party are barred where a corporate agent's fraud benefitted the corporation because that fraud is imputed to the corporation.  *See Motion*, pages 10–12 (*citing Seidman & Seidman v. Gee*, 625 So. 2d 1 (Fla. 3d DCA 1992).  However, Defendants' arguments are problematic because the case relied upon is distinguishable in that the *Seidman* case involves suit against an accounting firm that was hired for the purpose of discovering the fraud in which the corporation was engaged and failed to so discover said fraud.  In the present matter, suit was filed against Defendants because they specifically knew of the fraud, were conspirators in the fraud, and went to great efforts to hide the fraud.

530 F.3d 1339, 1355 (11th Cir. 2008) (explaining that the *in pari delicto* defense must be distinguished from the agency law principles that allow it to be asserted against a corporate plaintiff). State law determines when wrongful conduct should be imputed to a corporation. *Lernout*, 469 F.3d at 154. Here, Florida law applies because Mirabilis's principle place of business was Florida, and the wrongful acts are alleged to have occurred in Florida. *See O'Melveny v. Myers v. FDIC*, 512 U.S. 79, 83-85 (1994).

One of the leading cases regarding *in pari delicto* in Florida states that a bad actor's actions will not be imputed to a corporation and the defense of *in pari delicto* will fail if there are "innocent decision-makers" in the corporation. *O'Halloran* at 1045. The court in *O'Halloran* held "the presence of **any** innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation." *Id.* at 1045 (emphasis added); *See also Freeman v. BDO Seidman, LLP (In re E.S. Bankest)*, Adv. No. 06-1220-BKC-AJC-A, 2010 WL 1417732 (Bkrtcy. S.D. Fla. April 6, 2010). In *Bankest*, a United States Bankruptcy Court for the Southern District of Florida held that the presence of innocent directors barred the defendant's imputation and *in pari delicto* defenses. *Bankest*, 2010 WL 1417732 at *7-8. The *Bankest* court held that "if there are 'innocent decision-makers' at the corporation, the wrongdoing cannot be imputed to the corporation." *Id.*

In the instant matter, there is clear evidence that there were innocent decision-makers at Mirabilis.[23] Since there were the presence of "innocent decision-makers," imputation of bad acts

---

[23] Yaniv Amar was the sole shareholder of voting stock at Mirabilis. See 10/28/04 Board Meeting; Shareholders' Agreement; 2005 Auditors' Report; Stock Book; Minutes from 2006 Shareholder Meeting; Cuthill Affidavit. Further, at material times he was a director at Mirabilis, the President of Mirabilis' subsidiary AEM, which was the corporation managing payroll taxes, and the "controlling person" charged with insuring the payment of taxes. 10/14/10 Amar Depo. at 9, lines 21-22. State of Florida Department of Business and Professional Regulation Quarterly Report Form (Quarter Ending March 31, 2006). Mr. Amar specifically testified that he was unaware of the improper taking of the payroll taxes. 10/5/10 Amar Depo. at 96, lines 20-23; 10/14/10 Amar Depo. at 387, lines

by certain members of Mirabilis and therefore the defense of *in pari delicto* is unavailable to Defendants.

Even if this court were to find that *in pari delicto* is not barred by the presence of innocent decision makers in Mirabilis, the Defendants are still not entitled to summary judgment as to the defense of *in pari delicto*. *In pari delicto* is 'an affirmative defense, which Defendants have the burden to prove.'" *Martin v. Dodson*, 2010 WL 4683737 (E.D.N.Y. 2010) *quoting In re Parmalat Securities Litigation*, 659 F.Supp.2d 504, 530 (S.D.N.Y. 2009). Under Florida law, in the context of *in pari delicto* that "[a]s a general rule, a principal may be held liable for the acts of its agent that are within the course and scope of the agency." *O'Halloran*, 969 So.2d at 1044-45. *Tolz*, 332 B.R. at 230. "The party who seeks to establish the existence of such a relationship carries the burden of proof." *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F.Supp.2d 1270 (M.D.Fla. 2009). In the instant matter, the Defendants attempt to have Amodeo's actions imputed to Mirabilis because of some unspecified "agency."[24] However, the evidence adduced

