1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.  6:07-CV-1788-ORL-28-GJK

MIRABILIS VENTURES, INC., and
NEXIA STRATEGY CORPORATION,

           Plaintiffs,

     v.

PALAXAR GROUP, LLC,                    COPY
PALAXAR HOLDINGS, LLC,
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERENCE CHU,

           Defendants,

vs.

MIRABILIS VENTURES, INC., et al.,

           Counterclaim and
           Third Party Defendants.

- - - - - - - - - - - - - - - - x

           866  South Dixie Highway
           Coral Gables, Florida
           October 5, 2010
           9:30 a.m. - 4:50 p.m.

DEPOSITION OF YANIV AMAR

     Taken Before JAN L. BRONIS, a Notary Public
for the State of Florida at Large, pursuant to
Notice of Taking Deposition filed in the above
cause.

---

2

APPEARANCES

The Havener Law Firm, LLC
15511 Russell Road
Chagrin Falls, Ohio 44022
BY:  KATHLEEN B. HAVENER, ESQ.
On behalf of the Counterclaim Plaintiffs
Tele: (440) 893-01888

Broad & Cassel
390 North Orange Street, Suite 1400
Orlando, Florida 32801
BY:  NICOLETTE VILMOS, ESQ. (By Telephone)
On behalf of Mirabilis and Nexia
Tele: (407)839-4200


ALSO PRESENT

EDITH CURRY

AARON BATES (By Telephone)

---

3

INDEX

YANIV AMAR                              5

DIRECT EXAMINATION BY MS. HAVENER       6


EXHIBITS

Plaintiff's Exhibit 450 for            130
Identification
Plaintiff's Exhibit 451 for            131
Identification
Plaintiff's Exhibit 452 for            142
Identification
Plaintiff's Exhibit 453 for            157
Identification
Plaintiff's Exhibit 454 for            160
Identification
Plaintiff's Exhibit 455 for            165
Identification
Plaintiff's Exhibit 456 for            172
Identification
Plaintiff's Exhibit 457 for            177
Identification
Plaintiff's Exhibit 458 for            188
Identification
Plaintiff's Exhibit 459 for            194
Identification
Plaintiff's Exhibit 460 for            200
Identification
Plaintiff's Exhibit 461 for            207
Identification
Plaintiff's Exhibit 462 for            220
Identification
Plaintiff's Exhibit 463 for            224
Identification
Plaintiff's Exhibit 464 for            225
Identification
Plaintiff's Exhibit 465 for            236
Identification
Plaintiff's Exhibit 466 for            240
Identification
Plaintiff's Exhibit 467 for            244
Identification
Plaintiff's Exhibit 468 for            255
Identification

---

4

EXHIBITS (CONTINUED)

Plaintiff's Exhibit 469 for            261
Identification
Plaintiff's Exhibit 470 for            264
Identification
Plaintiff's Exhibit 471 for            268
Identification
Plaintiff's Exhibit 472 for            293
Identification
Plaintiff's Exhibit 473 for            296
Identification
Plaintiff's Exhibit 474 for            299
Identification
Plaintiff's Exhibit 475 for            303
Identification

**EXHIBIT**
**11**
tabbies

5

1  Thereupon--
2        YANIV AMAR
3  was called as a witness by the Third Party
4  Plaintiffs, and, having been first duly sworn,
5  testified as follows:
6        MS. HAVENER:  Can we enter appearances,
7  please?  My name is Kathleen Havener for the
8  Counterclaim Plaintiffs, Edith Curry, Frank
9  Hailstones, Palaxar, P-a-l-a-x-a-r, Group,
10  LLC, and Palaxar Holdings, LLC.
11        And, Nicolette, do you want to go next?
12        MS. VILMOS:  Yes.  This is Nicolette
13  Vilmos on behalf of Mirabilis.
14        MS. HAVENER:  And do you want to say your
15  law firm and stuff?
16        MS. VILMOS:  My law firm is Broad & Cassel
17  and I'm out of the Orlando office; 390 North
18  Orange Avenue, Suite 1400, Orlando, Florida
19  32801.
20        MS. HAVENER:  Are you also appearing for
21  Nexia?
22        MS. VILMOS:  I guess I am appearing for
23  Nexia.  Thank you.  Mirabilis and Nexia.
24        MS. HAVENER:  Okay.
25

6

1                DIRECT EXAMINATION
2  BY MS. HAVENER:
3        Q.   And you?
4        A.   Yaniv Amar, representing myself.
5        Q.   And would you give her your address,
6  please?
7        A.   3475 Northeast 191st Street, Number 10,
8  Aventura, Florida 33180.
9        Q.   Mr. Amar, have you ever had your
10  deposition taken before?
11        A.   No.
12        Q.   For the record, and for the benefit of
13  ourselves and the court reporter, I want to just
14  tell you what the ground rules are.  Have you ever
15  attended a deposition before?
16        A.   No.
17        Q.   I'm going to be asking you questions for
18  the record.  It's exactly as if you have sworn an
19  oath before a jury in front of a court of law.  I
20  presume you take the oath very seriously.  I know
21  you're an observant -- a religious person.
22  They are for the record, they can be read to the
23  jury or to the judge, they can be used for purposes
24  of impeaching you at trial, they can be used for
25  many purposes.  But it's exactly as if you're

7

1  appearing in a courtroom.
2        The most important thing from my perspective
3  is that you make sure that you understand the
4  question I'm asking you.  So if you don't
5  understand, please let me know.  Because I don't
6  want you to answer a question that you think I'm
7  asking but I'm not asking.
8        A.   Okay.
9        Q.   So I'd like to have your agreement that if
10  you don't know exactly what I'm asking you, please
11  let me know so that I can clarify the question for
12  you.
13        The second thing is, because we're both being
14  recorded and the court reporter is taking down what
15  we're saying, I want us to be as courteous as we
16  can to each other and to please be careful not to
17  speak over each other.  I have a very bad habit, I
18  acknowledge, of interrupting if I think you're
19  answering a question that I didn't mean to ask.
20  And so please remind me to let you finish your
21  answer, and then, if I'm correct, I'll say, "That's
22  not the question I was asking; here's what I'm
23  asking."
24        A.   Fine.
25        Q.   But she can't take down what we're saying

8

1  if we're talking at the same time.  So it's just to
2  make it much easier for her.
3        A.   Okay.
4        Q.   The other things are just, you know,
5  customary.  I have no intention of being too
6  personal or inquiring into things that are not my
7  business, but just to make sure that it's
8  appropriate for us to continue, I want to make sure
9  that you haven't taken any kind of drug in the last
10  24 hours that would impair your memory or would
11  make you unable to answer questions.
12        A.   I have not.
13        Q.   And you haven't indulged in alcohol this
14  morning or anything else that would make it hard
15  for you to answer questions?
16        A.   No.  No, I have not.
17        Q.   Okay.  And if for any reason you don't
18  understand what I'm saying, please make sure that
19  you let me know.  You can take a break whenever you
20  want.  Just let me know that you need to take a
21  break.  Other than when it's not appropriate to
22  take a break is when there's a question pending.
23  And the only reason that that would be okay is if
24  there's some reason why you think you might need to
25  go speak to your counsel.  But given that you're

9

1   not represented and I have no intention of going
2   into anything that might --
3       A.   Outside the scope of this Palaxar suit.
4       Q.   Right.
5       A.   Fine.
6       Q.   Exactly.  Well, it's not limited to the
7   events that happened in Scottsdale, because you're
8   also a fact witness to the other things that
9   happened at Mirabilis and Palaxar, if you
10  understand what I mean.  That you were there and,
11  therefore, you have information about what happened
12  that have to do with other parts of the lawsuit.
13      A.   Fine.
14      Q.   Okay.  Mr. Amar, where were you born?
15      A.   Israel.
16      Q.   When did you come to this country to live?
17      A.   I came to this country to live in 1998,
18  but I grew up in Canada.
19      Q.   Where did you grow up?
20      A.   Montreal.
21      Q.   Are you married?
22      A.   Yes.
23      Q.   And what is your wife's name, please?
24      A.   Natalie.
25      Q.   Do you have children?

10

1       A.   Yes.
2       Q.   How many?
3       A.   Two.
4       Q.   How old are they?
5       A.   Three and one.
6       Q.   Could you please tell me when you first
7   met Frank Amodeo?
8       A.   Roughly, 2000.  Maybe early 2000.  Late
9   '99, early 2000.  I don't recall exactly.  It's
10  been over ten years.
11      Q.   Under what circumstances did you meet him?
12      A.   We were introduced by a mutual
13  acquaintance.
14      Q.   And who was that person, please?
15      A.   Wayne -- I forgot his last name, but Wayne
16  something or other.
17      Q.   And do you know why Wayne introduced you
18  to Mr. Amodeo?
19      A.   Wayne introduced me to Mr. Amodeo because
20  he was working for a Kenneth Mueller, CPA, in
21  Orlando.  I was living in Orlando at the time.  And
22  Wayne was doing some bookkeeping work for a friend
23  of mine's company, he and I had met, and he wanted
24  to introduce me to Frank Amodeo, thought that, you
25  know, it might make friends.  And that was it,

11

1   really.  I was actually curious to meet him because
2   he spoke so highly of Frank.  So --
3       Q.   Could you tell me -- I'd like to know
4   about your background, starting with high school.
5       A.   What about it?
6       Q.   Where did you go to high school?
7       A.   I went to high school in Montreal.
8       Q.   And did you do any post secondary
9   education?
10      A.   Yes.  I went to school in New York City;
11  Yeshiva University.
12      Q.   And have you done anything post grad?
13      A.   No.  I actually -- I left my junior year
14  for a semester and it's been 17 years.  So I only
15  completed the first two years.
16      Q.   When did you move to Florida?
17      A.   In, roughly, '99.
18      Q.   What was the year that you dropped out of
19  school?
20      A.   "Drop out" is an interesting term, but
21  yeah, I left in '93.
22      Q.   Okay.  When you left school.
23      A.   '93.
24      Q.   Left in '93.  And between '93 and '99,
25  what were you doing occupationally?

12

1       A.   I bartended, I waitered.  Did a few things
2   in Montreal, you know, late teens, early 20's.
3       Q.   Do you remember where you were when you
4   first -- you said you were in Orlando -- but when
5   Wayne first introduced you to Mr. Amodeo?
6       A.   Where we met?
7       Q.   Yes.
8       A.   It was at a restaurant.  I don't know if
9   it was a Perkins or some -- like a diner
10  restaurant.
11      Q.   What was your first professional job?
12      A.   My first professional job?
13      Q.   In terms of that wasn't bartending or
14  waiting tables, or that was headed in the direction
15  that, you know, you considered -- well, let's put
16  it this way:  What do you consider to be your
17  occupation?
18      A.   I'm a consultant.
19      Q.   What kind of consultant?
20      A.   Marketing and HR services.
21      Q.   And what is your employment history in
22  marketing and employment services?
23      A.   Dating back to when?
24      Q.   Ever.
25      A.   Ever?

**13**

Q.   Yes.

A.   I did some consulting in '05 for
Mirabilis.  In '06, I had an intern position at
AEM.  And post that, I've been doing some marketing
and consulting work.

Q.   Did you have any work for any company
associated with Mr. Amodeo before '05?

A.   Yes.

Q.   And what was that?

A.   I mean, I wasn't really working for him,
but interesting history that Frank and I have, he
had owed me some money and I was kind of trying to
collect that money.  So --

Q.   How did it come about that Mr. Amodeo owed
you money?

A.   I lent him some money and he never paid me
back.

Q.   What was the circumstance under which you
lent him money?

A.   It was in late -- it was in early '01.  I
had a business in Orlando, it had to be liquidated,
it wasn't doing well, and there was a whole bunch
of receivables that he was supposed to pay me on
and never did.

Q.   What was the business?

**14**

A.   It was a call center.

Q.   A call center.  What does that mean?

A.   Telemarketing operation.

Q.   And do you mean by your previous question
that you sold the receivables to Mr. Amodeo?

A.   No.  I didn't sell the receivables to Mr.
Amodeo, no.

Q.   Were you doing telemarketing for Mr.
Amodeo?

A.   No, no, no.  For myself.

Q.   So -- well, first of all, what was the
name of the call center?

A.   ComCard.

Q.   ComCard?

A.   Yeah.

Q.   Did it have any kind of business
appelation afterwards?  Was it an LLC organization?

A.   Inc.

Q.   Inc.

A.   ComCard, Incorporated.

Q.   And was it incorporated in the State of
Florida?

A.   Yes.

Q.   And how did Mr. Amodeo come -- I still
want to understand how he came to owe you money as

**15**

a result of the call center.  How did one thing
lead to the next?

A.   Well, the company wasn't doing very well.
Frank was a -- introduced himself as able to
liquidate the assets of the company and pay me some
moneys from the receivables that were left over.
And, yeah, I never got paid on those receivables.
I mean, I've collected over the years, but I, you
know --

Q.   Why would he pay money on the receivables?
I don't understand.

MS. VILMOS:  Object to the form.

BY MS. HAVENER:

Q.   That's okay.  You can still answer.

A.   Yeah, I just -- I also had lent him money
as a personal favor.  It was --

Q.   Was that -- was the money that -- I'm
sorry.  I interrupted you.  Were you finished with
your answer?

A.   Yes.

Q.   Was the money that you lent him as a
personal favor reduced to writing?

A.   No.

Q.   So it was an oral agreement?

A.   It was a handshake, yeah.

**16**

Q.   Okay.  How much money?

A.   I don't recall.

Q.   Can you give me an estimate?  Was it
10,000?  Was it closer to 100,000?

A.   It was a couple hundred thousand.

Q.   Okay.  And how much money did he owe you
on the receivables?

A.   I don't recall.  It's been about ten
years.

Q.   Again --

A.   Total, it was about 200,000, between the
personal loans and the receivables of the assets
after we sold off everything.

Q.   When were you first in a business venture
with Mr. Amodeo?

A.   In a business venture with Amodeo?

Q.   Let me ask the question more carefully.
And when I'm asking this question, I'm looking for
any kind of business in which you were involved in
which Mr. Amodeo was also involved, whether as an
investor, as a consultant, as an employee or
officer or director.  You know, any business
relationship that you had with a company with which
Mr. Amodeo also had a relationship.

A.   In '03, there was a company that Mr.

17

1  Amodeo was working on called -- I forgot the name

2  of the -- it was a printing roll up that he was

3  working on.  And it was a company called Ameriplast

4  out of -- somewhere in South Florida.  It was in

5  Boca Raton.  And I thought I could bring a very

6  large client to the table so that --

7       Q.   What do you mean by a roll up?

8       A.   He wanted to merge a few printing

9  companies, a few struggling companies.  Roll them

10  all up into one and make one successful company.

11       Q.   Do you know the names of the ones that he

12  was going to merge?

13       A.   No, I was just involved in the -- well,

14  I'm not really involved.  I was trying to market

15  the products from Ameriplast.  They're a plastic

16  printing company.

17       Q.   Have you made loans in the nature of

18  100,000 or several hundred thousand dollars to

19  other people?

20       A.   I don't make a practice of it, no.

21       Q.   You don't make a practice of it; is that

22  what you said?

23       A.   Correct, yeah.

24       Q.   Thank you.  Was anyone else involved in

25  the Ameriplast -- is it fair to call it a deal, or

18

1  the Ameriplast roll up?

2       A.   Anybody else.  What do you mean by

3  "anybody else"?  There were a few people involved

4  in it.

5       Q.   Okay.  Could you name the people who were

6  involved in it?

7       A.   No, not really.

8       Q.   Was Mr. Sadrianna involved in it?

9       A.   Mr. Sadrianna was involved not in the

10  actual Ameriplast.  I think he was involved with

11  Frank in Orlando.  I was working out of the Boca

12  Raton site, but I believe Mr. Sadrianna might have

13  been involved.  I don't really recall.

14       Q.   When you say the Boca Raton site, was

15  Ameriplast located in Boca Raton?

16       A.   Yes.  Yeah, I had mentioned that.

17       Q.   And where were the other companies that

18  were being rolled up into Ameriplast located?

19       A.   I have no idea.  I really wasn't involved

20  in the roll up.  I was just trying to bring a large

21  client to the Ameriplast --

22       Q.   And what was that client?

23       A.   I don't remember the name of it, but it

24  was a phonecard company that needed the plastic

25  manufacturing.  It was a very large company out of

19

1  New Jersey.

2       Q.   And what was your relationship with the

3  phonecard company?

4       A.   I knew some people that worked there and

5  that could make the proper introductions if

6  Ameriplast could deliver.

7       Q.   What was Frank's relationship to the deal?

8  How was he involved?

9       A.   That's a question I really can't answer,

10  Kathleen.  Frank had his -- he got into the deal

11  somehow.  He, you know -- I really don't know.

12       Q.   When you did loan the money to Frank that

13  we spoke about earlier, what reason did you have

14  for doing that?

15       A.   He was a -- you know, he was kind of

16  struggling, he wasn't doing too well, and I -- I'm

17  a bit of a softie, I lent him some money, and I

18  thought I'd get paid back when he liquidated the

19  assets and he's worked out some things.  I was

20  always very impressed with Frank's abilities to,

21  you know, to accomplish certain things.

22       Q.   Do you know -- I think you said that that

23  was -- let me see.  Excuse me.  When did you lend

24  him the money?  You met him in late '99 or 2000?

25       A.   Uh-huh.  Early 2000.  I believe it was in

20

1  early '01.

2       Q.   That you loaned him the money?

3       A.   Yeah.

4       Q.   Did you already know about his history in

5  Georgia and his having spent time in prison?

6       A.   Nope.

7       Q.   You didn't?

8       A.   No.

9       Q.   When did you learn about that?

10       A.   After I lent him the money, yeah.  I

11  wasn't aware of his whole history.  I didn't know

12  he was a disbarred attorney and a convicted felon

13  and all.

14       Q.   When did you learn that information?

15       A.   I mean, I learned it in bits and pieces

16  along the way sometime between '01 and '03, you

17  know.  He didn't start publicizing it until the

18  Mirabilis scandal.

19       Q.   Mr. Amodeo, as you know, has been, at

20  least in the most recent years that I'm aware of,

21  very open about his history.

22       A.   Uh-huh.

23       Q.   But I'm gathering from your answers that

24  that was not the case when you first knew him.

25       A.   That was not the case, no.

21

1    Q.   When you did learn it, how did you learn
2  it?
3    A.   I don't recall.  But I did approach him
4  about it.
5    Q.   So someone else told you?
6    A.   I think someone else hinted to it and then
7  I approached him and we talked about it.  And I
8  don't think he confessed everything at once, but,
9  like I told you, I learned bits and pieces over
10 some time.
11   Q.   Do you know who else -- I apologize.
12 Strike that.
13        Do you know who the person was who hinted
14 about it?
15   A.   No.  I don't recall, actually.
16   Q.   Did Mr. Amodeo ever pay you back that
17 money?
18   A.   In bits and pieces.  Not really in
19 payment, but like in consulting contracts and some
20 moneys here and there.
21   Q.   After the Ameriplast deal, what was the
22 next interaction you had on a business basis with
23 Mr. Amodeo?
24   A.   I mean, I was -- I spent some time in the
25 office that he had built.  I think it was in late

22

1  '04.  I'm not exactly sure, but he had an office in
2  downtown Orlando.  Trafalgar, Matrix; there were
3  several entities that were operating out of
4  downtown Orlando office space.
5    Q.   You said before that you were impressed
6  with Frank's abilities?
7    A.   Yeah.
8    Q.   Did your attitude change after you learned
9  about his criminal history?
10   A.   No, it didn't.
11   Q.   When you became familiar -- you said you
12 spent some time in the offices of Trafalgar and
13 Matrix.  Were you involved with those companies?
14   A.   Not really.  I just thought it was -- you
15 know, he offered me to come and spend some time
16 over there.  I believed the only way I'd have a
17 chance of actually getting repaid is spending
18 considerable time over there, so I was --
19   Q.   So what were you doing there?
20   A.   I had an office space.  I really was not
21 doing much, and then after a few months I started
22 to get involved with a possible payroll processing
23 company.
24   Q.   What was that?  What was that company?
25   A.   I really don't recall the name.

23

1    Q.   You don't know the first payroll
2  processing company you were involved with?
3    A.   No.
4    Q.   What was the business of Trafalgar?
5    A.   The business of Trafalgar was trying to
6  turn precious metal concentrate into cash.  That's
7  what I understood.  I didn't really understand
8  everything else.
9    Q.   What was everything else?
10   A.   I really don't --
11   Q.   Do you understand it now?
12   A.   No.  No.
13   Q.   What was Matrix?
14   A.   A consulting firm of some sort.
15   Q.   Who did it consult for?  Do you know?
16   A.   I don't know of any of the clients.
17   Q.   When you said you were impressed with
18 Frank's abilities, to what were you referring?
19   A.   Be more specific, Kathleen.  What do you
20 mean by --
21   Q.   Well, what was it about Frank that
22 impressed you?
23   A.   I think Frank is a brilliant person.  He
24 just always came across as an extremely brilliant
25 person.

24

1    Q.   Do you still believe that?
2    A.   Yes, I do.
3    Q.   I'm going to go through -- and not because
4  I don't know this myself -- I want to know the
5  names of all the companies in which you were a
6  participant in which Frank was also a participant
7  in any capacity.  So I take it you were not a
8  participant in Trafalgar or Matrix?
9    A.   No.  Not actively, no.
10   Q.   Not actively.  Did you --
11   A.   There was another company, but I don't
12 recall.  There were so many corporations, Kathleen,
13 over the years.  I really don't recall.
14   Q.   Did you consult for either of those
15 companies?
16   A.   No.
17   Q.   Do you remember the first consulting
18 contract you had that involved a company of Mr.
19 Amodeo's or Mirabilis?
20   A.   It was probably in early '05 when I was
21 consulting for Presidion through -- whether it was
22 Mirabilis or Matrix or one of those companies.
23   Q.   I don't understand what you mean.  Were
24 you personally consulting for Presidion, or did you
25 mean that -- well --

25

1    A.   For Mirabilis, but the contract was
2    Presidion.
3    Q.   So were you at that time an employee of
4    Mirabilis?
5    A.   I don't know if it was Mirabilis or Common
6    Paymaster, but one of the entities owned by
7    Mirabilis.
8    Q.   Mr. Cuthill testified a couple of weeks
9    ago that Common Paymaster and Mirabilis were always
10   separate companies.
11   A.   Uh-huh.
12   Q.   So when you were working for Mirabilis,
13   you weren't sure if you worked for Common Paymaster
14   or Mirabilis?
15   A.   Well, I entered into an agreement with
16   Common Paymaster in late '05.  That's when I
17   entered into a contractual agreement with them.
18   But for most -- for probably six or seven months
19   preceding that I was consulting for Presidion.
20   Q.   Via -- was there a vehicle through which
21   you were consulting for Presidion?  In other words,
22   who signed your paycheck?
23   A.   I believe we were a PEO client of
24   Presidion.  So it's a -- you know.
25   Q.   Okay.  Do you know the name of it?

26

1    A.   Of the vehicle?  It was Presidion.
2    Q.   Of who signed your paycheck.  Whatever --
3    A.   It was Presidion.  It was Presidion at
4    that time.
5    Q.   Okay.  And that's Presidion Corporation?
6    A.   One of the seventeen companies, but, yeah
7    I think it was Presidion.
8    Q.   So but we're now talking about the public
9    company.
10   A.   At that time, yeah.
11   Q.   Okay.  And at another time were you paid
12   by a different Presidion organization?
13   A.   No, no, no.  It went from there to Common
14   Paymaster.
15   Q.   And while you were being paid by Common
16   Paymaster, for what entities did you provide
17   services?
18   A.   For Presidion Corporation.
19   Q.   Any others?
20   A.   No.  And Mirabilis, that was working on
21   some kind of a solution to help the distressed
22   Presidion.  And I believe Nexia was the actual
23   contract.
24   Q.   Nexia had a contract with whom?
25   A.   I believe they had a consulting agreement

27

1    with Mirabilis, that had an agreement with
2    Presidion.  I really don't know the exact
3    structures, Kathleen.  I wasn't privy to that
4    information.  Nor did I care.
5    Q.   You mentioned earlier that you then became
6    associated with AEM, I think?
7    A.   Yes.
8    Q.   And when was that?
9    A.   That was --
10   Q.   I'm sorry.  Initials A-E-M.
11   A.   -- late '05.  Third quarter or fourth
12   quarter of 2005.
13   Q.   Okay.  So in early '05 you were consulting
14   for Presidion; correct?  Did I understand that
15   correct?
16   A.   Correct.
17   Q.   And then sometime in '05 you signed a
18   contract with Common Paymaster.
19   A.   Yeah.  In late '05, yes.
20   Q.   And you were working -- associated in some
21   way with AEM also in late '05?
22   A.   Correct.
23   Q.   What was your role with AEM?
24   A.   I was the Interim President to AEM.
25   Q.   How long was the interim?

28

1    A.   Five months and change.
2    Q.   What time period?
3    A.   The official date I believe was
4    January 1st through June 13th.
5    Q.   Of?
6    A.   '06.
7    Q.   Did you ever hold any office in any of the
8    other Mirabilis-associated entities?
9    A.   No.  Aside from AEM, no.
10   Q.   Were you ever on the Board of Directors of
11   any of the Mirabilis-associated entities?
12   A.   Not to my knowledge.
13   Q.   Did you ever hold an office in any of the
14   Amodeo-associated entities?  And just to make that
15   clear, do you understand what I mean when I say --
16   A.   Yes.
17   Q.   -- Mirabilis-associated or
18   Amodeo-associated, or I might otherwise say
19   Mirabilis-related or Amodeo-related?  Do you
20   understand what I mean by the difference?
21   A.   Yes.  Aside from that payroll processing
22   company I told you in '03, '04, no, I don't recall
23   holding office in any other --
24   Q.   And were you ever on a Board of Directors?
25   A.   No.

29

1    Q.   Did you ever sign contracts on behalf of

2  AEM?

3    A.   Yes.

4    Q.   As president?

5    A.   Yes.

6    Q.   In any other role?

7    A.   No.  Not to my recollection.

8    Q.   Did you ever sign contracts on behalf of

9  Mirabilis?

10   A.   Not to my recollection.

11   Q.   Did you ever sign as a shareholder of

12  Mirabilis?

13   A.   There was a shareholder agreement that I

14  was handed.  I don't recall ever signing it.

