**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

MIRABILIS VENTURES, INC.
Bankruptcy Case No. 6:08-bk-04327-KSJ
Adversary Proceeding No. 6:08-ap-223-KSJ
_____/

MIRABILIS VENTURES, INC.,

   Plaintiff,
v.                                                         CASE NO. 6:09-cv-175-Orl-31DAB

RICHARD E. BERMAN, *et al.*,

   Defendants.
_____/

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO**
**EXCLUDE STEVEN L. YOAKUM AS AN EXPERT WITNESS**

Plaintiff Mirabilis Ventures, Inc. ("Mirabilis" or "MVI") files this response in opposition to *Defendants' Motion to Exclude Steven L. Yoakum as an Expert Witness and Incorporated Memorandum of Law* (Doc. 101, "*Motion*").[1] In the *Motion*, Defendants seek to exclude the testimony of Steven L. Yoakum to the extent that Plaintiff seeks to call Mr. Yoakum as an expert

---

[1] The *Motion* begins with a factual discussion of the basis of the claims which is never again referred to in the *Motion*. While the undersigned believes this to be irrelevant, to insure that a mischaracterization is not allowed to fester, this case is not, as Defendants described it, "an attempt . . . to shift blame for [Mirabilis's] criminal conduct . . . ." *Motion* at 2. Instead, it is an action to recover for the breach of fiduciary duties by those which gave rise to the criminal charges. A corporation can only act through its officers or directors. *Cedric Kushner Promotions, Ltd v. King*, 533 U.S. 158, 165 (2001) (citing 1 W. Fletcher, Cyclopeida of Law of Private Corporations § 30 (rev. ed. 1999). Thus, the question is never answered by Defendants which officers and directors of Mirabilis committed the alleged criminal conduct. It is Plaintiff's position that Mr. Berman and his firm conspired with Mr. Amodeo and other to misuse payroll taxes for their own benefit. The evidence supports this claim. *September 27, 2010, 2010 Deposition of Martin C. Flynn* (Exhibit 12 to *Notice of Filing Exhibits* (Doc. 99)) at 102-03, lines 14-16; 153-54, lines 2-19; *October 14, 2010 Deposition of Yaniv Amar* (Exhibit 10 to *Notice of Filing Exhibits* (Doc. 99)) at 105-07, lines 22-13; 108-10, lines 21-6. Thus, rather than shifting blame to Defendants, Mirabilis seeks to assign blame properly to the insiders directly involved.

witness . *Motion* at 3.² The *Motion* should be denied because Mr. Yoakum's testimony meets the requirements of Rule 702, Federal Rules of Evidence ("Rule(s)") and *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579 (1993). In sum, Defendant's Motion asserts Mr. Yoakum is not a proper expert because he provides only summaries of simple mathematical calculations. In response, Plaintiffs will demonstrate that the accounting work of creating a cash flow analysis from an accrual based accounting system containing tens of thousands of entries between dozens of entities is not simple mathematics, but instead a complex and highly technical use of accounting skills. The fact Mr. Yoakum, after forming these opinions, then summarized the opinions, does not make his work inadmissible. Instead, it makes it comprehensible.

## I.  Background Regarding Mr. Yoakum's Expert Testimony

Mr. Yoakum was timely disclosed as an expert witness as required by the *Case Management and Scheduling Order* (Doc. 35, "*CMSO*"). *See* August 2, 2010 "*Evaluation & Analysis of Mirabilis Ventures, Inc. – Sources and Uses of Cash*" ("*Mirabilis Cash Report*"), attached to the *Motion* as Exhibit A; August 2, 2010 "*Evaluation and Analysis of Berman Trust Transactions*" ("*Berman Cash Report*"), attached to the *Motion* as Exhibit B.³ Not only were expert reports provided to Defendants as required by Rule 26(a)(2), Federal Rules of Civil Procedure, but Mr. Yoakum's entire file was provided as well. *See Deposition of Steven L. Yoakum, CPA* ("*Yoakum Depo.*") at 62-63, lines 9-24 (attached hereto as Exhibit 1) (explaining how Mr. Yoakum's "work papers" are organized). Mr. Yoakum was deposed by Defendants.

