**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

MIRABILIS VENTURES, INC. — Bankruptcy Case No. 6:08-bk-4327-KSJ
Adv. Pro. No. 6:08-ap-222-KSJ

Debtor
______________________/

MIRABILIS VENTURES, INC., — CASE NO. 6:09-CV-175-Orl-31DAB

Plaintiff,

v.

RICHARD E. BERMAN, BERMAN, KEAN, & RIGUERA, P.A., ELENA WILDERMUTH,

Defendants.
______________________/

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION FOR SANCTIONS AND MEMORANDUM OF LAW IN SUPPORT**

Plaintiff Mirabilis Ventures, Inc. ("Mirabilis" or "MVI"), Robert C. Widman, Roy Kobert, and R. W. Cuthill, files this response in opposition to *Defendants' Motion for Sanctions and Memorandum of Law in Support* (Doc. 104, "*Motion for Sanctions*"), filed January 7, 2011.[1]

## I. FACTUAL BACKGROUND

### A. Alleged Safe Harbor Notice

On June 25, 2010, Defendants sent their purported safe harbor notice under Rule 11 and section 57.105, Florida Statutes. The notice asserted that there was no factual basis for Plaintiff's claims. The notice also asserted that there were legal defenses to the claims. As such,

[1] The Defendants in their Motion for Sanctions do not specify against whom they are seeking sanctions. However, the safe harbor letter may be read to include the persons listed above as persons against whom the Defendants are seeking sanctions. In an abundance of caution this response is filed on behalf of all persons to whom the letter was sent. It should also be noted that Rule 11 and section 57.105, Florida Statutes do not authorize sanctions against an officer of a party to litigation. Therefore it is unclear as to what theory the Defendants are seeking sanctions against Mr. Cuthill.

Defendants assert that it is sanctionable to pursue the claims against the Defendants. The Defendants do not cite to any pleading or document that it seeks to have withdrawn or corrected.

**B. Motion for Sanctions**

On January 7, 2011, Defendants filed the instant *Motion for Sanctions*. The *Motion for Sanctions* was unchanged from its June 25, 2010 version and completely ignores substantial evidence that has been developed since the *Motion for Sanctions* was first drmy to Plaintiff. As such, the *Motion for Sanctions* contains numerous factual assertions that are contrary to the evidence and other assertions that are just plain untrue. Furthermore, the *Motion for Sanctions* contains legal arguments that have been dealt with by Plaintiff in its *Response to Defendants' Motion for Summary Judgment* (Doc. 88, "*Response to Motion for Summary Judgment*") Defendants did not revise the *Motion for Sanctions* to address any of the arguments or exceptions to the imputation and *in pari delicto* defenses raised in the *Response to Motion for Summary Judgment*.

## II. APPLICABLE SANCTIONS STANDARDS

**A. Rule 11.**

Rule 11 contains a safe harbor provision that must be complied with prior to a party filing a motion for Rule 11 sanctions. *See* Fed.R.Civ.P. 11(c)(2). A motion for Rule 11 sanctions "must describe the specific conduct that allegedly violates Rule 11(b)." *See* Fed.R.Civ.P. 11(c)(2). Federal courts have found that failure to do so is fatal to a Rule 11 sanctions motion. *Schneider v. Northwestern Univ.*, 1995 U.S. Dist. LEXIS 861 (N.D. Ill. 1995) ("Plaintiff's request for sanctions under Rule 11 does not describe specific conduct alleged to violate subsection (b), and so is in violation of this provision of Rule 11. This, also, is sufficient to deny the request."). This 21-day window gives the offending party time to correct the offending paper, claim, defense, or

contention by either withdrawing or "appropriately correcting the offending document." *DeShiro v. Branch*, 183 F.R.D. 281 (M.D. Fla. 1998).

The Eleventh Circuit has adopted a two-step inquiry for courts to utilize in determining whether sanctions are appropriate:

> The objective standard for testing conduct under Rule 11 is "reasonableness under the circumstances" and "what was reasonable to believe at the time" the pleading was submitted. This court requires a two-step inquiry as to (1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous. . . Although sanctions are warranted when the claimant exhibits a "deliberate indifference to obvious facts." They are not warranted when the claimant's evidence is merely weak but appears sufficient, after a reasonable inquiry, to support a claim under existing law. Sanctions may be appropriate when the plain language of an applicable statute and the case law preclude relief. However, the purpose of Rule 11 is to deter frivolous lawsuits and not to deter novel legal arguments or cases of first impression. The grant of summary judgment, in and of itself, does not mean that an action is frivolous or warrants the imposition of sanctions.

*Baker v. Alderman*, 158 F.3d 516 (11th Cir. 1998) (internal citations omitted).

"Courts are hesitant to impose Rule 11 sanctions where the argument advanced is not directly precluded by controlling caselaw." *Feingold v. Bulter*, Slip Copy, 2010 WL 917314 (S.D.Fla. 2010). "[A] lawyer should not be sanctioned for failing to abandon his client's case at the drop of a summary judgment motion, unless there is no colorable defense to the motion that can be advocated and no possible merit to any argument that can be advanced." *Stitt v. Williams*, 919 F.2d 516, 528 (9th Cir. 1990).

**B. Section 57.105, Florida Statutes.**

The Defendants also move for sanctions based on Section 57.105, Florida Statutes. Section 57.105(1) states:

> [T]he court shall award a reasonable attorney's fee…on any claim or defense at any time during a civil proceeding or action in which the court finds that the losing party or the losing party's attorney knew or should have known that a claim or defenses when initially presented tot eh court or at any time before trial:



4838-7668-6344.5
43582/0004

> (a) Was not supported by the material facts necessary to establish the claim or defense; or
> (b) Would not be supported by the application of then-existing law to those material facts.

