UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**In Re: MIRABILIS VENTURES, INC.**
**Case No.: 6:08-Bk-04327-KSJ**
**Adversary Case No. 6:08-Ap-222-KJS**

---

**MIRABILIS VENTURES, INC.,**

**Plaintiff,**

**-vs-** **Case No. 6:09-cv-175-Orl-31DAB**

**RICHARD E. BERMAN, and BERMAN, KEAN & RIGUERA, P.A., a Florida limited liability company; and ELENA WILDERMUTH,**

**Defendants**

---

**EXPERT WITNESS REPORT**
**OF**
**DAVID M. RICHARDSON PURSUANT TO RULE 26**

I. OPINIONS

It is my opinion that the defendants RICHARD E. BERMAN ("BERMAN") and BERMAN, KEAN & RIGUERA, P.A. and ELENA WILDERMUTH ("WILDERMUTH") deviated from the applicable standard of conduct expected of attorneys in Florida in connection with their representation of Mirabilis Ventures, Inc. ("Mirabilis)"during a two year span of time beginning no later than February 11, 2005. During their representation

A. The defendants represented multiple clients with adverse interests, including



EXHIBIT
tabbies
5

Presidion Corporation, Presidion Solutions, Inc., Professional Benefits Solutions, Inc. ("PBS"), the "Sunshine Companies," Mirabilis, Nexia Strategy Corp. ("Nexia"), AQMI Strategy Corp. ("AQMI"), Wellington Capital Corp. ("Wellington"), and other related companies, and Frank Amodeo ("Amodeo").

B. BERMAN accepted employment by Common Paymaster Corporation (a "PEO") to work for Mirabilis and Nexia but remained a partner in BERMAN, KEAN, & RIGUERA, P.A. and during that employment both BERMAN and BERMAN, KEAN & RIGUERA, continued to provide legal services to Mirabilis and Nexia.

C. The defendants knew or should have known, and should have, but did not, inform the Mirabilis Board of Directors that

(i) the willful failure to pay over collected trust fund taxes is a felony under IRC § 7202,

(ii) a business plan that includes the diversion of trust fund taxes from their intended use to paying operating expenses, making investments or making distributions to shareholders, if carried out, would be a willful failure to pay trust fund taxes and might result in prosecution,

(iii) the diversion of collected trust fund assets over a period of time to pay operating expenses, make investments, make distributions to shareholders, or provide a source of cash flow for Mirabilis, would be considered willful and might result in a felony prosecution,

(iv) as the recipient of illegally diverted trust fund taxes, Mirabilis might be linked to that illegal conduct.

D. BERMAN and his law firm acquired significant, financial interests in Mirabilis which, under the circumstances, may have made it difficult for them to give detached advice.

E. The defendants lacked the expertise and experience necessary to understand the criminal implications of the Sunshine Companies Plan or that plan's application to Presidion Solutions and Mirabilis in the so-called PBS Plan, and should not have undertaken to provide advice on the application of section 6672 of the Internal Revenue Code.

F. BERMAN and his firm BERMAN, KEAN & RIGUERA, P.A. failed to provide adequate oversight of WILDERMUTH resulting in the issuance by the law firm of a May 6, 2005 opinion regarding the application of section 6672 of the Code that was ultimately determined to be misleading.

G. The defendants, upon learning of the illegal diversion trust fund taxes failed to notify their client, Mirabilis, and continued to represent the firm in acquisitions using funds derived from those diverted taxes.

H. BERMAN and his law firm abused the firm's trust account by allowing it to be used by Mirabilis and its affiliates as a commercial account through which trust funds were illegally used for other purposes.

## II. <u>The Basis and Reasons for the Opinions</u>

On December 21, 2004 eleven people gathered in the Miami office of Rachlin Cohen & Holtz, LLP. They were there to discuss a plan developed by Frank Amodeo to remove a $52

million liability of the Sunshine Companies for unpaid federal taxes from the financial statement of the Sunshine Companies' publicly traded parent, Presidion Corporation. This part of the plan was simple and legal - sell the stock of the Sunshine Companies.

But the parties also wanted to prevent the government from seizing the operating assets of the Sunshine Companies to satisfy the unpaid taxes. This was to be accomplished by first transferring the operating assets of the Sunshine Companies to another subsidiary of Presidion Corporation and then selling the stock The subsidiary that received the assets would carry on the business previously conducted by the Sunshine Companies and the government would have to look to the Sunshine Companies, which by design had no remaining assets, for the $52 million of unpaid taxes. This part of the plan was also simple, but it was illegal.

Unfortunately, all the bad things that transpired after that meeting, including multiple felonies relating to the accumulation of an additional $150 million of unpaid taxes, penalties and interest, the conviction of Mr. Amodeo who is serving over 22 years in prison, numerous law suits, and millions of dollars of legal fees and expenses of winding down the remaining companies, could have been avoided. That too would have been simple.

One does not have to be an accountant or a lawyer to recognize that transferring the assets out of the Sunshine Companies was, at least, a fraud on the Sunshine Companies creditors. In fact, one of the accountants at the meeting did raise the question of whether this plan involved fraudulent conveyances. Although we don't know the extent or nature of the discussion that followed this observation, it is clear that the parties did not cancel or even delay implementation of the plan to address question raised by the accountant.

This law suit by Mirabilis Ventures, Inc. ("Mirabilis") is against RICHARD BERMAN,

who attended the December 21, 2004, meeting in his capacity as General Counsel of Mirabilis, BERMAN's law firm, BERMAN, KEAN, & RIGUERA, P.A., and ELENA WILDERMUTH. who was a young associate in BERMAN's law firm. In addition to Mirabilis, these lawyers, and the other individuals at the December 21, 2004 meeting, there were numerous individuals and as many as one hundred corporations involved to some extent in this case.

The discussion in this report is limited to the activities, people and corporations that seem most important to the general question of whether these defendants committed mal practice. Although, I have made no independent analysis of the flow of cash in his case, it is clear that a large amount of trust fund tax was illegally diverted from its intended use. It is also true that some portion of the diverted trust funds went into BERMAN, KEAN & RIGUERA, P.A.'s trust fund account and subsequently was distributed to recipients other than the United States. These conclusions are based on the reports of the plaintiff's accounting and auditing experts.

A. <u>Background</u>.

Every year the United States fails to collect several hundred billion dollars of taxes that are legitimately due and owing to the government. Taxes that employers are required to deduct from their employees paychecks and pay over to the government account for approximately 20% of this "tax collection gap." These "withheld" taxes include income taxes, social security taxes and hospital (Medicare) taxes. When collected, these withheld taxes are held by employers as "a special fund in trust for the United States" ("trust fund taxes"). [IRC § 7501(a)].

There is a formidable array of civil and criminal penalties, both within and without the Internal Revenue Code, designed to encourage employers to withhold, account for, and pay over trust fund taxes and to do so in a timely manner. In addition, the United States has in its arsenal both collection procedures specifically designed for delinquent trust fund taxes and all other

collection procedures available to creditors under state and federal law.

To understand how the Defendants, RICHARD BERMAN, the law firm BERMAN, KEAN & RIGUERA, P.A. and ELENA WILDERMUTH deviated from the standard of care expected of attorneys and thereby committed mal practice in this case, it is helpful to have a general understanding of the civil and criminal laws applicable in the case of non payment of employment taxes and of the manner in which the United States government enforces these laws in a given case. The following is a brief summary of those laws and a discussion of one case involving facts similar to those present in this case.

1. The Applicable Law.

a. Civil Penalties. The principal civil penalty for non-payment of trust fund taxes is in § 6672 of the Internal Revenue Code (the "Code"). In the case of a corporate employer that fails to pay over employment taxes, the Internal Revenue Service may collect the unpaid taxes from "any person required to collect, truthfully account for and pay over" those taxes. In most cases that person is an individual who is officer, director or significant shareholder of the corporation. Although § 6672 of the Code is sometimes referred to as a penalty provision, in effect it is a collection device. If the responsible person pays the tax no further effort is made to collect it from the corporation or if the corporation ultimately pays the tax no further effort is made to collect it from the responsible person.

The principal collection remedy is the federal tax lien under § 6321 of the Code. Whenever a person neglects or refuses to pay any tax there is automatically created "a lien in favor of the United States" on all property of the debtor. Subject to significant due process rules and certain exceptions, this lien may be enforced by levy "upon all property and rights to property . . . belonging to such person. . . ." [IRC § 6331(a)].

Also, all states and the United States (Title 28, Part VI, Chapter 176, Subchapter D, Section 2201) have a fraudulent conveyance statute. Generally, if a delinquent taxpayer transfers assets and the transfer has the effect of making the taxpayer insolvent, or if the taxpayer was already insolvent at the time of the transfer, the federal government has several options under these statutes. It may seek avoidance of the transfer, a remedy against the asset transferred or against other property of the transferee, or other appropriate relief.

b. Criminal Penalties. The principal criminal sanction for non payment of trust fund taxes is in § 7202 of the Code. It provides, in part, that any person obligated to "truthfully account for and pay over" these taxes who fails to do so is guilty of a felony and is subject to a fine and/or imprisonment for not more than five years. Prosecutions under this statute generally involve (i) determining which person was required to truthfully account for and pay over the tax and (ii) whether that person's failure to truthfully account for and pay over was "willful".

Other criminal sanctions that have been applied by the government to persons who fail to truthfully account for and pay over trust fund taxes include the following.

§ 7201 – ATTEMPT TO EVADE OR DEFEAT TAX.
"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony . . . ."