---

4-8; 388, line 2. In fact, he specifically questioned Berman as to whether payroll taxes were being improperly used for business operations of Mirabilis and was assured by Berman that was not occurring and that everything was fine. 10/14/10 Amar Depo. at 105, lines 24-25; 106, lines 1-13, 16-25; 107, lines 1-20. Mr. Amar also testified that had he known about the diversion of payroll taxes, he would have told someone and stopped it. Id. at 388, line 5. Mr. Amar is an innocent decision maker as provided in O'Halloran and Bankest, and his presence bars the application of in pari delicto to Mirabilis. Another innocent decision-maker was Edith Curry. Ms. Curry was elected as an officer of Mirabilis in 2005, became a director in 2006, and served at various times on the audit/risk committee and executive committee. See 1/3/05 Board Meeting. Ms. Curry specifically testified that she was unaware of the theft of the payroll taxes even though she was an officer, director and served on important committees. 5/14/09 Sentencing Hearing at 119-20, lines 20-3. Ms. Curry testified that she was not advised of any plan to use payroll taxes for operating expenses and instead was told that prior delinquent payroll taxes were being repaid by cost saving measures. Id. She clearly qualifies as an innocent decision maker whose presence bars application of in pari delicto to Mirabilis.

[24] Defendants focus solely on the incorrect "fact" that Amodeo "controlled Mirabilis". *See Motion*, pg. 10. In support of this incorrect "fact", and as a incorrect basis for issue preclusion, Defendants' cite the Order Granting Summary Judgment in the *Palaxar* case (Exhibit 23) as being sufficiently final to have preclusive effect. *See Motion*, pg. 10, fn. 8. However, Defendants reliance on issue preclusion is now baseless because the *Palaxar Order* has been vacated. *See Order* vacating *Palaxar Order* (Doc. 339 in Case No. 6:07-cv-1788-Orl-28KRS)(Exhibit 24). Since the *Palaxar Order* has been vacated, it has absolutely no preclusive effect. *See Corp. of Lloyd's v. Lloyd's U.S.*, 831 F.2d 33, 36 (2d Cir. 1987) (stating, "Of course, vacating the order removes any res judicata or collateral estoppel effect it might have"); *see also Delta Air Line, Inc. v. McCoy Restaurants, Inc.*, 708 F.2d 582, 585 (11th Cir. 1983) (providing that the parties properly did not rely on a vacated judgment in a federal suit, as a vacated

establishes that Amodeo was neither an officer nor a director of Mirabilis. *See 10/28/04 Board Meeting*; *2005 Auditors' Report*; *Stock Book*; *Minutes from 2006 Shareholder Meeting*; *Cuthill Affidavit*. In fact, Amodeo was not even an employee of Mirabilis. *Cuthill Affidavit*; *Minutes from Board Meetings*. Even though the Defendants have the burden to establish the purported agency which allegedly forms the factual basis of *in pari delicto* and the scope of the alleged agency, the Defendants cite no evidence of agency in their *Motion*.

Furthermore, this case falls within the "adverse interest exception" to imputation. "[I]f a corporate agent was 'acting adversely to the corporation's interests, the knowledge and misconduct of the agent are not imputed to the corporation.'" *O'Halloran*, 969 So.2d at 1045 (quoting *State Dep't of Ins. v. Blackburn*, 633 So.2d 521, 524 (Fla. 2d DCA 1994). If "the agent's misconduct is calculated to benefit the agent and harms the corporation, the agent has forsaken the corporation and acts only for himself," and the adverse interest exception applies. *Welt v. Efloortrade, LLC (In re Phoenix Diversified Investment Corp.)*, --- B.R. ---, 2010 WL 4483361 (S.D. Fla. Nov. 1, 2010).

Amodeo, Mr. Holtz, and Berman tried to conceal the payroll tax fraud from the innocent directors, such as Mr. Amar and Ms. Curry. Mr. Amar testified that, when he asked about payroll taxes, he was assured that everything was in "fine order" and that they were not being used for operating expenses. Ms. Curry testified that she was misled regarding the solution for the payroll tax problem. When an agent intentionally attempts to keep certain actions from a company, it can be inferred that those actions are adverse to the company. *See Joel Strickland Enters., Inc. v. Atlantic Disc. Co.*, 137 So.2d 627, 629 (Fla. 1st DCA 1962) (stating that

---

ruling has no precedential value). As such, it is apparent that the purported control of Mirabilis by Mr. Amodeo is not a precluded issue, and accordingly Defendants have failed to assert any valid matter of issue preclusion in their *Motion*.

imputation is improper "where the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, as where an agent is in reality acting in his own business of for his own personal interest an adversely to the principal"). Here, Berman actively deceived Mirabilis's management, including Mr. Amar as set forth in Mr. Amar's express testimony.[25]

### b. Innocent Successor and Insider Exceptions to the *In Pari Delicto* Defense

There are additional exceptions to the *in pari delicto* defense which need to be identified and addressed, specifically the innocent successor exception and the insider exception.   In a typical bankruptcy case, the commencement of the case creates an estate which consists of all legal and equitable interests of the debtor in property, among other things.  *See* 11 U.S.C. § 541.  Because the language of § 541 provides that the estate consists of all interests of the debtor in property "as of the commencement of the case," courts have held that post-petition events should not be considered when evaluating a claim in bankruptcy.  *See, e.g., Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006); *Lafferty & Co.*, 267 F.3d at 355-37.  Therefore, claims brought by a bankruptcy trustee standing in the shoes of a debtor typically are subject to the same defenses that could be raised against the debtor.  *See id.*