15   Q.   Did you ever sign, for example, the

16  minutes of a Board of Directors meeting?

17   A.   For which company?

18   Q.   For anybody.  Any of the -- I'm going to

19  use now the term, "under the Mirabilis umbrella."

20  And by that I mean both Amodeo-associated and

21  Mirabilis-associated entities.

22   A.   Yeah.

23   Q.   I understand that there were a million.

24   A.   Yeah, yeah.  Not to my recollection.  It

25  could be.  I mean, I don't recall being a member of

30

1  any board or signing any corporate minutes.

2    Q.   What's FYI Enterprises?

3    A.   FYI Enterprises?

4    Q.   Yes.

5    A.   It's a company.  It was a corporation that

6  was defunct years ago.

7    Q.   What did it do?

8    A.   Nothing, really.  It was meant to do a few

9  things, but it didn't end up doing anything.

10   Q.   What was it intended to do?

11   A.   It was actually set up to buy a property

12  in Naples, but that deal never went through.  I

13  believe Frank had invested some money in it, but --

14   Q.   Who were the owners of FYI Enterprises?

15   A.   Myself.

16   Q.   You and only you?

17   A.   Yeah.

18   Q.   So, okay.  Let me get this straight.  Mr.

19  Amodeo had invested some money in a property in

20  Naples.

21   A.   Correct.

22   Q.   And it was intended that FYI Enterprises

23  would purchase that property or further invest?

24   A.   Correct.

25   Q.   And you were the sole owner of FYI.

31

1    A.   Correct.

2    Q.   What did FYI stand for, if anything?

3    A.   For Your Information.

4    Q.   Were you involved in any of -- I'm just

5  going to go off the top of my head.  I remember

6  from looking at papers a Very Private Eye, for

7  example.  Two Wheel Tunes.  I mean, there's many,

8  many companies that --

9    A.   No.

10   Q.   -- were under the Mirabilis umbrella.  Is

11  there anything that you were associated with that

12  you haven't told me about?

13   A.   No.  Well, not to my recollection,

14  Kathleen.

15   Q.   If we were told that Mr. Amodeo was a half

16  owner of FYI, is that incorrect?

17   A.   That is incorrect.

18   Q.   How much did you invest in FYI

19  Enterprises?

20   A.   Not too much.  It was a mechanism for me

21  to get some of the money back that Frank had owed

22  me.

23   Q.   And how was that intended to work?  If you

24  could explain the process by which you expected to

25  get some kind of return of --

32

1    A.   If there was a gain on that property, then

2  I would hopefully share in that and get some of my

3  money back.

4    Q.   Did you ever get that money back?

5    A.   No, not all of it.

6    Q.   Did you ever own any stock in Mirabilis

7  itself?

8    A.   Yes.

9    Q.   And please tell me the context of that,

10  your ownership of stock in Mirabilis.

11   A.   What do you mean, "the context of that"?

12   Q.   Did you purchase stock in Mirabilis?

13   A.   No.  No.

14   Q.   How did it come about that you became an

15  owner of stock?

16   A.   Shares were issued in late '05 and I

17  relinquished them in early '06.

18   Q.   Why were they issued to you in late '05?

19   A.   They were issued to 30, 40-some-odd

20  people.  I don't know why.  That's why I

21  relinquished them in late January of '06.  I was

22  like this is ridiculous how many shareholders there

23  were at the company.

24   Q.   Were you ever the only shareholder of

25  Mirabilis?

33

1    A.  Not to my knowledge.  Somebody tried to
2  tell me that that was the case, but, no, I wasn't.
3    Q.  Do you have any recollection of having
4  signed a proxy for your vote -- well, first -- I'm
5  sorry.  Let me start over.
6    Were your shares voting shares?
7    A.  Not to my recollection.
8    Q.  Do you know what type of stock you were
9  issued?
10    A.  What class?  No.
11    Q.  Correct.  I mean, you understand --
12    A.  I actually never received certificates.  I
13  just signed a shareholder agreement -- or I was
14  handed one.  I don't recall signing it.  And then I
15  handed them back a very short period of time later.
16    Q.  But you know, I think, from the
17  shareholders agreement, just like I do, that there
18  were supposed to be several classes of stock, and
19  they went by both letters and colors.  Do you
20  remember --
21    MS. VILMOS:  Object to the form.
22  BY MS. HAVENER:
23    Q.  Okay.  Do you remember the classes of
24  stock at Mirabilis?
25    A.  No.

34

1    Q.  Are you aware that there were different
2  classes of stock that went by letters, names?
3    A.  Or colors, whatever, yes.
4    Q.  Do you know what letter form you held?
5    A.  No.
6    Q.  Do you know what color form you held?
7    A.  I used to refer to it as toilet paper, to
8  be honest with you.
9    Q.  How did it come about that you believed
10  that stock was issued to you?  You just testified a
11  few moments ago that you never had shares in your
12  hand.
13    A.  Correct..
14    Q.  Under what circumstances was it conveyed
15  to you that you owned these shares of stock?
16    A.  I don't recall exactly, but it was a
17  meeting in late '05, and there were shares issued
18  to some people at Mirabilis.
19    Q.  And were you told verbally?  Were you told
20  in writing?
21    A.  No, I was told verbally, and I told you I
22  was handed a shareholder agreement which I don't
23  recall executing because, you know, to me, I didn't
24  really see much value in them.
25    Q.  To be clear, if I can, how long a time

35

1  period between late '05 and your relinquishing in
2  '06 was it?
3    A.  In late January in '06. I attended a
4  shareholders' meeting in downtown Orlando, I
5  believe in the AmSouth building.  And I saw 35, 40
6  people in there, I didn't know most of them, and I
7  was told that they were all shareholders.  And I
8  didn't know how anybody earned their shares in the
9  company, I didn't know if anybody purchased their
10  shares in the company.  And I was actually so
11  appalled and disgusted by what I witnessed that I
12  relinquished the shares verbally with Laurie Holtz
13  and Richard Berman as my witnesses.  And, you know,
14  I don't think I ever -- I don't think they were
15  officially relinquished until my resignation in
16  early June.
17    Q.  Did you relinquish the shares in writing?
18    A.  In late January, no.
19    Q.  No.
20    A.  No.
21    Q.  You just verbally expressed your desire to
22  relinquish the shares and Mr. Holtz and Mr. Berman
23  were there; right?
24    A.  Correct.  And I also made it very clear
25  that I hoped that they find a replacement for me as

36

1  soon as possible because I didn't really want much
2  involvement with Mirabilis.
3    Q.  And why was that?
4    A.  Because, Kathleen, I saw a bunch of
5  sycophants and liars and abusers and idiots in that
6  company.
7    Q.  Tell me who.
8    A.  Tell you who?  Primarily, your client,
9  Edith Curry; primarily, your other client, Frank
10  Hailstones; primarily, Richard Berman; and,
11  primarily, Laurie Holtz.  Those four, above all,
12  but there were 30 or 40 others.
13    Q.  Can you name some of those people?
14    A.  Paul Glover, Sharmila Khanorkar, James
15  Vandevere, Mr. Konicki -- I don't know.  I mean,
16  you have the names, Kathleen.  I didn't bring that
17  list with me.
18    Q.  Konicki?
19    A.  Yeah.
20    Q.  That's one I don't recognize.  And what
21  made you think that they were sycophants or idiots?
22    A.  Because I witnessed Frank talking a lot of
23  craziness at that meeting, Kathleen.  That he's
24  going to have an office within every living human
25  being on the Planet Earth, 12,000 offices.  This

37

1  was in early '06. And he claimed that by the year
2  2012, in roughly half a decade, he planned to have
3  12,000 offices within reach of every single human
4  being. And people, intelligent people like your
5  client over here, just sat there, whew, that sounds
6  pretty logical. And, you know what, Kathleen, it
7  wasn't logical. It was craziness. It was a manic
8  depressive who needed serious medication talking.
9  And I knew that.
10  Q.  You did know that?
11  A.  Everybody knew that, Kathleen.
12  Q.  How did you know that?
13  A.  That Frank was a manic depressive?
14  Q.  Yes.
15  A.  Because he told me he was a manic
16  depressive. But he didn't have to tell me, because
17  I thought he was. I saw that he was. He was not
18  all there.
19  Q.  Are you a psychiatrist?
20  A.  I'm not a psychiatrist, no.
21  Q.  So what caused you to believe he was manic
22  depressive?
23  A.  Aside from the fact that he told me? I
24  saw some symptoms that he was a manic depressive.
25  Q.  Could you describe the symptoms for me?

38

1  A.  Yeah. Either extremely, extremely happy
2  or extremely depressed. And I believe that Frank
3  suffers also from a Napoleonic complex. I'm not a
4  psychiatrist, but I just think that the things that
5  he's tried to accomplish in his life are way out of
6  reach. Very, very smart, brilliant man, but --
7  Q.  Well, Napoleon accomplished a lot.
8  A.  Yeah, he did. He did. But he ended up in
9  jail; did he not?
10  Q.  No. He ended up on an isolated island
11  living encumbered.
12  A.  It was a prison. Well, it was a prison.
13  Yeah, and Frank was -- at this point, it was known
14  to all, because it was published, that Frank was a
15  disbarred attorney, convicted felon, and recently
16  bankrupt.
17  Q.  Do you know how many times he went
18  bankrupt?
19  A.  No.
20  Q.  Could you name -- when you said that there
21  were a large number of shareholders and that you
22  saw how many people were at the shareholders'
23  meeting, besides my client, who is a sycophant and
24  an idiot, and besides my other client --
25  A.  No, I believe everybody in that room was.

39

1  Q.  Okay.
2  A.  Not particularly your client, but, yes,
3  she, I believe, is one of them, yeah.
4  Q.  And my other clients, Mr. Hailstones and
5  Mr. Holtz and Mr. Berman, name some more people who
6  were at that meeting among those many -- too many
7  shareholders.
8  A.  Woody Johnson, Horton Johnson, whatever he
9  goes by. Marty Flynn, James Sadrianna, Daniel
10  Myers. There were so many of them. Honestly,
11  there were so many of them, I really -- I don't
12  recall. There was that professor of Indian
13  descent. I forgot his name.
14  Q.  Rama somebody?
15  A.  Rama, yeah, Inguva. Rama Inguva. There
16  were a few others. A whole bunch of others,
17  actually. I didn't recognize most of them,
18  actually. I believe that's the meeting I was
19  introduced to Laurie Holtz. Oh, yeah, Richard
20  Berman was there, of course. I think I mentioned
21  that.
22  Q.  So what had changed in the time period
23  between, I think it was, '03 and '06? '03 you lent
24  him $200,000.
25  A.  No, that was in '01.

40

1  Q.  '01. Okay. So in '01 you had lent him
2  $200,000, which --
3  A.  That's not correct. Lent him some money,
4  plus there were some moneys from that -- I was
5  supposed to get from the liquidation of the assets,
6  yes.
7  Q.  But you don't lend money to somebody that
8  you think is crazy and manic depressive and --
9  A.  At that time, I didn't know that. No, I
10  didn't know that --
11  Q.  So what changed? How did you -- what
12  changed about your knowledge?
13  A.  My problem, Kathleen, was not particularly
14  with Frank. My problem was with everybody that
15  Frank surrounded himself with.
16  Q.  I understand. But what changed about
17  Frank that made you go from an attitude that caused
18  you to lend him a great deal of money -- what to me
19  seems like a great deal of money -- to believing
20  that everybody else in the room was an idiot for having
21  a shareholder in Mirabilis was an idiot for having
22  any faith in him?
23  A.  Because when I knew Frank in '01, he never
24  had the delusions of grandeur to conquer the world
25  and to have 12,000 offices, Kathleen. He could

41

1  hardly manage one office. He never expressed those
2  delusions to me, anyhow.
3      Q.  Did you know anything about what I think
4  he now describes as his addictive behaviors?
5      A.  No, not in detail.
6      Q.  Was it your impression that he developed
7  his bipolar disease after 2001?
8      A.  I don't know when he developed it.  I
9  think he was born with it.
10     Q.  So he was keeping it hidden, or is that --
11     A.  From me, he was, for sure.
12     Q.  And when did you come about -- when did
13  you come to the understanding that he was not in
14  full possession of his faculties?
15     A.  I don't know if it was in late '04 or '05
16  sometime that, you know, he told me he was under
17  some -- seeking some treatment.  I don't know the
18  details.
19     Q.  Do you know with whom he was seeking
20  treatment?
21     A.  No.
22     Q.  Okay.  I understand the behavior.  You've
23  already described the behavior when he was manic,
24  when he was extremely on a high.
25     A.  Uh-huh.

42

1      Q.  Could you describe the behavior when he
2  was extremely depressed?
3      A.  No.  He was just very, very sullen, closed
4  himself off in a room and, you know, whatever.
5  Just --
6      Q.  Were there times when he completely
7  isolated himself and you didn't see him?
8      A.  During what periods, Kathleen?
9      Q.  Ever.
10     A.  No.  I mean, I live in -- you know, 250
11  miles away from him.  I was not there very often in
12  '06.  In late '05 I was in the Jupiter site or in
13  the Doral office in South Florida.
14     Q.  Well, but something must have changed
15  between the time that you loaned him the money and
16  the time that you say that he was crazy.
17     A.  Uh-huh.
18     Q.  And I'm trying to figure out when along
19  that timeline you developed the understanding of
20  Frank as a person with a mental illness.
21     A.  I believe it was in '05 where he actually
22  just divulged to me that he did have some mental
23  illnesses.  I knew of his criminal background and
24  of his, you know, being disbarred and bankrupt.
25     Q.  So he told you he was mentally ill.

43

1      A.  Correct.  I think he published it on his
2  Website.  He had a frankamodeo.net.
3      Q.  Were there any other people involved with
4  Mr. Amodeo of whom you had a good impression?
5      A.  Initially, quite a few people.
6      Q.  Could you name them for me?
7      A.  Richard Berman, Laurie Holtz, Frank
8  Hailstones.
9      Q.  And what caused you to have a good
10  impression of Mr. Berman?
11     A.  Mr. Berman was -- I met him at his office.
12  Senior partner of Berman, Kean, Riguera in South
13  Florida.  He told me --
14     Q.  Why did you meet him at his office?
15     A.  Why did I meet him at his office the first
16  time?  He was, I believe -- I believe he
17  represented Frank in some legal matter having to do
18  with that print roll up.  I'm not exactly sure.
19  Frank had some issue with Merrill Lynch and I
20  believe he hired Berman's firm, if I recall
21  correctly.
22     Q.  Were you involved in that issue with
23  Merrill Lynch at all?
24     A.  No.  No, no.  Not from -- no, no.  I just
25  -- the company went defunct, I didn't bring the

44

1  client on, thank you very much.  I didn't have any
2  actual involvement.
3      Q.  What company was it that was involved with
4  the problem with Merrill Lynch?
5      A.  It was the parent company or the parent
6  holding company of that Ameriplast.  It's Print
7  something.  I'm not exactly sure.
8      Q.  Do you know what other people were
9  involved in that either -- in that dispute with
10  Merrill Lynch?
11     A.  If I recall correctly, just Frank and
12  perhaps Mr. Sadrianna, but I'm not sure about that.
13     Q.  Did you know Dr. Pollack?
14     A.  Yes.
15     Q.  What was your impression of Dr. Pollack?
16     A.  My first impression of him?
17     Q.  That's where we'll start.
18     A.  My very first impression of him was, yeah,
19  not very good.  He didn't make a good impression
20  upon me.
21     Q.  Why was that?
22     A.  Kathleen, Mr. Pollack is a -- I don't know
23  how it's relevant to this, but I was not impressed
24  by him.  I thought he was -- to be honest with you,
25  I pretty much knew that he was of Jewish descent

45

1   and the first meeting I had he's telling me about
2   the glory of the light of Christ.  And I was like,
3   oh, I find that interesting.  You know?  So it's
4   just -- I shouldn't judge him for that, but I did.
5       Q.   And then -- okay.  You said that was your
6   first impression.  Did your impression change?
7       A.   No, no.  Not on -- no.
8       Q.   Was Dr. Pollack one of the people at the
9   January meeting that you referred to?
10      A.   I believe so, yes.  Like I said, there
11  were 40-some-odd people, participants in that
12  meeting.
13      Q.   Do you know if Mr. Sadrianna was there?
14      A.   Yes.
15      Q.   Was Mr. Broadhead there?
16      A.   Possibly.  Yeah, very possibly.
17      Q.   What is your impression of Mr. Broadhead?
18      A.   I have no opinion of Mr. Broadhead.  And
19  he was married to Edie Curry.  Nice enough guy, you
20  know.
21      Q.   Tell me any other people that you remember
22  were there.
23      A.   Name me the names that I named and I'll
24  tell you --
25      Q.   Okay.  Well, you've named Mr. Berman, Mr.

46

1   Holtz, Mr. Hailstones.  Oh, why did you have a good
2   impression of Mr. Hailstones?
3       A.   Mr. Hailstones was introduced to me in, I
4   believe, late December of '05 as a Sarbanes-Oxley
5   expert, came from London, and he had a lot of
6   background with PricewaterhouseCoopers, and was
7   announced the President of Mirabilis.  And when I
8   met Frank Hailstones, at first I was impressed
9   because he seemed humble enough.  He had the title
10  of President, didn't take a fancy corner office,
11  took a simple office.  And I just -- I thought that
12  it was a humble attribute that he had and I thought
13  that he was, you know -- I was glad that he was on
14  board initially.  Initially.
15      Q.   And what changed?
16      A.   His complete -- his lack of logic.  I mean
17  --
18      Q.   About what?
19      A.   What is a president of a company to do,
20  Kathleen?  It's manage the company, operate the
21  company; correct?  On top of Mr. Hailstones being
22  the President of Mirabilis Ventures, he also was
23  the controlling person at AEM for the Department of
24  Business and Professional Regulations, so he was
25  one of the responsible parties for AEM.  That made

47

1   me feel much more comfortable.  Because I met --
2       Q.   Were you a controlling person?
3       A.   Yes, I was, yeah.
4       Q.   Okay.  So keep going.
5       A.   I was comforted by the fact that Mr.
6   Hailstones was also a controlling person of the
7   company.  With his background, I thought, okay,
8   great.  I thought that a guy like Frank Hailstones
9   being the president of the company and the Board of
10  Directors being chaired by Laurie Holtz that the
11  company was in -- was going to be in good financial
12  standing.  But I was awfully wrong about that.
13      Q.   Mr. Holtz wasn't the Chairman of the Board
14  of AEM, was he?
15      A.   No.
16      Q.   And Mr. Hailstones wasn't the president of
17  AEM, was he?
18      A.   No.  He was the president of the parent
19  company.  AEM --
20      Q.   So AEM was a Mirabilis-owned company?
21      A.   Correct.
22      Q.   And how soon after your -- I mean, between
23  late '05 and Mr. Hailstones' departure wasn't that
24  long.  When did your impression --
25      A.   When was his departure?

48

1       Q.   His departure was -- he was informed that
2   he wouldn't have a job immediately after he
3   returned from the Christmas holidays of '06, '07.
4       A.   Oh, he was terminated?
5       Q.   Yes.
6       A.   I thought he had resigned.  Okay.
7       Q.   Oh, no.
8       A.   Oh, really.
9       Q.   Really.
10      A.   Interesting.
11      Q.   No.
12      A.   He would have stayed there.  That's news
13  to me.
14      Q.   And he resigned on January 31st, 2007.
15      A.   Okay.
16      Q.   I mean, he was invited to resign and it
17  became official.  So when during that year did your
18  impression change?
19      A.   Fairly early on.  Fairly -- but --
20      Q.   Was it at that first meeting?
21      A.   No, no.  I didn't know him well enough at
22  that first meeting.  But my impression of him
23  changed throughout that year, yeah.
24      Q.   And who is Laurie Andrea?
25      A.   Laurie Andrea was another control person

---

49

1    of AEM.  She was the VP of Insurance.  She was --
2    you know, she --
3        Q.   Of what company?
4        A.   Of AEM.
5        Q.   Do you know if she owned any interest in
6    AEM?
7        A.   I don't recall.
8        Q.   And I can't remember, I think I already
9    asked you this, but did you own any interest in
10   AEM?
11       A.   In late '06 when it was a shell -- in late
12   '05, yes.  But then the company was -- had zero
13   employees, it had zero entities, and then it was
14   sold to Mirabilis Ventures.  I believe Edie Curry
15   negotiated the purchase of that shell corporation.
16   That's what I was told.
17       Q.   And who was she negotiating with?
18       A.   Former owners of Presidion; Mr. Sandlin
19   and Mr. Gaines, I was told.  I'm not sure.
20       Q.   Incidentally, did you know Mr. Sandlin is
21   dead?
22       A.   No.
23       Q.   He was murdered.
24       A.   He was murdered?
25       Q.   Yes.

---

50

1        A.   When was this?
2        Q.   September 16th, I think.  But --
3        A.   Of this year?
4        Q.   Yes.
5        A.   I had no idea.
6        Q.   I'll show you on the Internet.
7        A.   No, I had no idea.  Wow.
8        Q.   Was Laurie Andrea an idiot and a
9    sycophant?
10       A.   Yeah.  Not as much as the others, but --
11   I'll tell you, I categorize the people in -- I put
12   them in two categories, Kathleen.  Either they were
13   -- they drank Frank's Kool-Aid and they were really
14   -- they really believed his crap, or they were
15   kissing his ass and riding their coattails to the
16   -- to financial freedom.
17       Q.   And which one were you?
18       A.   I guess I might have been considered one
19   of the idiots.  But I had actually resigned after
20   that meeting, so, yeah.  Not resigned; sorry.  I
21   relinquished my shares.  And I had told them I
22   needed to be replaced as soon as possible thirty
23   days into my post.
24       Q.   And what was your post that you were
25   replaced from?

---

51

1        A.   Interim CEO.
2        Q.   Of?
3        A.   AEM.
4        Q.   And did you have any other posts in any
5    other companies?
6        A.   No.
7             MS. HAVENER:  Excuse me.  I just want to
8        check on the phone.  Have other people joined
9        the call besides Nicolette?  Is anybody there?
10       Nicolette, are you there?
11            MS. VILMOS:  I am here.
12            MS. HAVENER:  Okay.  And there is no one
13       else on the call?
14            MS. VILMOS:  I'm going to take that as a
15       no.
16            MS. HAVENER:  Yes, but I also have -- I
17       have evidence to the contrary, but we'll leave
18       that as it be.
19   BY MS. HAVENER:
20       Q.   Are you telling me that all your duties
21   with Mirabilis Ventures ceased in June of '06?
22       A.   Officially, yes.
23       Q.   And unofficially?
24       A.   I was asked to come back as a consultant
25   to help the transition with the new CEO.

---

52

1        Q.   And the new CEO being?
2        A.   Michael Stanley.
3        Q.   And did you come back as a consultant?
4        A.   Yes, I did.
5        Q.   What did you do as a consultant?
6        A.   I just helped transition whatever --
7    whatever was needed, but mostly sales.  The sales
8    department was dwindling.
9        Q.   What did you do as a salesperson?  What
10   were you selling?
11       A.   PEO services.
12       Q.   And to whom did you make sales of those
13   services?
14       A.   I just managed a small sales group out of
15   the South Florida office.
16       Q.   Do you have a consulting agreement for
17   that time period?
18       A.   No.
19       Q.   Did you have any responsibilities with AEM
20   after June of '06?
21       A.   No, aside from just sales, keeping --
22   trying to keep the sales intact, no.
23       Q.   But didn't you tell me that AEM was a
24   shell?
25       A.   No, but AEM was the company that I worked

Header: Case 6:09-cv-00175-GAP-DAB Document 99-9 Filed 12/17/10 Page 14 of 53 PageID 2247

**Page 53**

1  for that was managing this --
2  Q. So it went from a shell to being a PEO?
3  A. Correct.
4  Q. How were you paid?
5  A. How was I paid?
6  Q. Yes.
7  A. By check or direct deposit.
8  Q. It was a regular amount like you were
9  receiving a paycheck?
10  A. When? At the time that I was employed for
11  the company?
12  Q. Okay. Let's do that first. At the time
13  -- and that was -- I want to know the dates. You
14  said just from late '05 to --
15  A. December 27th of '05 through June --
16  Q. June of '06.
17  A. Yeah. .
18  Q. And, otherwise, you didn't have any other
19  paying position related to Mirabilis or AEM?
20  A. No, I was being paid by Common Paymaster,
21  and after that I --
22  Q. During those six or seven months.
23  A. Five-and-a-half, yeah.
24  Q. And that's the only time that you were
25  getting paid by Common Paymaster?