## II.  Content of Expert Reports and Basis for Mr. Yoakum's Opinions

---

² Defendants indicate they may file another motion in the future seeking to exclude Mr. Yoakum as a summary witness under Rule 1006, Federal Rules of Evidence. *See Motion* at 3, 14-15.

³ As provided in the *Case Management and Scheduling Order*, Plaintiff was required to disclose its expert reports by October 8, 2010. *CMSO* at 1. The expert reports were timely provided on August 2, 2010.

As an example, Defendants have argued Mirabilis received the funds and thus wasn't damaged "but instead was the financial beneficiary." See Motion, Page 7.

Mr. Yoakum has prepared two expert reports. The first is the *Mirabilis Cash Report*, which is attached to the *Motion* as Exhibit A; the second is the *Berman Cash Report*, which is attached to the *Motion* as Exhibit B. The *Mirabilis Cash Report* is "an evaluation of the financial and cash flow transactions related to Mirabilis Ventures, Inc. for the years 2004 through 2007." *Mirabilis Cash Report* at 1. The *Berman Cash Report* is an "evaluation of the financial and business transactions related to the Berman, Kean, & Riguera, P.A. Trust Account Records for Mirabilis Ventures, Inc. and related parties." *Berman Cash Report* at 1.[4] The two reports are related in that they reflect cash moving between Mirabilis and the Berman trust account.

Defendants assert that Plaintiffs intend to use Mr. Yoakum's testimony solely to establish the amount of damages. *See Motion* at 6-7, 9-10. Although Mr. Yoakum's testimony will establish part of the evidentiary basis for Plaintiff's damages, Plaintiff has never limited itself to using Mr. Yoakum's testimony establish damages or limited itself to solely reply upon Mr. Yoakum's calculations to establish damages. Mr. Yoakum's testimony may also be some evidence with some _____ value as to how Defendants failed to meet the standard of care, as well as to how the fraud was executed. Plaintiff's breaches of duty, Mr. Yoakum's analysis puts the _____ to that assertion as Mirabilis did not receive the majority of the funds and not much more in liability than it _____ in funds. Mr. Yoakum's analysis shows sources and uses of cash for both Mirabilis and the Berman trust account. His analysis reveals, and his testimony will show, that Mirabilis received some funds, the majority of which were then disbursed by

---

[4] Mr. Yoakum is a licensed Certified Public Accountant who has completed specialized training in the areas of financial accounting, fraudulent transactions, and forensic accounting. *Mirabilis Cash Report* at 1; *Berman Cash Report* at 1. Defendants do not challenge his general qualifications as an accountant. *Motion* at 6.

3

Defendants to other entities, including Defendants and the Berman Trust account. Therefore, Mr. Yoakum's testimony will provide support for Plaintiff's damages.

Mr. Yoakum's opinions in the *Mirabilis Report* are "based upon [his] review, evaluation, and analysis of the financial records maintained by Mirabilis Ventures, Inc." *Mirabilis Cash Report* at 1. Specifically, Mr. Yoakum used following documents and information to formulate his findings and opinions in the *Mirabilis Cash Report*:

- MVI's printed and electronic copies of the quick-book accounting transactions as maintained by MVI and obtained in the Bankruptcy Case No.: 6:08-BK-4327-KSJ.
- Other accounting, invoices, journal entries and related documents obtained from the financial records maintained by Mirabilis.
- Various memorand[a], correspondences, e-mails and other records obtained from the books and records maintained by Mirabilis.

(Note – the above records are generally referred to as MVI's books & records)

- Various Berman, Kean, & Riguera, P.A. Trust Account Records for Mirabilis Ventures, Inc. and related parties provided by that firm's legal counsel at various dates including summary recaps, journal client trust ledgers and other records.
- Information obtained through various discussions with R.W. Cuthill, Jr.

*Id.* at 2.