Section 57.105(3) further states that sanctions are not warranted:

> Under paragraph (1)(b) if the court determines that the claim or defense was initially presented to the court as a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law, as it applied to the material facts, with a reasonable expectation of success.

"The purpose of this statute is to discourage baseless claims, stonewall defenses and sham appeals in civil litigation by placing the price tag of attorney's fee awards on the losing parties." *Carnival Leisure Indust., Ltd. v. Holzman*, 660 So.2d 410, 412 (Fla. 4th DCA 1995). *See also Shwartz v. Millon Air, Inc.*, 341 F.2d 1220, 1227 (11th Cir. 2003) (citations omitted); *Army Aviation Heritage Foundation and Museum, Inc. v. Buis,* 504 F.Supp.2d 1254, 1268 (N.D. Fla. 2007). "However, Florida courts caution that 'section 57.105 must be applied carefully to ensure that it serves the purpose for which it was intended which is to deter frivolous pleadings.'" *Buis* at 1268 (citation omitted). "An award of attorney's fees pursuant to section 57.105 is appropriate only when the action is 'so clearly devoid of merit both on the fact and the law as to be completely untenable.'" *Stagl v. Bridges*, 807 So.2d 177 (Fla. 2d DCA 2002) (citations omitted"). *See also Department of Revenue ex. Rel. Marchines v. Marchines*, 974 So.2d 1085, 1090 (Fla. 2d DCA 2007). Although the 1999 amendment to section 57.105 has expanded a court's power to award fees, "the new statute is still intended to address frivolous pleadings." *Peyton v. Horner*, 920 So.2d 180, 183 (Fla. 2d DCA 2006). Furthermore section 57.105 fees are not always appropriate even when the moving party was successful in obtaining summary judgment. *Buis* at 1268. Plaintiff's claims are not and at no time were frivolous.

## **III. ARGUMENT**

**A. Procedurally Defective**

As an initial matter, Defendants' *Motion for Sanctions* is procedurally defective on its face. Rule 11 sanctions may only be based on matters contained in papers filed with the Court. Pursuant to Rule 11, the party must be given 21 days to withdraw or correct the offending filing. Here, there was no filing cited by the Defendants to which Plaintiff could have corrected. Instead, the safe harbor notice was apparently directed to any pursuit of any claims, regardless of its basis. Nowhere in Rule 11 is it supposed that a party can direct its safe harbor notice to the abstract notion of pursuing the claim. Instead the safe harbor notice must be directed toward a pleading. Defendants' *Motion for Sanctions* fails to "describe the specific conduct that allegedly violated Rule 11(b)." Instead, Defendants' *Motion for Sanctions* merely asserts that any pursuit of the claim would violate that rule.

**B. No Basis for Sanctions**

**1. General**

Defendant's general statement that it would be sanctionable to continue pursuing the case runs contrary to the law at this point. Instead, in the Rule 11 context, the courts have found "a lawyer should not be sanctioned for failure to abandon his client's case at the drop of a summary judgment motion, unless there was no colorable defense to that motion that can be advocated and no possible merit to any argument that can be advanced." *Stitt*, 919 F.2d at 528. In fact, as will be shown in detail below, there are viable claims and numerous colorable exceptions to the defenses Defendants assert bar the claims.

Defendants begin their Motion for Sanctions with a recitation of Amodeo's actions that lead to his individual criminal conviction. However Defendants completely ignore the actions taken by other co-conspirators, including the Defendants in this matter. Despite Defendants' claim that

they did not know of the payroll tax plan, there is record evidence to show that this is simply not true—the Defendants knew of and participated in the payroll tax plan. At least three (3) individuals have testified that the Defendants knew of the plan and provided advice on it. It is undisputed that Messrs Berman and Holtz held positions as directors of Mirabilis and were respectively Mirabilis' General Counsel and Chairman of the Board. Although they now assert Amodeo solely controlled Mirabilis, there is no doubt that under the Bylaws of Mirabilis they had the ability to control Mirabilis and stop this plan. The fact that they did not do so does not prove they do not have control. After the fact assertions of a lack of control to avoid responsibility are self-serving and should be rejected or at least viewed with a skeptical eye.

The testimony of Martin Flynn, Yaniv Amar and Dan Myers has been previously summarized in Plaintiff's Response to Motion for Summary Judgment.[2] Mr. Flynn testified that he asked Berman and Mr. Holtz about how the "Presidion Plan" was going which Mr. Flynn described to them as "the plan not to pay payroll taxes." *September 27, 2010 Deposition of Martin C. Flynn ("Flynn Depo.")* at p. 103, l. 2-10; p. 154, l. 6-8. (Doc. 88, Exhibit 12). After Messrs Berman and Holtz hesitated, Amodeo made a motion, indicating the two could tell Mr. Flynn about the plan. *Flynn Depo.*, at p. 103, l. 2-10. They assured Mr. Flynn there was nothing to worry about. *Flynn Depo.*, at p. 102-103, l. 24-1. They said that they've got it covered. *Flynn Depo.*, at p. 102-103, l. 24-1. They said it was their responsibility. *Flynn Depo.*, at p. 103, l. 2-10. Therefore, not only did Berman have actual knowledge of the plan, he stated that it was his responsibility, that there was nothing to worry about and that they had it covered.

[2] The testimony was available to Defendants before the June 25, 2010 *Motion for Sanctions* was sent in the form of affidavits of Messrs Flynn, Amar and Myers filed by another party in a different case against Mr. Berman. See Exhibits "1", "2", and "3" attached hereto.