§ 7212 – ATTEMPTS TO INTERFERE WITH ADMINISTRATION OF INTERNAL REVENUE LAWS
"Whoever corruptly . . . obstructs or impedes, or endeavors to obstruct or impede, the due administration of" the Internal Revenue Code shall be guilty of a felony.

§§ 7215 and 7512(b) – OFFENSES WITH RESPECT TO COLLECTED TAXES.
". . . any person who is required to collect, account for and pay over" employment taxes but who fails to do so, and who receives appropriate notice from the Internal Revenue Service, is required to deposit such taxes in a separate bank account by the end of the second business day after receipt of such taxes [§ 7512(b)], and the failure to follow this procedure is a misdemeanor (§ 7215).

18 U.S.C. 371 – CONSPIRACY TO COMMIT OFFENSE OR TO DEFRAUD UNITED STATES.
"If two or more persons conspire either to commit any offense against the United

States, or to defraud the United States . . . in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined . . . or imprisoned not more than five years, or both."

18 U.S.C. 2(a) – PRINCIPALS.

"Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

18 U.S.C. 1956 (a)(1)(A)(ii) – LAUNDERING OF MONETARY INSTRUMENTS.

"Whoever, knowing that the property involved in a financial transaction represents the proceeds of some from of unlawful activity . . . with intent to engage in conduct constituting a violation of Section 7201 or 7206 [Fraud and False Statements] of the Internal Revenue Code . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

18 U.S.C. 1957(a),(b)(1) – ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTS.

"Whoever, in any of the circumstances set forth in subsection(d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished" by a fine under Title 18 or imprisonment for not more than ten years, or both.

18 U.S.C. 1341 – Frauds and Swindles

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false of fraudulent pretenses, representation, or promises . . . shall be fined . . . or imprisoned not more than 20 years, or both."

18 U.S.C. 1343 – FRAUD BY WIRE, RADIO, OR TELEVISION

"Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce shall be fined . . . or imprisoned not more than 20 years, or both."

18 U.S.C. 1962 et seq. – PROHIBITED ACTIVITIES [RICO]

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering . . . ."

2. <u>How the Law Is Implemented</u>

A typical failure to pay employment tax case would involve a closely held, small to

middle size incorporated business with fewer than one thousand employees which is struggling financially. Its suppliers have put the company on a cash basis and its bank has stopped providing additional loans and is pressing for repayment of existing loans. To ride out the hard times, keep the business open, retain critical employees, pay the mortgage on his or her home and feed the family, the owner of the corporation uses trust fund taxes to pay current operating expenses or living expenses. The owner's expectation is that business will soon pick up and his or her intention is that the temporarily deferred taxes will be paid in the near future. But improvement in the business does not happen and the business folds.

Decades ago the Internal Revenue Service learned that even though an employer in this situation illegally diverted trust fund taxes and therefore willfully failed "to collect, truthfully account for and pay over" those taxes, it was hard to get a jury to convict the employer of the felony charge. Under these facts, to avoid kicking the taxpayer while he or she is down, juries often found that the non payment was not "willful."

This led to the enactment of §§ 7215 and 7512, an easier to prove misdemeanor for failing to comply with an accelerated deposit requirement after it was imposed by the Internal Revenue Service on a delinquent employer. As it has turned out, neither the misdemeanor in these sections nor the felony penalty in § 7202 is applied often because the Internal Revenue Service normally is willing to work with the employer and/or the responsible person to settle the matter with the financially strapped employer.

However, the criminal penalties, and particularly the § 7202 felony penalty, hover over all failure to pay employment taxes and they must be taken into account by both taxpayers and their professional advisors. The Internal Revenue Service will forward to its Criminal Investigation

Division cases involving flagrant, purposeful and continuing non payment. A prime example of such a case is, *U.S. v. Evangelista*, 122 F.2d 113 (2nd Cir. 1997). The facts in *Mirabilis v. Berman*, which are discussed below, are eerily like those in *Evangelista*.

Louis Evangelista, Sr. and his son Claude were convicted of conspiracy to defraud the United States under 18 U.S.C. § 371, failure to pay employment taxes under 26 U.S.C. 7202 and evading income tax under 26 U.S.C. 7201. They were both sentenced to fines, prison and supervised release. They appealed and the Second Circuit affirmed the convictions.

The Evangelistas operated several businesses, each through an entity. One of their corporations was a central paymaster for the other companies. A downturn in the real estate business in late 1988 forced them to stop paying their payroll taxes although they did file accurate Forms 941 reflecting their employment tax liability. They entered into negotiations over an extended period from 1989 to 1995 with the IRS and paid part of the past-due amount but never reached a formal agreement on how taxes would be paid.

During that period the Evangelistas schemed to

> "(a) defeat collection of the trust funds by the IRS, and
>
> (b) prevent the IRS from seizing other family and business assets to satisfy the trust fund obligations.

To this end, they:

> (a) spent corporate funds on "personal expenses and new businesses," and
>
> (b) "frustrated seizure of . . . family assets by transferring ownership of those assets from family members who were personally liable for the overdue trust funds . . . to those who were not."

The Second Circuit rejected each of the Evangelistas' arguments including the assertion that they relied on advice of their accountant. As to this defense, the Court noted that the accountant had never said that it was permissible to defer payments and although the accountant "advised that the IRS might be persuaded in negotiations to accept an arrangement under which the trust fund payments could be stretched out over time or reduced . . . . that is not at all the same as a good-faith belief that their conduct was lawful."

B. The Facts in this Case

Amodeo's evolving criminal scheme to evade tens of millions of dollars in taxes, interest and penalties, which gave rise to this lawsuit, occurred during the period between October, 2004 and March, 2007. Some officers, directors, shareholders, accountants and lawyers were caught in its expanding web.

The resulting criminal prosecutions gave rise to a paper trail large enough to fill warehouse. As might be expected, there are disagreements as to some details as well as different views as to the significance of agreed upon facts.

What is clear, however, is that one or more of the defendants in this case

(i) knew or should have known that their clients were engaged in illegal activity,

(ii) should have, but did not, inform their clients of that fact,

(iii) acquired a significant financial interest in the Mirabilis, the Plaintiff in this case, by becoming a shareholder, officer and employee of the corporation,

(iv) aided in the diversion of trust fund taxes to illegal uses,

(v) should not have undertaken to write an opinion in a highly technical area of law in which no attorney in the firm had any experience, or

(iv) had conflicts of interest in their representations of several of their clients.

Most important, at any critical point during the evolution of this criminal scheme, if the defendants had acted professionally and in accordance with the standard expected of attorneys, and had apprised their clients

(i) that what their clients were planning to do, or were already doing, might result in criminal sanctions, and that

(ii) if their clients did not cease the illegal conduct they, as lawyers, would be forced to withdraw from further representation,

then perhaps the businesses, jobs, and reputations could have been saved and the U.S. taxpayers could have saved a significant part of the dollars that were lost.

This evolving criminal scheme can best be explained in different but interrelated parts. They are the "Sunshine Companies Plan," the "Section 6672 Opinion Letter," and "Mirabilis. The defendants roles in these parts of the criminal scheme also involve violations of The Florida Bar's Rules of Professional Conduct. These Bar disciplinary violations are discussed at the end of this report.

As is discussed in this Report, BERMAN was intimately involved with Amodeo and Mirabilis from the inception of the Sunshine Companies scheme in or about December 2004 to its implosion in the Spring of 2007. He was listed as present at the important December 21 meeting regarding the so-called Sunshine Companies Plan. His firm prepared the much discussed Section 6672 opinion which was given to the Presidion Corporation auditors in support of the Sunshine Plan. The firm subsequently acknowledged that their opinion should not be relied on because of significant omissions.

BERMAN served in a number of capacities with Mirabilis which received of millions of dollars of trust funds illegally diverted by Presidion Solutions. Those positions included General Counsel, shareholder, employee, member of the Board of Directors, member of the Executive Committee of the Board of Directors, member of the Board's Investment Committee and member of the Board's Audit/Risk Committee. And, he attended the critical April 20 and 21, 2005 meetings at which the grand scheme involving Presidion Solutions and Mirabilis was spelled out. The lifeblood of the scheme was trust funds belonging to the United States which were illegally diverted to other uses.

Most important, at any time during this two year period, including at the December 21, 2004 meeting (or shortly thereafter), BERMAN, WILDERMUTH, and their law firm could have and should have either stopped implementation of the scheme or withdrawn from representation of the parties involved. Had they done so before steps were taken to implement the scheme, Amodeo might have avoided conviction and a twenty two year imprisonment, Mirabilis might not have been charged for criminal conduct, the United States might not have suffered the loss of over tens of millions dollars of trust fund taxes and numerous law suits and their consequent professional fees, might have been avoided.

1. <u>The Sunshine Companies Plan.</u>

In connection with one of the criminal cases which arose out of the facts underlying this case, the U.S. Attorney for the Middle District of Florida filed a document, on June 15, 2010, entitled "UNITED STATES' NOTICE OF STATEMENT OF FACTS WHICH THE UNITED STATES CONTENDS IT WOULD PROVE AT TRIAL" [Richardson Exhibit 1]. The first four pages of the document contain an explanation of the Sunshine Companies Plan which, for convenience, is

reproduced here with minor changes. In essence, the Sunshine Companies Plan involved deconsolidating, divesting, and liquidating the Sunshine Companies.