There is an important difference between this case and the typical bankruptcy case, however. Here, Mr. Cuthill was validly installed as president of Mirabilis prior to the filing of the Chapter

---

[25]   While Defendants, in the *Motion*, do not mention the "sole actor" exception to the adverse interest exception directly, their sole focus on Amodeo appears to intimate said exception.   As such, the "sole actor exception" is worth mentioning.  Under the sole actor exception, "[i]f an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's" *Tolz v. Proskauer Rose, LLP (In re Fuzion Technologies Group, Inc.),* 332 B.R. 225, 231 (Bankr. S.D. Fla. March 2, 2005).  Defendants assert that Amodeo controlled Mirabilis.  However, control does not meet the standard for the "sole actor" exception.  *See* O'Halloran, 969 So. 2d 1039, 1045 (Fla. 2d DCA 2007) (explaining that the sole actor exception applies "where the corporate actors whose conduct is at issue were the 'alter egos' of the corporation"; that is "[w]here a corporation is wholly dominated by persons engaged in wrongdoing").   As previously provided, Amodeo did not control Mirabilis, and there has been no evidence presented that Amodeo was the "alter ego" of Mirabilis.

11 petition.  *See Order Affirming Denial of Dismissal* at 5-6.  As such, any of Mirabilis's previous corrupt management team was replaced with an innocent successor prior to the commencement of the bankruptcy case.  In such circumstances, the *in pari delicto* defense does not apply.[26]

At least two federal courts have considered the issue within the last two years.[27]  In *Le-Nature*, a custodian ran the debtor-corporation for a short period of time prior to the filing of the corporation's bankruptcy petition.  *Kirschner*, 2009 WL 3571331 at *3.  The court found that the corporation "essentially rid itself of corrupt influence of certain corporate officers *prior* to the bankruptcy filing . . . ."  *Id.* at *6 (emphasis in original).  The court concluded that the application of the *in pari delicto* defense is inappropriate in circumstances where a corporation's previous wrongdoers are replaced with innocent successors prior to the filing of the bankruptcy petition.  *Id.*; *see also Bankest II,* 2010 WL 2926203 at *2.

Cuthill is in a position similar to Kirschner.  *Cf. Kirschner*, 2009 WL 3571331 (Sept. 16, 2009) at *5-6; *see also Lafferty & Co.*, 267 F.3d at 358 (stating in the receivership context that "several courts have declined to apply in pari delicto to bar the receiver from asserting the claims of an insolvent corporation on the ground that application of the doctrine to an innocent successor would be inequitable").  This is because the rationale underlying the *in pari delicto* defense "falls out [once the schemer] has been ousted from control of and beneficial interest in

---

[26] *Compare Edwards*, 437 F.3d 1145 at 1150 *with Freeman v. BDO Seidman, LLP (In re Bankest, L.C.)*, Adv. No. 06-1220-BKC-AJC-A, 2010 WL 2926203 at *2 (Bankr. S.D. Fla. July 23, 2010) (*Bankest II*).

[27] A United States District Court and a United States Bankruptcy Court in the Southern District of Florida have applied the innocent successor exception in circumstances similar to those here.  *See Kirschner v. Wachovia Capital Markets, LLC (In re Le-Nature's, Inc.)*, MDL No. 2021, W.D. Pa. No. 2:09-mc-162, Civil Action No. 08-1518, 2009 WL 3571331 (W.D. Pa. Sept. 16, 2009) *reconsideration denied* 2009 WL 3526569 (W.D. Pa. Oct. 23, 2009); *Bankest II,* 2010 WL 2926203 at *2 (following *Le-Nature*).

the corporations." *Scholes v. Lehman*, 56 F.3d 750, 754 that (7th Cir. 1995).[28]  Based on the foregoing, Mr. Cuthill is an innocent successor to whom the *in pari delicto* defense does not apply.

There is also an insider exception to the *in pari delicto* defense.  "While *in pari delicto* may be used as a defense to bar a corporation or successor bankruptcy trustee's claims against third parties, it does not apply to bar claims against corporate insiders." *Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007) (citations omitted); *see also In re Oakwood Homes Corp.*, 340 B.R. 510, 536 (Bankr. D. Del. 2006) (stating that "[*i*]*n pari delicto* does not provide a defense for insiders").[29]

Here, Berman was a member of the Board.  "[W]hen wrongful acts are committed against a corporation by its officers and directors, the wrongful nature of such acts is not imputed to the corporation." *Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 610 (Bankr. D. N.H. 2007).