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

**Page 54**

1  A. Correct.
2  Q. And then how were you getting paid as a
3  consultant?
4  A. I believe it was AEM or Mirabilis was
5  paying me on a monthly basis.
6  Q. When was your first awareness that there
7  was any intent to sue Ms. Curry?
8  A. Probably a week or two before the
9  conference in Scottsdale.
10  Q. And is the same true for Mr. Hailstones?
11  A. Yes.
12  Q. Are you aware that claims against
13  Ms. Curry -- did you have any awareness that claims
14  against Ms. Curry and Mr. Hailstones were being
15  researched in February or March of '07?
16  A. No.
17  Q. And who told you about the conference in
18  Scottsdale?
19  A. I believe it was Frank.
20  Q. And do you know who told Frank?
21  A. No.
22  Q. What did Mr. Amodeo say to you about the
23  conference in Scottsdale?
24  A. Frank told me, you won't believe this, but
25  there's a, you know, conference in Scottsdale going

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

**Page 55**

1  on for Palaxar Group. I said, what's Palaxar
2  Group. And he told me, go online and check it out.
3  And I researched it and I -- I just could not believe
4  the audacity, Kathleen. I just could not believe
5  the audacity of your clients.
6  Q. And what did you say to Mr. Amodeo?
7  A. I said, I have to see it with my own eyes.
8  I cannot believe it. I really thought -- I really
9  thought it was some elaborate prank. That's the
10  honest truth. I could not believe the audacity of
11  your clients.
12  Q. Tell me why.
13  A. The company in '07 was being investigated
14  for what I was told was the largest 941 tax fraud
15  in U.S. history, Kathleen.
16  Q. "The company" being?
17  A. Mirabilis and all of the 80-or-so
18  associated companies.
19  Q. Uh-huh.
20  A. And your clients were -- Frank Hailstones
21  was the President of Mirabilis Ventures, Edith
22  Curry was the Executive Secretary of the Board of
23  Directors. I believe her role was corporate
24  compliance. And the -- Laurie Holtz -- that's what
25  really struck me when I checked out the Website,

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

**Page 56**

1  Laurie Holtz sat on the advisory committee. He was
2  the Chairman of the Board of Mirabilis Ventures and
3  then he sat on the advisory committee of Palaxar.
4  I just -- I just could not believe my eyes when I
5  saw that site.
6  Q. Well, did you understand -- well, explain
7  to me what you thought was audacious about it.
8  A. Explain to you what I thought was
9  audacious?
10  Q. Yes.
11  A. Okay. I printed out the Website here.
12  And I look at this and I'm saying to myself, wow,
13  this looks really impressive. Wow, if I was a
14  first-time viewer of this site I'd be like, wow,
15  look at this; this is impressive. Look at this
16  whole advisory committee. Look at the
17  professionals involved in this. But what really
18  struck me, the audacity that really struck me was
19  on the conferences page on the Website. There is a
20  link to the Department of Justice, Kathleen, on
21  their Website. They're being investigated by the
22  Department of Justice for the largest 941 tax fraud
23  in the history of the country. I just thought it
24  was ridiculous.
25  Q. Actually, what makes you believe that

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

57

1    Ms. Curry or Mr. Hailstones --
2        A.  No, I don't know who personally.  I know
3    the company they were very involved with.  They
4    were very involved in Mirabilis.
5        Q.  Neither was a CFO; correct?
6        A.  No.  Not to my recollection, no.
7        Q.  It's true that Mr. Glover was the CFO;
8    correct?
9        A.  For a period of time.  Then after that,
10   that switched, from what I was told.
11       Q.  Do you have any understanding that
12   pursuant to the laws of the State of Nevada, which
13   is where Mirabilis is incorporated, the Board of
14   Directors is entitled by law to rely on the
15   officers of the company to do their named roles, to
16   perform their named functions?
17       A.  Uh-huh.
18           MS. VILMOS:  Object to the form.
19           THE WITNESS:  I wasn't aware of that, but,
20       okay, you just informed me.
21   BY MS. HAVENER:
22       Q.  Did you know anything about Ms. Curry's
23   background before she came to Mirabilis?
24       A.  No, that she was an attorney, that she was
25   a CPA, that she worked for a couple of banks in the

58

1    Virginia area and --
2        Q.  Have you ever heard of PERSEREC?
3        A.  No.
4        Q.  Have you heard of it now?
5        A.  PERSEREC?  No.
6        Q.  Have you heard of -- did you know what
7    Nexia certification was?
8        A.  No.  Not until this lawsuit.
9        Q.  Do you have any understanding about it
10   now?
11       A.  Not any -- no, not really.
12       Q.  So tell me if I'm misinterpreting you,
13   because I want to make sure that I'm understanding
14   what you're trying to say.
15       A.  Please, clarify.
16       Q.  No, I'm not trying to clarify.  I just
17   want to make sure I'm understanding what you're
18   saying.
19           Are you testifying to the judge and jury --
20   because that's where this is going --
21       A.  Yes, I understand.
22       Q.  Are you testifying that you believed that
23   it was audacious of Ms. Curry and Mr. Hailstones to
24   be promoting their development of a product that
25   could potentially uncover fraud?

59

1        A.  Yes.
2        Q.  Now, did you have any understanding that
3    this product had ever been used while they were at
4    Mirabilis?
5        A.  No, none whatsoever.  I had --
6        Q.  And so if the product wasn't used at
7    Mirabilis, so, therefore, it was never applied --
8        A.  I didn't care for the product; I cared
9    about the people that were marketing the product.
10       Q.  Well, I don't think that the people that
11   were -- I'm sorry.  I don't mean to be arguing, but
12   nothing on the Website says that these people can
13   uncover fraud.
14       A.  Uh-huh.
15       Q.  If you --
16           MS. VILMOS:  Object to the form.  It
17       wasn't a question.
18   BY MS. HAVENER:
19       Q.  Do you understand the difference between
20   when I say that -- or do you understand what I'm
21   saying when I say there is a difference between
22   people saying that they can uncover fraud and
23   people saying that they have a product that can
24   uncover fraud?
25       A.  I do understand the difference.

60

1        Q.  Okay.  And the Website says that -- or
2    said that Ms. Curry and Mr. --
3        A.  No, it still says that.  I believe that
4    the Website is still active; right?
5        Q.  Yes, but I'm talking about at the time
6    that you saw it.
7        A.  Correct.
8        Q.  That Ms. Curry and Mr. Hailstones or --
9    and, actually, Mr. Hailstones was never a partner
10   in Palaxar, but they had a product that could
11   uncover fraud; is that right?
12           MS. VILMOS:  Object to the form.
13           THE WITNESS:  Is that a question?
14   BY MS. HAVENER:
15       Q.  Was that your understanding?
16       A.  Repeat the question.
17       Q.  Was it your understanding when you looked
18   at the Website that these people were representing
19   to the world that they had a product that could
20   uncover fraud?
21       A.  No, I didn't differentiate at the time
22   between the people and the product.  I really
23   wasn't aware of the product until after I was sued
24   in connection with this.
25       Q.  But you got angry; correct?

61

1     A.   I got angry, yes.  I got --

2     Q.   And what made you angry?

3     A.   What made me angry?  What made me angry is

4  that a lot of people, from my understanding, were

5  investigated, a lot of people's lives were on the

6  line.  And I believe that your clients failed

7  miserably in their fiduciary duties to the

8  shareholders and to the employees of the company,

9  Kathleen.  They failed miserably.  The way I see

10  it, Kathleen --

11     Q.   To the shareholders and who else?

12     A.   To the employees of the company and all

13  the subsidiary companies.  When this huge implosion

14  happened, Kathleen, what I understood -- I never

15  actually physically saw it, but what I understood

16  is that through '06 -- maybe it started late '05

17  and continued to early '07, but for sure in 2006

18  the burn rate of the company was $8-10 million a

19  month.  Over and above that, they were purchasing

20  companies, like four, five, six new companies a

21  month that I only knew about --

22     Q.   Okay.  Whose impression was it -- I mean

23  -- I'm sorry.  From where did you get the

24  impression that that was the, quote, "burn rate" of

25  the company?

62

1     A.   I believe Daniel Myers told me that.

2     Q.   And who was it, what human being was it

3  that you thought was responsible for purchasing all

4  these distressed companies?

5     A.   I don't think it was one person.  I think

6  it was a decision of the Board.  I don't have --

7     Q.   Did you believe, during the time that you

8  were associated with either Mirabilis or AEM, that

9  Mr. -- that the Board was in control of what

10  happened?

11     A.   Yes.

12     Q.   Was it never your understanding that Mr.

13  Amodeo was in control?

14     A.   No, I believe that Frank had some

15  influence.  I don't believe that he was in control.

16  That wasn't what I was told, and that's my --

17     Q.   That's what you were told by whom?

18     A.   By Frank, by Richard Berman, and by Laurie

19  Holtz.

20     Q.   And who was Dan Myers when he gave you

21  this information about the burn rate and the --

22     A.   Who was he?

23     Q.   Yes.

24     A.   I mean --

25     Q.   What was his role at the company?

63

1     A.   One of the myriad of CPAs in the company.

2  I don't know what his official title was, but he

3  was --

4     Q.   He wasn't the CFO.

5     A.   Not to my knowledge.

6     Q.   Did you have any other relationship with

7  Mr. Myers?

8     A.   No.  We were friendly, but, no.

9     Q.   Did he ever do any personal -- I mean, any

10  services for you?

11     A.   Oh, he -- yes.  He actually acted as my

12  CPA for two years.

13     Q.   And what did he do as your CPA?

14     A.   Just filed my taxes.

15     Q.   What company were you involved in in 2004?

16  You said your involvement with Mirabilis and AEM

17  was officially from late '05 to June '06.

18     A.   Uh-huh.

19     Q.   In what company were you -- or partnership

20  or enterprise, whatever word you want to use --

21  were you involved in 2004?

22     A.   Honestly, I don't recall exactly, but

23  there was a company, Primary Bookkeeping.  I don't

24  know if it was '04 or late '03.

25     Q.   And who owned Primary Bookkeeping?

64

1     A.   For a certain period of time, I believe

2  that I did.  It was, once again, another one of my

3  attempts to get paid back.

4     Q.   And for a certain period of time, you did.

5  Who else, and at what time period?  I know it was a

6  compound question.  Who else was involved at

7  Primary Bookkeeping at any other time?

8     A.   I don't recall.  I mean, Frank Amodeo was,

9  but I don't recall the exact dates and --

10     Q.   And what happened during 2004 with Primary

11  Bookkeeping?

12     A.   Frank got into some legal mess once again

13  with a company called Atlas Steel or something.  I

14  don't recall.  Atlas Welding.  Some welding company

15  out in Florida.

16     Q.   And what do you mean by he got into some

17  kind of legal trouble?

18     A.   I don't know.  He provided some services

19  for them, payroll services, and there was a legal

20  headache.  I don't know.  I don't recall.

21     Q.   And you were the owner?

22     A.   For a certain period of time, I believe I

23  was.

24     Q.   Well, and so whose role was it to

25  supervise what Mr. Amodeo was doing?

65

1    A.    At that time, he was responsible for his
2    own actions.
3    Q.    But you owned the company.
4    A.    Yes.  For a small period of time, yes.
5    Q.    And you didn't have any responsibility as
6    the owner?
7    A.    I may have had some responsibilities, but,
8    you know.  I wasn't party to the lawsuit.
9    Q.    Okay.  Did Primary Bookkeeping pay their
10   941 taxes?
11   A.    I don't recall.  I would hope that they
12   did.
13   Q.    As the owner of the company, can you tell
14   me who at Primary Bookkeeping would have been
15   responsible for that?
16   A.    No, I can't answer that question.  No, I
17   don't --
18   Q.    You don't know?
19   A.    I don't know.
20   Q.    Do you know who the other employees were
21   of Primary Bookkeeping?
22   A.    It was one gentleman out of West Palm
23   Beach who worked with Frank, and I don't recall his
24   name.
25   Q.    Who is Jerry Beavers?

66

1    A.    That would be him, yeah.
2    Q.    And what was his job?
3    A.    Payroll processing, you know.  I don't
4    know exactly, but -- what his job title or role
5    was.
6    Q.    And how is it that you owned the company
7    but you don't know what people's roles were?
8    A.    Yeah.  I didn't really act as the owner of
9    the company.  It was, once again, a mechanism to
10   get paid back.  But Charles McBurney out of, I
11   believe, Jacksonville clarified that.  I don't have
12   the agreement, but --
13   Q.    So there is a written agreement about your
14   role in Primary Bookkeeping?
15   A.    Yes.
16   Q.    Do you know when that was executed?
17   A.    Late '04, early '05.  I'm not sure
18   exactly.
19   Q.    And did you have a relationship with Mr.
20   McBurney?
21   A.    Yes.
22   Q.    Was he your attorney?
23   A.    He was the attorney for the company.
24   Q.    For Primary Bookkeeping?
25   A.    For Primary Bookkeeping.

67

1    Q.    For what other companies was he the
2    attorney, if any?
3    A.    I don't know.
4    Q.    Was Dan Myers an idiot?
5    A.    Yes.
6    Q.    Okay.  Why?
7    A.    Why?  Because I believe that, you know,
8    he, you know -- why was he an idiot?  There are a
9    lot of reasons why people are idiots, but, yeah, he
10   was one of the professionals involved in this
11   company.
12   Q.    But, nevertheless, you hired him to do
13   your taxes.
14   A.    Oh, before that.
15   Q.    No, he was an idiot afterwards; that's
16   what you're telling me?
17   A.    No.  Okay.
18         MS. VILMOS:  Object to the form.
19   BY MS. HAVENER:
20   Q.    No, I'm asking.  I'm asking the question.
21   A.    Yes.
22   Q.    When did he turn into an idiot?
23   A.    I believe everybody turned into an idiot
24   sometime in early '06.
25   Q.    What made that happen, do you think?

68

1    A.    Greed.
2    Q.    But you also testified a minute ago that
3    it was Dan Myers who was telling you about the burn
4    rate and the number of companies that were being
5    acquired?
6    A.    Well, no.  I found out about the number of
7    companies that were being acquired through a
8    publication called the Nexalist, which was a
9    monthly publication that came out of Mirabilis.
10   Q.    But you testified earlier that it was Dan
11   Myers who told you about the burn rate.
12   A.    The burn rate; correct.
13   Q.    So that didn't alter your opinion that he
14   was an idiot.
15   A.    No, it did.  I believe that it was absurd
16   that nobody there was curious -- at least not to
17   me, and I was very verbal and vocal about it --
18   that the company is spending more money than
19   it's -- you know, where is the revenues coming
20   from?
21   Q.    But who was doing all that?
22   A.    Who was doing what?
23   Q.    Who was burning through the money and
24   acquiring companies?
25   A.    I don't know if any one person was

69

1  responsible for that, Kathleen.  I believe it was
2  the decision of the Board to buy the companies.
3     Q.  Without the influence of Frank Amodeo?
4     A.  No, I believe Frank might have had some
5  influence, yes.
6     Q.  Is it your understanding that the role of
7  the Board was to control Frank?
8     A.  Not to control Frank, but to protect him
9  of himself.  To protect him and the shareholders
10 from Frank.  Frank, I believe, had an addiction.
11 As part of the -- I found out after the fact that
12 it's part of the manic depression.  It's just to
13 spend and not have any realistic understanding of,
14 you know, fiscal responsibility.
15    Q.  Did you ever try to cross Mr. Amodeo?
16    A.  Did I ever try to cross him?
17    Q.  Yes.
18    A.  No.  In his viewpoint, perhaps.  But, no,
19 I never tried to cross him.
20    Q.  Did you ever see anybody who did try to
21 cross him?
22    A.  What do you mean by "cross him"?
23    Q.  Stand up to him.  Challenge him.
24    A.  Oh, I stood up to him.  I don't call that
25 crossing, no.

70

1     Q.  Okay.  So you tried to stand up to him?
2     A.  Yes.
3     Q.  What happened when you did that?
4     A.  I had resigned right after the fact.
5  There was a series of events that led to my final
6  resignation.
7     Q.  But you said that after you resigned you
8  went back as a consultant; correct?
9     A.  Correct, yes.
10    Q.  Did you have any control -- were you ever
11 effective at controlling Mr. Amodeo's conduct?
12    A.  No.
13    Q.  Were you ever -- did you ever see anyone
14 else who could effectively control Mr. Amodeo's
15 conduct?
16    A.  I thought that he was very influenced by
17 Richard Berman and Laurie Holtz.  Extremely
18 influenced.  He actually referred to them as his
19 angels; one on his right shoulder, one on his left
20 shoulder.  That's how he referred to them and
21 that's what they represented to me as well, that
22 they were there to protect Frank from himself.
23    Q.  Do you have any reason to believe that
24 that's not also what they told my clients?
25    A.  That's not what they told your clients?

71

1     Q.  Well, if they told you that --
2     A.  They told me what?
3     Q.  That they were his angels --
4     A.  Correct.
5     Q.  -- and Frank told you that, do you have
6  any reason to believe that they did not also
7  represent the same thing to my clients?
8     A.  No.
9     Q.  So it's quite possible that my clients
10 were told exactly what you were told.
11    A.  It's possible.
12    Q.  And it's quite possible that --
13       MS. VILMOS:  Object to the form.
14 BY MS. HAVENER:
15    Q.  It's quite possible that they believed it;
16 correct?
17       MS. VILMOS:  Object to the form.
18       THE WITNESS:  I don't know what they
19    believed or what they didn't believe.
20 BY MS. HAVENER:
21    Q.  But it's possible that they believed it.
22    A.  Anything is possible, Kathleen.
23    Q.  And you just testified, am I correct, that
24 you had no reason to believe that they were not
25 told exactly the same things that you were told.

72

1     A.  I have no reason to believe otherwise.
2     Q.  Right.  Thank you.
3        When you owned Primary Bookkeeping and Mr.
4  Amodeo was involved, were you effective in
5  controlling him and protecting him against himself?
6     A.  I was not, no.
7     Q.  Did you ever see anybody effectively
8  control him?
9     A.  I just answered your question, Kathleen.
10 I believe that Richard Berman and Laurie Holtz were
11 quite effective for a period of time, yes.
12    Q.  When was that period of time?
13    A.  From their involvement through sometime in
14 the middle of '06.
15    Q.  Okay.  If they were effectively
16 controlling Frank, what was the reason for --
17    A.  I don't know if "controlling" is the fair
18 term, Kathleen.  They had --
19    Q.  Protecting him from himself; I think
20 that's what you said.
21    A.  And influencing him, yes.
22    Q.  Okay.  If they were protecting Frank from
23 himself and had influence -- which, let me make
24 this clear.  Did you consider that to be a positive
25 influence?

73

1    A.   I did.

2    Q.   Okay.  If you believed that Mr. Berman and

3  Mr. Holtz were a positive influence over Frank in

4  the first half of 2006, what caused you to resign?

5    A.   What caused me to resign?  My resignation

6  was very simple, Kathleen.  I received several

7  issues on a monthly basis of the Nexalist.  I saw

8  the company buying more and more companies,

9  spending like, I was told, $8-10 million a month,

10  and Richard Berman, Laurie Holtz, and a slew of

11  other people could not answer where the money was

12  coming from.  Nobody could answer a very simple

13  question:  How is Mirabilis generating all this

14  money?  But what I did witness was everybody

15  pitching Frank on new deals, on new ideas.  But

16  what really -- what really struck me as very

17  peculiar was Presidion, when Frank and company got

18  involved, this is common knowledge, was $50 million

19  in debt to the IRS.  And they were an extremely,

20  extremely, poorly-run company.  Like it was

21  ridiculous.  I'm not going to go bore you with all

22  the details of why I thought so, but it was really

23  quite ridiculous how poorly managed they were.  But

24  what I found very interesting is that in late '05

25  somebody had convinced Frank to separate the entire

74

1  sales department from the company.  And Frank had a

2  pipeline with his Board of Directors of

3  $5.3 billion in new PEO sales for early '06.  B.

4  Billion, with a B.  You understand that all the

5  PEOs in the world combined probably hardly process

6  $5.3 billion.

7    But the two clients that I recall that were

8  being pitched heavily to Frank Amodeo were Dollar

9  Tree and -- Smithfield Hams?  Was that the right

10  name?  I don't know if you're familiar with it.

11  Your client represented to Frank that she had two

12  companies; one was Dollar Tree and another one was

13  Smithfield Hams.  I believe she was working with a

14  gentleman called Mike Dement.  $550 million and

15  $600 million in payroll.  And I just thought it was

16  laughable.  I thought it was completely laughable.

17    Q.   Why?

18    A.   Because a company that has a half a

19  billion dollars in payroll will not outsource to a

20  PEO.  And for whatever reason, if they chose to

21  outsource to a PEO, it would not be a PEO with a

22  history like Presidion's.

23    Q.   Wasn't Mike Dement an employee of

24  Mirabilis?

25    A.   I don't know.  I don't know Mike Dement.

75

1  I just knew that he was working with your client,

2  Edie Curry, on bringing those two large clients to

3  bear.

4    Q.   Do you know if there is any documentation

5  of those, what you refer to as, pitches?

6    A.   No.  I just recall being in a meeting in

7  Orlando and being showed a pipeline sales report

8  with $5.3 billion.

9    Q.   When was that?

10    A.   I don't recall exactly, but probably

11  sometime early '06.

12    Q.   And what did you hear at that meeting?

13  Well, first of all, what kind of meeting was it?

14    A.   I don't think it was an official meeting.

15  It was just, you know, Frank --

16    Q.   Do you know why you were in Orlando?  I'm

17  sorry.  I interrupted you.

18    A.   I believe it was just, you know, Frank

19  flaunting that he's going to have $5 billion-plus

20  of new sales.

21    Q.   And it was sometime in '06; correct?

22    A.   Late '05, early '06.  It was late '05 that

23  he separated the sales force from Presidion and he

24  developed a new sales force called Synentre, or

25  something.  I don't recall --

76

1    Q.   Well, what was Synentre?

2    A.   I don't know.  I believe it was a sales

3  division for PEO sales and marketing of other

4  services, Mirabilis-related services.

5    Q.   Okay.  And when you said "he" separated

6  the sales force from Presidion, you said -- you

7  meant Frank Amodeo?

8    A.   Frank Amodeo.

9    Q.   And Frank Amodeo, apparently, am I correct

10  in understanding --

11    A.   Well, no.  Actually, it was -- officially,

12  I think it was Craig Vanderburg that did it on

13  Frank Amodeo's advice.

14    Q.   Okay.  Am I correct in understanding then

15  that it was Frank -- that Frank Amodeo had that

16  kind of power?

17    A.   That power?  In late '05 he believe he --

18  I don't believe it was power.  I think he advised

19  Craig Vanderburg -- he convinced Craig Vanderburg

20  that he's being properly advised by a whole bunch

21  of very intelligent people and, yeah, they --

22    Q.   And how was that an issue that impacted

23  Mirabilis?

24    A.   Well, it didn't impact -- I don't know how

25  it impacted Mirabilis, but I know it impacted the

77

1  PEO quite a bit. He just decimated the entire

2  sales force. You know, Presidion had a pretty

3  healthy sales division, and sales and customer

4  service. They were referred to as FSRs; something

5  sales reps. I'm not exactly sure. I forgot --

6      Q.  Who were those people?

7      A.  I don't know. It was 20-some-odd people.

8  I don't --

9      Q.  Can you name any of them?

10     A.  No.

11     Q.  Okay. So Presidion had a sales force.

12     A.  Yeah, that had been doing pretty well.

13     Q.  That you thought was effective; correct?

14     A.  Correct.

15     Q.  And Frank Amodeo, it's your understanding,

16  advised Mr. Vanderburg to separate the sales force

17  from Presidion; correct?

18     A.  My understanding was that Frank was

19  advised by certain people -- and I don't know who

20  those certain people were -- at Mirabilis.

21     Q.  How did you come by that understanding?

22     A.  Because that's what Frank had told me.

23     Q.  So Frank told you that some people --

24     A.  What's so funny, Edie?

25     Q.  Frank told you that some people at

78

1  Mirabilis advised him to advise Craig Vanderburg to

2  separate the sales force from Presidion?

3      A.  Correct.

4      Q.  Correct? And but Frank didn't tell you

5  who?

6      A.  He might have. He probably did, but we're

7  going back five or six years, so I --

8      Q.  You don't remember who.

9      A.  -- I don't recall.

10     Q.  And how is Presidion related to Mirabilis

11  Ventures?

12     A.  Officially, I have no idea how to answer

13  that question. Unofficially, Mirabilis was, you

14  know, helping this distressed company and took

15  ownership -- or took management of their PEO

16  division.

17     Q.  Did you resign in June of '06 because you

18  were unhappy with all the idiots?

19     A.  I was uncomfortable --

20         MS. VILMOS:  Object to the form.

21         THE WITNESS:  I was uncomfortable with the

22     situation.

23  BY MS. HAVENER:

24     Q.  Tell me exactly what you mean when you say

25  that you were uncomfortable with the situation.

79

1      A.  So in late '05 when the decision was made

2  to separate the sales force -- and forget my role.

3  My title was Interim CEO, but my real role --

4      Q.  Interim CEO of AEM; correct?

5      A.  Of AEM, correct.

6      Q.  Okay.

7      A.  But my day-to-day duties was sales. My

8  goal was to help save this PEO by bringing on new

9  sales.

10     Q.  And when you say, "this PEO," you're still

11  talking about AEM.

12     A.  AEM, correct.

13     Q.  Okay.

14     A.  And when Frank made a decision to have a

15  national sales force and take these 20, 30-some-odd

16  people from Presidion as the working model and have

17  a national sales force and bring on this $5.3

18  billion of sales, I thought it was lunacy. I tried

19  hard to talk him out of it. I thought it was

20  completely ridiculous.

21     Q.  Tell me why.

22     A.  I just explained that to you.

23     Q.  No. Why was it lunacy?

24     A.  Why was it lunacy?

25     Q.  Yes.

80

1      A.  Because if you combine the four or five

2  highest-grossing PEOs, they probably combined don't

3  have $5 billion of sales. To organically grow with

4  $5 billion of sales would probably take twenty

5  years, but Frank thought it could be done in three

6  or four months.

7      Q.  And you tried to dissuade him from doing

8  it?

9      A.  I tried to dissuade him from doing it, and

10  I was partially successful.

11     Q.  Okay. In what way were you successful?

12     A.  I was able to just keep a small skeleton

13  crew of four or five salespeople in the South

14  Florida office. I made a deal with Frank, let me

15  just have Broward and Dade County; you take the

16  rest of the country.

17     Q.  Who were the people in that sales force in

18  South Florida?

19     A.  Maritza -- I forgot her last name.

20  Ophelia. And there were one or two other

21  salespeople. I don't recall their names.

22     Q.  And what do salespeople for a PEO do?

23     A.  They sell PEO services.

24     Q.  And they sell PEO services to what kind of

25  company?

81

1      A.   Any companies that have employees.

2      Q.   Okay.  When you made that deal to keep the

3  skeleton crew sales force in the South Florida

4  office, was that approved by the Mirabilis Board?

5      A.   I don't know.

6      Q.   Who gave you permission to do that?

7      A.   I don't recall anybody giving me

8  permission to do it, but Frank was okay with that.

9      Q.   So am I correct in understanding that it

10  was Frank Amodeo that you needed to convince to

11  keep your sales --

12      A.   Well, I believe that he needed the consent

13  of the Board, but that wasn't -- I never dealt with

14  the Board.

15      Q.   But you believe that you needed Mr.

16  Amodeo's approval to keep those employees in South

17  Florida; is that correct?

18      A.   I don't know if "approval" is the correct

19  word, but, yeah, I think -- I believe, as a

20  company, I believe that AEM needed approval of the

21  parent company, MVI.