With respect to findings and opinions in the *Berman Cash Report*, Mr. Yoakum reviewed following documents and information:

- The Berman, Kean, & Riguera, P.A. Trust Account Records for Mirabilis Ventures, Inc. and related parties provided with a cover letter dated February 5, 2010 signed by D. David Keller. (bates numbers "BKRMVI/TA-001" to "BKRMVI/TA-0985")
- The documents responsive to the subpoena issued to South Trust Bank specifically regarding Exhibits "A", "B" and "C" related to the Berman Trust Transactions with a cover letter dated May 18, signed by D. David Keller. (Some with selected bates numbers "BKRMVI/TA" and other documents not bates numbered.)
- An excel spread sheet identif[ied] as "Berman Kean & Riguera / Mirabilis Ventures Trust – Detail of Transactions" provided by e-mail on September 15, 2009.
- Other accounting, invoices and related records from Berman, Kean & Riguera, P.A. obtained from the financial records maintained by Mirabilis.
- The Berman Trust Transaction reflected in the Mirabilis quick book accounting records.
- Various memorand[a], correspondences, e-mails and other records obtained from the books and records maintained by Mirabilis.
- Information obtained through various discussions with R.W. Cuthill, Jr.

4

*Berman Cash Report* at 2.

Mr. Yoakum explained how he made findings and reached certain conclusions based on the information identified above. In preparing the *Mirabilis Cash Report*, Mr. Yoakum first "analyzed and evaluated" MVI's books and records. *Mirabilis Cash Report* at 2. These records "included both cash transaction and accrual accounting entries." *Id.* "The result of these cash and accrual entries was a series of accounts including assets, liabilities, equity, income and expenses." *Id.* Mr. Yoakum's analysis "consisted of a detailed review of the individual movements of cash as reflected in the balance sheet accounts (assets, liabilities and equity) for each of the years 2004, 2005, 2006, and 2007." *Id.* "[V]arious excel spreadsheets were prepared to summarize for each year the changes occurring in the balance sheet accounts <u>based upon the elimination of accrual entries and an isolation of the cash transactions</u>." *Id.* (emphasis added).

Similarly, in the *Berman Cash Report*, the Berman, Kean, & Riguera, P.A. Trust Account Records for Mirabilis Ventures, Inc. and related parties ("Berman Trust Transactions") were "analyzed and evaluated." *Berman Cash Report* at 2. Mr. Yoakum's "analysis and evaluation consisted of a detailed review of the individual movements of cash." *Id.* The cash transactions were then classified into groupings "based upon cash received into the trust account or cash disbursed (or transferred out) of the trust accounts." *Id.* Thus, Mr. Yoakum engaged in an accounting analysis that required the elimination of accrual entries and the isolation of cash transactions.

Defendants have selectively quoted Mr. Yoakum to say "the notice of (his) opinions. . . is . . . summarizing financial date." Of course, Defendants, happy with their quote, never follow up to determine what that means. A generalized statement that one has summarized financial data can mean anything from balancing your checkbook to analyzing and creating a summary of the

4851-9410-1768.1
43582/0003

historical financial transactions of a global conglomerate. Fortunately, which Mr. Yoakum's explored his work in his other testimony, makes clear that the employed detailed and highly technical accounting skills to determine how tens of millions of dollars flowed through this myriad of companies.

During his deposition on November 17, 2010, Mr. Yoakum provided further explanation of the analysis he performed. *See Yoakum Depo.*, attached hereto as Exhibit 1. Mr. Yoakum explained that he was asked to "look at the accounting transactions and prepare a cash-flow statement," the purpose of which was "to be able to reflect where the monies came in from and where they went out to." *Yoakum Depo.* at 19, lines 15-22. Mr. Yoakum was also asked to review the Berman trust account transactions. *Id.* at 20, lines 8-9.

When Mr. Yoakum initially reviewed the Mirabilis records, "the Berman trust cash transactions were lumped in with other cash transactions by Mirabilis for its accounting purposes"; that is, "[t]hree or four or five of [Mirabilis's cash accounts] were associated with the Berman trust transactions." *Id.* at 59, lines 19-24; 61, lines 5-8. To address this problem, Mr. Yoakum "collapsed" all of the cash accounts; then, the accounts were separated so that they accurately depict the cash flowing in and out of Mirabilis and the Berman trust account. *Id.* at 61, lines 11-15. Mr. Yoakum performed similar analyses on other accounts, as well. *Id.* at 61, lines at 18-23. Mr. Yoakum maintained detailed records in multiple notebooks and recorded the "adjustments" that were made to reach his final conclusion. *Id.* at 63, lines 14-18. Mr. Yoakum's records are organized based upon the type of analysis that he was performing. *Id.* at 63, lines 14-18.