His testimony is corroborated by Yaniv Amar's testimony. At almost the same time as Mr. Flynn's discussion with Berman, Berman was also having discussions regarding this subject with Yaniv Amar--the person responsible at the PEO manager, AEM, Inc., to insure that the payroll taxes were paid over to the United States government. *See State of Florida Department of Business and Professional Regulation Quarterly Report Form (Quarter Ending March 31, 2006)* Ex. 59 *to 10/14/2010 Deposition of Yaniv Amar* ("*10/14/10 Amar Depo.*") (Doc. 88, Exhibit 10) (showing Mr. Amar as the CEO and "controlling person" of AEM, Inc.). Mr. Amar had made a troubling discovery. He saw Mirabilis spending over $8 million per month, but he saw no apparent stream of income to finance such a large "burn rate". *Id.* at p. 97, l. 14-25. Instead, he had realized that the PEO business passed through about $10 million in monthly payroll tax trust funds. *Id.* at p. 100, l. 7-13. The possible relation of those amounts gave him grave concern. He discussed these concerns frequently with Berman. *Id.* at p. 105, l. 24-25; p. 106, l. 1-13, 16-25; p. 107, l. 1-20.

Mr. Amar's discussions with Berman began with the Sunshine company plans and negotiations over a year before Mr. Flynn's meeting with Berman. *Id.* at p. 22, l. 9-22. But by March, 2006, they had reached the point Mr. Amar had to confront Berman with his concerns. Mr. Amar challenged Berman to explain to him how Mirabilis was generating sufficient revenue to pay for this huge burn rate. *Id.* at p. 105, l. 24-25; p. 106, l. 1-13, 16-25. Berman replied that it was generated by Mr. Amar's business, the PEO activity. *Id.* at p. 106, l. 9-10. Mr. Amar corrected him, explaining that at best the PEO would receive 1% of the $600 million it managed, thus it could account for no more than $6 million annually. *Id.* at p. 106, l. 11-25; p. 107, l. 1. Thus, Mr. Amar pointedly asked Berman "AEM is covering the first three weeks of 2006. Explain to me how in the heck the other 49 weeks are funded." *Id.* at p. 107, l. 1-3.

These concerns of the correlation of the burn rate at Mirabilis and the payroll taxes were shared with Berman regularly over the next few months. *Id.* at p. 107, l. 14-25; p. 108, l. 1-19. Not being satisfied, Mr. Amar directly discussed with Berman his concern that the payroll taxes were not being paid. *Id.* at p. 108, l. 16-17; p. 109, l. 8-17. Mr. Amar went so far as to insist that Breman provide him documentation from the Treasury Department indicating the taxes had been paid. *Id.* at p. 113, l. 10-21. Berman couldn't give and never did give Mr. Amar the assurance he was seeking.[3]

In a statement, Daniel Myers, the CFO of Mirabilis, confirmed that Berman was well aware of the Presidion Plan, and he even notes that Berman and Amodeo "were at multiple meetings where we discussed payroll taxes", that they "sat in meetings where they would document the [Presidion] [P]lan, what the [Presidion] [P]lan was", and that "[t]hey would review memos, sign off on memos that were going out." *See July 20, 2009 Statement of Daniel Myers ("Myers Statement")* (Doc. 88, Exhibit 13) at 9, Section 0022, l. 3-8.[4] Mr. Myers describes the Presidion

---

[3] Berman had full knowledge of the plan not to pay the payroll taxes and was actively involved in that plan. *See Myers Statement*, at 6, Section 0013, l. 24-25; Section 0015, l. 1-17. As noted earlier, he had told Mr. Flynn as much by admitting to the "plan not to pay the payroll taxes" in their meeting. Berman and his firm, including attorney Elena Wildermuth ("Wildermuth"), continued to represent Mirabilis related to the payroll taxes while $26 million in stolen payroll trust funds flowed through the BKR trust account. *See Id.* at 10, Section 0023, l. 3-7; 12, Section 0028, l. 14-25; Section 0029, l. 1-2; *Steven L. Yoakum, CPA's August 2, 2010 "Evaluation and Analysis of Berman Trust Transactions" ("Yoakum Analysis")* (Doc. 88, Exhibit 15) Berman took fees from those funds. *See Yoakum Analysis*.

[4] As noted in the *Response to Motion for Summary Judgment*, on December 9, 2010, Plaintiff's counsel was first informed of a transcript of the *Myers Statement*. The transcript is admissible in the instant matter as a statement against the interest of Mr. Myers pursuant to Rule 804(b)(3) of the Federal Rules of Evidence. By refusing to testify as to the contents of the statement, Mr. Myers is "unavailable" under Rule 804(a). Rule 804(b)(3) allows for the admission of hearsay evidence if a declarant is unavailable when a statement is one that:

> a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability statement.

In the instant matter, the *Myers Statement* contains multiple admissions that would subject Mr. Myers to criminal prosecution. Therefore, the statements are against his interest pursuant to Rule 804(b)(3). See *United States v. Saget,* 377 F.3d 223 (2nd C.A. 2004). However, this Court's ultimate ruling on this evidentiary issue is not dispositive of a sanctions motion. It is not denied that Mr. Myers describes Berman's actions. Although he now

Plan as a plan "to get [Presidion] healthy without paying the taxes" and states that Berman "absolutely" had knowledge of the Presidion Plan and the actual non-payment of payroll taxes. *Id.* at 6, Section 0013, l. 11-15, and at 14, Section 0032, l. 7-9. Mr. Myers stated that Berman worked on the plan. *Id.* at 5, Section 0014, l. 4-17. Mr. Myers also states that Berman handled a trust account in which payroll taxes were transferred. *Id.* at 12, Section 0028, l. 10-21. Even aside from the prior statement, Mr. Myers stated at deposition that Berman was at multiple meetings were the Presidion Plan was discussed. *December 10, 2010 Deposition of Daniel Myers* ("*Myers Depo*") (Doc. 88, Exhibit 11), at p. 460, l. 9-13.