---

In the summer of 2004, Frank Amodeo ("Amodeo") was introduced to John Burcham ("Burcham"), the Chairman of the Board of Directors of Presidion Corporation, the publicly traded parent company of Presidion Solutions, Inc. ("PSI"). PSI was a Michigan-based holding company for several PEOs that provided comprehensive and integrated resource management services, including payroll services, to small and medium sized companies. Burcham enlisted Amodeo – to assist in bailing out his struggling company.

In July 2004, Burcham and Craig Vanderburg ("Vanderburg"), President of PSI, explained that PSI was financially burdened by approximately $4 million in unpaid payroll taxes that had been accrued by certain companies under its control, and by continuing difficulties in maintaining a sufficient asset reserve to keep its worker's compensation insurance policy in force with its insurance company, First Commercial Insurance Company ("FCIC").

PSI had previously acquired seven Professional Employer Organizations ("PEOs"), which made up PSI's "PEO book of business" (i.e., the contracts PSI had with its PEO clients). In or about May 2001, PSI acquired Sunshine Staff Leasing, and Sunshine Companies I, II, III, and IV (collectively referred to as the "Sunshine Companies"). Post-acquisition, these entities did business as Presidion Solutions I, II, III, IV, and V, respectively. . . . .The clients of the PEOs entered into contracts, or service agreements, with PSI or its subsidiaries.

Under the terms of the contracts, when PSI or its subsidiaries started providing services to the clients, PSI . . . assumed the liabilities and responsibilities for paying the wages of the

employees and for reporting and paying over to the Internal Revenue Service the payroll taxes of the worksite employees. At the end of a client's payroll cycle, the client would e-mail, fax, or mail the number of hours worked by the worksite employee(s) to PSI. After receiving the information, PSI computed the amount of FICA, Medicare (HITS), Withholding Taxes, Workers' Compensation Insurance, and 401K contributions to be added to the client's bill, along with PSI's administrative fee. PSI would then e-mail, fax, or mail this information back to the clients, who would either direct debit, mail, or wire the funds to PSI.

At the time that Burcham and Vanderburg commenced negotiations with Amodeo, PSI's publicly traded parent corporation, Presidion Corporation, was preparing for an annual audit. In an attempt to have Presidion Corporation appear more profitable and, perhaps, to avoid questions about the origin of the debt, PSI wanted the Sunshine Companies' payroll tax liabilities removed from Presidion Corporation's financial statements.

On October 18, 2004, Craig Vanderburg, on behalf of Presidion Solutions, signed a "Consult Agreement" [Richardson Exhibit 2] with Amodeo, acting on behalf of AQMI, a corporation which Amodeo created for this purpose. An "Addendum to the Consultant Agreement called for AQMI to provide tax advice to PSI regarding resolution of " Presidion's tax controversy," for a non-refundable fee in the amount of $150,000 and an additional fee of 25% of any tax savings of the company's current payroll tax liability. After payment of the $150,000, the Consultant Agreement provided that, commencing in January 2005, PSI would pay $75,000 per month to AQMI.

During the course of the due diligence investigation, it was discovered that the Sunshine Companies' accrued tax liabilities were actually much larger than had originally been disclosed

to Amodeo, amounting to approximately $13 million (including interest, penalties, and taxes) as of October 2004. Amodeo initially concluded that he could achieve the objectives sought by Presidion Corporation by purchasing the Sunshine Companies himself. Amodeo's plan (the Sunshine Companies Plan") was to have Wellington Capital Group, Inc. (Wellington"), a Nevada corporation wholly owned by Amodeo, purchase the Sunshine Companies from PSI and thereby relieve Presidion Corporation's consolidated financial statements of the Sunshine Companies' accumulated payroll tax liabilities. The purchase of the Sunshine Companies stock was made under the terms of a "Securities Purchase Agreement" dated December 8, 2004 and the closing was to be "on or before December 31, 2004." [Richardson Exhibit 3]

---

If Presidion Corporation's only goal had been to remove the Sunshine Companies' payroll tax liabilities from its financial statement, that would have accomplished by the sale of the Sunshine Companies' stock to Wellington. If the sale price was determined at arms' length and reflected the true value of the Companies, no one could have successfully challenged the validity of the sale. The IRS's position would not have been impaired because after the sale Presidion Solutions would have had, in hand, something of equal value to the stock that it sold.

But, Presidion Corporation, Amodeo, and their advisors had a grander scheme. They also wanted to retain in the Presidion Corporation family the Sunshine Companies' valuable book of business and other assets. Both goals were to be accomplished by first assigning, for no consideration, the Sunshine Companies' the book of business to another subsidiary of Presidion Solutions and then selling the Sunshine Companies stock to Amodeo's corporation, Wellington. The assignment and subsequent stock sale were documented by an "Assignment and Assumption Agreement" between Presidion Solutions, and Paradyme and a "Securities Purchase Agreement"

between Presidion Solutions, as seller and Wellington a buyer.

It was obvious that after stripping the assets out of the Sunshine Companies those Companies were worthless. The Companies had no assets and a $52 million trust fund tax liability. Amodeo understood that selling the Sunshine Companies stock for nothing would catch the eye of the Internal Revenue Service officers who would be trying to collect the unpaid taxes. For that reason they would have to "sell the [Sunshine Companies] at something that was clearly defined above the fair market value of the Companies . . . ." [Amodeo Mock Deposition at p. 14/7]. He determined that $500,000, an amount apparently arbitrarily chosen, would keep the IRS off the scent.

Several months after the assignment and sale were completed, Amodeo realized that the assets assigned to Paradyme included a $12 million deposit with an insurance company. This had to be retroactively corrected. As Amodeo described it in his mock deposition, a bizarre event by any measure, this is what happened.

"A. At least initially, it didn't appear there were any assets in the Sunshine Companies. Then we discovered there was an asset after I [Wellington] had acquired it [the Sunshine Companies] and shut it down. There were $12 million of deposits with an insurance company that were supporting worker's comp claims. So you couldn't touch them. They'er restricted but they existed

And so that was the real assets of it. That was kind of a plus. I didn't know it was there. But it was in the companies that were encumbered by the then existing tax levy. I told the IRS about debts in place or levies in place. And so I converted into a note and sent it to the IRS as a . . . as belonging to them underneath the liens.

Q. How much of a note did you convert it into?

A. Twelve million 245 dollars and change.

Q. From whom to whom?

A. It was from Paradigm, which was one of the Presidion Solution Subsidiaries, a sister to the Sunshine Companies." [Amodeo Mock Deposition at p.32].

The significance of this is that as of December 31, 2004, the Sunshine Companies Plan involved

(i) the Sunshine Companies transferring all their assets to Paradyme, for no consideration,

(ii) Wellington paying $500,000 for the Sunshine Companies, which Companies had no assets and a $52 million tax liability, and

(iii) creating a $12.4 million promissory note that, although it has been held out in various narrative to have been consideration for the "sale" of Sunshine Companies' assets to Paradyme, was actually a retroactive payment for a $12.4 million deposit the Sunshine Companies had in place with an insurance company.

As a footnote, Amodeo offered the $12.4 million promissory note to the Internal Revenue Service, which suggested that they would rather have its cash value. The Sunshine Companies subsequently sold the Paradyme $12.4 million promissory note to Mirabilis for 10% of its face value.

What was intended by this Sunshine Companies Plan, and what happened, was that the IRS appeared to have recourse only to the now minimal assets of the Sunshine Companies and the publicly traded Presidion Corporation not only got the $52 million dollar liability off of its books but also got to keep all of the Sunshine Companies' now unencumbered assets in one of its subsidiary, Paradyme.

But, there is no such simple way to defeat an employment tax liability and Amodeo's

scheme is no exception. If it worked, all employers would be structuring their businesses in order to take advantage of it. One reason why Amodeo's scheme to make the trust fund tax liability "go away" doesn't work is that it fits squarely in either of these felony statutes.

§ 7201 – ATTEMPT TO EVADE OR DEFEAT TAX.

> "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony . . . ."

§ 7212 – ATTEMPTS TO INTERFERE WITH ADMINISTRATION OF INTERNAL REVENUE LAWS

> "Whoever corruptly . . . obstructs or impedes, or endeavors to obstruct or impede, the due administration of" the Internal Revenue Code shall be guilty of a felony."

The scheme also is based on a fraudulent, and therefore reversible, transfer. The Sunshine Companies were probably insolvent, at the time of the transfer of its assets to Paradyme for no consideration (or became insolvent because of the transfer) and that transfer was obviously in fraud of all the Sunshine Company creditors including the United States.

BERMAN and his firm are implicated at the beginning point of this evolving criminal scheme because BERMAN attended the December 21, 2004 meeting, at which the details of the scheme were discussed, according to Mr. Holtz, "for hours" [Holtz deposition at p.78/10]. Berman's attendance is noted in hand written notes [the "Handwritten Notes"] taken during the meeting [Berman Exhibit 5].

Furthermore, on January 4, 2005, Amodeo sent a follow up memorandum addressed to BERMAN, with copies to the other attendees, regarding the "Sunshine Matter Timetable." The fact that there is no explanation to BERMAN in the "Sunshine Matter Timetable" explaining why BERMAN was getting the memorandum, confirms that BERMAN was at the meeting or, at the least, that he was fully aware of the Sunshine Companies Plan and that he had a specific roll

to play in implementing it.

BERMAN testified that he did not attend the meeting [Berman Deposition at pp. 68/22 - 69/18]. He acknowledged receiving the meeting's agenda, but "nothing ever came of it" [Berman Deposition at 70/8].