### c.  Disputing Claims that Previous Conviction establishes the *In Pari Delicto* Defense

---

[28] In *Scholes*, Judge Posner explained when a corporate wrongdoer is removed and replaced by an innocent successor, the taint of wrongdoing no longer exists, and the *in pari delicto* defense should not apply:

> The appointment of the receiver removed the wrongdoer from the scene.  The corporations were no more [the schemer]'s evil zombies.  Freed from his spell they became entitled to the return of the moneys—for the benefit not of [the schemer] but of innocent investors—that [the schemer]s had made the corporations divert to unauthorized purposes. . . .
> Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated.  Now that the corporations created and initially controlled by [the schemer] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by [the schemer].

*Id.* at 755-56 (citations omitted).

[29] Unlike the remaining exceptions argued herein, the undersigned has found no Florida or Eleventh Circuit cases expressly discussing the insider exception.  However, based upon the persuasive reasoning of these cases and their consistency with Florida law, the undersigned respectfully suggests it would be adopted in Florida.

In their *Motion*, Defendants also argue that Mirabilis' previous conviction[30] establishes the *in pari delicto* defense.  In citing cases supposedly supporting the assertion that the facts underlying the *nolo contendere* plea and the resulting conviction are admissible[31], Defendants fail to point out that none of the cited cases apply to a conviction arising from a plea of *nolo contendere* to a defense of *in pari delicto* or any other element of any defense.  The *Wyatt* case deals specifically with the use of convictions for impeachment purposes pursuant to Rule 609, Federal Rules of Evidence and the use of a conviction for purposes of admissibility of crimes or other bad acts to prove intent pursuant to Rule 404(b), Federal Rules of Evidence.  The *Adedoyin* case deals with the use of a conviction for the sole purpose of establishing a prior felony conviction.  Finally, the *Burrell* case simply construes Connecticut law as establishing that a conviction pursuant to an *Alford* plea is a prior conviction for purposes of 18 U.S.C. § 922(g)(1).

In their *Motion,* Defendants do not seek to use Mirabilis' conviction and the facts of the conviction for impeachment purposes or as evidence of crimes or other bad acts or to simply establish the existence of a prior conviction.  Defendants are actually trying to use Mirabilis' conviction and the facts of the conviction to establish Mirabilis' guilt and to prove the elements necessary to establish the defense of *in pari delicto*.  However, Defendants fail to point out in their *Motion* that applicable case law clearly provides that **convictions** based on *nolo contendere* pleas are **not admissible** for purposes of proving that the pleader is actually guilty of the crime

---

[30] The conviction referenced is based on Mirabilis' June 16, 2010 plea of *nolo contendere* to the allegations against it, asserting that Mirabilis was part of a conspiracy between Mr. Amodeo and certain named and unnamed co-conspirators to misdirect payroll taxes from clients of AEM, a Mirabilis subsidiary.  *See Transcript of June 16, 2010 Hearing on Change of Plea* (Case No. 6:08-cr-231-Orl-28KRS) (Exhibit 25).

[31] *See Motion*, pg. 14 (*citing United States v. Wyatt*, 762 F.2d 908, 911 (11th Cir. 1985) "(holding that a *nolo contendere* plea does not insulate the facts underlying it from admissibility under Fed. R. Evid. 404(b)); *See also United States v. Adedoyin*, 369 F.3d 337, 343-44 (3d Cir. 2004) ([supposedly providing] that Fed. R. Evid. 410 does not prohibit the admission of a conviction on a plea of *nolo contendere* as opposed to the plea itself, because the plea 'has the same legal consequences as a plea of guilty and results in a conviction'); *Burrell v. United States*, 2002 WL 31051594, *3, n. 3 (E.D.N.Y. Aug. 19, 2002) (a conviction based upon a *nolo* plea is a final adjudication, and thus 'the admissibility and the collateral consequences of the conviction are not determined by Rule 410')."

in question.[32]  Furthermore, Defendants fail to point out that there is no case law in Florida supporting the use of a *nolo contendere* plea and/or conviction as a basis for the defense of *in pari delicto*. Accordingly, Defendants' attempt to establish that Mirabilis' conviction precludes its current claims is completely without merit.