22      Q.   Well, I think you just testified a minute

23  ago that you needed to convince -- that you tried

24  to convince Frank and you were successful.

25      A.   No.  I tried to convince Frank that the

82

1  idea of separating the sales force was lunacy.  It

2  was really ridiculous.

3      Q.   Okay.  And you were partially successful

4  in convincing Frank.

5      A.   To keep the skeleton crew.

6      Q.   To keep your skeleton crew.

7      A.   Correct.

8      Q.   So if someone else was in charge other

9  than Mr. Amodeo, why did you need to convince Mr.

10  Amodeo that what was going on was lunacy?

11      A.   I didn't have too much contact with many

12  other people aside from Frank at Mirabilis.

13      Q.   Why?

14      A.   Because I had lost respect for most of

15  them, to be quite honest, and I --

16      Q.   And had you not lost respect for Mr.

17  Amodeo, as well?

18      A.   Partially, yes.  I did.  But do you

19  understand though that -- do you -- I mean, am I

20  speaking logic to you?  Do you understand -- do you

21  know -- you probably don't know much about PEOs.

22  Do you realize how ridiculous it is to assert that

23  you're going to have $5.3 billion of sales?  Do you

24  realize how ridiculous it is that your client tried

25  to convince Frank that it was very feasible and

83

1  likely that he was going to have two clients,

2  Smithfield Hams for $550 million, and Dollar Tree

3  for $600 million in payroll?  Does that seem

4  likely?

5      Q.   And did you hear her say that to him?

6      A.   I don't recall.

7      Q.   So if you didn't, how do you know about

8  it?

9      A.   I may have been at a meeting where she was

10  saying it.  I just thought it was --

11      Q.   So do you or do you not remember hearing

12  Ms. Curry say that there were going to be

13  5-point-something billion in sales?

14      A.   I didn't have very many meetings with

15  Curry, so I don't recall her saying that.

16      Q.   So how do you know that it happened?

17      A.   Because I saw a pipeline sales report with

18  people who were responsible next to it.

19      Q.   And who prepared those?

20      A.   I have no idea.

21      Q.   What made you rely on them as solid

22  information?

23      A.   Because it came from the company.  It was

24  a pipeline report for --

25      Q.   And did everything that ever came from the

84

1  company turn out to be true?

2      A.   No, obviously not.

3      Q.   And so do you understand that -- what

4  you're sensing from me is frustration.  Do you

5  understand why that some of what you're saying

6  doesn't make sense to me?

7      A.   Uh-huh.

8      MS. VILMOS:  Object to the form.

9  BY MS. HAVENER:

10      Q.   Because sometimes what you see coming down

11  from the company in writing you're taking as gospel

12  and it's making you angry and it's causing you to

13  --

14      A.   I'm not taking it as gospel.  No, it

15  wasn't being taken as gospel.  It was just I saw a

16  report and I thought it was complete craziness.  I

17  told Frank that I would be impressed if they were

18  able to deliver one percent, one percent of that

19  5.3.  If you could bring on 53 million, I would be

20  elated.  One percent of the 5.3 billion.  They

21  never succeeded in that.

22      Q.   And who is "they"?

23      A.   The sales force and, you know.

24      Q.   So you got information from documentation

25  that was sent to you from the company; correct?

85

1  A.  It wasn't sent to me.  It was showed to
2  me.
3  Q.  Showed to you.  Who showed it to you?
4  A.  I think Bruce Walko or, possibly, Frank.
5  Q.  And you didn't know who prepared it.
6  A.  No.
7  Q.  You believed it to be true.
8  A.  No, I didn't believe it to be true.
9  Q.  Okay.
10  A.  I believed it to be lunacy.
11  Q.  And you tried to convince Mr. Amodeo that
12  it was lunacy.
13  A.  Uh-huh.
14  Q.  And you were successful to the extent that
15  you were allowed to keep a skeleton crew of sales
16  force in your South Florida office.
17  A.  In two counties.  How many counties are
18  there in the country?  15, 20,000 counties?  Yeah,
19  I kept two counties in the entire country.  Not in
20  the State of Florida; in the entire country.
21  Q.  Right.  Which means you were -- are you
22  suggesting to me that that's minimal success or
23  that's really good success?
24  A.  Extremely minimal success.  Extremely
25  minimal.  I mean, think about it.

86

1  Q.  And so you achieved minimal success in
2  convincing Mr. Amodeo to permit you to keep a
3  certain number of your -- what you consider to be
4  your skeleton sales crew in two counties in the
5  country?
6  A.  Correct.  Because he was being advised by
7  several dozen accountants and lawyers who were
8  saying the contrary.
9  Q.  Now, how do you know that Mr. Amodeo was
10  being advised by these people?
11  A.  Because I witnessed them advising him.
12  Q.  Mr. Amar, you just testified that you were
13  in very few meetings where my clients were present.
14  A.  Correct.
15  Q.  Okay.  In those meetings --
16  A.  I didn't say it was your clients.  Other
17  -- there were other accountants and attorneys aside
18  from your clients.
19  Q.  But, nevertheless, it was my client you
20  were angry with; correct?
21  A.  Correct.
22  Q.  And what I'm trying to get is for you to
23  tell me what the connection is between your not
24  knowing who was giving Mr. Amodeo bad advice and
25  your rage at my client.

87

1  A.  It was not rage.
2  Q.  Okay.  Your anger at my client.
3  A.  It was not rage.  No, rephrase that.  It
4  was definitely not -- it was not anger, it was not
5  rage.  It was just shock at the audacity of your
6  client.  I was --
7  Q.  You testified before that you were angry.
8  A.  I was angry when I saw the site.  I was
9  not angry at your clients.  I was just shocked at
10  the audacity.  I was angry when I actually saw the
11  Website, yes.
12  Q.  And you were angry because they were
13  selling an anti-fraud product.
14  A.  If they were selling an anti-fraud product
15  and there were these global experts in absolute
16  fraud protection, where was their expertise while
17  this fraud was going on?
18  Q.  What was Curry and Hailstones' connection
19  to the sales force at Presidion?
20  A.  Frank Hailstones was the control person of
21  the company, so he had some --
22  Q.  At Presidion?
23  A.  No, not at Presidion.  At AEM.  At AEM.
24  Q.  So tell me -- I don't understand the
25  connection.  I'm not getting it somehow.  It was

88

1  the sales force of Presidion that was being
2  separated.
3  A.  Correct.
4  Q.  And what was the connection to AEM?
5  A.  AEM was going to manage the book of
6  business and try to salvage some entity of the
7  company, try to salvage some revenues in the
8  company to keep the company afloat.
9  MS. VILMOS:  Ms. Havener, it's 11 o'clock.
10  Whenever you get a chance, if we could take a
11  break whenever it's a good stopping point for
12  you.
13  MS. HAVENER:  Okay.
14  BY MS. HAVENER:
15  Q.  Were Curry and/or Hailstones in charge of
16  the sales force at Presidion?
17  A.  Not to my knowledge.
18  Q.  Did Curry or Hailstones, to your
19  knowledge, have anything to do with the sales force
20  at Presidion?  Any connection to it?
21  A.  Aside from Ms. Curry marketing two very,
22  very, large clients, I believe there were carrots
23  being dangled in front of Frank.
24  Q.  What proof do you have that that happened?
25  A.  I saw the pipeline report and I was told

---

89

1  by Frank that Ms. Curry has the ability to bring

2  two very large clients.

3     Q.  And to what extent do you consider Frank

4  Amodeo's report to you reliable?

5     A.  At that time, I thought that they were

6  fairly reliable.  I mean, there was no reason that

7  he would lie to me.

8     Q.  Okay.  You've testified that you thought

9  he was crazy --

10     A.  Correct.

11     Q.  You thought he was manic-depressive.

12     A.  Uh-huh.

13     Q.  And, nevertheless, you believed everything

14  he said to you?

15     A.  No.

16     Q.  How did you pick and choose what you

17  believed and didn't believe?

18     A.  I -- if I saw something in writing and it

19  was presented to me by somebody other than Frank,

20  or even in the presence of Frank, I didn't believe

21  it, but I thought that it was accurately portraying

22  what the company expected.

23     Q.  Even if you didn't know who wrote it?

24     A.  No, I didn't --

25     Q.  Did you ever see documents that you

---

90

1  thought were inaccurate?

2     A.  No, I can't testify to the fact if they

3  were accurate or inaccurate.

4     Q.  You testified earlier that Frank did not

5  immediately tell you about his background.

6     A.  Correct.

7     Q.  At what point did Frank become a person

8  whose words you believed you could rely on?

9     A.  I never fully --

10     Q.  You said he had no reason to lie to you;

11  correct?

12     A.  Correct.  Correct.

13     Q.  So when?  I'm asking for a time.  At what

14  point did Mr. Amodeo go from being someone upon

15  whose word you could not rely because he didn't

16  tell you about his background to someone upon whom

17  you relied with some consistency?

18     A.  I don't know exactly at what point that

19  happened or at what point that didn't happen.  It

20  kind of --

21     Q.  But it did happen; correct?

22     A.  No, not completely.  It wasn't a complete

23  -- it wasn't a black or white situation, Kathleen.

24     Q.  Okay.

25     MS. HAVENER:  We'll take a break now.

---

91

1     (Thereupon a brief recess was taken, after

2  which the following proceedings were had:)

3     MS. HAVENER:  Nicolette, we're going back

4  on.  Aaron Bates has joined us.  So if you'll

5  make a record, Aaron, A-a-r-o-n, Bates,

6  B-a-t-e-s.

7     Are you here appearing as a party, Aaron,

8  or on behalf of Bates Mokwa?  Or do you want

9  to make an appearance, is what I'm asking.

10     MR. BATES:  No, I'm appearing as a party.

11     MS. HAVENER:  Okay.

12  BY MS. HAVENER:

13     Q.  Do you know that Dr. Pollack is a doctor?

14     A.  Yes.

15     Q.  Did you know at the time that these events

16  that we're discussing were happening that he was a

17  psychiatrist?

18     A.  Yes.

19     Q.  Did he ever say anything to you about Mr.

20  Amodeo's mental health?

21     A.  We've discussed it, yes.

22     Q.  During what time period did you discuss it

23  with Dr. Pollack?

24     A.  Probably late '05.  I don't recall exactly

25  and I don't recall the exact conversation, but we

---

92

1  did discuss it.

2     Q.  You can't remember what he told you?

3     A.  No.

4     Q.  No part of it?  Any --

5     A.  No.  He just acknowledged that Frank did

6  have some mental illnesses and that he was there

7  and -- kind of help keep an eye out for him.

8     Q.  But you didn't feel any need to resign at

9  that time?

10     A.  No, no.

11     Q.  When is the last time you spoke with Mr.

12  Sadrianna?

13     A.  Probably about a week ago.

14     Q.  And what was the context of that

15  conversation?

16     A.  Just asked him if he was being deposed by

17  Mr. Keller in the near future, because there were

18  some scheduling issues when I had spoken with Mr.

19  Keller's office last, and that was it.

20     Q.  Had he at that time been deposed by us?

21     A.  When did you depose him?  What date?

22     Q.  September 20 -- oh, no, it was the 24th.

23  It was a Friday, September 24th.

24     A.  I may have spoken to him for a couple

25  minutes after that.

93

1    Q.   Did you discuss the deposition at all?

2    A.   No.

3    Q.   Is it possible that it was Mr. Sadrianna

4  who told you about what was happening in

5  Scottsdale?

6    A.   No, it's not.

7    Q.   And why is that?

8    A.   Because I hadn't spoken to Mr. Sadrianna

9  from, I believe, February of '07 through the

10  pretrial mediation that we had in June.  I hadn't

11  spoken to him in three years.  A little bit over

12  three years.

13    Q.   So if Mr. Sadrianna remembers that he told

14  you about it, he would be lying?

15    A.   No, just -- I don't believe that he'd be

16  lying; just different recollections.  I don't

17  recall talking to him from the first quarter of '07

18  through June of --

19    Q.   Okay.  So please tell me now, I want to

20  move to the events -- oh, when was the -- just, I'm

21  sorry, one more question about that.

22    When was the last time you spoke to Mr. Bates?

23    A.   Mid September sometime probably.

24    Q.   And what was the context of that

25  conversation?

94

1    A.   He and I are good friends.  We just -- you

2  know.  Friendly conversation.

3    Q.   Okay.  Would you please tell me when was

4  the first time you heard anything about what was

5  going to be happening in Scottsdale.

6    A.   You asked that question already, Kathleen.

7  I believe it was about two weeks before the

8  conference.

9    Q.   And I think you testified that it was Mr.

10  Amodeo who told you; correct?

11    A.   Correct.

12    Q.   Do you remember what he said?

13    A.   No.  He just -- we spoke on the phone and

14  he told me, you're not going to believe this.  You

15  know?

16    Q.   And what did you say?

17    A.   I didn't say anything.  I said -- he just

18  said, look at the site, I went to the look at the

19  site, I called him back, and I was like, I don't

20  believe the audacity.

21    Q.   And then did you talk to him in advance

22  about your going out to Arizona?

23    A.   No, I had mentioned to him that first

24  conversation we had about it, or after I viewed the

25  Website, that I have got to see this to believe it.

95

1  Like I had to see it with my own eyes.  So I wasn't

2  really making any imminent plans to go, but I did

3  mention to him that, hey, I got to see this with my

4  own eyes.  The sheer audacity of your clients I had

5  to see with my eyes.  And I believe I likened -- I

6  believe in the conversation I had with him I

7  likened it to 30, 40 people in a room and somebody

8  dying of cardiac arrest and finding out a few days

9  later that two people in the room are global

10  experts in cardiology or heart surgeons, but they

11  didn't save that client.

12    So it's the same thing I felt about Edie Curry

13  and Frank Hailstones.  I'm like, if they're such

14  experts and if this patented software is so

15  successful, you know, why didn't they detect this

16  fraud?  How did they not detect this fraud?

17    See, the way I viewed it is very simple.

18  Either they were part of the problem with Mirabilis

19  or they were grossly negligent.  I don't see a

20  third solution.  I don't see -- what do you claim,

21  that your clients are just ignorant, were so

22  ignorant that, oh, they believed everything Frank

23  told them?  Is that what you're alleging?

24    Q.   It's not my job to answer questions.

25    A.   Okay.  I'm asking rhetorically, but I

96

1  don't need an answer.

2    Q.   I understand.  Did anybody else during the

3  time that -- I mean, during the time that you're

4  aware of that they were at Mirabilis, detect fraud?

5    A.   Detect fraud?

6    Q.   Did Paul Glover ever say, God, Yaniv, you

7  know, there's gross fraud going on and, you know,

8  we need to stop it?

9    A.   No, he told me there was gross negligence

10  going on.  Because he was -- a few times we had

11  conversations where he was extremely agitated and

12  -- you know.

13    Q.   Did Dan Myers ever say, oh, my God,

14  there's terrible things going on at Mirabilis?

15    A.   Not to me, no.  Not to me.  I don't know

16  --

17    Q.   But have you heard him saying it to

18  someone else?

19    A.   No.

20    Q.   Did Mr. Holtz ever say, oh, my God, you

21  know, there's terrible things going on here?

22    A.   No, no, no.  Holtz actually gave me

23  assurances that things were --

24    Q.   Did Mr. Sadrianna -- he's a CPA; right?

25    A.   Uh-huh.

97

Q. He used to be an IRS agent; right?

A. I don't know that. I'd assume that.

Q. And did Mr. Sadrianna ever say, oh, my God, there's terrible things going on at Mirabilis?

A. Not to me. I don't know what they said to other people. Like I said, I was not there often in '06.

Q. So after you said, I've got to see this with my own eyes, what happened next?

A. Maybe a week or ten days go by. I had spoken with Matt and Aaron, and we were just kind of laughing about it, to be quite honest. I was like -- I just -- really, I thought it was some elaborate hoax. And then when I realized it wasn't a hoax, I was like, I think I'm going to fly out and see this for myself. I'm --

Q. Okay. Go ahead.

A. Yeah, and it was three days before the conference, I believe on the -- I sent you everything on Expedia. I think I booked it on the 11th. I went for 27 hours, yeah.

Q. And what did Matt and Aaron say to you when you were laughing about it?

A. No, they said that they were -- it wasn't for sure, but they were planning on going just to

98

serve Mr. Hailstones and Ms. Curry. They wanted to make sure that they could serve Hailstones while he was in town or in the country. I had no idea what they were serving them, what lawsuit. I was not party to that suit, nor did I care.

Q. Did you have any understanding of any plans before that to file suit -- for Mirabilis to file suit against Ms. Curry or Mr. Hailstones?

A. No, I just -- that was probably a few days before the conference.

Q. When Mr. Amodeo spoke to you about the conference and said, can you believe this --

A. Uh-huh.

Q. I think that's what you testified to.

A. Yeah.

Q. Did he tell you that there was a lawsuit being prepared?

A. No, he told me that they were trying to recover assets, but I don't recall him specifically telling me that he was suing Edie or Frank.

Q. What did he mean when he said they were trying to recover assets?

A. Exactly what it means -- what it says, that there were a whole bunch of -- -

Q. Who is "they"

99

A. Mirabilis. Whatever remnant of Mirabilis was left was trying to recover some assets and retrieve whatever moneys they could.

Q. At that stage, so September of '07, what was your impression of who was left at Mirabilis?

A. Not many people. Not many people. Frank, Marty, a couple of attorneys and executive assistants.

Q. Who were the attorneys?

A. Well, Aaron Bates and Matt Mokwa were two of the attorneys, and there were a whole bunch of outside law firms. And --

Q. Jodi Jaiman?

A. Jodi Jaiman was there, Jay Stollenwerk. I believe Shane, also, but I don't know in what capacity they were there.

Q. So you spoke with Matt and Aaron about it and what came out of that conversation?

A. Exactly what I just said. They were tentatively thinking about going to make sure they could sue -- serve notice to Frank Hailstones.

Q. And did you say, I'm going to come too?

A. I said, you know what, I -- no, I told them before that, I go, I think I have to see this with my own eyes. I gotta go see this.

100

Q. And they said they were going.

A. They said they may go. They weren't sure yet.

Q. Okay.

A. They weren't sure yet.

Q. So how did it come about that you knew that you were going to be in Scottsdale at the same time?

A. I booked, I believe, the Thursday prior to that Sunday flight. Three or four days when I made the final decision.

Q. Okay. So at this time did Mr. Bates and Mr. Mokwa inform you about the lawsuit?

A. They told me they were going to serve Frank Hailstones.

Q. With the lawsuit.

A. With the lawsuit.

Q. Did you ask what the lawsuit was about?

A. No.

Q. So at some point you learned that you were all going to be in Scottsdale at the same time.

A. Correct.

Q. When was that?

A. When I booked, I believe it was Thursday night, I think I called him on Friday and asked him

---

101

```
 1  if they were going.
 2       Q.  You called them both?
 3       A.  I called Matt, I believe, and he said that
 4  he and Aaron were going to be there for a football
 5  game on Saturday, Matt lives there, and then we'll
 6  meet up on Sunday.
 7       Q.  Okay.  And did you meet on Sunday?
 8       A.  Yes.
 9       Q.  And what was the context of your meeting
10  on Sunday?
11       A.  We went to a bar and watched a football
12  game.  We're friends.
13       Q.  Where was the bar?
14       A.  Somewhere in Scottsdale.
15       Q.  Where were you staying?
16       A.  I gave you the hotel reservation.  Some
17  hotel in Scottsdale.
18       Q.  And when you were at the bar, did you talk
19  about what was going to happen?
20       A.  I'm sure we talked about it, but I don't
21  recall any specifics.  We were just -- we are
22  friends, Kathleen.
23       Q.  I understand.  Were you discussing with
24  them -- did you ever discuss with them, oh, my God,
25  I can't believe the audacity of these people?
```

---

102

```
 1       A.  Yes, yes, absolutely.
 2       Q.  And did that happen at that Sunday
 3  conversation?
 4       A.  No.  At that point, I don't think we
 5  discussed it.  I think I just kind of laughed at
 6  it.  I just -- you know?  I don't recall any
 7  specifics of that.
 8       Q.  When I asked you a few minutes ago who was
 9  still at Mirabilis and I asked you about Jodi and
10  Jay and Shane, and you said that Frank and Marty
11  and Aaron and Matt --
12       A.  And a couple of security guards.
13       Q.  Yes.
14       A.  I don't recall all the people.
15       Q.  Were you hanging around -- were you still
16  involved with Mirabilis at that time?
17       A.  I was not still involved with Mirabilis,
18  but I was hanging around occasionally, yeah.
19       Q.  What were you doing hanging around?
20       A.  I was just trying to stay close to the
21  information, because I was honestly quite -- I was
22  extremely scared.  And I don't scare easily,
23  Kathleen.
24       Q.  What were you scared of?
25       A.  I was scared of the investigation into the
```

---

103

```
 1  largest 941 fraud in U.S. history.
 2       Q.  When did you find out about that
 3  investigation?
 4       A.  I found out about that investigation in
 5  early '07, January of '07, I believe.
 6       Q.  And who told you about it?
 7       A.  I believe it was Frank.
 8       Q.  And so just let me make sure I heard this
 9  correctly.  You were hanging around at Mirabilis
10  because you were afraid about the investigation?
11       A.  No, I wanted to stay close to the
12  information.
13       Q.  But you said you were afraid.
14       A.  Yes.
15       Q.  What were you afraid of?
16       A.  Consequences.
17       Q.  For yourself?
18       A.  For myself and for others.
19       Q.  What, specifically, were you afraid of?
20       A.  I've -- aside from a few traffic
21  infractions, I've never had an experience in
22  anything like this, so I just didn't know what to
23  expect.  But I -- you know, there was obviously a
24  concern that a company that I was involved with is
25  being investigated for one of the largest frauds in
```

---

104

```
 1  this country's history.
 2       Q.  With regard to Mirabilis, Mirabilis
 3  Ventures, or AEM or Nexia Strategy, identify for me
 4  any person of whom you are aware as you sit here
 5  today who had any criminal history of fraud.
 6       A.  The only one that I know of is Frank.
 7       Q.  When Mr. Amodeo told you about the
 8  investigation, do you remember what he said?
 9       A.  About which investigation?  Into --
10       Q.  Into the biggest 941 fraud in U.S.
11  history.
12       A.  No, I don't recall the words, but I recall
13  my reaction.  It was not a good one.
14       Q.  What was your reaction?
15       A.  I was visibly very upset.
16       Q.  Describe your reaction for me.
17       A.  How do I describe a reaction?  I was
18  upset.
19       Q.  Okay.
20       A.  I had a stomachache.  I had a headache.
21       Q.  Rumpelstiltskin was upset.
22       A.  Okay.
23       Q.  You know, were you jumping up and down --
24       A.  No, I wasn't jumping up and down.
25       Q.  -- were you throwing things out the
```

105

1  window?

2      A.  No.

3      Q.  I'm asking for a description.

4      A.  No.  I had a stomachache, a headache, and

5  I was like -- I just was not happy.

6      Q.  Were you angry?

7      A.  Yes, I was angry.

8      Q.  Who were you angry at?

9      A.  At Frank and at all his professionals that

10 he had hired to protect the company and --

11 including myself -- from this kind of craziness of

12 happening.  I suspected that there was an issue six

13 months prior to that.  That's why I had resigned.

14     Q.  So when you suspected there was an issue,

15 did you call the authorities?

16     A.  I did not.

17     Q.  Why?

18     A.  I didn't think it was my responsibility to

19 call the authorities.  But I did speak to the

20 professionals that I thought could help.

21     Q.  Who did you speak to?

22     A.  Richard Berman, Laurie Holtz.

23     Q.  When was that?

24     A.  Probably a week prior to my resignation in

25 June of '06.

106

1      Q.  When you discussed it with Mr. Berman and

2  Mr. Holtz, do you know if there was any record of

3  that meeting?

4      A.  No.

5      Q.  Did anybody take notes?

6      A.  No.

7      Q.  Did you make notes of it yourself

8  afterwards?

9      A.  No, I did not have a stenographer present,

10 no.

11     Q.  That wasn't my question.  I'm not --

12     A.  No, I didn't --

13     Q.  I'm really not trying to be mocking.  I'm

14 just trying to figure out what happened.

15     A.  No, there were no notes.  There were no

16 notes taken.

17     Q.  Okay.  When Mr. Stanley took over, that

18 was after you; correct?

19     A.  That was -- I think he took control

20 officially in May or June as soon as he got

21 approved by the DBPR.

22     Q.  And so you transitioned -- did you begin

23 transitioning out at that time?

24     A.  No.  I actually resigned and left, I took

25 a trip to Israel, and while I was in Israel I got a

107

1  call from Mike Stanley and Laurie Andrea and --

2  three-hour conversation, and they -- they asked me

3  to stay on.  I refused.  And after three hours of

4  influencing and convincing I agreed to come back

5  after my two- or three-week vacation and help

6  transition --

7      Q.  As a consultant?

8      A.  As a consultant.

9      Q.  Did you tell Mr. Stanley or Miss -- is it

10 Ms., or Mr. Andrea?

11     A.  Mrs. Andrea.

12     Q.  Did you tell Mr. Stanley or Mrs. Andrea

13 about your concerns?

14     A.  Yes.

15     Q.  And what was their reaction?

16     A.  Their reaction -- well, I mean, I really

17 spoke to Mike Stanley about it.  And he -- he was,

18 I believe, a CPA by trade.  He had a lot of

19 experience in the human resource domain.  I think

20 he was named the Mirabilis HR domain -- President

21 of the HR domain.  And I was given some assurances

22 that things were going to be fiscally responsible

23 and --

24     Q.  Did he comment about the purported fraud

25 in the past?

108

1      A.  No, he didn't, but he did comment that he

2  believed that AEM's 941 status was in good

3  standing.

4      Q.  And did he tell you what gave him that

5  impression?

6      A.  I don't know.  Just the paper trail that

7  he --

8      Q.  So are you telling me that Mr. Stanley

9  wasn't concerned about the investigation?

10     A.  There was no investigation yet at that

11 time.

12     Q.  Oh, right.  Okay.  Sorry.  But you told

13 him about your concerns?

14     A.  Yeah, I was very vocal about my concerns.

15 Everybody knew my concerns.

16     Q.  And Mr. Stanley reassured you and said he

17 thought there were no concerns.