Mr. Yoakum explained that his analysis also took into account cash transactions that involved a "noncash part." *Id.* at 65-66, lines 8-2. Mr. Yoakum indicated that this accounting

6

4851-9410-1768.1
43582/0003

method—representing noncash parts of cash transactions—is very technical. *Id.* Mr. Yoakum also combined the accounting of the Berman trust accounts with "actual source documents" to form his opinion and issue his reports. *Id.* at 179, lines 2-24. Thus, Mr. Yoakum's analysis and reports involved more than merely summarizing the information that had been provided to him.

Defendants put great emphasis on the Mr. Yoakum's use of the words "recap" and "summary" in his expert report, as well as Mr. Yoakum's statement that the *Mirabilis Report* "is an accurate summary of the amounts, source and use of the cash transactions as represented in the books and records of Mirabilis Ventures, Inc." *Mirabilis Report* at 1. In itself, summary financial data is not inadmissible. Here, there was not only a summary of Defendants' assets, but also an evaluation and analysis of Mirabilis' books and records, which included both cash transactions and accrual accounting entries, involving a detailed review of cash movement, the elimination of accrual entries, the isolation of cash transactions, the "collapsing" of various accounts, and the analysis of noncash parts of cash transactions. The fact that Mr. Yoakum then summarized those fully developed and technically involved opinions does not mean his work is a mere summary. Mr. Yoakum's opinions are fully set out. By using the words "recap" and "summary," Mr. Yoakum was not conveying that he merely provided a recap or summary of data that was provided to him. Rather, Mr. Yoakum was explaining he prepared a recap of **his analysis,** and he has provided this analysis to the Court in a summary format that can be easily read and understood. *See Yoakum Depo.* at 243, lines 19-24 (stating that Mr. Yoakum's opinions are "summarized in summary form in these reports"). It is evident from a review of the *Mirabilis Report* and the *Berman Trust Report* that Mr. Yoakum's analysis and opinions have been summarized into the form of charts. *See Mirabilis Report* at 13-14; *Berman Trust Report* at 13-

7

14. That Mr. Yoakum was able to present his findings and opinions cogently in a format that is easy to understand does not mean that his analysis is a mere summary.

### **III.  Rule 702 and *Daubert***

Rule 702 and *Daubert* govern the admissibility of expert testimony.  Rule 702 provides as follows:

> If scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "is one of admissibility rather than exclusion." *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir.1991).

To be admissible, the expert testimony must constitute scientific, technical, or specialized knowledge, and that knowledge must assist the trier of fact.  *Daubert*, 509 U.S. at 592-93.  "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid[5] and of whether that reasoning or methodology properly can be applied to the facts at issue." *Id.*[6]  While *Daubert* teaches that the District Court has a gatekeeper role applying these principles, that role is limited, and it remains in the traditional province of the jury to weigh challenges to reliability. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*, 326 F.3d 1333, 1341 (11th Cir 2003) (stating that "a district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury") (internal quotation and

---

[5]  In *Daubert*, the Court identified four non-exclusive factors to consider the scientific validity of an expert's proposed testimony:  whether the theory or technique has been tested; whether it has been subjected to peer review; its known or potential error rate; and the degree of acceptance within the scientific community.  *Daubert*, 509 U.S. at 593-94.  In the context of a nonscientific expert, like an accountant, these factors are not particularly helpful.

[6]  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), the Supreme Court extended the principles of *Daubert* to all expert testimony.

4851-9410-1768.1
43582/0003

citation omitted). "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Comm. Note (2000).

Interpreting *Daubert*, the United States Court of Appeals for the Eleventh Circuit has explained that a three-part inquiry applies to determine whether an expert has met the requirements of Rule 702: "(1) [whether] the expert is sufficiently qualified to testify on the issues he intends to address; (2) [whether] the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) [whether] the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Guinn v. Astrazeneca Pharmaceuticals, LP*, 602 F.3d 1245, (11th Cir. 2010) (quoting *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004)).