In the *Motion for Sanctions*, Defendants allege that "Defendants were not told, and did not know of the illegal scheme to steal payroll tax trust funds." This is directly contradicted by the above described testimony of three separate individuals and at worst is a fact question to be determined by a jury. There is certainly evidence that has been developed that would render the Defendants liable in this matter. Even Berman recognizes that if he had knowledge of the payroll tax plan he would have to take action based on this knowledge. As testified by Berman:

> Q. If you had been aware that unpaid Presidion payroll taxes were flowing into Mirabilis to be used for acquisitions and corporate purposes, in view of your position with Mirabilis would you have felt you were required to advise the board that the use of those funds was improper?
> **A. I would have been required to do more than that, yes, sir.**

*Deposition of Richard Berman* ("*Berman Depo*") (Doc. 103, Exhibit H) at p. 171. It is uncontroverted that Berman took no action at all. But Berman was an Officer and Director who could have raised this at a Director's meeting and stopped this plan. He cannot rely on his failure to exercise control within his responsibility by now stating only Amodeo had control. Mr. Berman had the legal ability to control, the responsibility to exercise that control and failed

---

exercises his Fifth Amendment rights, it is unclear if he will continue to at trial due to having reach a plea, having been cleared of any prosecution or otherwise.

to act. Therefore, if three separate witnesses are to be believed as to Berman's knowledge, Berman, by his own admission, failed in his responsibilities. Given this evidence, it is baffling as to why Defendants still assert that pursuit of such an action would be considered sanctionable. Certainly, the pursuit of this matter given the evidence of Berman's knowledge is not "frivolous".

Despite actual knowledge, early on, of the Sunshine Plan and Presidion Plan, the Defendants point to certain memoranda authored by the Defendants regarding payroll taxes as to why they believe pursuit of this claim is sanctionable.[5] The Defendants point to the memoranda and state that the memoranda state that a party must pay payroll taxes or be subject to penalties.[6] This is a very simplistic reading of the memoranda *in toto*. When read as a whole, it is clear that the memoranda were an attempt by a client to find ways to avoid paying payroll taxes by asking very specific questions involving complex factual scenarios. For example, in the March 29, 2005 Memorandum, the question purported to be answered is whether a third party could be held liable for payment of payroll taxes based on a specific section of the code. Wildermuth purposefully ignores other issues that should have impacted her analysis, such as fraudulent

---

[5] In the Motion for Sanctions, the Defendants claim that the IRS has never asserted liability for the Sunshine Plan taxes against Presidion Corporation or PSI on which certain of the Wildermuth memoranda give advice. However, the Defendants fail to mention that the IRS has sought liability against Mirabilis for the Sunshine Plan. Mirabilis has been assessed over $9 million dollars as a result of the Sunshine Plan. *See Indictment of Frank Amodeo* (listing amounts not paid by the Sunshine Companies for the 4th Quarter of 2004 which total over $9 million as monies owed to the IRS in calculating $200 million claim)(Doc. 80, Exhibit 9) see also *Superseding Indictment* January 21, 2009 (stating that Amodeo and co-conspirators failed to remit payroll taxes including amounts of Sunshine Companies III and Sunshine Staff Leasing) (Exhibit 4). That $200 million calculation was then the basis for a civil judgment against Mirabilis. See *Forfeiture Money Judgment dated July 2, 2010*. (Doc. 88, Exhibit 22) The final assessment of the Sunshine Plan tax liabilities is approximately $52 million. *See The United States Notice of Statement of Facts Which the United States Contends it Would Prove at Trial*, June 15, 2010 (Doc. 88, Exhibit 19). Apparently, Ms. Wildermuth was incorrect when she opined as to third party liability for the Sunshine Plan.

[6] This argument fails to address Berman's statements to Mr. Flynn and Mr. Amar, however. Mr. Flynn was told that Mr. Holtz and Berman had it covered and it was their responsibility. *Flynn Depo.*, at p. 102-103, l. 24-1; p. 103, l. 2-10. Berman told Mr. Amar everything was fine. *10/14/2010 Amar Depo* at p. 27, l/ 7-24; p. 68-69, l. 20-21. Even though he recognizes it was his responsibility, he did not "have it covered."

transfer statutes. Wildermuth specifically carves this out of her analysis since it may lead to the conclusion that there could be liability—which was not the answer wanted by the client, Amodeo. These memoranda indicate that the client, Amodeo, is seeking to avoid the payment of payroll taxes by seeking answers to hyper-technical questions involving specific code sections while expressly ignoring others that would be adverse. This should have raised a significant red flag to the Defendants. When combined with three witnesses testifying of Defendants' actual knowledge of the plan, this limited advice is clearly intended to further the illegal plan by providing it the stamp of legitimacy from a lawyer. As noted by Dr. Richardson in his report, the actions taken and not taken by the Defendants constitute malpractice and are actionable. [7] Certainly the pursuit of these claims is not "frivolous".