BERMAN also acknowledged that he attended one meeting in February, 2005, with Revenue Officer Judy Berkowitz, but he said that dealt with Kingdom Vision Networks and the Sunshine Entities tax obligation was not discussed." [Berman Deposition at 94/17 - 95/23]. According to BERMAN's time records, the meeting he attended with Revenue Officer Berkowitz took place on February 16, 2005. [Berman Exhibit BKRMVI/TA-0064].

Mr. Marrero also attended the February 16, 2005, meeting with Revenue Officer Berkowitz, and remembers that BERMAN was at that meeting. But his recollection of what was discussed was different than BERMAN's and very specific.

> Q. What do you recall was discussed in that meeting?
>
> A. Discussions centered around the potential for exchanging credits for tax liabilities to offset payroll taxes.
>
> > [This was a proposal that Amodeo had raised in connection with resolving the Sunshine Companies tax liability.]
>
> Q. Was this meeting set up solely to deal with Sunshine's matter or was it any other matter that was on the agenda?
>
> A. As far as I know it was only Sunshine related. [Marrero Deposition at pp. 21/25 - 22/26].

The Handwritten Notes state that the "fraudulent consequences" of the scheme were discussed. They also discussed Frank Amodeo's question, "How do we value the transfer of the

contracts from Sunshine Companies to Paradyme so the IRS cannot challenge?" If you were trying to have an "above board" transaction, the question to be, "How do we determine the fair market value of the Sunshine Companies", not how much do we have to pay to keep the Internal Revenue Service from questioning the transaction. As far as I can tell, no valuation was made of the Sunshine Companies assets - they were just transferred without consideration.

Finally, if the purpose of the Sunshine Companies plan was not already clear, consider Amodeo's quoted statement in the notes: "If it works the tax liability will go away."

It cannot be questioned - an important purpose of the Plan was to defeat the government's demand for payment of the unpaid employment taxes by transferring the Sunshine Companies' assets to a new company, Paradyme.

Denying or inhibiting the governments access to the Sunshine Companies' assets in this fashion fits squarely in the felony statute, IRC § 7201 - the basic tax evasion statute - as well as in some of the other crimes listed above. BERMAN should have recognized that the plan was fraudulent and either stopped it or opted out of representing any of the players. If he had taken either action, perhaps the personal and financial disasters that followed would not have happened.

As to the basic elements of the Sunshine Plan, BERMAN testified that he did receive an e-mail from Marrero containing a "List of Questions/Actions from RO Berkowitz" [Berman Exhibit 16], which, among other things, listed a number of unfiled returns and liabilities in excess of $24 million for Sunshine Staff Leasing's unpaid trust fund taxes [Berman Deposition at p. 96/4]. He also acknowledge that he knew that Sunshine had assigned its assets to Paradyme [Berman Exhibit 17 and Berman Deposition at p. 97/3 - 98/1].

When asked if he received the May 27, 2005 e-mail addressed to him apparently from

Jason Carlson [Berman Exhibit 17] he acknowledged having a "vague recollection of it. . . ." When asked if he understood from what was expressly stated in the e-mail that the Sunshine Companies had been sold to Wellington, BERMAN responded

> "I don't know what I knew at that point in time. I know that this memo didn't mean anything to me because it was like somebody was asking us to do something that we already said we wouldn't do. And I really didn't pay any attention to the memo for that reason. I didn't understand the purpose of the memo or the memo." [Berman Deposition at p. 99/19].

Given the fact that this May 27, 2005 memo raised an important issue arising out of the Sunshine Companies plan, the response that - "I really didn't pay any attention to the memo" was, at the least, unprofessional.

2. The Section 6672 Opinion Letter.

If the Handwritten Notes taken at the December 21, 2004 meeting were erroneous and BERMAN did not attend the meeting, or he attended the meeting and did not hear the discussion of a possible fraudulent conveyance and/or did not recognize or understand that the scheme was based on a proposed fraud of the Sunshine Company creditors, then BERMAN had another opportunity to weigh in and possibly minimize the damage. It came when on March 17, 2005 BERMAN asked his associate WILDERMUTH to come up with a more favorable opinion than the first opinion that Presidion Corporation got on the question of the scope of application of § 6672 of the Internal Revenue Code. This is what happened.

In late 2004 or early 2005 the auditors for the publicly traded Presidion Corporation, asked for a legal opinion on whether its subsidiary, Presidion Solutions, Inc., which was the former parent of the Sunshine Companies, "can be assessed as a Responsible Party for

Sunshine's [pre-2005 ] unpaid payroll taxes." It was necessary that the opinion "be very fact specific to the issue on the probability that the IRS will be able to assess Presidion Solutions, Inc." for those taxes under the provisions of § 6672 of the Internal Revenue Code. [Berman Exhibit 11, e-mail from Jim Baiers to Lynda Goudreau, dated March 17, 2005].

Section 6672 provides as follows.

> Any ***person*** required to collect, truthfully account for, and pay over any tax imposed by this title who ***willfully*** fails to collect such tax, or truthfully account for and pay over such tax, or ***willfully*** attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. (Emphasis added.)

The questions generally litigated under § 6672 are

(i) which person in the corporation is responsible for collecting, accounting for, and paying over the trust funds, and

(ii) did that person "willfully" fail to do so.

If Presidion Solutions, Inc. is a "person" for purposes of the statute, and if Presidion Solutions, Inc. controlled the cash flow of its Sunshine Companies subsidiaries during the time that the Sunshine Companies failed to pay its trust fund taxes, then Presidion Solutions could be held liable for those taxes. This was of concern because if Presidion Solutions remained responsible for the unpaid trust fund taxes that accrued before the Sunshine Companies stock was sold to Wellington, then the goal of getting the $52 million liability off of the financial statement of Presidion Solutions' parent, Presidion Corporation, would not be realized.

Amodeo had asked his legal counsel Lawrence Haber to research the question. Haber responded on or about March 16, 2005, by sending Amodeo "Draft 10" of a Memorandum he and his paralegal Matt Porter prepared [Berman Exhibit 11]. Amodeo had the Memorandum

distributed to a number of people, including BERMAN. The Memorandum concluded that a corporate parent of a subsidiary that is delinquent in paying trust fund taxes *may be a "person"* for purposes of § 6672. The opinion was based on a statement in the Internal Revenue Manual to that effect.

That was definitely not what Amodeo wanted to hear. His response, on March 17, 2005, was unequivocal. "[D]o nothing with the draft at this time. It is a draft . . . not final product and it should not be distributed to anyone whatsoever. Do not release it and do not tell anyone anything regarding it" [Berman Exhibit 11].

BERMAN testified that he saw the Haber memorandum but not the e-mail that went with it [Berman Deposition at 87/9].

To support his multi-million dollar fee arrangement for eliminating Presidion Corporation's exposure to the Sunshine Corporation's trust fund tax liability, Amodeo needed an opinion that reached the opposite result - i.e. that a corporate parent of a subsidiary that is delinquent in paying trust fund *is not a "person"* for purposes of § 6672. He got two opinions, one from BERMAN'S firm and one (in draft form) from a New York City firm.

a. The WILDERMUTH Opinion. BERMAN'S firm's opinion, was written by ELENA WILDERMUTH, an associate in the firm. She had less than three years experience as a lawyer and this was her first assignment in the tax area. However, she did have an LLM in Taxation from the University of Florida College of Law.

An early draft of the WILDERMUTH opinion, oddly based on a brief hypothetical fact pattern involving "Corporation A" and "Corporation B", rather than on the actual facts, was completed on March 29, 2005 [Berman Exhibit 12, and a similar version on the same day with minor variations at Berman Volume IV, p. EW-0014]. From March 17, 2005 to March 28 2005,

WILDERMUTH billed 49 hours preparing this draft and incorporating various comments from several reviewers. [Berman Exhibit BKRMVI/TA-0087]. Her "Brief Answer" in the memorandum was that "the Courts are split on whether the term "person" includes entities or solely individuals."

She also noted that "[t]he IRS may impose criminal and civil penalties (pursuant to Sections 7202 and 7215) . . . ." However, she specifically limited the scope of her inquiry by saying, "there could be other basis for liability against Corporation B (e.g. fraudulent transfer, piercing of corporate veil, etc.), which are outside the scope of this discussion." [Berman Exhibit, March 29 version, footnote 4 on page 7.]

Even though she limited the scope of here inquiry, on pages 10 and 11 of the memorandum she discussed the possibility that under certain circumstances, a court might "pierce the corporate veil" and charge a parent with the liabilities of a subsidiary. She also said that, "Since the courts have made this relatively simple inquiry very complicated it is virtually impossible to have only one argument that would be completely effective and final." [Berman Exhibit 12, page 13 of the March 29, 2005 Opinion].

WILDERMUTH's one sentence conclusion to her opinion was the following.

> From the facts provided, it would be very unlikely for the IRS to impose liability on Corporation B for payroll taxes of Corporation A pursuant to Section 6672 unless Corporation B was specifically assigned the duties to withhold and pay over applicable employment taxes for Corporation A.

Stated another way, she agreed with the Haber memorandum that, in fact, a parent corporation can be liable for the subsidiary's delinquent trust fund taxes if the parent is actively involved in administering the withholding for the subsidiary's employees.

This draft was distributed for comment. It touched off an almost year-long discussion among WILDERMUTH, BERMAN, other lawyers, accountants, auditors, and clients over the wording of the opinion. The first salvo was an extensive revision by James Baiers, a lawyer and officer of Presidion Corporation [BERMAN, Exhibit 12], followed by Amodeo's comments regarding Baiers' revisions [BERMAN Exhibit 12].