### 3.  Collateral Estoppel

#### a.    Overview of Collateral Estoppel Law

Mirabilis previously pleaded *nolo contendere* to the allegations against it, asserting that Mirabilis was part of a conspiracy between Amodeo and certain named and unnamed co-conspirators to misdirect payroll taxes from clients of AEM, a Mirabilis subsidiary.  "A plea of nolo contendere is a mere statement of unwillingness to contest and no more. It is not receivable in another proceeding as evidence of guilt."  *Mickler v. Fahs*, 243 F.2d 515, 517 (5th Cir. Fla. 1957).  Specifically, as provided in Rule 410, Federal Rules of Evidence, a *nolo contendere* plea is not admissible in any civil or criminal action, case, or proceeding against the person who made the plea.  *See* Fed. R. Evid. 410.  By entering a *nolo contendere* plea, a defendant actually resolves the litigation in question in a manner which specifically avoids an admission of any guilt in subsequent litigation. *See United States v. Williams*, 642 F.2d 136 (5th Cir. 1981).

Collateral estoppel bars relitigation of an issue previously decided if the party against whom the prior decision is asserted had 'a full and fair opportunity' to litigate that issue in an earlier case.  *See Blohm v. Comm'r of Internal Revenue*, 994 F.2d 1542, 1553 (11th Cir. 1993). The party seeking to invoke collateral estoppel must establish that (1) the issue in the pending case is identical to that decided in a prior proceeding; (2) the issue was necessarily decided in the

---

[32] *See Adedoyin*, 369 F.3d 344 (*citing Olsen v. Correiro*, 189 F.3d 52, 58-62 (1st Cir. 1999) (providing that convictions based on pleas of *nolo contendere* are admissible to prove the fact of conviction only, and that a plea of *nolo contendere* is not an admission of guilt and thus the fact that a defendant made such a plea cannot be used to demonstrate that he was guilty of the crime in question).

prior proceeding; (3) the party to be estopped was a party or was adequately represented by a party in the prior proceeding; and (4) the precluded issue was actually litigated in the prior proceeding. *See Blohm*, 994 F.2d at 1553.

This Court has already opined as to the collateral estoppel effect of this specific *nolo contendere* plea and subsequent conviction of Mirabilis in this case. *See United States v. AEM, Inc.*, 718 F. Supp.2d 1334 (M.D. Fla. 2010). In providing consent for Mirabilis to change its previous plea and enter a plea of *nolo contendere*, this Court stated:

> In this instance, the Receiver believes that pleas of guilty would result in his being legally estopped from pursuing civil actions for professional malpractice on behalf of the Corporate Defendants, whereas nolo pleas will not have the same effect. This Court would be skeptical of such an argument if the civil case were for the benefit of the criminal defendants. That, however, is not the situation here. The only potential beneficiaries of the civil action are the innocent creditors of the Corporate Defendants, including the Government. Under the circumstances of this case, there is value in allowing the civil litigation to proceed on its merits.

*See id.*

### b.    No Preclusive Effect for Collateral Estoppel in the Present Matter

In the *Motion*, Defendants ignore the above statements of this Court regarding Mirabilis' forfeiture judgment and *nolo contendere* plea and conviction, and instead Defendants purport to argue that Mirabilis' forfeiture money judgment[33] and Mirabilis' conviction based on the plea of *nolo contendere*[34] are admissible and have preclusive effect. *See Motion*, pgs. 15 and 17.

---

[33] Defendants cite *U.S. v. Weiss*, 467 F.3d 1300 (11th Cir. 2006) as upholding collateral estoppel effect of criminal forfeiture order. *See Motion*, page 17.

[34] Defendants cite *Walker v. Schaeffer*, 854 F.2d 138 (6th Cir. 1988) for the proposition that a conviction based on a no contest plea has collateral estoppel effect in subsequent civil litigation in which the criminal defendant is the civil plaintiff. Defendants' also cite the following cases which cite and/or follow *Walker*: *Morrison v. Board of Trustees of Green Tp.*, 529 F. Supp. 2d 807, 818-19 (S.D. Ohio 2007); *Daubenmire v. City of* Columbus, 452 F. Supp. 2d 794, 807 (S.D. Ohio 2006); *Shelton v. City of* Taylor, 92 F. App'x 178, 183 (6th Cir. 2004); *Brown v. Theos*, 550 S.E.2d 304 (S.C. 2001); *Rose v. Uniroyal Goodrich Tire Co.*, 219 F. 3d 1216, 1220-21 (10th Cir. 2000); *Behm v. Campbell*, 925 So. 2d 1070 (Fla. 5th DCA 2006); *Alatraqchi v. City and County of San Francisco*, 2001 WL 637429 (N.D. Cal. May 30, 2001); *Delong v. State ex rel. Oklahoma Dept. of Public Safety*, 956 P.2d 937 (Okla.Civ.App.1998).

However, Defendants' reliance on the cited cases is improper, as the cited cases are wholly distinguishable from the present matter.