18     A.  He didn't give me any reassurances.  He

19 just told me he thought -- he just spoke to AEM.

20 He didn't speak to Mirabilis.  He just spoke to

21 AEM.  He believed at that time that AEM was in good

22 standing.

23     Q.  So when you found out about the

24 investigation, were you angry with Mr. Stanley?

25     A.  Very.

109

```
1    Q.  Did you vocalize that?

2    A.  Yes.

3    Q.  Okay.  Whose job did you think it was to

4  detect fraud at Mirabilis?

5    A.  Well, I thought it was -- you know, I was

6  very comforted -- I can only speak to myself.  I

7  don't know what the official duties were and what

8  the official jobs were, but when I see Laurie Holtz

9  being the dean of forensic accounting, he

10 practically invented the industry of forensic

11 accounting, when I see Frank Hailstones having his

12 anti-fraud Sarbanes-Oxley background, when I see

13 your attorney being, you know, a corporate

14 compliance --

15   Q.  Excuse me.  I don't have an attorney.

16   A.  Excuse me.  Your client, who is an

17 attorney and in charge of corporate compliance for

18 the company, I believed that things were going to

19 be done correctly.  So whose job did I think?  I

20 thought it was all their jobs.  I certainly didn't

21 believe it was Frank's job.

22   Q.  Did you think it was yours?

23   A.  To a certain extent, yes.

24   Q.  So you thought that you had failed as well

25 as everybody else.
```

110

```
1    A.  I never saw a financial statement, I never

2  saw a bank statement, I never transferred a single

3  penny out of any account.

4    Q.  Were you aware that it was Mr. Glover's

5  job to produce financial statements for 2005 in

6  2006?

7    A.  For the first couple of months in '06,

8  yes.  And then I believe that he was marginalized.

9  You know, he was put out to pasture.  I believe

10 that's how I was told.

11   Q.  Who told you that?

12   A.  He did.

13   Q.  Did you know that he was being asked --

14 that he was continually asked, where are the

15 financial statements?

16   A.  Right.  And he got audited financials, I

17 believe, for AEM, or for Mirabilis Ventures.  I

18 don't recall, but there were James Moore & Co --

19   Q.  Do you know when that was?

20   A.  Sometime in the second quarter, I believe,

21 of '06, if I recall correctly.  I don't have it in

22 front of me, but I did see that.  I did see the

23 audited financials.

24   Q.  Did James Moore find fraud?

25   A.  If the financials were audited, I believe
```

111

```
1  they didn't.

2    Q.  So does that lead you to conclude that

3  somebody was hiding fraud?

4    A.  Possibly.  Anybody -- I believe, Kathleen,

5  that anybody that conducts fraud tries to hide the

6  fraud.  But it's -- you know, how can they hide it

7  from 30, 40, 50 accountants and attorneys?  I just

8  -- I don't think any one person is that clever.  I

9  don't think Frank was that clever.

10   Q.  So you think somebody knew about it and

11 covered it up?

12   A.  Yes.

13   Q.  And who do you think that was?

14   A.  Well, I witnessed in -- sometime in '07, I

15 witnessed a video of a Board of Directors meeting

16 that was taken, I believe, April 18th of '06.

17   Q.  Yes.  And you sent that to me in

18 production.

19   A.  Correct.

20   Q.  Right.

21   A.  And they acknowledged -- I don't recall

22 the exact number, but they acknowledged at that

23 time an enormous, enormous tax debt.  And what I

24 recall from seeing that video is that Frank

25 Hailstones, the President of Mirabilis, member of
```

112

```
1  the Board of directors of Mirabilis -- your client

2  here, Edie Curry, was at that meeting --

3  acknowledged that there was an enormous, to the

4  tune of tens of millions, possibly over a hundred

5  million dollars of tax debt.  Oh, but that's a

6  Presidion issue.  Oh, we'll just wrap up the second

7  quarter.  It was already two weeks into the first

8  quarter -- into the second quarter, but it was

9  like, we'll just wrap it up and start fresh

10 July 1st.

11   Q.  Was Mr. Glover at that meeting?

12   A.  If I recall correctly, yes.

13   Q.  Does the fact that there is a problem

14 with, quote, payroll taxes acknowledged necessarily

15 mean that there's a fraud?

16   A.  If we're talking about a rounding error,

17 then no.  But we're talking about a sum that is so

18 huge.

19   Q.  When did you see that April 16th video?

20   A.  Sometime in early '07 I believe Frank gave

21 it to me.

22   Q.  Did you notify the DBPR?

23   A.  The DBPR?  No.

24   Q.  Did you notify the authorities?

25   A.  I did hand a copy to my attorney and asked
```

113

1  him if he wanted to share it with the authorities.
2      Q.  Did that happen?
3      A.  I believe so.
4      Q.  Did you know in early '07 that Mr. Amodeo
5  was already in negotiations with Mr. Gold?
6      A.  No.
7      Q.  Do you know that now?
8      A.  Yes.
9      Q.  How did you find out when Mr. Amodeo's
10  negotiations with Mr. Gold started?
11      A.  I don't recall exactly how I found out,
12  but I know I read somewhere on one of the Orlando
13  Sentinel articles that he was an informant.  I had
14  no knowledge of that.
15      Q.  And you also know he pled guilty to
16  committing the fraud.
17      A.  Yes.
18      Q.  So if you're aware that Mr. Amodeo
19  confessed to it, as that's one premise, and if you
20  believe that someone who's committing fraud
21  ordinarily tries to cover it up --
22      A.  Uh-huh.
23      Q.  -- then why is it that you're not angry at
24  Frank Amodeo for the fraud?
25      A.  I'm not saying that I'm not angry at Frank

114

1  Amodeo.  But I believe that he hired all these
2  professionals to protect him from himself.
3      Q.  And, nevertheless, he did it and confessed
4  to doing it --
5      A.  I don't believe he was that clever --
6      Q.  -- and he succeeded --
7      A.  I don't believe he was that clever to hide
8  it from the -- we're not talking one or two
9  professionals, Kathleen.  We're talking about 80,
10  90 accountants and attorneys, forensic accountants,
11  Sarbanes-Oxley experts.  Yeah, I don't believe he
12  was that clever.  I believe Frank was clever.  I
13  think he's a genius, really.  Personally, I do.  I
14  don't think any one person in the world is that
15  clever, Kathleen.  I really don't.
16      Q.  You didn't suspect it.
17      A.  Oh, I certainly suspected there was
18  something going on very early on.
19      Q.  But you didn't say anything?
20      A.  Of course, I said something.
21      Q.  What did you say?
22      A.  I believe I had a meeting with Laurie
23  Holtz in late March.  He was the only professional
24  that ever -- the only member of the Board that ever
25  came to the company -- to the Doral office.  He

115

1  came down with Fernando Simo, who was -- had held a
2  title at Mirabilis and --
3      Q.  He was actually the President of
4  Mirabilis.
5      A.  He took over from Frank -- I thought Frank
6  Hailstones was the President of Mirabilis.
7      Q.  I think Fernando --
8      A.  I thought he was COO, if I recall
9  correctly.
10      Q.  Yes.  Right.  Okay.
11      A.  Right.  So he was head of operations.  He
12  wanted to come and see the operation.  Every new
13  person that was introduced to me, it was like -- it
14  was laughable.  Yes, I just need a couple of weeks
15  to get things installed, everything will be
16  fiscally responsibile.  And every time somebody new
17  was introduced, yeah, yeah, we're going to make
18  sure that everything is fiscally responsible.
19      So they came down to see the operation.  They
20  saw that I was running pretty much the same amount
21  of payroll that Presidion was running with -- I
22  believe they had nine offices and 240 internal
23  employees.  I had cut it down to one office and
24  like 70 employees, so just to show how grossly --
25      Q.  You were cut back?

116

1      A.  Yeah.  But I was still successful in
2  keeping the business operational.  And what I found
3  very funny was -- and I explained this to Fernando
4  Simo and Laurie Holtz -- I go, it's funny that they
5  had a -- Mirabilis, had a $5.3 billion sales
6  pipeline and the entire country to sell their
7  services in and I have four people in one little
8  office.  I think I was responsible for bringing on
9  $95 million of new sales in '06.  You know?  That's
10  noteworthy.
11      Q.  Yes.  And you were -- but you stayed on --
12  Mike Stanley and Ms. Andrea or Mrs. Andrea
13  convinced you to stay on as a consultant.
14      A.  Correct.
15      Q.  So did you consider yourself to be one of
16  the professionals who were supposed to be protecting
17  Frank from himself?
18      A.  No.  No.  I'm not a professional.
19      Q.  Okay.
20      A.  I don't hold any professional degrees.
21      Q.  So was your consultancy focused only on
22  sales?
23      A.  Only on sales?
24      Q.  Yes.  For what were you a consultant?
25      A.  Well, to keep the sales force intact.

117

1   And, also, Mike Stanley had no plans of moving down
2   to South Florida.  So he asked me to stay on board
3   because, you know, he had concerns that he was
4   going to not be able to earn the respect of all the
5   employees down there.  I believe that's how he
6   worded it to me.
7       Q.  When you resigned, what was your plan for
8   your next venture?
9       A.  I was going to take a little sabbatical
10  and enjoy the first year of marriage with my wife
11  and then find something else to do.  I wasn't
12  concerned.
13      Q.  How much were you paid when you were
14  employed as the President of AEM?
15      A.  It was -- it started out at $8,000 and it
16  moved up to $10,000 a month.
17      Q.  A month.
18      A.  Yeah.
19      Q.  Okay.  I want to finish what we were -- we
20  got sidetracked when we were speaking about
21  Scottsdale.
22          You had the meeting with Mr. Bates and Mr.
23  Mokwa on Sunday.  And what happened after that?
24      A.  After the meeting after the football game?
25      Q.  Yes.

118

1       A.  I think we had dinner, they went to their
2   hotel room, I went back to my hotel room, and we
3   reconvened the next day.
4       Q.  You were staying in separate hotels?
5       A.  Yes.
6       Q.  All three of you?
7       A.  I don't know where they were staying.  I
8   just --
9       Q.  Okay.  And what happened the next morning?
10      A.  The next morning, we met at -- I believe
11  it was the Renaissance, wherever the conference was
12  being held.  Matt and Aaron met with the process
13  server.
14      Q.  You weren't there?
15      A.  No, I was there, yeah.
16      Q.  Okay.
17      A.  But I had no -- I was not party to that
18  conversation.  And we --
19      Q.  What was the conversation at that meeting
20  with the process server?
21      A.  No, nothing.  Just they --
22      Q.  Well, it can't be nothing.
23      A.  No, no.  But they handed -- I don't know.
24  I mean, they handed him the lawsuit or whatever and
25  he said, okay, just he'll find them and serve them.

119

1   That was it.
2       Q.  Who said, go find them and serve them?
3       A.  No, not -- I didn't say go find.  I said I
4   think they -- I don't recall exactly the
5   conversation, but they said that they were going to
6   point out Edie Curry and Frank Hailstones.
7       Q.  Did somebody see Ms. Curry out the window?
8       A.  No.  Not to my -- no.
9       Q.  Did anybody show Mr. Zollars a picture of
10  either Ms. Curry or Mr. Hailstones?
11      A.  I don't recall them showing a picture.
12      Q.  Okay.  So then I presume after the meeting
13  you all walked out together from the casita where
14  you were meeting; is that right?
15      A.  What's a casita?
16      Q.  Well, the room where you were meeting.
17      A.  Yes.
18      Q.  And then just describe for me what
19  happened, please.
20      A.  We walked -- it's an outdoor hotel.  It's
21  not like an indoor hotel, so it's an outdoor hotel.
22  We walked out of the room where we -- I wasn't
23  staying there, but where we met.  And we were
24  probably, if I recall, I don't know, 60, 70 feet
25  away from the entrance of where the conference was

120

1   being held.  It was around 8:30 in the morning.
2   And Edie Curry and Frank Hailstones were in the
3   parking lot, the same parking lot we were at,
4   outside.  So they approached us.  And that was
5   interesting.  Edie Curry approached me and said,
6   "Is that Yaniv Amar?"  You know, she was being
7   rhetorical.  And she proceeded to hug me.  And I
8   pulled back and said, "This is not a social call."
9       Q.  Okay.  Can you please use the same tone of
10  voice and at the same pitch and volume --
11      A.  That Edie Curry used?
12      Q.  That you used.
13      A.  What do you mean?
14      Q.  When you pulled back and you said --
15      A.  "This is not a social call."
16      Q.  So it was in a normal tone of voice?
17      A.  A normal tone of voice.
18      Q.  Okay.  And then what?
19      A.  And then she said, "Well, what are you
20  doing here?"  And she goes -- and then she
21  proceeded to -- and then she was -- she acted very
22  defensive.  "If you're here about the lawsuit,
23  well, I can explain."  I was like, "I don't know
24  anything about this lawsuit."
25      Q.  How did Ms. Curry know anything about the

121

1  lawsuit?  She hadn't been served yet.
2      A.  I don't know.  I believe she might have
3  read the article that just came out two days prior.
4  There was a newspaper article that came out
5  Saturday.
6      Q.  Okay.  Do you know when the conference
7  started?
8      A.  I believe it started on the 14th,
9  October 14th, if I recall correctly.  It's right
10  here.  I don't know.
11     Q.  Okay.
12     A.  Yeah, it started the 14th.  We met the
13  morning of the 15th.
14     Q.  And what did the article say about the
15  lawsuit?
16     A.  You read the article.  I don't recall.
17  It's just Mirabilis recovering assets, and there
18  was one paragraph about Edie Curry and Frank
19  Hailstones in there.  Do you want me to read it?  I
20  have it right there.
21     Q.  If you have it, just tell me what it said
22  about the lawsuit.
23     A.  "A suit against Palaxar Group LLC,
24  ex-Mirabilis President Hailstones, and
25  ex-Secretary-Treasurer Edith Curry."

122

1      Q.  What's the date on that one?  Excuse me.
2  I didn't mean to interrupt you.
3      A.  October 13th, 2007.
4      Q.  Okay.  Go ahead.
5      A.  "Alleges the executives breached contracts
6  to Mirabilis and misappropriated trade secrets and
7  patents developed by the company before they left.
8  The suit said the former executives are marketing
9  an anti-fraud product that would deprive Mirabilis
10  of revenue.  Neither could be reached for comment."
11     Q.  But it doesn't say anything about them not
12  having detected fraud; right?
13     A.  No.  That's what it says.
14     Q.  And why would you think that Ms. Curry --
15  you know she lived in Richmond.
16     A.  Uh-huh.
17     Q.  And she had been in Scottsdale for the
18  weekend; correct?
19     A.  Uh-huh.
20     Q.  Why would you have thought that she would
21  have read the article?
22     A.  Oh, maybe somebody notified her of it,
23  maybe she checked Orlandosentinel.com, you know.  I
24  don't know.
25     Q.  Did somebody have the article with them at

123

1  that time?
2      A.  At that meeting on Monday morning?
3      Q.  Right.  Yes.
4      A.  Yes.
5      Q.  Who was that?
6      A.  I believe Matt Mokwa had a copy with him.
7      Q.  Okay.  And then what happened?
8      A.  What happened when?  After Edie --
9      Q.  After Edie -- you said she became
10  defensive.
11     A.  Yes.
12     Q.  What did you say next?
13     A.  I said, "Edie, I really" -- "I'm not here"
14  -- "I couldn't care less about this lawsuit."  She
15  goes, "Well, what are you doing here?"  So I
16  responded with a question of my own.  I said,
17  "Well, if you're such a global expert in anti-fraud
18  detection, where in the fuck was your expertise
19  while this fraud was going on?"
20     Q.  Was that the tone of voice you were using?
21     A.  Yes, yes.
22     Q.  Okay.  And who was standing around?  Who
23  was there?
24     A.  Aaron Bates, Matt Mokwa, the process
25  server.  I forgot his name, but Aaron Bates' nurse

124

1  was maybe 10, 15 feet away.  And that was it.
2      Q.  Not Mr. Hailstones?
3      A.  Oh, Mr. Hailstones, of course.  Mr.
4  Hailstones, yes.
5      Q.  And you didn't see anyone else?
6      A.  No.
7      Nowhere near.
8      A.  No.  There was some people at the entrance
9  of the conference, but that was not near where we
10  were.
11     Q.  When you say, "not near;" how far away?
12     A.  I didn't measure, but 60, 70 feet.
13     Q.  And were you shouting?
14     A.  No.
15     Q.  Okay.  Why in your Answers to
16  Interrogatories was it all written in capital
17  letters?
18     A.  That's how I write.  That's just --
19     Q.  Well, some of it wasn't.
20     A.  That's -- show it to me.  I mean, no, I
21  didn't insinuate that I was shouting because I
22  wrote in capital letters.  That's how I write.
23     Q.  Okay.  Do you remember what else you said
24  after -- you said, "Where the fuck was your
25  expertise when --"

125

1      A.   This $200 million fraud was going on.
2      Q.   Okay.  And did you say anything else?
3      A.   Well, Edie responded with a -- with a very
4  cynical smile, "Well, we'll just let Randy decide
5  about that."  I said, "Randy?"  I said, "Wow,
6  you're on first-name basis with the U.S. Attorney."
7  Okay.  I just found that interesting that she, you
8  know --
9      Q.   Why?
10     A.   Why?
11     Q.   Yes.
12     A.   No, I -- "We'll just let Randy decide."
13 That's not the answer I expected, you know.
14     Q.   Why were you surprised that she was on a
15 first-name basis with the U.S. Attorney?
16     A.   Because I referred to him as "Mr. Gold,"
17 you know, with some reverence.  So Edie Curry was
18 on a first-name basis with him, I thought, okay,
19 you know, that's interesting.
20     Q.   What did you think was interesting about
21 that?
22     A.   I just thought it was interesting.  I
23 didn't think anything other than, oh, wow,
24 interesting.
25     Q.   What did Mr. Mokwa say?

126

1      A.   Mr. Mokwa said something to the effect --
2  I think Edie said, "What is it in your hands?"
3  Something, you know, "What's the paper?"  She goes,
4  "Hey."  "It's the newspaper; the Orlando Sentinel.
5  Here.  You made the front page."  Something to that
6  effect.
7      Q.   And did he say anything else?
8      A.   Not to my recollection.
9      Q.   Did he say why they made the front page?
10     A.   No.  I don't recall.
11     Q.   When he said, "You made the front page,"
12 how did Ms. Curry respond?
13     A.   She goes, "Can I see that?"  She asked if
14 she could see it.  And she said, "Oh, we made the
15 front page.  Oh."
16     Q.   Had you gone at any time to the
17 presentation or to any part of the seminar?
18     A.   No.
19     Q.   Did you speak -- what happened immediately
20 after the confrontation?
21     A.   We walked away.
22     Q.   What did you say to each other, if
23 anything?
24     A.   I didn't say anything to Edie.  Her and I
25 didn't discuss anything.  And I just --

127

1      Q.   What did you say to Mr. Bates and Mr.
2  Mokwa?
3      A.   After we left?
4      Q.   Yes.
5      A.   Nothing.  We just --
6      Q.   Nothing?
7      A.   I mean, we said, what, you know, whatever.
8  It's done.  I don't know what we talked about.  We
9  just said, you know, wow, okay, that was easy.
10     Q.   Okay.  And what did they say to each
11 other?
12     A.   What did Matt Mokwa and Aaron Bates say to
13 each other?
14     Q.   Uh-huh.
15     A.   I don't recall.
16     Q.   Did you walk away in silence?
17     A.   No, I walked away.  I believe I was
18 chuckling a little bit.  I was just like -- once
19 again, I was just still amazed by the whole
20 audacity.
21     Q.   So you flew all the way to Scottsdale to
22 have this, you know --
23     A.   I didn't -- I flew there -- I flew to
24 Scottsdale to witness with my own eyes to see if
25 this was actually happening.

128

1      Q.   What?  She was walking around the parking
2  lot?
3      A.   No.  That she was the keynote speaker and
4  this global expert in anti-fraud detection, while
5  she or the company she was very involved with was
6  being investigated for a very large fraud.
7      Q.   That not only Ms. Curry didn't find, but
8  nobody else found either.
9      A.   I don't know.  I don't know who found
10 what.  I know that I suspected things fairly early
11 on.  And I'm --
12     Q.   But you didn't do anything about it.
13     A.   I resigned.  And I expressed my concerns
14 with the Board of Directors.
15     Q.   Did you express your concerns to the Board
16 of Directors with Ms. Curry present?
17     A.   No.
18     Q.   And even though you were --
19     A.   I had very little contact -- I explained
20 that to you, I had very little contact with Ms.
21 Curry during 2006.  We had one confrontation about
22 her trying to convince Frank Amodeo to move the PEO
23 processing center to Richmond, Virginia.  I thought
24 that was another one of her laughable moves.
25     Q.   Why?

129

```
 1       A.  Because we just -- the company just spent
 2   an enormous amount of time, energy, and suffered a
 3   huge amount of client attrition for moving the
 4   processing center from Jupiter, Florida, down to
 5   Doral, Florida.  And two months after doing it,
 6   somewhat successfully, Edie Curry is trying to
 7   convince Frank to move the processing center to
 8   Richmond, Virginia, to process payroll.  I just
 9   found that interesting.
10       Q.  Well, I also want to go back to Scottsdale
11   for a second.  You flew all the way out to
12   Scottsdale because you said you wanted to see for
13   yourself --
14       A.  For myself.
15       Q.  -- that she was the keynote speaker, or
16   somebody was the keynote speaker, at this
17   presentation about anti-fraud.
18       A.  Yeah.
19       Q.  But you didn't go to see the speech.
20       A.  No.
21       Q.  You didn't go to see the presentation.
22       A.  I wasn't a member.  I wasn't invited to
23   the presentation.
24       Q.  And you weren't interested in what they
25   had to say?
```

130

```
 1       A.  No.  I just wanted to see if they were
 2   really actually -- if they really had the audacity
 3   to show up.
 4       Q.  Did you have any reason to believe that
 5   they wouldn't?
 6       A.  No.  I just --  it's one of those things
 7   that I wanted to see for myself.
 8       Q.  And -- okay.
 9       A.  Is that so hard for you to believe,
10   Kathleen, that I had to -- I wanted to see this
11   with my own eyes?
12       Q.  I'm not here to answer questions.
13       A.  Yeah.
14           MS. HAVENER:  Would you please mark this
15       -- we only need to write it on mine.  She'll
16       mark one and -- oh, we only need one.  I
17       didn't realize -- I forgot I made a copy for
18       your counsels.  We'll start with 450.
19           (Thereupon a document was marked
20       Plaintiff's Exhibit 450 for Identification in
21       the proceeding.)
22   BY MS. HAVENER:
23       Q.  You're holding in your hand a copy of
24   what's been marked as 450.  Do you recognize this
25   as your resignation from Common Paymaster?
```

131

```
 1       A.  Yes.
 2       Q.  What did you mean when you said that --
 3   oh.  Just would you read your last paragraph, the
 4   third paragraph?
 5       A.  "My employment in your company has been
 6   professionally rewarding and I appreciate the
 7   interest you have showed in my career since I have
 8   joined the company.  I wish Common Paymaster
 9   continued success."
10       Q.  And you copied it to?
11       A.  Marty Flynn, Laurie Holtz, Frank Amodeo.
12       Q.  And what did you mean by when you said it
13   had been professionally rewarding?
14       A.  It was just a polite way of handing in my
15   resignation.  I didn't really mean anything by it.
16   It wasn't necessarily that rewarding, but I just
17   wanted to be polite in my departure.
18           (Thereupon a document was marked
19       Plaintiff's Exhibit 451 for Identification in
20       the proceeding.)
21   BY MS. HAVENER:
22       Q.  I'm handing you what is marked as
23   Exhibit 451, Plaintiff's Exhibit 451.  And it's the
24   Minutes of a Special Meeting of the Board of
25   Directors of Mirabilis Ventures, LLC, held on
```

132

```
 1   December 28th, 2006.
 2       A.  Uh-huh.
 3       Q.  Now, I think I asked you before, but I
 4   just need to remind myself.  Were you ever on the
 5   Board of Directors of Mirabilis?
 6       A.  Like I told you, in early or mid '05 I may
 7   have been, but --
 8       Q.  And at some point you were a shareholder
 9   in Mirabilis.
10       A.  Correct.
11       Q.  At any point were you aware of being the
12   sole shareholder at Mirabilis?
13       A.  Like I said, somebody tried to convince me
14   of that in early '07, but --
15       Q.  Are you aware of having been the only
16   shareholder who owned any voting shares in
17   Mirabilis?
18       A.  Once again, somebody tried to convince me
19   of that in early '07.
20       Q.  And I think you testified before that it
21   was never your impression that Mr. Amodeo had
22   control over Mirabilis Ventures.
23       A.  No, I didn't say that.
24       Q.  Well, what did you say?
25       A.  I said I didn't believe he ever had the
```

133

1  sole control over Mirabilis Ventures.

2      Q.  Oh, I remember what I wanted to ask you.

3  You were at the company in February of '06;

4  correct?

5      A.  Correct.

6      Q.  Were you a participant in the telephone

7  call that happened that was referred to as the

8  "all hands call" that occurred on February 28th,

9  2006?

10     A.  Refresh my memory.  I don't recall that

11  telephone call.

12     Q.  There was a conference call which Mr.

13  Amodeo asked everyone in the company to dial into,

14  and during that phone call he expressed very

15  extreme dissatisfaction, as I understand it, with

16  Ms. Curry.  Do you remember that?

17     A.  I don't remember it being on that call,

18  but I recall that -- something happening.  This was

19  in February of '06?

20     Q.  Yes.  On February 28th of '06.  You don't

21  remember being on the call?

22     A.  I don't recall being on that call.

23     Q.  Do you remember having any discussions

24  about that call?

25     A.  No.

134

1      Q.  Do you remember hearing about the call?

2      A.  I remember something, there was some kind

3  of a rift between them, but I didn't recall -- I

4  didn't think it was that early.  I thought it had

5  been after my departure.  I don't recall it being

6  in February or March of '06.

7      Q.  So you don't -- okay.  Thank you.

8          MS. HAVENER:  I'm sorry.  For those on the

9      phone, did I finish reading into the record

10     what this exhibit is?