## IV. Analysis

Defendants do not challenge Mr. Yoakum's general qualifications as an accountant. *Motion* at 6. Rather, Defendants contend that Mr. Yoakum does not meet the "reliability test," and that his testimony will not assist the jury. *Id.* at 7. These arguments are addressed in turn.

### A. Reliability

With respect to reliability, Defendants complain that "[a]ll of the documents relied upon by Mr. Yoakum to prepare his summary of the Sources of Cash and Uses of Cash by Mirabilis in the years 2004 through 2007 were prepared by Plaintiff's liquidating agent, R.W. Cuthill, or some unidentified person or persons at Mirabilis and provided to Mr. Yoakum to summarize." *Motion* at 8. To the contrary, Mr. Yoakum identified precisely the sources of information he used for his cash-flow analysis. *See Mirabilis Cash Report* at 1. The information came from the

9

books and records of Mirabilis, as well as information from Mr. Cuthill, Mirabilis' President.[7] *See Mirabilis Cash Report* at 3. Defendants acknowledge as much in a footnote. *See Motion* at 8, n.4 (referring to *Mirabilis Cash Report* at 2). Mr. Yoakum indicated that, to a limited extent, he "look[ed] behind" the accounting data for the purpose of verifying certain transactions. *Yoakum Depo.* at 36, lines 8-15.[8] In other words, Mr. Yoakum engaged in accounting reconciliation, which allowed him to verify certain of Mirabilis' transactions. *See id.* at 36-37, lines 24-14. It is difficult to imagine what information should be used to perform a cash-flow analysis of Mirabilis if not the verified books and records of Mirabilis.

Defendants next argue that Mr. Yoakum's methodology "does not support allowing [him] to be presented to the jury as an expert on financial and accounting transactions" to the extent he only used "basic mathematical calculations (adding, subtracting, and tracing numbers)." *Id.* at 7-8. However, Mr. Yoakum did more than perform simple arithmetic. As explained above in Section II, Mr. Yoakum analyzed and evaluated Mirabilis' books and records, conducting a detailed review of the individual movements of cash, which involved an elimination of accrual entries and the isolation of cash transactions. *See Mirabilis Cash Report* at 2-3; *Berman Cash Report* at 3. Mr. Yoakum collapsed cash accounts together so that they could be properly separated out to reflect the movement of cash accurately. *Yoakum Depo.* at 61. Mr. Yoakum conducted an analysis of noncash parts of cash transactions. *Id.* at 65-66. He combined accounts with actual source documents. *Id.* at 179. Such technical accounting functions are beyond the skill of the average layperson or duty member. Mr. Yoakum has explained the accounting

---

[7] Mr. Cuthill was validly installed as President of Mirabilis before it filed its voluntary bankruptcy petition. *See Order* resolving consolidated appeals in *Rachlin Cohen & Holtz, LLP v. Mirabilis Ventures, Inc. (In re Mirabilis Ventures, Inc.)* (Doc. 30 in Case No. 6:09-cv-1658-Orl-31) ("*Order Affirming Denial of Dismissal*") at 4-6, 7 n.3.

[8] Additionally, Mr. Yoakum "sample-tested" transactions using invoiced to verify the amount of attorneys' fees. *Yoakum Depo.* at 120, lines 6-12.

methodology that he applied, and he has made his files available for inspection. *Id.* at 61-66. Furthermore, Mr. Yoakum applied this methodology reliably to the facts of this case.

The cases cited by Defendants involve accountants who, unlike Mr. Yoakum, failed to employ a reliable methodology. *See, e.g., Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir. 1993) (explaining that the expert "conceded that he did not employ the methodology that experts in valuation find essential"); *S.E.C. v. Lipson*, 46 F.Supp.2d 758, 762 (N.D. Ill. 1998) (excluding an expert who intended to testify that internal financial reports were not reliable when he had not audited those reports and therefore had no reliable basis for such an opinion).[9] Here, in contrast, the evidence of record shows that Mr. Yoakum's cash-flow methodology is reliable; indeed, there is no evidence to the contrary.

Defendants have mischaracterized Mr. Yoakum's methodology as a summary without addressing the analysis that he actually performed. The evidence of records indicates that Mr. Yoakum's analysis is consistent with generally accepted accounting principles and forensic accounting techniques. It is reliable.