Besides the misstatement that there is no evidence that the Defendants knew of the payroll tax plan, the Defendants make another critical misstatement in the *Motion for Sanctions*. The Defendants confuse Presidion and Mirabilis. In the *Motion for Sanction*, Defendants rely on misinterpreted quotes from Amodeo's Change of Plea Hearing on September 23, 2008. Specifically, Defendants cite the following specific Amodeo testimony: "I was the owner of a

---

[7] Dr. Richardson's Report contains an excellent discussion on the Wildermuth memoranda. *See Richardson Report* dated October 8, 2010 (Exhibit 5). After reviewing the evolution of the memoranda, Dr Richardson comes to the following conclusion: "Amodeo wanted a favorable opinion, that Presidion Solutions was not responsible for its subsidiaries' (the Sunshine Companies') $52 million unpaid trust fund taxes. BERMAN, Wildermuth and their law firm accommodated him. That the defendant's handling of these matters was unprofessional is apparent." *Richardson Report* at page 33-34. Dr Richardson goes on to state that "Unfortunately, [Wildermuth] allowed the client to so concentrate her inquiry that, at least up to the completion of the May 6th version of her opinion, she did not step back and think about the validity of the Sunshine Plan. And she bowed to the Amodeo's and Baiers' requests that her opinion be brief-like. That is to say, written in support of one side of the question, rather than opinion-like, which would be more objective in its analysis." *Id.* at 36. Dr. Richardson reaches the inescapable conclusion that "It is difficult not to conclude that BERMAN, Wildermuth, and their law firm failed to live up to the applicable standard of conduct expected of attorneys in Florida. Their failure to recognize the fraud involved in the Sunshine Companies Plan, or, if they recognized the fraud, their failure to address its implications, coupled with providing the final May 6th opinion on parent company liability for a subsidiary's unpaid trust fund taxes, which they later said was misleading and should not be relied on, permitted Amodeo's grand scheme – Presidion and Mirabilis growing in concert to a NASDAQ listing – to go forward." *Id.* at 34. When an expert also concludes that the Defendants' conduct and advice is actionable, it is difficult to conclude that pursuing the claim is frivolous and sanctionable.

company, which owned a PEO, that allowed a third party to collect the payroll taxes . . ." Defendants contend that the company owned by Amodeo was "Mirabilis". However, this is a complete misrepresentation of the quote. In order for the quote to make sense, it is apparent that Amodeo is referring to Wellington, as the company he owned, which in turn owned Presidion. The third party referenced is AEM, which collected the payroll taxes. *Myers Depo.* at p. 410, l. 14-19; 22-23. Amodeo did not own Mirabilis, and Mirabilis did not own a PEO that allowed a third party to collect payroll taxes.

Furthermore, the Defendants assertion that Amodeo was "the principal and controlling shareholder of Mirabilis" is again factually false. As set out in the *Response to Motion for Summary Judgment*, Amodeo was not a shareholder of voting shares of Mirabilis. According to the *2005 Auditors' Report*, as of December 31, 2005, Mirabilis had issued only 100 shares of Class A Common Stock (Black Shares) in total. *2005 Auditors' Report* at 20-21 (Doc. 88, Exhibit 3). The black shares were the only voting shares. *See Shareholders' Agreement* at 2 (Doc. 88, Exhibit 4); N.R.S. § 78.196 (requiring one or more classes or series of shares to have unlimited voting rights); *2005 Auditors' Report* at 21.

As outlined in the *Response to Motion for Summary Judgment*, the evidence shows that all of the voting stock, specifically the Black Shares, was issued to Mr. Amar. According to minutes from the 2006 Annual Meeting of Shareholders, Mr. Amar was identified as the "sole Class A shareholder."[8] At that same meeting, Mr. Amar appointed Berman to the board of directors and recommends Berman as an officer of Mirabilis. Berman is then elected an Executive Vice President and Secretary of Mirabilis and his firm is named General Counsel. See *Minutes from January 25, 2006 Shareholder Meeting* (Doc. 88, Exhibit 17) *and Minutes from January 25,*

[8] A complete narrative of the issuance of the stock can be found in the *Response to Motion for Summary Judgment* and is not set forth here.

*2006 Board of Directors Meeting* (Doc. 88, Exhibit 6). Given the documentary and testimonial evidence, it is clear that Mr. Amar was the only holder of voting shares and therefore had all voting control over Mirabilis. Stating that Amodeo was the "the principal and controlling shareholder of Mirabilis" is just flat wrong.

What seems lost on the Defendants is that Mirabilis itself did not misdirect any payroll taxes. As noted in the *Response to Motion for Summary Judgment*, it was called the "Presidion Plan" and not the "The Mirabilis Plan" for good reason. A Mirabilis subsidiary (AEM) managed the Presidion book of business, which included payroll taxes *United States' Notice of Statement of Facts Which the United States Contends It Would Prove at Trial* (Doc. 88, Exhibit 19) at 11. There is no allegation in the *Government's Statement of Facts* that Mirabilis itself misdirected payroll taxes. All of those payroll taxes were deposited into an account managed by Presidion's CFO, Sue Shoemacher, not a Mirabilis employee. *Id.* at 10. It is alleged that Amodeo and one of his co-conspirators, Mr. Vanderberg, directed funds be paid out of that account for the benefit of Presidion, Amodeo, and others. *Id.* at 10. Mirabilis's alleged liability arises from funds moving through Mirabilis and its subsidiaries, not for affirmative acts of Mirabilis to misdirect the funds.[9] Based on the above factual evidence, Mirabilis has a claim against the Defendants.

---

[9] Thus, Defendants' repeated allegation that Amodeo "controlled" Mirabilis misses the point that control of Mirabilis could not have misdirected these funds from the account managed by Presidion. Instead, it is Amodeo's ownership of Presidion, through Amodeo's company, Wellington, that allowed the misdirection of funds from an account managed by Sue Shoemacher of Presidion. *See Cuthill Affidavit* at Ex. F (Doc. 88, Exhibit 1). In fact, the indictment of Amodeo alleges he controlled Predion. *See Indictment of Frank Amodeo.* Furthermore, the Defendants have stated that Amodeo's control has been adjudicated by the Court in *Miravilis Ventures, Inc. v. Saxon Gilmore, et al.*, Case No. 6:09-cv-1974-Orl-31DAB, and therefore Plaintiff is collaterally estopped from claiming otherwise. However, in order for collateral estoppel to apply, the party seeking to invoke collateral estoppel must establish that (1) the issue in the pending case is identical to that decided in a prior proceeding; (2) the issue was necessarily decided in the prior proceeding; (3) the party to be estopped was a party or was adequately represented by a party in the prior proceeding; and (4) the precluded issue was actually litigated in the prior proceeding. *Blohm v. Comm'r of Internal Revenue, 994 F.2d 1542, 1553*(11th Cir. 1993). In the Saxon Gilmore case, whether Amodeo controlled Mirabilis was not a necessary finding by the Court. The Court merely found that the person sued was not providing legal services in his scope of employment. The control of Mirabilis was completely irrelevant. Therefore, collateral estoppel would not be applicable.