Among other things, Baiers' proposed the following changes.

(i) He strengthened WILDERMUTH's "Brief Answer" at the beginning of the memorandum by deleting the following sentences.

> "However, the Courts are split on whether the term 'person' includes entities or solely individuals. The courts that support the overbroad inclusion definition concentrate their analysis on the substance over form doctrine. Nevertheless, such cases can be distinguished from our situation.
>
> And substituting:
>
> Cases in which the term "person" has been held to include entities other than individuals can be distinguished from our situation.

(ii) He deleted the references to the possibility of criminal penalties under §§ 7202 and 7215.

(iii) He deleted a reference to a Fifth Circuit case which included banks "in the definition of 'responsible persons' under 6672."

(iv) He deleted the entire discussion entitled "Substance Over Form and Other Judicial Doctrines.

(v) He changed the conclusion to: "From the facts provided and the above analysis it would be very unlikely for the IRS to impose liability on Presidion for payroll taxes of the Sunshine Entities." This did not eliminate, but also did not disclose, the requirement that the parent corporation be tested for the extent of its

involvement in withholding and paying over the taxes.

BERMAN testified that he didn't recall seeing Baiers' proposed changes but he did "recall Mr. Biaers trying to have ELENA make changes to the memo, which she was not comfortable with, that she and I discussed." [Berman Deposition at 88/17].

Amodeo's comments to WILDERMUTH, on Baiers' revised version, reveal that Amodeo wanted a "brief" supporting his position, not an opinion, which the auditors wanted and which would objectively address the issue. He said,

> "I am trying now to work this into a brief in support of our position and the original conclusion . . . . It seems [Baiers'] suggestions are prudent in the 'brief' format." [Berman Exhibit 12, second version of the memorandum].

Jose Marrero, a Principal in Rachlin Cohen & Holtz and a former high level official in the Criminal Investigation Division of the Internal Revenue Service, also reviewed WILDERMUTH's draft. On April 4, 2005 the sent an e-mail to a number of people, not including WILDERMUTH, suggesting that § 7201, the general tax evasion statute, might apply. He said:

> IRC sections 7201 (Attempt to evade or defeat tax, *or in this case, evasion of payment*); and 7205 (willful Failure to File Return, supply information or pay) are also applicable remedies/charges available to IRS in employment tax investigations. [Berman Exhibit 12, emphasis added.]

On April 7, 2005, WILDERMUTH sent a revised version of the opinion to Matt Porter. In her e-mail she said the following.

> "As stated in the memo itself, the scope of this analysis is very narrow and encompasses only potential liability of Presidion and/or Wellington pursuant to section 6672. The are

other theories of liability that can be available to the IRS. (Upon the facts presented, the other theories look weak; however, they are not out of the question) [Berman Exhibit 12].

She was, of course, correct that there were, and still are, other theories - both civil and criminal - available to the IRS. The question then becomes, if the law firm's opinion was to be used by Presidion Corporation's accountants in the preparation of an audited statement for the company, why would BERMAN and WILDERMUTH not address these important exceptions to their opinion? Failing to do so could have easily mislead the auditors and, in turn, the officers, directors, shareholders, and the public as to the financial stability of Presidion Corporation. Any such misleading opinion could also raise securities law violations.

There followed an April 14th version of the opinion, which BERMAN acknowledges having seen [Berman Deposition at 91/14] and a May 4th version of the memorandum.

The May 4th version brought RICHARD BERMAN directly into the discussion. In an e-mail to Craig Vanderburg and Tessah Ivey on May 4, 2005 BERMAN clarified that certain audit language and other information that Jim [Baiers?] asked to be included in the opinion could not be included. [Berman Exhibit 17.]

And, in an e-mail exchange between WILDERMUTH and Amodeo (through Tessah Ivey) [Berman Exhibit 17], regarding including in the opinion information about the transfer of the Sunshine Companies' state licenses, WILDERMUTH said:

> As we discussed over the phone, my first choice would be to leave the tax memo the way you have it now without any references to the assignment. However, if that creates unnecessary logistical problems, I am comfortable with the following language:
>
>> "Prior to the foregoing sale and as a condition thereof. The Sunshine Entities assigned all of the client service agreements together with several other assets to Paradyme, Inc., a wholly own[ed] subsidiary of Presidion. The state employee leasing company group licenses remained with the respective Sunshine Entities."

WILDERMUTH added this language to the May 4th, "Final" version of the opinion, and it was distributed to interested parties including the Presidion Company's auditor. If BERMAN did not know in December, 2004 that prior to the sale of the Sunshine Companies stock, their assets had been stripped from them and assigned to Paradyme, he learned that fact no later than May 4, 2005.

The Presidion Solutions officers, Jim Baiers and Craig Vanderburg were pleased with the addition. Baiers sent e-mail to Vanderburg which said:

> Please note in the second full paragraph on page two that they did insert the facts about the transfer of contracts and certain assets to Paradyme prior to the sale of the Sunshine entities and that this did not change their conclusion that it would be very unlikely for the IRS to impose liability on Presidion [Berman Exhibit 12].

Baiers and Vanderburg were rightly concerned that these added facts might make a difference. Unfortunately, BERMAN and WILDERMUTH failed to recognize, or recognized and failed to address, the problem the tax fraud/fraudulent conveyance issue these facts raised.

This was BERMAN'S and WILDERMUTH's second opportunity to raise questions about the legality of the Sunshine Companies Plan. But, instead of stepping back and reviewing the Sunshine Companies Plan in its entirety, they retreated behind their purposefully narrow issue about the definition of "person" for purposes of § 6672 and a new question of for whom had they written the opinion.

The conclusion in the May 6, 2005 (8th) version of WILDERMUTH'S opinion was basically the one Baiers proposed after reviewing the first version.

"Accordingly, from the facts provided, it would be very unlikely for the IRS to impose

liability on Presidion for the payroll taxes of the Sunshine Entities pursuant to Section 6672."

By letter dated May 11, 2005, the auditor's attorney suggested several changes in the tax memorandum, including that it should be addressed to Presidion Corporation not to AQMI.

This caused concern by BERMAN and Wildermuth because, they said, the brief-like memorandum was not an "opinion" and Presidion Corporation was not their client. To convert the memorandum into an opinion for Presidion corporation, Amodeo advised Baiers and Vanderburg by e-mail that BERMAN would "need considerably more documentation in their files than was required to issue the letter to AQMI." The e-mail included long list of required documents, which Amodeo had discussed with BERMAN. [Berman Exhibit 12, e-mail from Tessah Ivey to Baiers and Vanderburg, dated May 16, 2005; see also Berman Exhibit 17, e-mail from Berman to Tessah Ivey, dated May 13, 2005].

But before the conversion of the memorandum to AQMI into an opinion to Presidion Corporation was accomplished, Baiers notified Amodeo, through Tessah Ivey, that the Wildermuth memorandum had been rejected by the auditors [Berman exhibit 12, e-mail dated May 23, 2005]. The auditors advised that they were going to have to put the trust fund tax liability back in the financials unless the Wildermuth tax memorandum was modified in significant respects, including expanding the explanation of the facts and modifying the conclusion to assert that "Presidion has no remaining liability for the Sunshine entities' taxes." [Berman Exhibit 12, E-mail from Baiers to Tessah Ivey dated May 23, 2005].

The additional required facts included that the "Sunshine entities transferred $18,492,465 in net assets ($10 million of this amount was in goodwill) to . . . [Paradyme] in December of 2004, prior to the sale of the Sunshine entities common stock *for no consideration*" [emphasis

added].

The auditors were on to something.

If the Sunshine Companies' valuable assets were transferred without consideration to [Paradyme] then the transfer would have been in fraud of the Sunshine Companies creditors. Thus raising rights to recover the assets transferred or their value as well as possible criminal charges. The auditors' demand that the opinion letter be unequivocal as to the fact that "Presidion has no remaining liability for the Sunshine entities' taxes" makes it clear that the auditors believed there was exposure and they were not willing to take the risk.

Based on the documents I have reviewed, these demands by the auditors caused a several month delay in finalizing the opinion letter. The story picked up at the end of October when Baiers e-mailed WILDERMUTH a copy of a red-lined version of the opinion in which he had incorporated the additions proposed by the auditors earlier in the year [Berman Exhibit 12, e-mail from Baiers to Wildermuth, dated October 31, 2005].

This evoked a response by WILDERMUTH, ("Response I")[Berman, Exhibit 12, e-mail from Wildermuth to Baiers dated November 11, 2005]. Her response was followed by a second revised red-line version from Baiers [Berman, Exhibit 12, e-mail from Baiers to Wildermuth dated November11, 2005]. This also evoked a response by WILDERMUTH ("Response II")[Berman, Exhibit 12, e-mail from Wildermuth to Baiers, dated December 23, 2005]. and ultimately a December 29 e-mail from WILDERMUTH to Amodeo ("Response III")[Berman, Exhibit 17].[1]

---

[1]See also the e-mail from Wildermuth to Jim Baiers, dated November 30, 2005 [Berman Exhibit 17], in which, among other things, Wildermuth says the following regarding her tax opinion.

The purpose of this letter is very important. If it is going to be relied upon by the

Tracking the changes proposed by Baiers and to some extent objected to by Wildermuth is less important for purpose of this Report than statements made in by Wildermuth in the three responses about the prior, May 6th "Final" version of the opinion and generally about the Sunshine Plan. What is disturbing about the revelations in her responses is that Wildermuth knew the May 6th memorandum, which she expected the auditors to rely on, reached an unsustainable conclusion and it should not have been provided to them.