First, Defendants cite the *Weiss* case in support of their assertion that the forfeiture money judgment estops Mirabilis from contesting the findings of the Court regarding its criminal conduct. However, Defendants are stretching the actual holding in *Weiss*. While *Weiss* does address collateral estoppel issues and does involve a forfeiture money judgment, in *Weiss*, it is not the existence of the forfeiture money judgment which is the determinative basis for estoppel. *See Weiss*, 467 F.3d at 1308-1310. Rather, in *Weiss*, which involves standing to challenge the ownership of a mortgage, the issue before the court was whether the issue decided in the prior proceeding was identical to the issue in the case now before the court: namely, the ownership of a mortgage. *See id.* at 1308. Ultimately, *Weiss* was decided on the basis of issue preclusion, not on the basis of the existence of a forfeiture money judgment.

In the present case, Defendants have not established that any issues it would attempt to preclude would bar the current claims. Issue preclusion is limited to issues which were "critical and necessary" for a decision in the matter. *See Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000). Here the specific allegations against Mirabilis in the *Government's Statement of Facts* primarily involve allegations that in May 2006, Mirabilis passed through approximately $1.5 million dollars of payroll taxes to Hoth Holdings, Inc. and used some payroll tax funds for its last payroll in December 2006.[35] The other allegations related to Mirabilis describe what

---

[35] The allegations in the Government's statement of the facts never identify what officer or director of Mirabilis took the illegal action. Corporations can act only through natural persons, and accordingly, any illegal action must have been undertaken by natural persons. During both times at issue, specifically the May 2006 pass through of approximately $1.5 million dollars of payroll taxes by Mirabilis to Hoth Holdings, Inc. and the December 2006 use of some payroll tax funds for Mirabilis' last payroll, Berman was a member of the Board of Mirabilis. Thus, assuming facts for the purposes of issue preclusion, it cannot be assumed from these facts that it was not Berman, Wildermuth, and/or BKR who permitted the illegal action on behalf of Mirabilis. This is especially true here, where the evidence clearly supports the position that Berman knew of, participated in, and attempted to hide the existence

could be innocent activity of Mirabilis.  Thus, even if issue preclusion is applied, the issues which Mirabilis would be precluded from relitigating are its involvement in relatively limited allegations of passing through these payroll tax funds.[36]

Second, Defendants cite *Walker* and its progeny and cases following the rationale in *Walker*, for the proposition that a conviction based on a *nolo contendere* plea has collateral estoppel effect in subsequent civil litigation in which the criminal defendant is the civil plaintiff.  *See Motion*, pages 17-20; *See* fn. 21.  However, each of the cases cited are wholly distinguishable from the present matter.  The majority of the cases cited by Defendants involve civil rights complaints filed against law enforcement pursuant to 42 U.S.C. Section 1983.[37]  Several of the cases cited by Defendants also involve false arrests claims against law enforcement.[38]  In such cases, the facts involve law enforcement arresting an individual, the individual pleading *nolo contendere* to the criminal charges against it, and then the individual turning around and attempting to civilly sue law enforcement for civil rights violations or for false arrests.  Such cases are highly fact-sensitive, and in such cases, courts have understandable held that Federal Rule of Evidence 410 will not be used to prevent the preclusive effect of such *nolo contendere* pleas in subsequent civil proceedings in which the defendants are now plaintiffs.  The rationale in those cases is quite simple:  Courts simply decline to interpret Federal Rule of Evidence 410

---

of the plan not to pay the payroll taxes.  See *Flynn Depo.*, page 154, lines 6-8, 103, lines 2-10, 102-103, lines 24-1, 103, lines 2-10.  Such actions would not support Berman's reliance on these facts for his defense.

[36] By comparison, the evidence tends to show that Berman sat in conspiracy with Amodeo and Holtz to hide a much larger payroll tax scheme from the officers and directors of Mirabilis and its subsidiary AEM.  Thus, these are not the same acts, nor is the culpability of Mirabilis necessarily the same as that of Berman, Wildermuth, and BKR.  The factual disputes bar summary judgment as the precluded issues (if any) do not support the defense of *in pari delicto*. *See Moecker*, 144 F. Supp.2d at 1350.

[37] *See Walker*, 854 F.2d at 138; *Morrison* 529 F. Supp. 2d at 807; *Daubenmire,* 452 F. Supp. 2d at 794; *Shelton,* 92 F. App'x at 178.

[38] *See Delong,* 956 P.2d at 937; *Behm*, 925 So. 2d at 1070; *Alatraqchi*, 2001 WL 637429.

so as to allow the former defendants to use the plea offensively, in order to obtain damages, after having admitted facts which would indicate no civil liability on the part of the arresting police. *See Walker*, 854 F. 2d at 143.