11         MS. VILMOS:  The Board meeting minutes?

12         MS. HAVENER:  Yes.

13         MS. VILMOS:  Yes.  December 28th, 2006?

14         MS. HAVENER:  Correct.

15         MS. VILMOS:  Yes.

16  BY MS. HAVENER:

17     Q.  Do you know if you've ever seen this

18  document before?

19     A.  I have not.

20     Q.  And who signed it, please?

21     A.  Mark J. Bernet.

22     Q.  And who is that?

23     A.  I believe he replaced Richard Berman as

24  the corporate counsel for Mirabilis.

25     Q.  Did you ever know him?

135

1      A.  Yes.

2      Q.  How did you know him?

3      A.  He contacted me in early '07 introducing

4  himself as the new counsel at Mirabilis.

5      Q.  And what else did he say?

6      A.  What else did he say when?

7      Q.  When he contacted you in early '07.

8      A.  What did --

9      Q.  Why did he call you to introduce himself?

10  What was your connection with Mirabilis at the

11  time?

12     A.  I had no connection with Mirabilis aside

13  from consulting and --

14     Q.  So you were a consultant at the time?

15     A.  Correct.

16     Q.  Do you know why Mr. Mark Bernet called

17  you?

18     A.  No.  He had heard about me and wanted to

19  introduce himself to me.  And he did.

20     Q.  And you don't know why?

21     A.  No.  Just -- I don't know why.  I guess he

22  -- whatever remnant was left he wanted to speak

23  with and investigate the situation.

24     Q.  Okay.  If you'll take a look at these

25  minutes.

136

1      A.  Yes.

2      Q.  I'm just going to read into the record for

3  the benefit of the people on the phone.

4      A.  Which paragraph are you reading?

5      Q.  I'm starting at the third paragraph where

6  the bullet points -- with the "Mr. Bernet..."

7      "Mr. Bernet suggested the following agenda for

8  the meeting:

9      - A report from Mr. Walsh and Mr. Hailstones

10  concerning their conversation of December 22, 2006,

11  with Frank Amodeo, relating to the funding issues

12  of the Company."

13     A.  Uh-huh.

14     Q.  Okay.  Second:

15     "A discussion concerning a potential

16  $9 million tax credit held by AEM, Inc., and Marty

17  Flynn's request that a portion of that credit be

18  used to pay delinquent taxes owed by

19  SecureSolution."

20     A.  Uh-huh.

21     Q.  "A discussion concerning the issuance of

22  'target' letters by the United States Attorney to

23  Marty Flynn, Bob Palumbo, Bob Konicki, Dan Meiers

24  [sic] and Bob Curry."

25     " - A discussion concerning the status of the

137

1  sale of the PEO assets."

2      A.  Uh-huh.

3      Q.  And then at the bottom of the next

4  paragraph it says:  "Mr. Bernet reported that in

5  his conversation with Mike Stanley prior to the

6  Board's meeting, Stanley reported that he could not

7  value the companies."

8      Would you please read the next paragraph into

9  the record?

10     A.  "Holtz said that the PEO sales are another

11  example of the control that Frank Amodeo has over

12  MVI.  Holtz said that Mr. Amodeo has always had

13  control of MVI, but that he was to turn control of

14  MVI over to professional business managers and an

15  independent board of directors.  So far, this has

16  not happened, but the current Board needs to take

17  steps to assure that it occurs."

18     Q.  And the next page, the last paragraph on

19  the page.

20     A.  "Mr. Walsh then led a discussion

21  concerning the meeting last week involving Mr.

22  Walsh, Mr. Hailstones and Mr. Amodeo.  Mr. Walsh

23  stated that Mr. Amodeo agreed that after

24  December 31, 2006, MVI will control all of its bank

25  accounts, and that only MVI would be permitted to

138

1  commit MVI to any transactions.  Mr. Walsh told Mr.

2  Amodeo that MVI has a cash need of approximately

3  $17 million for 2007, in response to which Mr.

4  Amodeo suggested that Titanium would retain SimDag

5  until at least April 1, since most of its funding

6  needs would be fulfilled at that time."

7      Q.  Okay.  You can stop now.  Unless if you

8  want to continue, feel free.

9      A.  No, that's fine.

10     Q.  What's SimDag?

11     A.  I don't know.  One of the companies.  I've

12  heard that name before.

13     Q.  Okay.

14     A.  One of the Mirabilis-held entities.

15     Q.  And you said before that Mr. Bernet signed

16  this.

17     A.  That's what it shows here.

18     Q.  And he signed it as the Acting Secretary;

19  correct?

20     A.  Yeah.  I don't know that that's his

21  signature, but it says, "Mark J. Bernet, Acting

22  Secretary."

23     Q.  Okay.  Do you have any reason to suspect

24  that Mr. Bernet would sign something that was

25  false.

139

1      A.  No.

2      Q.  So does it make sense to you that these

3  are the correct minutes of that meeting?

4      A.  Yes.

5      Q.  And does that reflect in any way your

6  understanding of the way Mirabilis had worked up

7  until that point?

8      A.  This is the first time I'm reading this

9  document.

10     Q.  I understand.

11     A.  Yeah.

12     Q.  But we've had several conversations and

13  had several questions and answers about Mr.

14  Amodeo's control versus the Board's control.

15     A.  Yeah.  This --

16     Q.  Do you recall those?

17     A.  No, I don't recall, but this doesn't --

18  this, to me, doesn't reflect the way things

19  happened at Mirabilis.  This is dated December 28th

20  of 2006.  I think this was already when the

21  situation was about to implode and people were

22  trying to save --

23     Q.  Well, not only you were gone, but Ms.

24  Curry was gone too.

25     A.  I don't know when she resigned.  When did

140

1  she resign?

2      Q.  In October -- or actually she was told in

3  September that her -- that the Richmond base of

4  Nexia Strategy was no longer going to be funded and

5  her resignation was effective at the end of October

6  of 2006.

7      A.  Okay.

8      Q.  But beginning in September, they were

9  negotiating her departure.

10     A.  Uh-huh.

11     Q.  So you're not the only person who left.

12     A.  I was the first though.

13     Q.  Really?

14     A.  I'm proud to say that I believe I was the

15  first.  I don't know if anybody -- that's what I

16  believe.  I don't know if it's factual or not, but

17  that's, you know --

18     Q.  And when you resigned, were you taking a

19  stand?  Was that your understanding of what --

20     A.  Yes.  Because I resigned, I did not ask

21  for any of my severance pay that I was entitled to,

22  and I did not ask to hold on to my shares.  I

23  resigned and I relinquished all my shares known and

24  unknown to me, and I didn't demand my severance

25  pay.

141

```
 1      Q.   Is there any reason why those stats are
 2  not conveyed in your resignation letter?
 3      A.   No, but they are conveyed in the Hold
 4  Harmless Agreement that I was handed a week later.
 5      Q.   Do you have a copy of that?
 6      A.   I don't know if I have it here, but I do
 7  have a copy of that.
 8      Q.   Could you provide that to me, please?
 9      A.   My Hold Harmless Agreement?
10      Q.   Yes.  At your earliest convenience.
11      A.   Yes, I suppose I can.  I didn't bring a
12  copy of it.
13      Q.   Are you aware of the terms of Ms. Curry's
14  separation?
15      A.   No.
16      Q.   Do you know if she gave up her shares?
17      A.   I have no idea.
18      Q.   Do you know if she ever owned any shares?
19      A.   I saw her at the shareholders meeting in
20  January so I presume that she was a shareholder,
21  but, no.
22      Q.   Do you know if any shares were ever issued
23  to Ms. Curry?
24      A.   No.
25      Q.   And you don't know the terms of her
```

142

```
 1  separation.
 2      A.   No.
 3      Q.   Do you know if she accepted her severance?
 4      A.   I have no idea, Kathleen.
 5      Q.   Would that make any difference to you?
 6      A.   No, none whatsoever.
 7           MS. HAVENER:  Okay.  Would you please mark
 8      this as the next in succession.
 9           (Thereupon a document was marked
10      Plaintiff's Exhibit 452 for Identification in
11      the proceeding.)
12  BY MS. HAVENER:
13      Q.   Okay.  I'm showing you what's been marked
14  as Exhibit 452 in this deposition.
15      A.   Yes.
16      Q.   Do you recognize this document, Mr. Amar?
17      A.   Not offhand, but I don't -- if I did see
18  this, I haven't seen it in four-and-a-half years so
19  I don't recall it, but --
20      Q.   Okay.  As you know, when you get an e-mail
21  stream they don't start at the top, they start at
22  the bottom.
23      A.   Okay.
24      Q.   At the bottom of the first page --
25      A.   Yes.
```

143

```
 1      Q.   -- do you see that Mr. Vanderburg is
 2  sending an e-mail to himself and to Tessah Ivey?
 3  Do you --
 4      A.   No.  Isn't --
 5      Q.   At the bottom of the first page.
 6      A.   Oh.  Craig Vanderburg is sending it to
 7  himself and to Tessah, yes.
 8      Q.   Do you agree with me that it was not
 9  uncommon for Mr. Amodeo to use other people's
10  e-mail addresses to communicate?
11      A.   Well, he had executive assistants that
12  communicated for him, yes.
13      Q.   I understand.  And so when Ms. Ivey was
14  sending out an e-mail, it was not uncommon for
15  people to be communicating with her because they
16  wanted Mr. Amodeo to know something; correct?
17      A.   That's my understanding.  I didn't
18  communicate via Tessah, but --
19      Q.   Did you have Mr. Amodeo's e-mail?
20      A.   I had his cellphone number.  I mostly
21  called him on his cellphone.
22      Q.   So you don't remember communicating with
23  him via e-mail?
24      A.   I'm sure we have on rare occasions, but I
25  really spoke to him on the cellphone.
```

144

```
 1      Q.   Do you know if you ever communicated with
 2  Ms. Ivey or Mr. Williams or --
 3      A.   Yeah, I'm sure I have, yeah --
 4      Q.   -- other people --
 5      A.   -- and traced all the work, yes, I'm sure
 6  I --
 7      Q.   -- intending to get the message to Mr.
 8  Amodeo?
 9      A.   Yes.
10      Q.   Okay.  And in this e-mail, which is dated
11  February 1st, 2006 --
12      A.   Uh-huh.
13      Q.   -- Mr. Vanderburg is communicating with
14  Tessah and he says he wanted to follow up with
15  Frank on this.  "Yaviv--" which I presume refers to
16  you "-- is pushing to get this account/checkbook.
17  Thanks."
18      A.   Yes.
19      Q.   Do you remember what that's referring to?
20      A.   Yes.
21      Q.   Could you explain it to me?
22      A.   I actually didn't have any financial
23  control over the PEO, so every time we needed to
24  get something approved it would have to go through
25  the chain of command, the whole Mirabilis chain,
```

145

1 until it got accepted or approved by the -- some
2 form of subcommittee from the Board of Directors.
3 So I asked --
4        Q.   Even though you were AEM?
5        A.   Correct.  Well, AEM was --
6        Q.   A subsidiary, yes.
7        A.   -- a subsidiary of MVI.
8        Q.   Yes.  But it didn't have its own Board?
9        A.   No, it did not have its own Board.  But I
10 was pushing to get, what I referred to, WD-40
11 money.  I needed a few thousand dollars in a
12 standalone account where I could take care of
13 little things, whether it be marketing, but I
14 remember why I was pushing hard for it at this
15 time.
16       Q.   Can you tell me why you were asking Frank
17 and not the Board?
18       A.   I -- I didn't follow protocol.
19       Q.   Would you say that it was unusual for
20 people to ask Frank rather than the Board?
21       A.   I don't know what was usual or unusual.  I
22 just know that I didn't follow the protocol.
23       Q.   You didn't go through the Board to get
24 something you wanted from Mr. Amodeo?
25       A.   In this instance, I recall talking to

146

1 Frank Amodeo and Daniel Myers about it, saying that
2 I need a standalone account.
3        Q.   So you have given me the impression in
4 this deposition that you expected that the Board of
5 Directors should be overseeing what Mr. Amodeo was
6 doing.
7        A.   Uh-huh.
8        Q.   Nevertheless, you did not approach the
9 Board of Directors, or anybody on it; you went
10 directly to Mr. Amodeo.
11       A.   In this case --
12            MS. VILMOS:  Object to the form.
13            THE WITNESS:  In this case, I believe I
14       went to Daniel Myers and then it was escalated
15       to Frank Amodeo.
16 BY MS. HAVENER:
17       Q.   Okay.  Thank you.
18            MS. HAVENER:  This one has already been
19       marked as another exhibit.  It's already been
20       marked by one of the other court reporters, if
21       you understand what I'm saying, Edie.  One of
22       the other court reporters has the original
23       copy.
24            THE WITNESS:  Is that for me?
25 BY MS. HAVENER:

147

1        Q.   Yes.  This has already been marked as
2 Exhibit 412 in a different deposition.  If you
3 would just look through this series of e-mails,
4 please.
5            MS. HAVENER:  For those of you on the
6       phone, it starts with an e-mail of July 7th,
7       2006, from Claudia Amell to Dan Myers.
8            THE WITNESS:  Uh-huh.  Who is Claudia
9       Amell?
10 BY MS. HAVENER:
11       Q.   I have no idea.
12       A.   What was that?
13       Q.   Edie believes that she was Dan Myers'
14 assistant.
15       A.   Okay.
16       Q.   Okay.  If you'll turn to the back page,
17 please.  I'm showing you what is -- the back page
18 of this exhibit is Page 124 of Mr. Gold's cross
19 examination of Frank Amodeo.  I'm sorry, I don't
20 know what date it is.  I think it's May 14th of
21 2009.  It's part of the sentencing transcript.
22       A.   Okay.
23       Q.   And if you'll look at -- start at Line 8
24 --
25       A.   Uh-huh.

148

1        Q.   -- and go down to the end of the page.
2        A.   Okay.
3        Q.   The question is:
4        "All right.  And that is the minutes of
5 Mirabilis Ventures, Inc., dated February 15th,
6 2005, a Special Joint Meeting of the Directors and
7 Shareholders, is that correct?"
8        The answer is:  "That's correct."
9        And it's Mr. Amodeo who is answering the
10 questions.  I'm just explaining to you.
11       A.   I understand.
12       Q.   Question -- and on Page 2 it says:
13 "It's signed by you; is it not?"
14 "A.  Yes, it is.
15 "Q.  It says Frank Amodeo is sole director and
16 shareholder?
17 "A.  Yes, it does.
18 "Q.  So --
19 "A.  We've been over this, Mr. Gold.  You know
20 I was only a proxy for Mr. Amar.  They didn't give
21 me the stock.  He held the stock because he didn't
22 get his money.  By the time he got his payments,
23 they didn't release the shares to me.  They didn't
24 want me involved.
25 "Q.  My question is, does that say you were

149

1   the sole director and shareholder?

2        "A.  It does say that."

3        Did I read that correctly?

4        A.  Yes.

5        Q.  What's your understanding of the situation

6   around February 15th, 2005, as to who owned the

7   shares in Mirabilis?

8        A.  My understanding was it was Frank that

9   owned the shares at that time.

10       Q.  Okay.  Would you turn to the

11  next-to-the-last page, please.

12       A.  Yes.

13       Q.  Have you ever seen this document before?

14       A.  If I have, it's been six-and-a-half years,

15  so, I mean --

16       MS. HAVENER:  For those of you on the

17       phone, this is the Revocable Proxy; as always,

18       unsigned.

19       MS. VILMOS:  Did you mark it as a new

20       exhibit number?

21       MS. HAVENER:  No.  It's part of a

22       composite exhibit.  I'm going to tell you --

23       MS. VILMOS:  Oh, 412?

24       MS. HAVENER:  Yes.  It's the

25       second-to-the-last page of 412.

150

1   BY MS. HAVENER:

2        Q.  Have you ever seen it?

3        A.  If I have, it's been six-and-a-half years,

4   so I --

5        Q.  Do you remember it being referred to

6   recently?

7        A.  No.

8        Q.  Did you ever sign an irrevocable proxy

9   with respect to shares in Mirabilis Ventures that

10  you recall?

11       A.  No.  This is unsigned.  And I assume if

12  there was a signed copy, you'd have it.  I don't

13  recall signing it, but I may have.

14       Q.  When Mr. Amodeo testified on the previous

15  page as we read into the record, was he telling the

16  truth?

17       MS. VILMOS:  Object to the form.

18  BY MS. HAVENER:

19       Q.  As you understand it.

20       A.  I don't know when this was dated and I

21  don't know if he was telling truth or not.

22       Q.  Well, the date is written in there

23  February 15th, 2005.  So it's as of that date.  He

24  testified, on the other hand, on May 14th, 2009,

25  but he's testifying about February 15th, 2005.

151

1        A.  I don't know what my impression is.  This

2   is the first time I've read this.  I don't know if

3   he was telling truth or not.

4        Q.  Well, he says he was a proxy for you.  Is

5   that right or not?

6        A.  Yeah, I'm not sure.  I'm not sure if it's

7   right or not.  I don't recall giving a proxy or

8   being the sole shareholder, but --

9        Q.  You don't recall ever being the sole

10  shareholder?

11       A.  I recall incorporating the company and

12  handing him, you know --

13       Q.  I'm sorry.  Excuse my coughing.  I didn't

14  hear what you said because I was coughing.

15       A.  I recall incorporating the company in

16  Nevada and handing Frank the company, the stock.

17       Q.  And -- that's interesting.  Do you

18  remember whether or not it was bearer stock?

19       A.  I recall something to that effect that it

20  was bearer stock.

21       Q.  And you handed the bearer stock to Mr.

22  Amodeo?

23       A.  I don't recall if there were actual

24  certificates or not, but I recall being explained

25  that bearer stock was whoever bears the stock owns

152

1   the stock.

2        Q.  Why did you hand the stock to Mr. Amodeo?

3        A.  Because there was never my intention to be

4   the owner of this company.

5        Q.  If you'll -- we're going backwards through

6   the exhibit.  The next is --

7        A.  The staple just came undone.

8        Q.  I'm sorry.  The next thing we're looking

9   at is at the bottom of what is the fourth page of

10  the exhibit, counting from the front.  So the third

11  to last.  And it's an e-mail from Yvette Ramos.  Do

12  you know who that is?

13       A.  Yvette Ramos?

14       Q.  Uh-huh.

15       A.  No.

16       Q.  To Claudia Amell.  And we've identified

17  Ms. Amell as Dan Myers' executive assistant.  And

18  Yvette Ramos appears to be -- this is an e-mail

19  dated Friday, July 7th, 2006, at 10:40 in the

20  morning.  And it says, "E-mailing Proxy."  And

21  apparently a document called "Proxy" was attached

22  to the e-mail.  Do you have any understanding of

23  what that is about?

24       A.  No.

25       Q.  And then the next is an e-mail from

153

1  Claudia Amell dated July 7th, 2006, at two minutes

2  later, and it's to Dan Myers.  Again, it says,

3  "E-mailing Proxy.  Is this what you're looking

4  for?"

5      The next one is Dan Myers, Friday, July 7th,

6  2006, e-mail at 11:25 to you.  Says:  "Subject:

7  E-mailing Proxy.  Here it is."

8      Do you recall that?

9      A.  From Dan Myers to me, "Here it is."  No, I

10  don't recall that, but --

11      Q.  And the next one is six minutes later,

12  Friday, July 7th, 2006, at 11:31 a.m., from you to

13  Richard Berman.  Subject is:  "E-mailing Proxy."

14  What's attached is a document called,

15  "proxydocpdf."  "Richard, here it is.  Let me know

16  if you need anything else.  Regards and good shava,

17  Yaniv."

18      A.  Yes.

19      Q.  Do you remember that at all?

20      A.  No, I don't recall this.

21      Q.  Do you even know what it's talking about?

22      A.  I'm going to assume that it has to do with

23  -- because he was drafting the Hold Harmless and

24  indemnification that I had requested after I

25  resigned, that he needed all the paperwork that led

154

1  to my employment and resignation.

2      Q.  So you didn't have the Hold Harmless

3  Agreement at the time that you resigned?

4      A.  No, no.  It was handed to me --

5      Q.  It was ex post facto.

6      A.  Yes.

7      Q.  Okay.

8      A.  What is ex post facto?  It's just after

9  the fact?

10      Q.  After the fact.

11      A.  After the fact.  It was probably two or

12  three weeks after, I received it.

13      Q.  Okay.  Now, the next one, for some reason,

14  is earlier.  It's Thursday, July 6th, at 6 o'clock

15  at night, 2006.  It's from Yaniv Amar to Dan Myers,

16  and the subject is, "Power of Attorney and -- well,

17  and "Proxy Control."  Do you know what you were

18  referencing with about twenty exclamation points

19  after it?

20      A.  Exclamation marks.

21      Q.  Do you remember what you were referencing

22  in that e-mail?

23      A.  I'd like to see the e-mail that Dan sent

24  me that I responded that way, but, no.

25      Q.  Well, I think that might be -- okay.

155

1  Well, I'm mistaken.  Dan Myers then e-mails a few

2  minutes later, or half an hour later, 6:44 p.m.,

3  the same date, July 6th, 2006.  He e-mails his own

4  executive assistant forwarding your e-mail, which

5  doesn't have a subject line.  So there's no

6  subject.  "Please help me find this.  Thanks."

7      A.  Uh-huh.

8      Q.  Presumably, that's referring to this Power

9  of Attorney and Proxy Control.  That would appear

10  correct; right?

11      A.  That's a fair presumption, yes.

12      Q.  And Claudia Amell then responds the next

13  morning at 9:12 to Dan Myers.  Again, the subject

14  is just, "Re," and it says, "For whom?"

15      A.  Uh-huh.

16      Q.  And Dan Myers responds five minutes later,

17  "Yaniv and Frank for control of Mirabilis.  Can't

18  you read my mind?"

19      Obviously -- well, obviously nothing.

20      Okay.  And then here's the e-mail again, your

21  July 6th, 6:14 in the evening --

22      A.  Why is it only the subject?  Where is the

23  rest of the text in that e-mail?  Did you have

24  that?  Or it was just --

25      Q.  No.  This was produced to us by Mirabilis.

156

1  It is what we got.

2      A.  Okay.  I would like to see where the

3  actual content of the e-mail went, but, okay.

4      Q.  You mean what you were referencing?

5      A.  I understand that I was probably

6  referencing, you know, part of the --

7      Q.  Something that --

8      A.  No, because Richard Berman had probably

9  asked me in order to correct -- and I will try to

10  get you a copy as soon as possible -- the

11  indemnification and Hold Harmless --

12      Q.  Okay.

13      A.  He asked to reference all the agreements

14  that were signed.

15      Q.  Okay.

16      A.  So I thought that Dan Myers or Procuri or

17  something had this beautiful document saving --

18      Q.  Pro --

19      A.  Procuri.  It was this document --

20      Q.  Oh, yes.  Okay.  A document management

21  system?

22      A.  Yeah, I believe it was Edie Curry's idea,

23  but --

24      MS. VILMOS:  Ms. Havener, I just wanted to

25  -- it's 12:20.  Were you planning on breaking

157

1  for lunch?  Or what's the plan?

2      MS. HAVENER:  Yes, I was going to stop at

3  12:30, if that's okay.

4      MS. VILMOS:  Okay.  That's fine.

5  BY MS. HAVENER:

6      Q.  And then apparently Ms. Amell asks

7  Ms. Ramos for it and she sends it, and then

8  Ms. Amell sends an e-mail to Mr. Myers and says,

9  "Is this what you were looking for?"

10      And you think that -- I'm just trying to get

11  this straight.  You believe that this is all in

12  association with your Hold Harmless Agreement and

13  the negotiations --

14      A.  And my resignation, yes.

15      Q.  Okay.  Thank you.

16      MS. HAVENER:  Would you mark this one as

17  the next in succession, please.  Am I correct,

18  it's 453?

19      (Thereupon a document was marked

20  Plaintiff's Exhibit 453 for Identification in

21  the proceeding.)

22  BY MS. HAVENER:

23      Q.  Mr. Amar, do you recognize this document?

24      A.  July of '05, five-and-a-half years ago, I

25  don't recall it, but I signed a lot of things six

158

1  years ago.  I do see my signature there.  That's

2  me.

3      Q.  And you signed as the Chairman of

4  Mirabilis Ventures; is that right?

5      A.  It appears to be, yes.

6      Q.  And do you recall that you were, in fact,

7  the Chairman of Mirabilis Ventures on the 6th day

8  of July 2005?

9      A.  No, I don't recall that, but I signed it.

10      Q.  Do you know why you would have signed it

11  if it wasn't correct?

12      A.  No, I don't think I knowingly signed it

13  incorrectly, but --

14      Q.  Is that your writing that says,

15  "Chairman"?

16      A.  It appears to be, yes.

17      Q.  Are you aware that in Mr. Amodeo's guilty

18  plea agreement he said that the fraud that he

19  perpetrated started in December of '04?

20      MS. VILMOS:  Object to the form.

21      MS. HAVENER:  I just asked him if he's

22  aware of that.

23      THE WITNESS:  No.

24  BY MS. HAVENER:

25      Q.  Were you ever on the Board of Directors of

159

1  Mirabilis?  You're signing as the Chairman.

2      A.  As Chairman.  I guess in '05 I may have

3  been, yeah.  I mean, you know --

4      Q.  But you don't recall it?

5      A.  I don't recall ever being in the boardroom

6  and having an executive board that responded to me.

7      Q.  Well, do you know why you would sign

8  something that way if it wasn't right?  And

9  actually write in, in your own handwriting, the

10  word "Chairman"?

11      A.  No, I don't know why I did that six years

12  ago.

13      Q.  And you don't -- excuse me.  If, in fact,

14  you were the Chairman of the Board of Directors,

15  wasn't it your job at that point to be overseeing

16  Frank Amodeo and watching out for fraud?

17      A.  At this point in time, I wasn't aware of

18  any business dealings that Mirabilis had in the PEO

19  world.  Presidion still managed its own book of

20  business at this time.

21      Q.  In '05?

22      A.  Yes.

23      Q.  Am I incorrect that that transfer happened

24  in the very beginning of '05?

25      A.  No.  There was a management contract or

160

1  some kind of a consulting contract.  But my

2  understanding was that the transfer happened in

3  late '05 with an effective date of December '06.