**B. Assistance to the Jury (Relevance)**

Defendants further argue that the *Mirabilis Cash Report* would not assist the jury because mathematical calculations are not helpful to a jury. *See Motion* at 9 (citing *Grupo Televisa S.A.*

---

[9] *The Baker Grp. v. Burlington N. Santa Fe Ry. Co.*, No. 98-1087-CV-W-FJG, 2003 WL 25774303 (W.D. Mo. May 2, 2003) (unpublished) is distinguishable on at least three grounds. First, the expert in *Baker* was "to testify as to the mathematics (computing losses of lease income, and cost of repairing railcars) for each plaintiff related to damages." *Baker*, 2003 WL 25774303 at *2. Here, in contrast, Mr. Yoakum was performing a technical and complicated analysis involving cash flow. *Mirabilis Cash Report* at 2; *Yoakum Depo.* at 19. Second, in *Baker*, the expert's testimony was excluded because the expert "did not identify what accounting standards, practices or principles he relied upon in forming his opinions." *Baker*, 2003 WL 25774303 at *7. Mr. Yoakum's analysis and report are different because Mr. Yoakum explained how he reached his results and offered to make available his entire file showing how he reached these results. *See Mirabilis Cash Report* at 5; *Yoakum Depo.* at 63-70. Third, the expert in *Baker* did not perform his own analysis or computations, but rather merely verified the mathematical computations that someone else had performed. *Baker*, 2003 WL 25774303 at *7. Here, Mr. Yoakum used the data and information that was provided to him, namely the books and records of Mirabilis, to perform his own cash-flow analysis and computations. *Mirabilis Cash Report* at 3, 5.

*v. Telemundo Comm. Group*, No. 04-20073-CIV, 2008 WL 125601 (S.D. Fla. Jan. 7, 2008) (summarily finding that an expert who merely made "common sense" conclusions would not assist the jury)). As previously explained, however, Mr. Yoakum's opinions are not mere summaries; rather, they constitute a cash-flow analysis based on reliable accounting practices and techniques. *See supra* Section II. This case involves a complicated payroll tax fraud in which cash was moved among different entities. Therefore, a cash-flow analysis would clearly be helpful to a jury. *Cf. Zic v. Italian Gov't Travel Office*, 130 F.Supp.2d 991, 999 (N.D. Ill. 2001) (rejecting argument that an expert's testimony would not be helpful to the jury because the analysis was not sophisticated enough).

As the Eleventh Circuit has held, the _____ for this analysis is whether there was an application of scientific, technical or specialized expertise, to understand the evidence or determine a fact in issue." *Ginn, 602 F.3d*, 1252. Here there is ample evidence that the technical and specialized expertise, which Defendants conclude Mr. Yoakum possess, were employed when he took such actions as collapsing cash accounts, eliminated _____ entries, isolated cash transactions and corrected for partial non cash transactions. All of these functions are the use of technical and specialized knowledge that laypersons do not possess. Mr. Yoakum then presented this financial information so that a jury could understand evidence of cash flow which will be used to help explain other evidence of what fraud occurred here, by whom and how it was accomplished. It will also show any benefit or detriment to Mirabilis of this fraud. These are facts in issue.

Finally, Defendants make much of the fact that Mr. Yoakum does not testify to origin of the funds, suggesting that it is not useful. See Motion, Page 10. But this misses the point. It is as if Defendants believe Plaintiff intends to call Mr. Yoakum and no one else as a witness. There are

12

ample witnesses to describe the origin of these funds. In fact, such a basic fact, may not even be proper as opinion testimony. Instead, fact witnesses can prove that issue. Once that is established, the flow of those funds will demonstrate numerous relevant facts, including but not limited to (i) how much Mirabilis actually received, (2) how much Mirabilis is liable for due to the actions of Defendants, (3) how much stolen payroll taxes Defendants received which demonstrates among other things their _____ and (4) how much funds Defendants knew were being spent through their own trust account, which is additional evidence of their knowledge of the fraud. These are relevant issues and Mr. Yoakum's technical analysis will assist a jury in understanding them.