Pursuing these claims against the Defendants with this factual support is certainly not sactionable or frivolous.

### C. Specific Legal Arguments in Response[10]

#### 1. Imputation Barred by Innocent Decision Makers

In the *Motion for Sanctions*, the Defendants next argue certain affirmative defenses that they claim bars Plaintiff's causes of action. The first argument Defendants attempt is that the imputation defense bars Mirabilis' claims against the Defendants.[11] However, the Defendants fail to even mention that the doctrine of imputation is inapplicable when there are innocent decision makers present, as in the instant case. As stated in the *Response to Motion for Summary Judgment*, the *in pari delicto* defense can be asserted against a corporation only if misconduct can be imputed to the corporation. *See Liquidation Comm. Of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008) (explaining that the *in pari delicto* defense must be distinguished from the agency law principles that allow it to be asserted against a corporate plaintiff).

One of the leading cases regarding *in pari delicto* in Florida states that a bad actor's actions will not be imputed to a corporation and the defense of *in pari delicto* will fail if there are

---

[10] While not designated as a specific argument, at one point the Defendants state that the undersigned are "pursuing the suit for an improper purpose." This Court has already addressed that argument. The District Court also found that "the decision to file [a bankruptcy petition] was not made by Amodeo, and there was no evidence presented that Cuthill (or Moecker for that matter) intended to aid Amodeo by doing so." *Order Affirming Denial of Dismissal* at 11. (Doc. 30).

[11] The first argument in Defendants' *Motion for Summary Judgment*, which is not made in the *Motion for Sanctions* is reliance on *Steele v. Kehoe*, 747 So.2d 931 (Fla. 1999) for the proposition that malpractice is not the proximate cause of damages where the criminal defendants willful actions break the chain of causation. While *Steele* is not on point, as described in the *Response to Motion for Summary Judgment*, it should be noted that the argument could not form the basis for this sanctions motion. First, *Steele* deals solely with malpractice claims and would have no bearing on breach of fiduciary duty and abetting Amodeo's breach of fiduciary duty. Second, *Steele* and the other cases cited deal with actual adjudications (usually based on guilty pleas) of an individual's willful conduct. Here, Mirabilis pled nolo contendre and any actions were those of its officers and directors which may well include Messrs Berman and Holtz. As such there is not a break of causation but action by Defendants that caused any conduct of Mirabilis.

"innocent decision-makers" in the corporation. *O'Halloran* at 1045. The court in *O'Halloran* held "the presence of **any** innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation." *Id.* at 1045 (emphasis added); *See also Freeman v. BDO Seidman, LLP (In re E.S. Bankest)*, Adv. No. 06-1220-BKC-AJC-A, 2010 WL 1417732 (Bkrtcy. S.D. Fla. April 6, 2010). Furthermore, the Defendants do not address and completely ignore the holding in *Bankest*. In *Bankest*, a United States Bankruptcy Court for the Southern District of Florida held that the presence of innocent directors barred the defendant's imputation and *in pari delicto* defenses. *Bankest*, 2010 WL 1417732 at *7-8. The *Bankest* court held that "if there are 'innocent decision-makers' at the corporation, the wrongdoing cannot be imputed to the corporation." *Id.*

In the instant matter, there is clear evidence that there were innocent decision-makers at Mirabilis.[12] The Defendants in their Reply on Summary Judgment address this defense by claiming that Mr. Amar and Ms. Curry are not innocent decision makers. However, there is no dispute that the both Mr. Amar and Ms. Curry were directors of Mirabilis. The Defendants

[12] As noted above, Yaniv Amar was the sole shareholder of voting stock at Mirabilis. Further, at material times he was a director at Mirabilis, the President of Mirabilis' subsidiary AEM, which was the corporation managing payroll taxes, and the "controlling person" charged with insuring the payment of taxes. *10/05/2010 Deposition of Yaniv Amar* ("*10/05/10 Amar Depo.*") (Doc. 88, Exhibit 9) at p. 9, l. 21-22. *State of Florida Department of Business and Professional Regulation Quarterly Report Form* (Quarter Ending March 31, 2006). Mr. Amar specifically testified that he was unaware of the improper taking of the payroll taxes. *10/5/10 Amar Depo.* at p. 96, l. 20-23; *10/14/10 Amar Depo.* at p. 387, l. 4-8; p. 388, l. 2. In fact, he specifically questioned Berman as to whether payroll taxes were being improperly used for business operations of Mirabilis and was assured by Berman that was not occurring and that everything was fine. *10/14/10 Amar Depo.* at p. 105, l. 24-25; p. 106, l. 1-13, 16-25; p. 107, l. 1-20. Mr. Amar also testified that had he known about the diversion of payroll taxes, he would have told someone and stopped it. *Id.* at p. 388, l. 5. Mr. Amar is an innocent decision maker as provided in O'Halloran and Bankest, and his presence bars the application of in pari delicto to Mirabilis. Another innocent decision-maker was Edith Curry. Ms. Curry was elected as an officer of Mirabilis in 2005, became a director in 2006, and served at various times on the audit/risk committee and executive committee. *See Minutes of January 3, 2005/05 Board of Directors Meeting* (Doc. 88, Exhibit 5). Ms. Curry specifically testified that she was unaware of the theft of the payroll taxes even though she was an officer, director and served on important committees. 5/14/09 Sentencing Hearing at 119-20, lines 20-3. Ms. Curry testified that she was not advised of any plan to use payroll taxes for operating expenses and instead was told that prior delinquent payroll taxes were being repaid by cost saving measures. *Id.* She clearly qualifies as an innocent decision maker whose presence bars application of in pari delicto to Mirabilis.