For convenience I have listed each statement of Wildermuth that is of interest here and then made a comment about its significance. I think the statements stand alone and are not taken out of context.

Response I.

> Statement: "Thus, from the facts as we knew them and from the facts provided by you in the background information, the only sure way to limit Presidion's exposure to liability under Section 6672 was to show that the Section was intended to be used only against individuals and not a corporate entity. If we simply apply the two-prong test of Section 6672 . . . Presidion could be considered a responsible party. That was one of the reasons why the two-prong analysis was not even addressed in the memo (the second reason - not enough info)."
>
> > Comment: Apart from the general question of whether a corporation could be a person, at the time they prepared the May 6th memo, BERMAN and Wildermuth knew that Presidion Solutions could have been a responsible party.
>
> Statement: "Once again, the purpose of the memo was to give supporting authority to the position that Section 6672 applies only to individuals and not entities (courts are not in complete agreement on this also).
>
> > Comment: Actually, the May 6th memo was held out to be an opinion on the

---

auditors, which would be inappropriate, the analysis is misleading because it is not complete. . . . If you would like us to apply the facts to the judicially imposed two-prong test of 6672, we can do that . . . . However, if we apply the two-prong test (taking aside the issue of whether an entity can be "any person" for purpose of 6672), the facts we do know now would lead us to the conclusion that there may be a good possibility that PresidionCorporatio would fall within the ambit of Section 6672.

question and was given to the auditors for use in preparing audited financial statements of Presidion Corporation, a publicly traded corporation. If the courts are not in agreement, her conclusion in the May 6th version was too strong.

Response II.

Statement: "We, as attorneys, cannot allow the auditors knowingly (even if it is not purposeful) to rely on something that we know they should not have relied upon. Without the two-prong test, the opinion is incomplete."

Comment: The May 6th Final memorandum, which was provided to, and intended to be used by, the auditors was incomplete because it lacked an analysis of the two-prong test. Knowing this BERMAN and Wildermuth should not have provided the memorandum to the accountants.

Response III.

Statement: "Even though, I strongly believe that 6672 applies solely to individuals . . . some courts extended the application to entities. Therefore, based on this fact alon[e], I can not predict the positive outcome of proceedings that would depend on the specific judge's call."

Comment: This is inconsistent with the opinion in the May 6th memo which she did predict a positive outcome. It says: "it would be very unlikely for the IRS to impose liability on Presidion for the payroll taxes of the Sunshine Entities pursuant to Section 6672."

Statement: "[A]nalyzing all the legal theories of potential liability (which is absolutely necessary for purpose of the memo a I know it), there is a good possibility that Presidion Corporation can be responsible for such tax liability (taking in consideration all the legal theories combined)."

Comment: This information is critical to an accurate representation of the financial statement of Presidion Corporation. Rendering an opinion (or writing a memorandum) for the auditors of a public company, and limiting the conclusion to "it would be very unlikely" that something will occur, while believing that "there is a good possibility that . . . taking in consideration all legal theories combined" it will occur, cannot possibly be justified.

Amodeo wanted a favorable opinion, that Presidion Solutions was not responsible for its subsidiaries' (the Sunshine Companies') $52 million unpaid trust fund taxes. BERMAN, Wildermuth and their law firm accommodated him. That the defendant's handling of the matter

was unprofessional is apparent.

What is also clear, and more important, is that if BERMAN, Wildermuth and their law firm had pointed out that the Sunshine Companies Plan was based on a fraudulent transfer of assets which had criminal as well as civil implications, or if they had not supported the Sunshine Plan by providing Amodeo, AQMI and Presidion Corporation and the auditors, an "incomplete" memorandum on § 6672 which the defendants knew "they should not have relied upon," then what followed, as the Sunshine Companies book of business was passed around among companies that Amodeo owned or controlled, might not have happened. Amodeo might not have gone to prison for twenty-two years, the United States might not have lost tens of millions of dollars, Mirabilis might not have ballooned and the collapsed, and untold millions of dollars might not have been spent to unwind what did happen.

It is difficult not to conclude that BERMAN, Wildermuth, and their law firm failed to live up to the applicable standard of conduct expected of attorneys in Florida. Their failure to recognize the fraud involved in the Sunshine Companies Plan, or, if they recognized the fraud, their failure to address its implications, coupled with providing the final, May 6th opinion on parent company liability for a subsidiary's unpaid trust fund taxes, which they later said was misleading and should not be relied on, permitted Amodeo's grand scheme - Presidion and Mirabilis growing in concert to a NASDAQ listing - to go forward.

The question that comes to mind is, "How could BERMAN, an experienced, highly regarded trial lawyer, get caught up in this disaster. I believe that, in an effort to assist a valued client, he took on a matter that neither he nor Wildermuth, nor anyone else in his firm was qualified to handle.

BERMAN acknowledged receiving an April 21, 2005, e-mail from Marrero which listed

information that Revenue Officer Berkowitz had requested. [Berman Exhibit 16, and Berman Deposition at 96/9]. He acknowledged that he was aware of the bullet point issues she raised. But when asked whether he was involved in preparing answers to Berkowitz's questions he said:

"Not really, Jose Marrero and Dan Meyers were the people dealing with the IRS. They were both far more qualified than me to deal with that."

BERMAN was asked in his deposition [Berman Deposition at 118/24] whether he had been involved in responding to questions posed by Berkowitz in a Fax Transmittal on June 15, 2006. BERMAN responded:

"I made grammatical corrections. There were experts involved, including Dan Myers and Jose Marrero. It wasn't my area of expertise. They had employed experts to deal with those issues."

On November, 2006, WILDERMUTH prepared a Confidential Memorandum "Re: Evaluation of the 'Original Obligations' included in the Debt Refinancing Agreement." The Debt Financing Agreement was between Mirabilis and Presidion Solutions and covered transactions between them and various affiliates throughout the two year period including 2005 and 2006. In this extensive Memorandum, she raised substantive questions about the validity of statements in the Debt Financing Agreement. In his deposition BERMAN made the following comments.

Q. Did you discuss the memorandum with her"

A. Not very much.

Q. Did you discuss it with her at all?

A. I don't think I had much discussion with her because it had more questions than answers. . . . .

Q. Did you see this document at the time she wrote it?

A. I probably saw it. But until there were answers to the question, I didn't pay any attention to it. As I said this was shortly after the audit report had come out.

In these several statements BERMAN demonstrated not only his awareness of his lack of expertise in employment tax law but also his lack of guidance and oversight of his associate . In this case, he gave ELENA Wildermuth, his young associate with less than three years of experience, none of which dealt with tax law, the task of writing an opinion, on the basis of hypothetical facts, which did not reflect the actual facts, for an important, but difficult, client who had already received and disliked one opinion and wanted a different answer. Amodeo knew that Presidion Solutions was heavily involved in the administration of the Sunshine Companies PEO businesses and would be a responsible person for § 6672 purposes and he therefore wanted Wildermuth only to focus on the question of whether Presidion Solutions, a corporation, qualified as a "person" for purposes of that statute.

Unfortunately, she allowed the client to so concentrate her inquiry that, at least up to the completion of the May 6th version of her opinion, she did not step back and think about the validity of the overall Sunshine Plan. And she bowed to the Amodeo's and Baiers' requests that her opinion be brief-like. That is to say, written in support of one side of the question, rather than opinion-like, which would be more objective in its analysis.

Regrettably, without oversight and guidance by an attorney with experience in tax law or at least in employment tax law, Wildermuth was not likely to emerge unscathed from the situation she was placed in by BERMAN and his firm. She and BERMAN and their law firm should have known that Amodeo did not "discover" a foolproof way to fund a rapidly growing

business without exposure to financial or criminal consequences. In fact, given Amodeo's background, they should have been on high alert and very careful in their dealings with him. And, most important, they should have known that stripping out all the assets of a corporate debtor, then selling and dissolving the asset-free, but heavily indebted, corporate shells, would not eliminate civil liability for the trust fund taxes and likely would create criminal exposure.

b. The Kostelanetz & Fink, LLP Opinion. A brief word about the Kostelanetz opinion [Berman Exhibit 14] is helpful, if only to demonstrate its irrelevance. On November 30, 2004, there was a conference call among an attorney in the Kostelanetz & Fink, LLP law firm, Amodeo, BERMAN, and Presidion executives to discuss the "Presidion Tax Matter." Baier described the firm as, "a real high powered tax firm" [Berman, Exhibit 14]. That firm provided Baiers a draft of an opinion on April 14, 2005. The draft did not mention the question of whether a corporation a "person" issue. It looked at the facts it had been given, applied the two prong test, and concluded that Presidion Solutions was not a responsible person for § 6672 purposes.

The only problem was that the law firm was not told that the Sunshine Companies assets had been transferred to Paradyme for no consideration prior to the sale of the Sunshine Companies'stock by Presidion Solutions. And, it was told, and it based its opinion on, the incorrect fact that "Presidion had no direct or indirect responsibility to make payments of wages to employees; to withhold employment taxes from employees wages; or to remit employment taxes to the IRS on behalf of the employees."

Baiers hailed the draft as "VERY strong in our favor, but I think we may have to tone down the discussion of how much control Presidion had over Sunshine's tax obligations." [Berman Exhibit 14]. Toning down the discussion must have been Baiers' euphemism for

correcting the false facts. Baiers'acknowledgment that Presidion Solutions in fact was involved in the Sunshine Companies affairs supports WILDERMUTH's understanding that by applying the two prong test, Presidion Solutions might be found to be a responsible person for § 6672 purposes.