The facts in the present case are significantly different from the facts in the cited civil rights and false arrest cases. Specifically, in the present case, Mirabilis did not admit facts which would indicate that there is no civil liability on the part of Berman, Wildermuth, or BKR. Essentially, Defendants are attempting to make the general holding that Federal Rule of Evidence 410 does not prevent the preclusive effect of *nolo contendere* pleas in subsequent civil proceedings in which defendants are now plaintiffs. It is inaccurate for Defendants to state such general holdings without explaining the specific facts and rationales underlying said holdings. It is notable that Defendants do not cite any cases where a court has prevented the preclusive effect of *nolo contendere* pleas in subsequent civil proceedings involving civil legal malpractice claims in which a previous criminal defendant is now a plaintiff. [39] The reason that Defendants fail to cite any such cases is because there are no such cases with facts remotely similar to the present facts. If this Court were to agree with Defendants' assertions that Mirabilis' *nolo contendere* plea alone bars Mirabilis's legal malpractice suit against Defendants, this Court would be the first Court to rule in such a manner based upon such a factual situation in which the previous criminal *nolo contendere* plea did not admit facts which would indicate that there is no civil liability on the part of the individuals later sued civilly. Defendants' attempt to establish that Mirabilis' conviction precludes its current claims is without merit, is a drastic extension of

---

[39] Defendants do cite *Brown,* 550 S.E.2d at 304, which addresses civil suit against a criminal defense attorney. However, as previously addressed in this memorandum, there is a significant distinction between subsequent suit against civil attorneys as opposed to subsequent suit against criminal attorneys based upon representation in criminal conviction matters. Defendants also cite *Rose,* 219 F. 3d at 1216, which addresses the admissibility of a previous criminal conviction in a civil suit against an employer for false firing when the criminal conviction is used to establish why the firing occurred. On its face, such a case presents completely distinguishable facts from the present matter.

current case law, and should not be allowed as a basis for granting summary judgment in this matter.

### 4. Unclean Hands

Plaintiff does not dispute Defendants' assertions that disgorgement is an equitable remedy or that Plaintiff's claim for an accounting is equitable in nature. *See Motion*, page 21. As such, Plaintiff agrees with Defendants' assertion that the equitable defense of unclean hands is an appropriate defense to such equitable remedies and claims. However, Plaintiff notes that the threshold for a valid "unclean hands" defense is willful misconduct, not merely negligent misconduct.[40] Furthermore, intent is a question of fact which is not easily resolved on a motion for summary judgment. *See Guthartz v. Park Ctr. West Corp.*, 2009 U.S. Dist. LEXIS 12409 (S.D. Fla. Feb. 5, 2009).

As previously discussed, the specific allegations against Mirabilis in the *Government's Statement of Facts* primarily involve allegations of the passing through of limited payroll tax funds that Amodeo took from Presidion due to his control of it. The facts asserted in the present litigation are that Berman sat in conspiracy with Amodeo and Holtz to hide a much larger payroll tax scheme from the officers and directors of Mirabilis and its subsidiary AEM. Plaintiff is specifically seeking disgorgement of any payments and benefits received by Defendants, in the form of legal fees paid to Defendants by Plaintiff. Furthermore, regarding Plaintiff's request for an accounting, it remains unclear the source of the funds in question. As such, there are valid issues of fact as to intent and whether the conduct purportedly constituting Plaintiff's "unclean hands" is connected with the matter in the current civil litigation. Accordingly, summary

---

[40] *See Eresch v. Braecklin*, 133 F. 2d 12, 14 (10th Cir. 1943) (*citing* 30 C.J.S. Equity, Section 95a); *Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 308 (9th Cir. 1982) (providing that "bad intent" is the essence of the defense of unclean hands).

judgment is precluded.

### 5.      Claim for Damages

Defendants assert that Mirabilis is unable to recover the damages that Mirabilis seeks by mischaracterizing the nature of damages that it is seeking.  Mirabilis is seeking compensatory damages based on Defendants negligent actions, intentional breach of fiduciary duties, and negligent supervision.  *Fourth Amended Complaint*.[41]

A proper measure of damages suffered as a result of professional negligence which result in adverse tax consequences includes interest and penalties suffered as a result of those actions.[42] *Ducote Jax Holdings, LLC v. Bradley*, 335 Fed.Appx. 392, 401 (5th Cir. 2009) (holding that damages represented the difference between the amount of money plaintiffs would have paid the IRS and the amount they eventually paid); *see also P.H. Glatfelter Co. v. Lewis*, 746 F.Supp. 511, 519 (E.D. Penn. 1990) (holding that damages accrued as a result of accountant's actions upon assessment by IRS of penalties and interest).  In the instant matter, these types of damages are exactly included in what Mirabilis is claiming--the interest and penalties suffered as a result of Defendants' negligence and breach of fiduciary duties.[43]

---

[41] These damages include the $200,000,000.00 Unsecured Claim that Mirabilis had to consent to with the United States of America.  (DE 101 in bankruptcy).  The Unsecured Claim includes penalties and interest incurred, along with payroll taxes and other miscellaneous items.  *Cuthill Depo.* at 299-300, lines 18-22.  These damages were incurred as a direct result of Defendants' negligence and breach of fiduciary duties.