4  Or, excuse me, of January of '06.

5      Q.  Right.  But -- okay.  Well, but just to go

6  back to my point.  As the Chairman of the Board of

7  Mirabilis, did you or did you not consider it your

8  role to be overseeing what Frank Amodeo was doing?

9      A.  I didn't think I had the qualifications to

10  oversee what Frank was doing.

11      (Thereupon a document was marked

12  Plaintiff's Exhibit 454 for Identification in

13  the proceeding.)

14      MS. HAVENER:  For those of you on the

15  phone, these are the Minutes of Annual Meeting

16  of the Shareholders of Mirabilis Ventures,

17  Inc., dated January 25, 2006.

18      MS. VILMOS:  Is that 453?

19      MS. HAVENER:  454.  I'm sorry.  453 was --

20  and I didn't describe it.  I apologize.  It's

21  Document 198-2 filed in the case; Page 7 of

22  54.  It's an Assignment and Acceptance.

23  Assignor is Mirabilis Ventures, Assignee is

24  Laurie Andrea, and it's signed by Yaniv Amar

25  and handwritten in is written -- it, Mirabilis

161

1  Ventures, Inc., is the Assignor, and it says,
2  "Name:  Yaniv Amar.  Its:  Chairman."  And
3  it's handwritten.  That's 453.
4       454 is Document 198-1, the Minutes of the
5  Annual Meeting of the Shareholders of
6  Mirabilis Ventures, Inc.
7       MS. VILMOS:  Thank you.
8  BY MS. HAVENER:
9  Q.   This document says, am I correct, Mr.
10  Amar, that the meeting of the shareholders of
11  Mirabilis Ventures, Inc., convened at 4 p.m. on
12  January 25th, 2006?
13  A.   Uh-huh.
14  Q.   "Present at the meeting was Yaniv Amar,
15  sole Class A shareholder."  Do you see that?
16  A.   Yes.
17  Q.   What does that mean?
18  A.   I'm not sure.  I don't recall seeing this
19  agreement.
20  Q.   But do you know what it means, whether you
21  saw the agreement or not?  It's not an agreement,
22  first of all.  It's minutes.
23  A.   Minutes.
24  Q.   Do you know what it means, Class A
25  shareholder?

162

1  A.   Well, it's pretty literal.  I mean, that I
2  was a sole Class A shareholder.
3  Q.   What were Class A shares?
4  A.   I have no idea what Class A, B, or C
5  shares were.
6  Q.   And it says, "several Class B shareholder
7  candidates."  Do you remember who those were?
8  A.   No.
9  Q.   And when, again, was the meeting that you
10  said you attended that had 30 or 40 potential
11  shareholders?
12  A.   Right around this date.
13  Q.   Okay.  And so --
14  A.   And it wasn't several.  It was several
15  dozen, actually, that attended.
16  Q.   Well, although it says several, you
17  believe that there were several dozen people
18  present.
19  A.   I don't believe.  There were several dozen
20  people present.
21  Q.   Okay.  And who is Phil Kaprow?
22  A.   He was an attorney at Mirabilis.
23  Q.   And was that his job at Mirabilis?  Was he
24  counsel at Mirabilis, or did he have a different
25  job?

163

1  A.   I don't know what his role was.  I know he
2  was an attorney.
3  Q.   Okay.  Is there any reason why Mr. Kaprow
4  would have misrepresented the facts in the minutes?
5  A.   I can't speak to what Philip Kaprow did,
6  but I --
7       MS. VILMOS:  Object to the form.  Sorry.
8  Go ahead.
9       THE WITNESS:  But I certainly do not
10  recall ever seeing this document, and I never
11  -- I could tell you absolutely, would never
12  assign these people to a Board of Directors.
13  Never.
14  BY MS. HAVENER:
15  Q.   Well, but --
16  A.   And especially not in early '06 when I was
17  already appalled by what I was witnessing.  So --
18  Q.   Well, who did assign members to the Board
19  of Directors?
20  A.   I don't know, but it certainly was not me.
21  Q.   But you don't know who?
22  A.   No.
23  Q.   Wasn't it Mr. Amodeo?
24  A.   I -- that's probably, you know --
25       MS. VILMOS:  Object to the form.

164

1       THE WITNESS:  He might have had some --
2  yeah, something to do with it, I don't know if
3  he did or not, but I know it was not me.
4  BY MS. HAVENER:
5  Q.   Do you know of anyone else, other than Mr.
6  Amodeo, who had input into who went on the Board of
7  Directors?
8  A.   I think, you know, Richard Berman and
9  Laurie Holtz, because they were the Chairman and
10  corporate counsel.
11  Q.   Did you ever give the bearer stock to
12  anyone but Mr. Amodeo?
13  A.   No.
14  Q.   Are you aware of Mr. Amodeo's ever giving
15  it to anyone else?
16  A.   No.
17  Q.   Was it your understanding that Mr. Amodeo
18  was the only voting shareholder in Mirabilis?
19  A.   No, it was not my understanding.
20  Q.   Who did you believe had voting shares in
21  Mirabilis?
22  A.   I thought several of the members of the
23  Board of Directors had some voting shares.  I
24  really don't even know the difference between a
25  Class A or a Class B.  I told you, I referred to

165

1   these shares as toilet paper. I really did.
2   Because I thought that, you know, they were
3   worthless.
4          MS. HAVENER: Okay. It's 12:30. We have
5   one more document if you'll bear with me. Is
6   that okay? Hello?
7          MS. VILMOS: Yes, that's fine.
8          MS. HAVENER: If you'll mark that as the
9   next in succession.
10          (Thereupon a document was marked
11   Plaintiff's Exhibit 455 for Identification in
12   the proceeding.)
13  BY MS. HAVENER:
14      Q.   This is an e-mail from Dan Myers to Yaniv
15  Amar, dated Wednesday, November 2nd, 2005. It's
16  produced by Mirabilis in this litigation. Can you
17  please tell me what this is, Mr. Amar?
18      A.   This seems like a statement of net worth.
19      Q.   And keep looking. And it's from whom to
20  whom?
21      A.   It's from Dan Myers to me.
22      Q.   And who is Dan Myers, at that time?
23      A.   In this capacity, he was my accountant.
24      Q.   But what's his title?
25      A.   I told you, I wasn't aware of his title at

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

166

1   Mirabilis.
2      Q.   It's right there written on this page.
3      A.   Oh.
4      Q.   Executive Vice President of Finance.
5      A.   Executive Vice President of Finance, yes.
6      Q.   Is that correct, to your understanding?
7      A.   Of which company? I'm not sure. It says
8   EVP of Finance, but it doesn't say which company.
9      Q.   Okay. Whose phone number is that,
10  407-318-8000?
11      A.   I don't recall. I don't recall what the
12  phone number was six years ago.
13      Q.   Okay. Do you see the statement of net
14  worth?
15      A.   Yes.
16      Q.   And was one of your assets, Mirabilis
17  Ventures B stock, worth $4,750,000?
18      A.   That's what it says here.
19      Q.   That was toilet paper?
20      A.   Yeah, absolutely. I don't recall seeing
21  this statement of net worth, and if I would have
22  seen it then or now I'd laugh at it. 'Cause it's
23  Mirabilis Ventures B, I guess that's referring to B
24  Class shares, and it 4.75 million. How do they
25  base that? I have no idea. To me, it was

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

167

1   worthless.
2      Q.   So did you respond to Mr. Myers and say,
3   you know, what are you talking about?
4      A.   Quite possibly. Six years ago, I don't
5   recall.
6      Q.   Can you produce that --
7      A.   My response to him?
8      Q.   -- your response?
9      A.   No, it probably was a verbal response.
10      Q.   You give -- or Mr. Myers lists your
11  occupation as business owner. Do you see that on
12  the last page? Oh, I'm sorry. Attached to the
13  e-mail -- the e-mail was dated November 2nd, 2005.
14  The first attachment is a statement of net worth
15  with the same date listing -- of Yaniv Amar, I'm
16  sorry, listing assets, liabilities, and net worth.
17  And under "Other Assets" it lists, "Mirabilis
18  Ventures B" at a value of $4,750,000. It says on
19  the next page it was prepared by Titanium
20  Consulting, which has a different address than Dan
21  Myers as Executive Vice President.
22      A.   Correction. It says Dan Myers prepared
23  the tax returns. Not this statement of net worth.
24      Q.   Well, but they're attached to the same
25  document, and Mr. Myers -- all of this was attached

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

168

1   --
2      A.   Oh, all of this was one attachment?
3      Q.   Yes.
4      A.   Okay.
5      Q.   And it lists your occupation as business
6   owner. Could you tell me what business you owned
7   at the time?
8      A.   In 2004?
9      Q.   Uh-huh.
10      A.   I believe it was Primary Bookkeeping at
11  the time.
12      Q.   And is it correct that Primary Bookkeeping
13  had a $12,649.00 loss that year? If you'll look at
14  -- well, there's no wages listed; correct; on this
15  2004 tax return --
16      A.   Uh-huh.
17      Q.   -- which is Mr. Amar's tax return. And so
18  I'm presuming that the 12,649 is the net
19  operating loss of the business that you owned.
20      A.   Uh-huh.
21      Q.   Is that correct?
22      A.   It's fair to say that, yes.
23      Q.   Okay. Do you know if Primary Bookkeeping
24  paid its 941 taxes?
25      A.   I do not recall. I would ask Dan Myers or

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

169

1  Mr. McHenry.

2      Q.  But it was your company?

3      A.  It was one of the mechanisms to get paid

4  back from Frank.

5      Q.  But it was your company; correct?

6      A.  The ownership was mine for a short period

7  of time, yes.

8      Q.  And attached after the 2004 tax return is

9  your 2003 tax return; is that correct?

10     A.  Uh-huh.

11     Q.  And, again, it lists a "business owner" as

12 your occupation.

13     A.  Yes.

14     Q.  It lists $300,000 in wages, salaries, and

15 tips.  From where were those wages?

16     A.  In 2003?

17     Q.  Uh-huh.

18     A.  I really have to go back and look what

19 happened seven-and-a-half years ago.  I don't

20 recall.  I really --

21     Q.  And from what business was there a -- it

22 says rental real estate royalties, partnerships, S

23 corporations, trusts, et cetera, and it asks for a

24 Schedule E.  What was the business that lost

25 $335,018.00?  Do you recall?

170

1      A.  It was one of the companies associated

2  with the call center that I had in 2000, 2001, I

3  believe, but I don't recall the company.

4      Q.  Was it Professional Sales Force, Inc.?

5      A.  That's what it says.

6      Q.  And tell me again, what was Professional

7  Sales Force, Inc.?

8      A.  Professional Sales Force, Inc., was a

9  company that was supposed to bring in some nurse

10 staffing to the U.S.

11     Q.  And did it have anything to do with Mr.

12 Amodeo?

13     A.  Not initially, but, yes, he got involved.

14     Q.  And how did that happen?

15     A.  I don't recall exactly what happened seven

16 years ago, Kathleen, but I ran into some issues

17 with trying to bring in Indian and Filipino nurses

18 into the country.

19     Q.  You were associated with it first; is that

20 right?

21     A.  I don't recall.  I really don't recall

22 from seven years ago.

23     Q.  But did you say that this was one of the

24 companies that you were involved with as a means of

25 trying to get your payment back from your loan?

171

1      A.  Yeah.  There were a few of them.  You just

2  refreshed my memory.  I haven't even heard that

3  name in a long time, but, yes.

4      Q.  But you don't remember if you were

5  associated first or Mr. Amodeo?

6      A.  No.

7      Q.  Okay.  And then also attached to this is

8  an IRS e-file from 2005.  Do you recognize this,

9  Mr. Amar?

10     A.  I don't believe I have that.

11     Q.  Oh, you don't have it in your --

12     A.  I don't think so.  An e-file from '05?

13     Q.  Okay.  Do you have your tax return from

14 '05?

15     A.  No.  Just '03 and '04.

16     Q.  Okay.  We can skip that for now.

17        MS. HAVENER:  We're going to go off the

18     record now and take a break.  It's 20 till

19     1:00 right now.  We'll come back at 20 to

20     2:00.  Or let's make it 1:30.

21        (Thereupon a lunch recess was taken, after

22     which the following proceedings were had:)

23        MS. HAVENER:  Would you mark this as the

24     next in succession, please.

25

172

1        (Thereupon a document was marked

2     Plaintiff's Exhibit 456 for Identification in

3     the proceeding.)

4  BY MS. HAVENER:

5      Q.  Mr. Amar, I've handed you what's been

6  marked as 456 in this deposition, Mr. Amar.  First

7  of all, if you'd just look it over.  I'm confused

8  about the initial -- about the e-mail, because the

9  e-mail is dated December 30th, 2004, but it

10 references a fax that it says is dated 12/28/07.

11 However, the fax is actually dated 12/28/04.

12     A.  Okay.

13     Q.  Do you remember anything about this

14 document?

15     A.  No.

16     Q.  What was Mr. Myers' role at Primary

17 Bookkeeping?

18     A.  A CPA, I believe.

19     Q.  Was he an officer of Primary Bookkeeping?

20     A.  Not to my recollection.

21     Q.  Was he an employee associated with the

22 company?

23     A.  I don't recall.

24     Q.  Was he at Titanium Consulting?  Do you

25 remember that?

173

1    A.  I believe he was involved in that company,
2   yes.  That's his company.
3    Q.  And it's Titanium Consulting.  Was that
4   Data Services?
5    A.  No.
6    Q.  Was that ever called Data Services?
7    A.  Not that I know of.
8    Q.  Okay.  Did it ever have any other name?
9    A.  Not that I know of.
10    Q.  And do you know who M. Berkowitz is?
11    A.  Ms. Berkowitz?
12    Q.  Do you think that the "M" stands for
13   "Ms."?
14    A.  I believe so, yeah.  Ms. Berkowitz, yeah.
15    Q.  Oh, Ms. Berkowitz.
16    A.  Yeah, Ms. Berkowitz.
17    Q.  And the fax says: "Ms. Berkowitz, I hope
18   you had a happy holiday season.  I can't find a
19   record of sending me the 941C for 9/30/03, the 941
20   for 12/31/03, or the 1120S for 2003.  Additionally,
21   attached is a letter with specific language from
22   Mr. Amodeo.  The original check I have is for the
23   incorrect amount.  I made a mathematical error.  A
24   new check should be waiting for me today (which I
25   will confirm this morning).  Please let me know if

174

1   you have any questions.  Dan Myers."
2    Do you remember anything about this event?
3    A.  No.  What was the attachment to this
4   e-mail?
5    Q.  This fax.
6    A.  The fax and the actual copy of the check?
7    Q.  Yes.  And the letter that's on the back of
8   the page.
9    A.  Okay.
10    Q.  Do you see the letter as well?
11    A.  I see the letter, yes.
12    Q.  And the letter is dated December 28th,
13   2004; Re:  Primary Bookkeeping.  It's addressed to
14   Ms. Berkowitz at the Internal Revenue Service.
15    "Dear Ms. Berkowitz, Mr. Amodeo has asked his
16   commercial accounting firm to review the following
17   language in order to insure it meets the objectives
18   of resolving 'trust fund' liability and
19   non-impairing collection action against other
20   responsible parties for contribution if needed.
21    "The firm reviewing language is Rachlin, Cohen
22   & Holtz LLP; in particular, the principal assigned
23   to Mr. Amodeo's tax matters:  Jose Marrero.  Mr.
24   Marrero will return from a personal leave on
25   12/29/04.  It is our belief this matter can be

175

1   resolved on 1/3/04."
2    And then the language she refers to is:
3   "Frank Amodeo tenders to Internal Revenue Service
4   the amount of $253,362.71, which constitutes the
5   'so-called' trust fund liability related to
6   employment taxes that Primary Bookkeeping, Inc.,
7   was supposed to, but did not collect, during 2003.
8   This amount is payment-in-full, but does not impair
9   Amodeo's rights of contribution against other
10   persons.  Further, Service in cooperation with
11   Primary Bookkeeping, Inc., shall attempt to collect
12   obligations owed to Primary Bookkeeping, Inc.  Any
13   excess over remaining PBI tax liabilities shall be
14   remitted to Amodeo.
15    "If you have any questions, please do not
16   hesitate to contact me.
17    "Sincerely, Dan Myers."
18    And then there's a check attached to it for
19   $253,362.71.  Do you remember anything about this?
20    A.  No.
21    Q.  Do you know whose signature this is on the
22   check?
23    A.  No.
24    Q.  Oh, I'm sorry.  Its a Cashier's Check.
25   That was my mistake.  Whose handwriting is on the

176

1   check?
2    A.  It's not mine.
3    Q.  Do you see it says Frank Amodeo is the
4   purchaser?
5    A.  Yes.
6    Q.  And it's made out to the Internal Revenue
7   Service; correct?
8    A.  Yes.
9    Q.  And you don't remember anything about this
10   transaction?
11    A.  No.
12    Q.  Did you not tell me that you were
13   President of Primary Bookkeeping at the end of '04?
14    A.  Yes.
15    Q.  So why is it that you didn't know anything
16   about this transaction although you were the
17   President?
18    A.  I don't know.  I can't answer that
19   question, Kathleen.  I don't recall.
20    Q.  And I think just before the break you said
21   that you couldn't recall if there were ever any 941
22   taxes that were not paid by Primary Bookkeeping.
23    A.  Correct.
24    Q.  So do you understand from this that this
25   was making up for past nonpayment?

177

1    A.  For that year.

2    Q.  Yes.

3    A.  Right.

4    Q.  How many executives were at Primary

5  Bookkeeping in 2004?

6    A.  I don't recall.

7    Q.  Were there more than one?

8    A.  I really -- I really have very little

9  recollection about that.  Whether you asked me if

10  Dan Myers was an executive or Frank or just --

11    Q.  Were there five?  Were there ten?  Were

12  there a hundred?

13    A.  No.

14    Q.  You have no idea?

15    A.  No idea.

16    Q.  No idea at all?

17    A.  No.

18    Q.  Okay.

19      (Thereupon a document was marked

20    Plaintiff's Exhibit 457 for Identification in

21    the proceeding.)

22  BY MS. HAVENER:

23    Q.  This is marked 457 in this deposition.

24  It's a fax cover page showing that the faxes were

25  received, and it's from Laurie -- I'm sorry, Mr.

178

1  Berman to Laurie Holtz, dated January 25th, 2005.

2  The "Re" line says, "Frank Amodeo/General Matters."

3  Attached to it is a memorandum.  Do you see that?

4    A.  Yes.

5    Q.  And the memorandum purports to be from

6  Frank Amodeo to Richard Berman.  Do you see that?

7    A.  Yes.

8    Q.  And this says:  "This memo is meant to

9  clarify the ownership of certain companies within

10  my influence.  Also to provide a guideline to how

11  the ownership will change and a baseline for future

12  acquisitions."  It lists Frank L. Amodeo, 100% of

13  AQMI Strategy Corporation, which is a C-Corp.  Does

14  comport with your understanding?

15    A.  No.  But, I mean, I can read that.

16    Q.  100% of Wellington Capital Group, Inc., as

17  a C Corp.  Does that comport with your

18  understanding?

19    A.  That's what it says.  I, you know --

20    Q.  But do you know who owns AQMI Strategy or

21  Wellington?

22    A.  I knew Frank did, but I thought there were

23  some other owners.

24    Q.  Okay.  100% of Mirabilis Ventures, Inc.,

25  as a C Corp.  Does that comport with your

179

1  understanding?

2    A.  It did up until you showed me these

3  proxies that I supposedly signed that I owned it.

4  But, yes.

5    Q.  10% of Quantum Delta Enterprises, a

6  C Corp.  Did you have any understanding about that

7  company?

8    A.  No.

9    Q.  2%; 3,000,000 shares of Presidion

10  Corporation; did you have any understanding about

11  that?

12    A.  No.

13    Q.  And 50% of FYI Enterprises, Inc.  Does

14  that comport with your understanding?

15    A.  No.

16    Q.  And am I correct that you testified

17  earlier that it was your belief that you alone

18  owned FYI Enterprises, Inc.?

19    A.  Yes.

20    Q.  And what was your investment in FYI that

21  led you to that belief?

22    A.  I did not make an investment in FYI.

23    Q.  You started the company?

24    A.  Yes.

25    Q.  And what was FYI intended to do?

180

1    A.  Acquire a piece of real estate in Naples.

2    Q.  Yes.  I'm sorry.  I forgot.  But so -- I'm

3  sorry.  I'm going to go down to -- did I miss it

4  somehow -- FYI Enterprises, Inc., on the next page.

5  Do you see that?

6    A.  Yes.

7    Q.  "FYI Enterprises, Inc., is my

8  'partnership' with Yaniv Amar and does not have any

9  current projects or significant assets."

10    Was that untrue?

11    A.  He was not a partner in the company, but

12  we were going to do a profit share if we were going

13  to make money on that deal in Naples.

14    Q.  So at this point he did not own 50%.

15    A.  No.

16    Q.  Do you have any understanding as to why

17  Mr. Amodeo would make that representation to Mr.

18  Berman?

19    A.  No.  I have no idea why he made any of

20  these representations, and it obviously contradicts

21  with some things that you showed me evidence to the

22  contrary, so --

23    Q.  Right.  Thank you.  This has already been

24  introduced.  I'm showing you what's been marked as

25  Exhibit 413.  It's an e-mail from Dan Myers to

181

1  Shane Williams dated May 8th, 2006, at 11:43 a.m.,
2  saying, "Funding for AEM and FYI." And it says,
3  "Shane, can you check with Frank on funding in the
4  amount of $20,000 for the AEM standalone account
5  and $1,080,000 for the FYI account?"
6      Do you have any recollection about those
7  transactions?
8      A.  The 20,000, yes. And the -- for AEM
9  standalone account. And the FYI account, we were
10  supposed to make an investment.
11     Q.  But do you recall that money being
12  transferred into the FYI account or receiving those
13  funds in any way?
14     A.  No.
15     Q.  If you'll look on the -- so if Jim
16  Sadrianna testified to having transferred that
17  money, and we have bank statements also that show
18  that transaction, are they just mistaken?
19     A.  No, I don't know that they're mistaken. I
20  need to review everything for the last five, six
21  years of my life and try to pinpoint this.
22     Q.  Well, a million dollar transaction is
23  something you would forget about?
24     A.  No, no.
25     Q.  But you don't recall this one.

182

1      A.  I do recall something to that effect. I
2  don't recall the exact circumstances.
3      Q.  Okay. But do you know what happened to
4  that million dollars? $1,080,000?
5      A.  It was invested in a project.
6      Q.  So you do recall getting a million
7  dollars.
8      A.  I don't -- I don't recall the transfer of
9  the million eighty.
10     Q.  Oh. What was the million eighty -- why
11  was it transferred to FYI Enterprises?
12     A.  For an investment.
13     Q.  And what was it invested in?
14     A.  In a piece of property.
15     Q.  Where was that?
16     A.  In Louisiana.
17     Q.  And who owns it now?
18     A.  It's a bankrupt entity.
19     Q.  Who owns the property?
20     A.  I am not sure. I couldn't make the cash
21  call, so I kind of haven't been involved in the
22  last four years.
23     Q.  How was it transferred from FYI
24  Enterprises to another entity?
25     A.  I don't know if I wrote a check or if I

183

1  wired the funds.
2      Q.  No, I'm trying to figure out how -- you,
3  at some point, invested in it; correct?
4      A.  Correct.
5      Q.  But did that mean that you owned the
6  property or just a portion of it?
7      A.  A tiny little portion of it.
8      Q.  And am I understanding that you simply
9  lost your investment?
10     A.  Yes.
11     Q.  You don't know the name of the bankrupt
12  entity? Do you know the name of the bankrupt
13  entity?
14     A.  Market Street Properties.
15     Q.  Do you know who owns it?
16     A.  No.
17     Q.  Was it associated with Lou Pearlman, to
18  your knowledge?
19     A.  No.
20     Q.  Do you know anybody that was associated
21  with it?
22     A.  No.
23     Q.  Can you name any person, any human being
24  that was associated with Market Street Properties?
25     A.  There was -- the gentleman who told me

184

1  about it was Elie Mimoun.
2      Q.  Can you spell that for me?
3      A.  M-i-m-o-u-n.
4      Q.  M-i-m-o-u-n. And Elie is E-l-i-e?
5      A.  I believe so, yeah. Or E-l-i.
6      Q.  And what about this -- you told me earlier
7  that this standalone account was for if you needed
8  to make small purchases for AEM.
9      A.  Yes.
10     Q.  So what was the $20,000 spent for?
11     A.  The first transaction was to pay for a
12  prosthetic limb for one of the employees. The rest
13  of the money was spent on some marketing, some
14  lunch. And I don't recall the --
15     Q.  How much was the prosthetic limb?
16     A.  I think it was $16,000, but I was able to
17  negotiate and just get a premium of like 2 or
18  3,000, if I recall correctly.
19     Q.  Okay. And who was the person?
20     A.  One of the employees in the company and,
21  unfortunately, I don't recall her name, but really
22  nice girl.
23     Q.  Had she been injured in an accident?
24     A.  I don't know. I think she was born with a
25  malady of some sort.

185

Q.   Do you know where the $1,080,000 that was
transferred into the FYI account came from?

A.   No.

Q.   Would it surprise you to know that it was
unpaid payroll taxes?

A.   It would surprise me to know that.

Q.   And why is that?

A.   Because I obviously would not have taken
it if it was unpaid payroll taxes.

Q.   If you'll look back at that transaction,
the transfer into FYI Enterprises, it took place on
5/15/2006; correct?

A.   I thought it was sooner than that.   I
thought it was earlier than that, but that's what
it says there.

Q.   And that was immediately before you
resigned; correct?

A.   I recall it being sooner than that.

Q.   But you think -- so do you think this is
wrong?

A.   No, I just -- I can't -- I can't know for
sure if it is or not.   I'd like to see the
statements, but --

Q.   Excuse me for just a second.
Earlier in the day you testified that you had some

186

suspicion about -- some suspicions -- correct me if
I'm misspeaking, about -- in early '06 --

A.   Uh-huh.

Q.   -- in January of '06, about the funding of
Mirabilis; correct?   And you believed that there
was --

A.   I became suspicious in June right before
my resignation.

Q.   Oh, not in January.

A.   No, I had some concerns as to how the
company was generating its revenues because it was
spending, you know, 10 million a month, but --

Q.   So your concerns didn't solidify until
June?

A.   Until I finally resigned, yeah.

Q.   And what changed between January and June
to make you come to the realization that your
concerns were genuine or that there was something
true about the company that you had suspected
earlier?