Moreover, in most of the cases cited by Defendants, the courts found that the experts' analysis suffered from faulty methodologies. *See Klaczak v. Consol. Med. Transp.*, 458 F.Supp.2d 622, 666-69 (N.D. Ill. 2006) (finding, among other things, that the expert lacked expertise, was unqualified, failed to consider other evidence, and his analysis could be performed by the jury); *De Jager Constr., Inc. v. Schleininger*, 938 F.Supp. 446, 455 (W.D. Mich. 1996) (excluding expert accountant because expert's "fallacies were caught," the expert made mathematical mistakes, and he had a "modus operandi of making unsupported assertions and projections, of deliberately ignoring documents and figures which would strike a certified public accountant in the face, and of picking and choosing among purported facts to maximize plaintiff's damages");[10] *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, No. 92-c-2379, 1993 WL 387346 (N.D. Ill. Sept. 23, 1993) (excluding a CPA as an expert because the

---

[10]  In *De Jager*, the court nonetheless recognized that "certified public accountancy is a skilled profession which requires, in many instances, considerable education, training, experience, judgment and skill beyond that which an ordinary juror would possess. CPA's are subject to accountancy standards and are licensed by the state much as lawyers are licensed professionals. In other words, a CPA generally possesses the 'specialized knowledge' to qualify as a helpful expert witness under the proper circumstances." *De Jager*, 938 F.Supp. at 449.

13

CPA's testimony was not related to his expertise or specialized knowledge, and excluding another expert because she provided no data other than her own experience to support her claims).[11] Here, in contrast, Mr. Yoakum applied a reliable methodology (an accounting cash-flow analysis) to the facts of this case in a reliable manner that will assist the jury.

Although the fraud would have been apparent to sophisticated attorney like Richard Berman, a jury of laypeople would clearly benefit from the testimony of an expert explaining the movement of cash into and out of Mirabilis and the Berman Trust account. Such an explanation would assist the jury to understand the nature of the fraud. This is exactly what Mr. Yoakum was hired to do, and it is exactly what the *Mirabilis Cash Report* and *Berman Cash Report* show in a simple and understandable format.

## V. Conclusion

It is undisputed that Mr. Yoakum is qualified as an expert in accounting. Mr. Yoakum's opinions, as set forth in the *Mirabilis Cash Report* and *Berman Cash Report*, are based on a reliable methodology (that is, cash-flow accounting principles and techniques). Mr. Yoakum's opinions are based on an analysis of the books and records of Mirabilis and the Berman trust account. His analysis is not merely a summary of information adduced by "basic mathematics." Mr. Yoakum's opinions will assist the jury in understanding cash flows and accounting principles that would be difficult for a layperson to comprehend without explanation. Although Mr. Yoakum's testimony will not be the sole basis for establishing damages, and Mr. Yoakum's testimony will not be relevant solely to the issue of damages, his testimony will provide relevant evidence that will be helpful to the jury in establishing damages. Mr. Yoakum's testimony will inform the jury as to the amount of money than came into Mirabilis from specific sources and

---

[11] As noted earlier, Mr. Yoakum will testify on matters other than damages, rendering inapplicable the cases that evaluate experts' methodology for valuation to determine damages.

where those funds went, particularly with respect to the Berman trust account. For the foregoing reasons, the *Motion* should be denied, and Mr. Yoakum should be permitted to testify as an expert witness.

                        **BROAD AND CASSEL**
                        Counsel for Mirabilis Ventures, Inc.
                        390 North Orange Avenue, Suite 1400
                        Orlando, Florida  32801
                        Telephone:    407-839-4200
                        Facsimile:    407-425-8377


By:   */s/Todd K. Norman*
       Todd K. Norman, Esquire
       Florida Bar No. 0062154
       tnorman@broadandcassel.com

15

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished this 14th day of January, 2011 via CM/ECF to all parties receiving electronic service, and via U.S. Mail to: D. David Keller, Keller Landsberg, PA, Broward Financial Centre, Suite 1400, 500 East Broward Boulevard, Fort Lauderdale, Florida 33394; and Bradley M. Saxton, Esq., Winderweedle, Haines, Ward & Woodman, P.A., P.O. Box 1391, Orlando, Florida 32802-1391.

By: */s/Todd K. Norman*
Todd K. Norman, Esquire
Florida Bar No. 0062154
tnorman@broadandcassel.com

4851-9410-1768.1
43582/0003