merely claim that even as officers and directors they weren't "decision makers." However, the evidence states otherwise. There are signed Meeting Minutes in which Mr. Amar takes action as a shareholder of Mirabilis. *See Minutes from January 25, 2006 Shareholder Meeting* (Doc. 88, Exhibit 17). There are additionally signed meeting minutes in which Ms. Curry casts board meeting votes on actions of Mirabilis and the company and takes action in those minutes. *See Minutes from January 25, 2006 Shareholder Meeting* (Doc. 88, Exhibit 17)*; Minutes from March 23, 2006 Board of Directors Meeting* (Doc. 88, Exhibit 7)*; Minutes from May 19, 2006 Board of Directors Meeting* (Doc. 88, Exhibit 8). The simple fact is that Mr. Amar and Ms. Curry voted on actions taken by Mirabilis at Mirabilis board and shareholder meetings. It is simply not credible that they are not "decision makers." If an officer and voting members of a board of directors are not decision makers, it is difficult to fathom who would be. This is at best a classic case of a dispute of material fact and is certainly not the basis for sanctionable conduct

In the instant matter, the Defendants attempt to have Amodeo's actions imputed to Mirabilis because Mirabilis was allegedly the principal beneficiary of his conduct. However, Mirabilis was not the principal beneficiary of the conduct. In fact his conduct was adverse to Mirabilis and therefore falls within within the "adverse interest exception" to imputation.

Amodeo and Berman tried to conceal the payroll tax fraud from the innocent directors, such as Mr. Amar. Mr. Amar testified that, when he asked Berman about payroll taxes, he was assured that everything was in "fine order" and that they were not being used for operating expenses. When an agent intentionally attempts to keep certain actions from a company, it can be inferred that those actions are adverse to the company. *See Joel Strickland Enters., Inc. v. Atlantic Disc. Co.*, 137 So.2d 627, 629 (Fla. 1st DCA 1962) (stating that imputation is improper "where the conduct of the agent is such as to raise a clear presumption that he would not



4838-7668-6344.5
43582/0004

communicate to the principal the facts in controversy, as where an agent is in reality acting in his own business of for his own personal interest an adversely to the principal"). Here, Berman actively deceived Mirabilis's management, including Mr. Amar as set forth in Mr. Amar's express testimony. Therefore, Amodeo's actions are not imputed to Mirabilis. The Defendants' Motion for Sanctions does not address these bars to the imputation defense and certainly does not state why they are frivolous or would otherwise be sanctionable.

**2. *In Pari Delicto***

In the *Motion for Sanctions*, the Defendants allege that the claims are barred by the doctrine of *in pari delicto*. As stated above, the presence of innocent decision makers bars the application of the *in pari delicto* defense. Furthermore, there are additional exceptions to the *in pari delicto* defense which the Defendants ignore and are applicable in the instant matter, specifically the innocent successor exception and the insider exception. In a typical bankruptcy case, the commencement of the case creates an estate which consists of all legal and equitable interests of the debtor in property, among other things. *See* 11 U.S.C. § 541. Because the language of § 541 provides that the estate consists of all interests of the debtor in property "as of the commencement of the case," courts have held that post-petition events should not be considered when evaluating a claim in bankruptcy. *See, e.g., Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006); *Lafferty & Co.*, 267 F.3d at 355-37. Therefore, claims brought by a bankruptcy trustee standing in the shoes of a debtor typically are subject to the same defenses that could be raised against the debtor on the date of filing. *See Id.*

There is an important difference between this case and the typical bankruptcy case, however that the Defendants simply ignore. What is ignored by the Defendants is that, unlike a typical bankruptcy, in the instant matter Mr. Cuthill was validly installed as president of Mirabilis **prior**



4838-7668-6344.5
43582/0004

to the filing of the Chapter 11 petition. *See Order Affirming Denial of Dismissal* at 5-6. As such, any of Mirabilis's previous corrupt management team was replaced with an innocent successor prior to the commencement of the bankruptcy case. In such circumstances, the *in pari delicto* defense does not apply.[13] While Defendants attempt to rely on the typical trustee case, they completely ignore this distinction that courts have found to be controlling.

The Defendants cite case law for the proposition that a trustee in a bankruptcy is not an innocent successor. However, in the cases cited by the Defendants, the trustee was appointed *after* the corporation was put into bankruptcy. In the instant matter there is no dispute that Mr. Cuthill was appointed an officer and director of Mirabilis *before* Mirabilis entered into bankruptcy. There is further no dispute that Mr. Cuthill was not part of the payroll tax scheme. There is also no dispute that Mr. Cuthill made the decision to put Mirabilis in bankruptcy. Based on the foregoing, Mr. Cuthill is an innocent successor to whom the *in pari delicto* defense does not apply. The fact that Mr. Cuthill later becomes a trustee is of no importance. The trustee takes the matter as it enters bankruptcy. Since Mr. Cuthill was an innocent successor before the bankruptcy, once Mirabilis went into bankruptcy the trustee is also an innocent successor. The Defendants have cited no case law otherwise. The Defendants simply ignore this fact when requesting sanctions.