On April 21, 2005, Baiers faxed a revised copy of the Kostelanetz draft opinion back to that firm with the minimizing comment: "Just a couple of changes." The only significant change was to delete the following opinion changing language.

> ". . . Presidion did not manage the daily affairs of the Companies; Presidion was not responsible for making financial decisions for the Sunshine Companies; Presidion did not control the day-to-day banking activities and disbursement records of the companies; . . ."

Without knowledge of the stripping of Sunshine Companies assets, and with the false impression that Presidion Solutions had no role in the administration of the Sunshine Companies business, the Kostelanetz draft opinion was and remains meaningless.

3. Mirabilis.

After the Sunshine Plan was put into effect on or about December 31, 2004, the Sunshine Companies, then owned by Wellington, stopped doing business. They were dissolved some in the Summer of 2005. Presidion Solutions and its subsidiaries owned and managed the PEO businesses that had been transferred to them by the Sunshine Companies. Ultimately, a newly acquired subsidiary of Presidion Solutions, generally known as PBS, handled all Florida employees. All non-Florida employees (only about 5% of the total) were processed through Paradyme.

Coincident with the development and implementation of the Sunshine Companies Plan,

Amodeo was working on another project. Through his wholly owned AQMI Strategy Corporation ("AQMI") Amodeo entered into a Consultant Agreement, dated as of November 1, 2004 with Mirabilis Ventures, Inc.(Mirabilis).

On December 1, 2004, Mirabilis provided AQMI a $2.5 million Line of Credit.

Under the terms of an Addendum to Consultant Agreement" dated December 9, 2004, the services to be provided by Amodeo were described as follows.

"To develop and implement a strategy to create a human resources firm portfolio utilizing the 'Capital Genesis' system, specifically to have Mirabilis acquire or create a 'platform company' to act as a parent for a national chain of subsidiary firms."

This Mirabilis mega corporation PEO plan was allowed to incubate while Amodeo, BERMAN and others dealt with the Sunshine Companies unpaid trust fund tax matter in December, 2004 and early 2005.

On February 11, 2005, BERMAN and others received by e-mail attachment a letter from Amodeo (Berman Exhibit 9). In the letter Amodeo assured everyone that "All companies in the Mirabilis Venture, Inc. Network are in compliance with all tax laws." As to Sunshine Staff Leasing, Inc. and Sunshine Companies III (two of the "Sunshine Companies with large unpaid trust fund taxes) he pointed out that most of the tax liability occurred "before any of us even knew these businesses existed" and he described their job as finding "a way to salvage the valuable assets which would otherwise dissipate. If we do this successfully, all parties benefit, including the Government."

As well as anything else this summarizes the goal of Amodeo's flawed plan which was to build up Mirabilis using PEO trust fund dollars, go public, and use some of the proceeds to pay the trust fund taxes penalties and interest." BERMAN acknowledged receiving this letter

[Berman Deposition at p. 84/21].

On February 25, 2005, Dan Meyers, Vice President of AQMI distributed to several people, including BERMAN, a schedule of "projected uses of cash and the related months they are due." The schedule showed cash needs for the listed companies during the ten months ending with December, 2005, to be $22.6 million [Berman, Exhibit 10]. It is telling that nothing was said about where they would get this money. BERMAN testified that he did not remember receiving this document [Berman Deposition at 85/22].

On April 20, 2005, BERMAN attended a "presentation re: Mirabilis structure." He billed 6.3 hours and $2,205 for his time. The next day, he attended "Mirabilis Board Meeting and shareholder's meeting" and then went to Ft. Lauderdale. He billed 8.4 hours and $2,940 for his time. [Berman Exhibit BKRMVI/TA-0097].

The "minutes" of the April 21, 2005 meeting [Richardson Exhibit 4] reflect that eighteen people were in attendance, including BERMAN, who was listed as "Counsel for Mirabilis."

The meeting started with Amodeo's admonition that "there were to be no discussion of this beyond the room." According to the minutes, he then summarized the status of the Internal Revenue Service's efforts to collect the Sunshine Companies trust fund taxes as follows.

> "Frank gave instructions to the IRS to close the corporate case so Presidion is off the hook. . . . . The IRS letter will be circulated to everyone . . . . that will tell everyone that the IRS collection from the primary taxpayer [the Sunshine Companies] is no longer viable and they will begin to pursue collateral obligations. Primarily indications to them is that the responsible person consists of Vanderburg, Baiers and Burcham , and the inquiry will be to them only.

The minutes then describe several approaches he planned to use with the government to protect

"the individuals and other people who may be deemed liable." And, he concluded "[i]f the IRS does not cooperate, we will bankrupt the other four Sunshine entities . . . ."

He then cautioned the "if the first three individuals are skewered, [the IRS] will begin to look for conveyances that could be recovered (a lot of shareholders of the company were paid a lot of money for their business)." From this, it is clear that Amodeo was concerned about exposure to allegations of fraudulent conveyances and wanted to get the Sunshine Companies trust fund problem, and any related § 6672 problems for individuals, resolved as quickly as possible.

This admission that recoverable, and therefor possibly illegal, conveyances had occurred with respect to Presidion Corporation or its subsidiaries was the third-flagged opportunity for BERMAN to question the legality of the transactions relating to the Sunshine Companies plan. One would think that a lawyer who attended the meeting as Counsel for his client Mirabilis, and who charged $2,940 for his services in that capacity, would have considered Amodeo's concern about fraud to be important to his client, Mirabilis, and would have made an appropriate inquiry. It is not apparent that BERMAN made an inquiry or, if he did, that it resulted in any action taken.

The April 21, 2005 meeting makes a critical point. As Amodeo defined the long-term plan, Presidion Solutions, a PEO/human resources corporation, and Mirabilis, a holding company whose subsidiaries engaged in other businesses, were inextricably linked. As Mirabilis acquired new businesses, Presidion Solutions would acquire new corporate clients for its payroll management business.

As Amodeo explained it, ". . . Presidion is important to [Mirabilis], because every company has people, people are recurring regular costs, and so we can provide lots of other services . . . as long as they use our staffing company, and *we make that cash flow* . . . ."

[Richardson Exhibit 4 at p.9, emphasis added].

This statement is a stunning revelation about the grand plan. Staffing companies (PEO's), aren't known for their "cash flow". Cash flow is normally thought of as cash generated by the business that is available to management to disburse. This "available for business purposes" cash flow generally includes profits and the tax savings from non cash deductions such as depreciation or amortization with respect to leveraged assets such as improved real estate, manufacturing plants or gas pipe lines. Staffing companies have computers but depreciation, even on large computer installations, would not provide significant cash flow. Only by counting the trust fund taxes as cash flow would staffing companies be a prime cash flow producer. And viewed that way they would certainly shine.

In light of how the acquisition by Mirabilis of Presidion Solutions played out - over $100 million of illegally diverted trust funds, it's not a stretch to conclude that, in this one statement, Amodeo told those assembled at the April 21, 2005 meeting exactly what he planned to do. He would consider the trust funds to be cash flow and would use them to acquire more businesses for Mirabilis, which would generate more trust fund cash flow for Presidion Solutions, which would generate more cash flow for Mirabilis to acquire more businesses, etc. . . until the Mirabilis/Presidion Solutions combine got big enough for listing on NASDAC. "[Presidion's] goal is to get 100,000 employees in five years time. My real goal is 30 months, but everybody ought know the official goal is five years time." At that time "we're really big company." Then everyone, including the government would be made whole.

If BERMAN did not know before this meeting that Amodeo was going to use the PEO generated trust fund money to fund the planned explosive growth of Mirabilis, he learned it or should have learned it, and this April 21, 2005 meeting. Piecing together "as long as they use our

staffing company, and *we make that cash flow . . .* ," with "My goal is [100,000 employees in] 30 months" is like "what is two plus two", everyone knows the answer.

A couple of weeks later, in May, 2005, Amodeo had the opportunity to begin the process of acquiring Presidion Solutions and its subsidiaries which included the Sunshine Companies books of business. It was at that time that Presidion Corporation was said to have had a "severe shortage of working capital, liabilities (including payroll tax deficiencies) totaling millions of dollars and of most urgency, the potential cancellation of its workers' compensation insurance police with FCIC" [Richardson Exhibit 1, United States' Notice of Statement of Facts, page 8].

In the course of addressing these issues, Amodeo (through Nexia) proposed that AEM, a Mirabilis subsidiary, purchase the Presidion Solutions book of business. The purchase price was to be one half of one percent of gross payroll over a period of months, up to $12 million. This was to take place on May 1, 2005, but it was postponed. In the interim, Nexia took control of Presidion Solutions.

In connection with these transactions, Vanderburg and Baiers gave irrevocable proxies to Amodeo with respect to their stock in Presidion Corporation [Berman Exhibit 24, page 9]. The proxies were effective as of May 24, 2005, and gave Amodeo control of the company. In June of 2005, Amodeo became Executive Vice President of Presidion Solutions [Berman Exhibit 26].

On July, 28, 2005, a meeting was held in Miami among Amodeo, Holtz, Berman and others regarding Mirabilis. It came to their attention that Presidion Solutions was about to lose its workers' compensation coverage which would have put it out of business. Amodeo resolved the workers' compensation problem and, in that connection, Wellington purchased Presidion Solutions stock and its subsidiaries, PBS and Paradyme for $100,000 (or possibly $125,000 as is reported elsewhere). AEM, a Mirabilis subsidiary was to acquire Presidion Solutions book of

business, in a transaction that was ultimately to be effective January 1, 2006.