[42] Defendants emphasize that Mirabilis has not paid all or any part of the $200,000,000.00 forfeiture money judgment and intimates that accordingly no claim for damages will lie.  *See Motion*, pg. 24.  This is simply factually untrue.  Mirabilis had to surrender numerous assets after the entering of the Oder Approving Compromise of Controversy by and among Debtors and the United States of America.  (DE 146 in bankruptcy).  Furthermore, whether or not Mirabilis paid any of the damages suffered as a result of Defendants' actions is immaterial.  It is the incurring of the liability and not the payment of a liability that is the triggering point.  Florida follows the "judgment rule" and not the "payment rule" when determining if liability attaches.  *See American Fire & Cas. Co. v. Davis*, 146 So.2d 615 (Fla. 1st DCA 1962).  In the instant matter, the "payment rule" would make no sense.  Under the "payment rule", if a bad actor was efficient enough to completely destroy a company so that the company could not make any payments, he would be better off than if he only partially damaged a company so that the company could make some payments.  This would be an absurd and illogical result and does not reflect the state of the law in Florida.

[43] Defendants attempt to mischaracterize Mirabilis' claims as claims of common-law indemnity.  *See Motion*, pg. 24.

In an attempt to shove Mirabilis' causes of action into an indemnification claim, Defendants cite *UCAR Int'l, Inc. v. Union Carbide Corp.*, 2004 WL 137073 (S.D.N.Y. 2004) for the proposition that "where a corporation's damage claims against third parties are the result of a common set of operative facts through which it committed wrongdoing, those damages are 'nothing more than a veiled and improper attempt to seek contribution and indemnification' that will not be allowed"). *Motion* at 25. However, this is a gross mischaracterization of *UCAR Int'l, Inc.* In *UCAR Int'l, Inc.*, the plaintiffs signed an agreement that it would not seek indemnification against defendants for certain damages regarding certain actions taken by defendants, including penalties incurred as a result of a criminal and civil liability. *Id* at 9. Unsurprisingly, when the plaintiffs sued defendants for damages incurred out of those actions, the court found that the gravamen of the complaint was for indemnification for the damages incurred. *Id* at 9-10. The court would not allow the plaintiffs to maneuver around its indemnification agreement. This is a far cry from this matter and the proposition that the Defendants claim that the case supports. In fact, as stated above, courts have routinely allowed plaintiffs to recover from professionals for penalties and interest incurred as a result of professional negligence without a finding that it was for "indemnification."

### III. CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests the Court to deny *Defendants' Motion for Summary Judgment* (Doc. 80).

---

On the Fourth Amended Complaints' face, Mirabilis is suing for negligence, breach of fiduciary duties, and negligent supervision. In no place in the Fourth Amended Complaint is Mirabilis seeking indemnification. Therefore, Defendants' cited case law regarding indemnification is irrelevant.

**BROAD AND CASSEL**
Attorneys for Mirabilis Ventures, Inc.
390 North Orange Avenue, Suite 1400
Orlando, Florida  32801
Telephone:     (407) 839-4200
Facsimile:     (407) 425-8377

By:          */s/ Todd K. Norman*
             Todd K. Norman, Esquire
             Florida Bar No. 0062154
             tnorman@broadandcassel.com
             Roy S. Kobert, Esquire
             Florida Bar No. 777153
             rkobert@broadandcassel.com

<u>**CERTIFICATE OF SERVICE**</u>

   **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via regular U.S. Mail this 17th day of December, 2010 to: D. David Keller, Esquire, Keller Landsberg, P.A., Broward Financial Centre, Suite 1400, 500 East Broward Boulevard, Fort Lauderdale, Florida 33394 and Bradley M. Saxton, Esquire, Winderweedle, Haines, Ward & Woodman, P.A., Post Office Box 1391, Orlando, Florida 32802-1391.

By:          */s/ Todd K. Norman*
             Todd K. Norman, Esquire
             Florida Bar No. 0062154
             tnorman@broadandcassel.com
             Roy S. Kobert, Esquire
             Florida Bar No. 777153
             rkobert@broadandcassel.com