A.   Nothing solidified.   Just questions went
unanswered, and the company, Nexia, was buying
companies and companies and companies every month.
Nobody could give me a straight answer.   I decided
to resign.

187

Q.   But you didn't hesitate to take this
million dollars even though you were --

A.   It didn't come from any of the -- I was --
the way I was explained, it didn't come from any of
the related entities.

Q.   Where did it come from?

A.   I'd need to see the statements, I don't
recall exactly, but I thought it was a loan from
Titanium.

Q.   Titanium?   Which Titanium?   Oh, I'm sorry.
This is another -- was Titanium a Frank Amodeo
company?   Forget about that one right now.   I
handed it to you too early.

A.   I don't know if it was a -- it was --
there was some relation to Frank Amodeo with that
company, yes.

Q.   Okay.   When you say some relationship,
does that mean Mirabilis owned it or Frank Amodeo
owned it?

A.   I thought Dan Myers owned it.

Q.   Where would Titanium Technologies have
gotten a million dollars?

A.   I'm not sure.

Q.   Was that the kind of company it was that
operated on that scale?

188

A.   I really don't know.   You have to ask the
owners of Titanium.   But I don't know.

Q.   And what was -- how was FYI connected to
Titanium?

A.   It was not connected.   It just -- Titanium
made an investment in FYI, a loan to FYI, to make
this investment.

Q.   Was it repaid?

A.   No.

Q.   Was it documented by a Promissory Note?

A.   I don't recall one.

MS. HAVENER:   Okay.   Will you mark this as
the next in succession, please.

(Thereupon a document was marked
Plaintiff's Exhibit 458 for Identification in
the proceeding.)

BY MS. HAVENER:

Q.   Will you please look at this document, Mr.
Amar, and tell me if you recognize it in any way.

A.   No, I don't -- I don't recognize it.

Q.   Well, it's my understanding that it's a
composite of companies in which Mr. Amodeo had some
kind of ownership interest or with which he had
some connection.   Would that comport with your
understanding?

189

1    A.  No.  But, okay, I'm looking it over.

2    Q.  Okay.  Is it accurate that you were the

3  President of Professional Sales Force on 4/8 of 03?

4    A.  I presume.  That's what it says.

5    Q.  Was the company reinstated in 4/8/03?

6    A.  I don't recall, but where does it state

7  that?

8    Q.  It says -- under "Event," it says -- at

9  the columns at the top, or the list at the top,

10  under "Event," it says, "Inactive," but reinstated

11  -- or "Reinstatement."

12    A.  Is that on Page 1?

13    Q.  Yes.

14    A.  HRM, HRM; Professional Sales Force,

15  Reinstatement, 4/8/03.

16    Q.  And it lists you as the President;

17  correct?

18    A.  That's what it says, yes.

19    Q.  And Mr. Sadrianna is the Registered Agent?

20    A.  I don't recall that, but, okay.

21    Q.  Whose address is 3107 West Hallandale

22  Beach Boulevard?

23    A.  That's an office that I occupied.

24    Q.  I'm representing to you, because I know,

25  that this is information acquired from Sunbiz.org.

190

1  Do you remember that you became the President of

2  Primary Bookkeeping, Inc., on 9/9/03?  Oh,

3  actually, I'm sorry.  I'm misspeaking.  You already

4  were the President of Primary Bookkeeping, Inc.,

5  and the change was a change of Registered Agent.

6  Actually, it's a change of address.  Do you see

7  what I'm talking about?

8    A.  Yeah, on Page 2?

9    Q.  The only change appears to be the address;

10  is that right?

11    A.  For what?  For Primary Bookkeeping?

12    Q.  No.  For whatever is 456 South Orange

13  Avenue to 457 South Orange Avenue.

14    A.  What page is this?

15    Q.  The second page.

16    A.  Oh.

17    Q.  At the third and fourth from the top.

18    A.  Registered Agent address; okay.

19    Q.  Okay.  And then the next one down, what

20  was Beverages, Inc.?

21    A.  I don't know.  I thought that was a

22  company that Mr. Beavers had or was involved with.

23    Q.  So you don't recall that you were ever the

24  President?

25    A.  No, I don't.

191

1    Q.  And you don't recall that you were ever

2  the Registered Agent?

3    A.  No.

4    Q.  But that is your address.

5    A.  That is the office address that I occupied

6  at that time, yes.

7    Q.  Okay.  If you'll go down the list a little

8  bit farther and look at Professional Sales Force.

9    A.  Yes.

10    Q.  And an annual report was filed on 4/24/04.

11  Is it correct that you were the President at that

12  time?

13    A.  4/28/04?

14    Q.  Yes.  I'm sorry.  I misspoke.  4/28/04,

15    A.  I'm just reading what it says here.  Yeah.

16  I don't know whether -- yeah.

17    Q.  Okay.  But you don't have any independent

18  recollection?

19    A.  From seven years ago, no.  Six-and-a-half

20  years ago, no.

21    Q.  Okay.  And then go one down from that.  Is

22  the Market Street Villages -- is that the Market

23  Street that you were referring to a moment ago?

24    A.  No.

25    Q.  So Market Street Properties is not

192

1  connected to Market Street Villages?

2    A.  No.

3    Q.  It's just a coincidence, as far as you

4  know?

5    A.  I assume there are a lot of Market

6  Streets.

7    Q.  But it lists Marty Flynn as the President

8  of Market Street; correct?

9    A.  That's what it says.

10    Q.  And then Wellington Capital, is it

11  consistent with your understanding that Mr. Amodeo

12  was the President?

13    A.  Of Wellington?

14    Q.  Yes.

15    A.  There were quite a few people there, but,

16  yes, it can be consistent.  We had a few people

17  involved at Wellington.  I thought Daniel Jitu was

18  the President, but, okay.  I'm just reading what it

19  says here.

20    Q.  And Trafalgar Capital, did you understand

21  Mr. Amodeo to be the Director, the President, and

22  the Secretary?

23    A.  No.

24    Q.  Who did you understand to hold those

25  positions?

193

1      A.   I thought there was a Daniel Jitu and
2   there was another gentleman.  I thought he was the
3   President of that company.
4      Q.   Daniel -- could you spell the last name
5   for me?
6      A.   Jitu, I believe, is J-i-t-u.  And there's
7   a John Murphy, I believe.  I thought he was the
8   President of Trafalgar.
9      Q.   Were you still the President of Primary
10  Bookkeeping on 4/12/05? .
11     A.   That's what it says here.
12     Q.   Do you remember that to be true?
13     A.   No.
14     Q.   Do you remember someone else being the
15  president or you just --
16     A.   I remember a document that Charles
17  McBurney wrote that showed some kind of a change in
18  ownership.  I don't know if it was in late '04 or
19  early '05.
20     Q.   And what was the change?
21     A.   That the company really belonged to Frank
22  Amodeo.
23     Q.   Okay.  But Mr. McBurney is listed as the
24  Registered Agent at this time; right?
25     A.   Yes.

194

1      Q.   And when did you say you remembered that
2   document from?  Late '04 or '05?  Is that what you
3   said?
4      A.   Yeah.
5      Q.   Okay.
6           (Thereupon a document was marked
7      Plaintiff's Exhibit 459 for Identification in
8      the proceeding.)
9   BY MS. HAVENER:
10     Q.   Mr. Amar, would you pleases look over this
11  document for me.
12     A.   Yes.
13     Q.   Do you recognize it?
14     A.   No.
15     Q.   Would you turn the page, please.
16          MS. HAVENER:  I'm sorry.  The document is
17     an e-mail from Kevin Leonard -- for the people
18     on the phone -- from Kevin Leonard, dated
19     August 22nd, 2006, to Dan Myers.
20  BY MS. HAVENER:
21     Q.   Mr. Myers says, "I --" I think it's
22  supposed to say, "I am unclear exactly the content
23  of the confirmation needed by the auditors to make
24  them happy regarding the 2004 Bank of Commerce
25  $500,000.

195

1      "Below is a draft of simple letter that Yaniv
2   could sign to confirm the existence and use of the
3   $500,000.  I believe this is what the auditors
4   required.  Yaniv could address this to the auditors
5   directly.
6      "Let me know if you had something else in
7   mind.  Kevin."
8           And then the example letter says,
9   "This letter will confirm that on February 10th,
10  2005, I withdrew from Mirabilis' Bank of Commerce
11  account the amount of $500,000.  I was the
12  authorized signer for Mirabilis for this Bank of
13  Commerce Account.
14     "The $500,000 was used to purchase the stock
15  of Caribbean Data & PSF.  In turn Caribbean Data
16  was --"  I think it's supposed to say "sold,"
17  although it says, "old to Wellington Capital for
18  for $1,000,000.  Signed, Yaniv Amar."
19          Do you remember the letter that's attached?
20     A.   No.
21     Q.   No.  Do you remember an account at the
22  Bank of Commerce in 2004 for which you were the
23  sole signatory?
24     A.   Yes.
25     Q.   And what was that account?

196

1      A.   It was an account that was opened with the
2   Mirabilis Ventures corporation.
3      Q.   And what was in that account?
4      A.   I don't recall this amount of money being
5   in that account.
6      Q.   What amount do you recall being in that
7   account?
8      A.   I remember opening the account with
9   several hundred dollars.
10     Q.   Do you remember acquiring Caribbean Data
11  Corporation with that account?
12     A.   No.
13     Q.   Do you remember acquiring Caribbean Data
14  Corporation at all?
15     A.   No.
16     Q.   Is that your signature at the bottom?
17     A.   It appears to be, yes.
18     Q.   So do you just not remember or do you --
19     A.   No, I -- first of all, I don't remember.
20  And, second of all, many, many -- I'm sure as
21  evidenced by what you have -- many documents were
22  handed to me and I was asked to sign by either Dan
23  Myers or Frank Amodeo and I signed certain
24  documents that I -- without full knowledge.
25     Q.   Including something for $500,000?

197

```
 1        A.   Yes.
 2        Q.   After you resigned?
 3        A.   The dates show that it appears to be, yes.
 4        Q.   Okay.  Would you have signed something
 5   after you resigned?  Does that make sense?
 6        A.   If I -- if it's my signature, then I
 7   obviously did.
 8        Q.   From a company that you were already
 9   suspicious had fraud going on?
10             MS. VILMOS:  Object to the form.
11   BY MS. HAVENER:
12        Q.   Does it make sense to you that you would
13   have signed something after you resigned from a
14   company involving a $500,000 transfer when you
15   already suspected that the company was engaged in
16   fraud?
17        A.   If I did it, I did it.  It doesn't make
18   sense the way you phrase it, but --
19        Q.   Okay.  How would you phrase it?
20        A.   No, you phrase it -- but, you know, you're
21   right.  If I signed it, I -- I was handed many
22   things by Richard Berman or Daniel Myers --
23        Q.   Okay.  Under what circumstances were you
24   handed things to sign after you resigned from the
25   company?
```

198

```
 1        A.   Under what circumstances?  Under
 2   circumstances like this, where I was asked to sign
 3   certain things.
 4        Q.   And they were e-mailed to you as --
 5        A.   No.  A lot of times I still met with
 6   Richard Berman at his office.  I met with Frank and
 7   Richard Berman at the office.
 8        Q.   For what purpose?
 9        A.   For what purpose?
10        Q.   Yes.
11        A.   Richard and I still remained friends for
12   some time after my resignation.
13        Q.   Okay.  Do you know if this was handed to
14   you by Richard Berman?
15        A.   I don't recall.
16        Q.   Do you remember being involved in a
17   transaction that Kevin Leonard was involved in?
18        A.   No.
19        Q.   But you do remember Mr. Myers sometimes
20   gave you documents to sign.
21        A.   Correct.
22        Q.   And would you have -- did you have
23   sufficient confidence in Mr. Myers to simply sign
24   the document without examining it?
25        A.   At that time, evidently, I did.
```

199

```
 1        Q.   So this was after -- this is dated after
 2   your statement of net worth that Mr. Myers sent to
 3   you attached to his e-mail --
 4        A.   Uh-huh.
 5        Q.   -- in which he valued your Mirabilis stock
 6   at four million plus.
 7        A.   Uh-huh.
 8        Q.   Do you recall that?
 9        A.   I recall you showing me that document.  I
10   don't recall the actual statement of net worth.
11        Q.   Okay.  In other words, you don't remember
12   seeing it at the time.
13        A.   I don't recall a document from six or
14   seven years ago, no.
15        Q.   Okay.  But -- all right.  Nevertheless, he
16   gave you a document a year later, or perhaps
17   sometime around the same time.  Actually, now that
18   I think of it, that tax return was late in the
19   year.  I'm sorry.  I think I misspoke.  That tax
20   return was e-mailed to you in November of '05.  So
21   -- and this was approximately a year later.
22        A.   Okay.
23        Q.   And you had no reason to doubt Mr. Myers',
24   you know, accuracy or trustworthiness; is that
25   correct?
```

200

```
 1        A.   I wouldn't say that.  I obviously did if I
 2   had resigned, but I see that I signed this
 3   document.  I don't recall seeing it or signing it,
 4   but that is my signature.
 5        Q.   Okay.
 6             MS. HAVENER:  Would you mark this, please.
 7             (Thereupon a document was marked
 8        Plaintiff's Exhibit 460 for Identification in
 9        the proceeding.)
10   BY MS. HAVENER:
11        Q.   This document is -- was this the Minushka
12   you were speaking about earlier?  Did you name this
13   person?
14        A.   No.
15        Q.   No.  Okay.  You gave the name of some of
16   your employees.
17        A.   Minushka?
18        Q.   Yes.  I can't -- it was a name --
19        A.   Oh, Maritza.
20        Q.   Maritza.
21        A.   No, no.  I don't believe this is the same
22   person.
23        Q.   Okay.
24             MS. HAVENER:  This is -- for those on the
25        phone, it's an e-mail from Dan Myers dated
```

201

1   Wednesday, February 14th, 2007. It's sent to
2   Minushka Ramirez, M-i-n-u-s-h-k-a, Ramirez;
3   copy to Marty Flynn, and it says, Financial
4   Statement." And then the comment is only,
5   "Here you go."
6       And then underneath, Mimi Ramirez, who I
7   assume is Minushka Ramirez, earlier in the day
8   is -- she's assistant to Marty Flynn, so the
9   e-mail reflects. She's asking Dan to please
10  forward Marty Flynn's financial statement to
11  her and she needs it as soon as possible.
12  BY MS. HAVENER:
13      Q.  Do you see on the next page, Mr. Amar,
14  that Mirabilis Ventures was valued at $500 per
15  share per an independent valuation by Titanium
16  Technologies on 9/11/06? That's in the footnote.
17      A.  I see that.
18      Q.  And Titanium Technologies has committed to
19  loan up to $250 per share of Mirabilis Ventures,
20  with the sole collateral for the loan being the
21  stock. Do you see that?
22      A.  I see that.
23      Q.  And Titanium Technologies was Dan Myers;
24  correct?
25      A.  I believe so, yes.

202

1       Q.  But you testified earlier that you did not
2   believe the stock was valued at anything close to
3   that amount. Is that --
4       A.  I thought it was worthless, yeah.
5       Q.  So we've seen several documents here today
6   where Dan Myers seems to be making a whole lot of
7   errors with respect to the value of certain things;
8   correct?
9       A.  You know, I don't know if that's a
10  question, but, yeah, it looks like it wasn't a
11  hundred percent accurate. If it was -- I don't
12  know what Mirabilis (1) means. On my statement you
13  showed me it was Mirabilis B. I don't know what
14  Mirabilis Ventures (1) means. I don't know what
15  that refers to. Oh, that's just a footnote. If
16  that's what class stock that was or --
17      Q.  No, no. That's just the footnote.
18      A.  Okay.
19      Q.  Would you go back to 459, please. This is
20  the document that has the letter attached to it
21  that you signed. And both -- am I right that both
22  Kevin Leonard --
23      A.  459? I don't have a number on it.
24      Q.  I'm sorry. It's the e-mail from Kevin --
25  the top says Kevin Leonard to Dan Myers.

203

1       A.  Okay. Yes.
2       Q.  Am I right that both of those people are
3   CPAs?
4       A.  Dan Myers is. Kevin Leonard, I thought he
5   was an MBA. I didn't know that he was a CPA.
6       Q.  Okay. And this is the one that you said
7   that you received $500,000 from Mirabilis for the
8   acquisition of Caribbean Data Corporation?
9       A.  Uh-huh.
10      Q.  This is the representation that you said
11  you thought was inaccurate?
12      A.  No, I just can't speak to the accuracy.
13      Q.  Oh, you can't recall it.
14      A.  Yeah, I don't recall.
15      Q.  But it was a representation you made to
16  the Mirabilis Board; am I correct?
17      A.  That's what it says here, yes.
18      Q.  Now, am I correct in understanding that
19  the Board of Directors -- well, if you'll turn back
20  to the previous page of that letter.
21      A.  Yes.
22      Q.  Kevin Leonard represented to Dan that
23  there was confirmation needed by the auditors;
24  right?
25      A.  (Witness nods head.)

204

1       Q.  So am I safe in assuming that you were
2   making this representation to the Board of
3   Directors to be provided to the auditors?
4       A.  I didn't know that at the time. There was
5   no indication of that. I never saw this e-mail
6   before. It was between Kevin and Dan.
7       Q.  But you knew that you were making the
8   representation to the Board of Directors.
9       A.  Not for the audit. Not for the purposes
10  of the audit.
11      Q.  But, nevertheless --
12      A.  Yes, if I signed this, I -
13      Q.  -- you were making --
14      A.  -- it was addressed.
15      Q.  And would you anticipate that the Board of
16  Directors of Mirabilis would rely on a
17  communication from you?
18      A.  I don't know if they would or not, but I
19  would assume that they would.
20      Q.  Thank you. Mr. Amodeo, we were talking
21  earlier about --
22      A.  My name is Mr. Amar.
23      Q.  I'm sorry. You know what, I did the same
24  thing to Mr. Sadrianna and to Mr. Cuthill. I so
25  apologize. I have one thing on the brain.

205

1    We were talking earlier about the trip to
2  Scottsdale.
3    A.  Uh-huh.
4    Q.  And you said you wanted to see for
5  yourself.
6    A.  Yes.
7    Q.  What did you want to accomplish when you
8  went there, other than just to see for yourself?
9    A.  Nothing, Kathleen.  I didn't want to
10  accomplish anything.  I just really wanted to see
11  why.  I wanted to -- you know, I was hoping to have
12  a -- you know, to witness for myself, and if I had
13  a chance to speak with Edie, which I'm glad she
14  approached me and I did have a chance to speak with
15  her.  I just asked her why, if she's such an expert
16  in fraud, why could she not have detected this one.
17    Q.  And did she answer that question for you?
18    A.  No.
19    Q.  Did you speak with Mr. Amodeo about it
20  afterwards?
21    A.  After the conference?
22    Q.  Yes.
23    A.  Yes.
24    Q.  And under what circumstances?  When did
25  that happen and how did that happen?

206

1    A.  Probably when I was at the airport.  I had
2  to ride back to the airport.
3    Q.  And why did you call Mr. Amodeo?
4    A.  Just to tell him what happened.  I wasn't
5  reporting back to him.  It just --
6    Q.  And what was his reaction?
7    A.  Nothing.  I don't recall.  He was kind of
8  nonchalant about it.  He was -- you know, he was
9  glad that they were served and that was it.
10    Q.  I'm trying to figure out why you would
11  call Mr. Amodeo.  Why would Mr. Amodeo care?
12    A.  Why would he care?
13    Q.  Uh-huh.  Who made the decision to sue
14  Ms. Curry and --
15    A.  I have no idea.  I had no knowledge of
16  this suit until a few days before this --
17    Q.  And you didn't ask whose decision it was
18  to sue them?
19    A.  No.  I didn't really care.
20    Q.  Who was in control of Mirabilis Ventures
21  at that time, as far as you knew?
22    A.  I thought Frank and his Board.
23    Q.  And his Board at that time was Jodi Jaiman
24  and Shane Williams and Jay Stollenwerk; correct?
25    A.  As I understand it, yes.

207

1    Q.  So it's your understanding that Mr.
2  Amodeo, with the Board, made the decision to sue
3  Ms. Curry and Mr. Hailstones.
4    A.  Yes.
5    Q.  But, again, you didn't have any reason to
6  believe that Mr. Amodeo would care one way or the
7  other about what you had to say about the service
8  of process.
9    A.  No, he -- I think he -- he just expressed
10  that he was glad that they were served and that was
11  it.  He didn't --
12    Q.  So what made you call him?
13    A.  What made me call him?  I spoke to Frank
14  quite regularly at that point.  You know?
15    Q.  And you didn't need a reason.  It was just
16  --
17    A.  No.  No.
18    Q.  Okay.  Thank you.
19    (Thereupon a document was marked
20  Plaintiff's Exhibit 461 for Identification in
21  the proceeding.)
22  BY MS. HAVENER:
23    Q.  Were you still receiving any money from
24  Mr. Amodeo in any capacity at that time?
25    A.  Which time?

208

1    Q.  In around the time that the suit was filed
2  and served.
3    A.  No.  I believe my consulting contract
4  ended in April or May of that year, of '07.
5    Q.  And after that you had no connection with
6  any Mirabilis or Amodeo-related entity?
7    A.  Not financially, no.
8    Q.  What other way?
9    A.  No, I told you, I was just kind of trying
10  to get information.  I was, you know, concerned
11  about the outcome.
12    Q.  Were you concerned about the outcome of
13  the investigation as it might impact you?
14    A.  Primarily, yes.  And a few other people.
15    Q.  And in what way were you worried that it
16  might affect you?
17    A.  I was the Interim CEO for a good period of
18  the time that this took place and I had signed a
19  whole bunch of agreements that I didn't fully
20  understand what I was signing, so I was concerned.
21    Q.  When you were the CEO, you stayed CEO even
22  though you were suspecting fraud.  I know you
23  resigned at the end of the period.
24    A.  At the end of what period?
25    Q.  Of --

209

1    A.   In June.

2    Q.   In June of '06.

3    A.   Uh-huh.

4    Q.   But you told us that you first started

5  being concerned in January of '06.

6    A.   End of January, yes.

7    Q.   And so for that period you remained CEO.

8    A.   Correct.

9    Q.   You suspected that fraud was going on;

10 correct?

11   A.   No, I suspected that something didn't add

12 up.  I suspected that a lot didn't add up.

13   Q.   Okay.  And you didn't report it to

14 anybody.

15   A.   To Richard Berman and to Laurie Holtz.

16   Q.   Nobody else?

17   A.   I spoke to Dan Myers about it, I spoke to

18 Paul Glover about it, I spoke to Sharmila Khanorkar

19 about it.

20   Q.   And did Paul Glover say to you anything

21 that made -- caused you to be -- to have further

22 suspicion?

23   A.   No.  Paul Glover expressed a lot of

24 frustration that he couldn't get accurate

25 financials -- even though he was the CFO at the

210

1  period in question, he couldn't get accurate

2  financials because he said that the Lawson system

3  for the PEO was so outdated or messed up or

4  whatever he just couldn't get accurate financials.

5    Q.   And what was the Lawson system?

6    A.   That was the PEO system, the software, the

7  database for the company.

8    Q.   Like a financial database?

9    A.   It was a payroll processing software with

10 a back end.  I don't know if it was Great Plains or

11 whatever.

12   Q.   Whose idea was the Lawson program --

13   A.   It was --

14   Q.   -- to use the Lawson program?

15   A.   It was a Presidion decision from years

16 before Mirabilis ever got involved.

17   Q.   Okay.

18        MS. HAVENER:  Have you marked this

19   document?

20        THE COURT REPORTER:  I marked 461.

21 BY MS. HAVENER:

22   Q.   Can I give you one, please?

23   A.   Yes.

24   Q.   If you'll just take a look at this.

25        MS. HAVENER:  For those people on the

211

1  phone, it begins with an e-mail from Paul

2  Glover to Dan Myers and Frank Amodeo dated

3  Tuesday, April 11th, 2006, at 1:57 p.m.

4  The subject line is, "FW:  Letters."  The

5  attachments it says is, "Kevin Monroe

6  Verification Letter 060215WJ.doc."  And then

7  MHR --

8        MS. VILMOS:  Sorry.

9        MS. HAVENER:  Sorry?

10       MS. VILMOS:  From Glover to whom?

11       MS. HAVENER:  To Dan Myers and Frank

12   Amodeo.

13       MS. VILMOS:  Thank you.

14       MS. HAVENER:  And then the second part of

15   the subject line says, "MHR Self Audit Program

16   060213.doc."  And Mr. Glover is signing as

17   Executive Vice President and CFO of Mirabilis

18   Ventures, and says to Mr. Myers and Mr.

19   Amodeo:  "Have we made any commitments that I

20   need to be aware of?"

21 BY MS. HAVENER:

22   Q.   Do you see that, Mr. Amar?

23   A.   Yes.

24   Q.   Do you know what Mr. Glover was paid?

25   A.   No.

212

1    Q.   I'll represent to you that his annual

2  salary in 2006 was $585,000 a year.

3    A.   That was his salary?

4    Q.   Yes.

5    A.   Wow.

6        MS. VILMOS:  Object to the form.

7        THE WITNESS:  Okay.

8  BY MS. HAVENER:

9    Q.   Do you see that you -- at the bottom of

10 this, a few hours before, on Tuesday, April 11th,

11 2006, at 11:09 -- forwarded from yourself to Frank

12 Hailstones an e-mail called "Letters."  And what

13 you forwarded was Woody Johnson's e-mail to you

14 from several months before, February 16th, 2006,

15 with a cc to Jeffrey Rutzen; is that correct?  Is

16 that how you pronounce it?  I don't know.

17   A.   I don't recall Rutzen.  I think it was

18 Rutzen, but I don't -- I knew the name; I didn't

19 know him.

20   Q.   Okay.  And his e-mail to you that you then

21 forwarded to Mr. Hailstones said:  "Yaniv, Last

22 versions of letters, attached.  These are without

23 any edits that Frank may have made.  Woody."

24   A.   Okay.

25   Q.   Do you understand that he was talking