Furthermore, the insider exception to the *in pari delicto* defense is also ignored. "While *in pari delicto* may be used as a defense to bar a corporation or successor bankruptcy trustee's claims against third parties, it does not apply to bar claims against corporate insiders." *Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007) (citations omitted); *see also In re*

---

[13] *Compare Edwards*, 437 F.3d 1145 at 1150 *with Freeman v. BDO Seidman, LLP (In re Bankest, L.C.)*, Adv. No. 06-1220-BKC-AJC-A, 2010 WL 2926203 at *2 (Bankr. S.D. Fla. July 23, 2010) (*Bankest II).*

*Oakwood Homes Corp.*, 340 B.R. 510, 536 (Bankr. D. Del. 2006) (stating that "[*i*]*n pari delicto* does not provide a defense for insiders").[14] Here, Berman was member of the Board, an officer and General Counsel of Mirabilis. "[W]hen wrongful acts are committed against a corporation by its officers and directors, the wrongful nature of such acts is not imputed to the corporation."[15] *Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 610 (Bankr. D. N.H. 2007). Although Plaintiff acknowledges that there are no Florida or Eleventh Circuit cases discussing the insider exception, the reasoning applies and is persuasive. It is certainly not frivolous or otherwise sanctionable to request that this Court adopt this well thought out position.

**3. Collateral Estoppel**

Finally, Defendants state that "its anticipated conviction collaterally estops it from blaming the Defendants for its own actions." *Motion for Sanctions* at 25. However, Mirabilis did not plead guilty—it entered a *nolo contendre* plea that was accepted by the Court. "A plea of *nolo contendere* is a mere statement of unwillingness to contest and no more. It is not receivable in another proceeding as evidence of guilt." *Mickler v. Fahs*, 243 F.2d 515, 517 (5th Cir. Fla. 1957). By entering a *nolo contendere* plea, a defendant actually resolves the litigation in question in a manner which specifically avoids an admission of any guilt in subsequent litigation. *See United States v. Williams*, 642 F.2d 136 (5th Cir. 1981). Defendants fail to point out that

---

[14] Unlike the remaining exceptions argued herein, the undersigned has found no Florida or Eleventh Circuit cases expressly discussing the insider exception. However, based upon the persuasive reasoning of these cases and their consistency with Florida law, the undersigned respectfully suggests it would be adopted in Florida.

[15] The Defendants repeatedly state that the Plaintiff is trying to shift blame by bringing the claims against the Defendants. However, corporations can only act through its officers and directors. *O'Halloran v. First Union National Bank of Florida*, 350 F.3d 1197, 1205 (11th Cir. 2003). In the instant matter, Berman was an Officer, Director and General Counsel for Mirabilis. Furthermore, according to at least three witnesses he is one of the people who knew of the payroll tax plan. Berman participated in the plan along with Amodeo and Laurie Holtz. One reading of the evidence is that Berman is a co-conspirator with Amodeo and as General Counsel, Officer and a Director of Mirabilis, helped implant and carry out the payroll tax plan. The doctrine of in pari delicto does not shield a co-conspirator from liability for participation in this scheme. And it is not an attempt to "shift blame" to hold the co-conspirator liable for their actions.

there is no case law in Florida supporting the use of a *nolo contendere* plea and/or conviction as a basis for the defense of *in pari delicto*. Furthermore, this Court has already opined as to the collateral estoppel effect of this specific *nolo contendere* plea and subsequent conviction of Mirabilis in this case. *See United States v. AEM, Inc.*, 718 F. Supp.2d 1334 (M.D. Fla. 2010). In providing consent for Mirabilis to change its previous plea and enter a plea of *nolo contendere*, this Court stated:

> In this instance, the Receiver believes that pleas of guilty would result in his being legally estopped from pursuing civil actions for professional malpractice on behalf of the Corporate Defendants, whereas nolo pleas will not have the same effect. This Court would be skeptical of such an argument if the civil case were for the benefit of the criminal Defendants. That, however, is not the situation here. The only potential beneficiaries of the civil action are the innocent creditors of the Corporate Defendants, including the Government. Under the circumstances of this case, there is value in allowing the civil litigation to proceed on its merits.

*See id.* As pointed out by this Court, a *nolo contendre* plea would not bar this suit. Therefore, the pursuit of this suit is not frivolous or otherwise sanctionable.

## IV. CONCLUSION

Based on the foregoing, it is clear that the arguments made in by Plaintiff in pursuing this claim were not frivolous or otherwise sanctionable. In fact, there is every reason to believe they are meritorious. However, the resolution of this motion should not be based upon which party prevails. That is not the standard. The arguments advanced were based on valid precedent adopted in this jurisdiction. There has been no showing that there were specific on point precedent that Plaintiff ignored. Plaintiff did not rely upon any facts that lack support by competent evidence. Defendants have not shown that any of the evidence cited by Plaintiff was inaccurately described. Thus, there is simply no basis for the award for the Rule 11 Sanctions, or section 57.105, Florida Statutes.

**BROAD AND CASSEL**
Attorneys for Mirabilis Ventures, Inc.
390 North Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone:(407) 839-4200
Facsimile: (407) 425-8377

By: *[/s/ Todd K. Norman]*
Todd K. Norman, Esquire
Florida Bar No. 0062154
tnorman@broadandcassel.com
Roy S. Kobert, Esquire
Florida Bar No. 777153
rkobert@broadandcassel.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished this 14th day of January, 2011 via CM/ECF to all parties receiving electronic service, and via U.S. Mail to: D. David Keller, Esquire, Keller Landsberg, PA, Broward Financial Centre, Suite 1400, 500 East Broward Boulevard, Fort Lauderdale, Florida 33394; and Bradley M. Saxton, Esquire, Winderweedle, Haines, Ward & Woodman, P.A., P.O. Box 1391, Orlando, Florida 32802-1391.

By: */s/ Todd K. Norman*
Todd K. Norman, Esquire
Florida Bar No. 0062154
tnorman@broadandcassel.com