This structure of severing of the assets of Presidion Solutions and its subsidiaries (which were to go to AEM) from their accumulated debt for, among other things, unpaid trust funds (which liabilities would stay with Presidion Solutions and its subsidiaries) was a clone of the Sunshine Companies Plan. It also had all of the Sunshine Companies Plan's infirmities.

BERMAN attended a meeting of the Board of Directors of Mirabilis held on March 23, 2006, at which he was appointed to the Board and placed on two committees - the Audit/Risk Committee and the Investment Committee. It was at this meeting that the Board authorized the Investment Committee "to commit $8,000,000 for acquisitions in April, 2006 and $8,000,000 for acquisitions in May, 2006 . . . ." [Berman Exhibit 33]. BERMAN must have wondered where this money was going to come from and should have asked.

After the April 21 meeting, Laurie Holtz made a presentation based on a Board Briefing Paper entitled "Business Alignment and Control.". The opening paragraph of the paper describes the progress of the mega corporation scheme to date as follows.

> MVI has come a long way in a very short period of time; less than 18 months after the company was formed it has grown to a network of over 100 companies - 48 of whom are revenue generating - and is currently on target for a $800m run rate on revenues for 2006. Common Paymaster now has over 2000 employees in a myriad of industries ranging from PEO's to Construction and continues to grow. We *have* come a long way. [Berman Exhibit 33].

At a meeting of the Board of Directors of Mirabilis held on May 19, 2006, and attended by BERMAN, the board asked Berman to provide a contract for his firm's representation of the company to be considered at the next Board meeting. The Board also added BERMAN to its

Executive Committee.

On June 15, 2006, Revenue Officer Judy Berkowitz faxed a series of questions to Dan Myers. Getting to the heart of the matter, she asked "Where did the money go that [Sunshine staff Leasing, Sunshine Companies III and Professional Benefits Solutions] collected from their customers?" The response to the Berkowitz June 15, 2006 series of questions was prepared and it was reviewed and revised by BERMAN [Berman exhibit 43].

On June 26, 2006, the Internal Revenue Service filed a Notice of Federal Tax Lien against Professional Benefit Solutions (PBS) for a total of $97,070,425 [Berman Exhibit 40]. The Notice was signed by Revenue Officer Judy Berkowitz.

That BERMAN was fully aware of the developments over the period including 2005 and 2006 is confirmed not only by his numerous responsibilities with the company, including being an employee, a member of Mirabilis' Board of Directors and Mirabilis' General Counsel, but also by regular e-mails he received and telephone conversations and meetings he had with Amodeo and others involved with Mirabilis. That he was fully aware of these developments is confirmed by Daniel L. Myers in his affidavit dated August 17, 2009. [Richardson Exhibit 5]. Among other things he said are the following.

> 5. Beginning in 2004 and continuing through 2006, I met with the Internal Revenue Service . . . on numerous occasions to discuss matters related to the Sunshine Companies Plan and the Presidion . . . Plan, particularly the nonpayment of payroll taxes.
>
> 6. Attorney Berman was made aware of all matters discussed during my meetings with the IRS, including, the nonpayment of payroll taxes.
>
> 7. Additionally, throughout 2005 and 2006, Attorney Berman was present in numerous meetings where the Presidion . . . Plan was discussed and documented.

In his deposition dated September 3, 2009, Yaniv Amar stated that

> "[O]n or about October 5th, 2006, Mr. Amodeo, Daniel Myers and Attorney Berman interviewed tax controversy attorneys, in Attorney Berman's office in Ft. Lauderdale. Prior to the scheduled meetings, Attorney Berman invited me to join the meetings. He thought it might give me some long overdue comfort that everything was fine between the various companies and the IRS. I was again reassured by Attorney Berman that everything was in order with the unpaid tax debt." [Richardson Exhibit 6].,

According to an "Individual Compensation Breakdown for Mirabilis covering 2005 and 2006 [Berman Exhibit 7], as an employee, BERMAN earned $7,500 in 2005 and $227,500 in 2006. In addition, BERMAN's law firm, BERMAN, KEAN & RIGUERA, received $3,356,521 during those years. For a small firm like BERMAN's, Mirabilis was a very important client. BERMAN acknowledged in his deposition that Mirabilis generated more income for the firm than any other client. BERMAN testified that the fees received were only $2,279,000 plus $300,000 costs [Berman Deposition at 76/13].

It is possible that BERMAN's willingness to accommodate Amodeo, or, on occasion to look the other way, was influenced by the fact his firm was earning, on average more than $100,000 a month from Amodeo and his various corporations. I prefer to think that BERMAN, Wildermuth and their firm got into a situation in which, because of lack of experience and expertise, they had an incomplete understanding of the consequences of their clients' plans and goals. But, no matter how or why they got involved in the Mirabilis/Presidion collapse, they should take responsibility for the significant damage they caused.

4. The Florida Bar Rules of Professional Conduct.

The very first Rule of professional conduct, Rule 4-1.1[Richardson Exhibit 7] deals with competence. It says:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

In this case, BERMAN, the partner in charge of the matter, is a trial lawyer. He acknowledged that he had no expertise in employment tax law and WILDERMUTH's three years of experience were in other areas of the law. Although Wildermuth had earned an LLM degree in taxation, and had a grasp of some of the statutory language dealing with a client imposed narrow issue, neither she nor BERMAN recognized the fraudulent base of the Sunshine Companies Plan. They simply were not competent to represent these clients on these matters.

Rule 4-1.7 deals with conflicts of interest. The basic rule is that a lawyer shall not represent one client if that representation will be directly adverse to another client. In this case, the defendants represented Frank Amodeo and a number of companies in which he had varying interests which created conflicts with the minority or other shareholders of those companies. There were, for instance, a number of shareholders of Mirabilis, a company for which BERMAN was General Counsel. Mirabilis entered into a number of transactions with Amodeo and with companies wholly owned by Amodeo. Every transaction between Mirabilis and either Amodeo or one of his wholly owned companies potentially involved conflicts of interest. For instance at some point, two subsidiaries of Mirabilis were transferred to Amodeo. This was obviously not in the interests of Mirabilis or of the minority shareholders in Mirabilis.

Also, while serving as counsel for Mirabilis, the defendants prepared an opinion on the possible application of section 6672 of the Code to Presidion Solutions, a subsidiary of the Publicly traded Presidion Corporation. That opinion, on which, according to Wildermuth, noone

should rely, was intended to support the effectiveness of the Sunshine Companies Plan, which, in turn was needed by Amodeo to justify his $10 million plus fee. Who was the client in that case? Amodeo, AQMI, Presidion Solutions, Presidion Corporation, Mirabilis, Wellington and/or the principal shareholders of Presidion Corporation? Not all of these entities would or should have participated in the Sunshine Companies Plan if they had been properly informed of the consequences.

Furthermore, [t]he lawyer's own interests should not be permitted to have adverse effect on representation of a client." I this case, BERMAN's $227,500 salary from Mirabilis and his stock interest in that company might well have affected his ability to give Mirabilis detached advice.

The commentary to Rule 4-1.7 also address the question of whether being counsel to a corporation and serving on its board of directors and concludes, "If there is a material risk that the dual role will compromise the lawyer's independence of professional judgment, the lawyer should not serves as director." At the first instance that BERMAN knew that trust funds were being illegally diverted and used by Mirabilis, he should have made and issue of it.

III. In the course of preparing this report, I have, referred to the documents listed in Exhibit A attached hereto and to the Exhibits used in the deposition of Richard Berman. These documents were either selected by the Robert Widman or given to me by him at my request. Mr. Cuthill has also provided documents including three CD's, one containing a large selection of documents and the other two a single document. Although I skimmed through a few documents on first CD, I have not used any information derived only from that source in arriving at any conclusions or in preparing this report. Also, there is a warehouse full of documents relating in some manner to

this case. It is possible that there are documents in the warehouse or on the CD's, in addition to those of which I have paper copies, that may be of interest in connection with this matter.

There are some things that would be of interest in connection with this matter but which have not been located or are otherwise not available. One is the compendium of 145 documents possibly relating to transactions discussed in this Report. These documents were assembled by Hans Beyer, at Frank Amodeo's request, during or about January, 2006. To date, this compendium has not been located. Also I have not reviewed any minute or stock record books of any companies involved in this case or any income or employment tax returns of any of the companies or individuals involved in this case.

Also as of the time of writing this report, I have not read the transcripts of two individuals involved in some manner with the events that gave rise to this case but who, I am told, declined to answer some, or any, questions during their depositions. Finally, the depositions of several persons who are thought to have participated in or have direct knowledge of what transpired, whose depositions, as of the time of writing this report, have not been taken. Those persons include, at least, James Baiers, Yaniv Amar, Martin Flynn, and Judy Berkowitz, and the Internal Revenue Service Revenue Officer to whom collection of the unpaid employment taxes in question was assigned in early 2005.

Information from any of these, and other, sources might have a bearing on this opinion.

IV. At this time I do not expect to use exhibits other than the documents on which have relied. However I may develop some exhibits that will diagram the transactions described in this report.

V. My Curriculum Vitae is attached as Exhibit A.

VI. I have not testified or been deposed as an Expert Witness within the last five years.

VII. My compensation is at the rate of $400 an hour.

September 30, 2010

David M. Richardson

David M. Richardson