*David M. Richardson*
*PO Box 505*
*Eearlton, FL 32631*
*(352) 468-1432*

## LEGAL EXPERIENCE

| | |
|---|---|
| 7/1/84 – 2008 | Professor of Law University of Florida College of Law<br>Director, Graduate Tax Program, 7/1/84 - 6/30/88 |
| 1/1/84 - 6/30/84 | Partner, Richardson & Jackel,<br>Miami, Florida |
| 4/1/82 - 12/31/83 | Member, Valdes-Fauli, Richardson, Cobb & Petry, P.A.,<br>Miami, Florida |
| 1975 - 3/31/82 | Partner in the law firm of Roberts & Holland,<br>New York, N.Y., Miami, Florida, and Washington, D.C. |
| 1966 - 1974 | Partner in the law firm of Culverhouse, Tomlinson, Mills,<br>DeCarion & Anderson<br>Miami and Jacksonville, Florida<br>(associate from 1966 to 1970) |

## EDUCATION

New York University, LL.M. in Taxation, 1974

Columbia University Law School, LL.B., Cum Laude, 1966.
Harlan Fiske Stone Scholar.

University of Florida, Graduate School, Department of Physics, 1961-62.

Rensselaer Polytechnic Institute, B.S. in Physics, 1961.

ALL-STATE LEGAL
EXHIBIT
A

## PROFESSIONAL ACTIVITIES

Adjunct Professor, University of Miami, School of Law, 1973 - 1979; 1983 - 1984.

Lecturer in Taxation, Florida Atlantic University, 1976 - 1977.

Member of the Executive Council of the Tax Section of The Florida Bar, 1971 - 1990; Chairman of the Tax Section of The Florida Bar, 1981 - 1982.

Member and first chairman - Tax Certification Committee of The Florida Bar, 1982 -1984.

Member of the Southeast Regional Liaison Committee of the Internal Revenue Service, 1982 - 1983; Vice Chairman, 1983.

Visiting Professor, Beijing University, Beijing, China, 1991.

Member of The American College of Tax Counsel.

First editor of the Florida Tax Review, 1992 - 1994.

Visiting Professor, Leiden University, Leiden, Holland, 1998 and 2000.

Editor, Electronically enhanced Internal Revenue Code, CD Rom "Onedisc" published by Tax Analysts, January, 1998.

Recognized by the Tax section of The Florida Bar as the "Gerald T. Hart Outstanding Tax Attorney for 1999-2000."

Member of the Board of Editors of the LexisNexis Graduate Tax Series.

## PUBLICATIONS

Tax Credit Under the Work Incentive Program, 58 ABA Journal 1109 (1972).

Pension Reform - Preserving The Private Pension Promise, 48 Florida Bar Journal 708 (1974).

Capital Construction Funds Under The Merchant Marine Act, 29 Tax Law Review 751 (1974).

Buying and Selling an Incorporated Business - A Survey of Federal Income Tax Consequences, 50 Florida Bar Journal 353 (1976).

The Family Business as a Tax Shelter, 52 Florida Bar Journal 325 (1978). Co-authored with Jacob Fishman.

Taxation By Florida of Transfers of Wealth Upon Death - The Present Law and Available Options. Prepared for The Governor's Tax Reform Commission, July 1979.

Profits on Conversion - Maximizing the Landlord's After-Tax Return, 55 Florida Bar Journal 121 (1981).

Investment in Florida Real Property: New Requirements for Alien Corporations, with E. Scott Golden, 30 Canadian Tax Journal 112 (1982).

Florida Corporate Income Tax: Back to Piggybacking, 30 Canadian Tax Journal 462 (1982).

One State's Reaction to Reaganomics: The 1982 Amendments to The Florida Income Tax Code, Report of the Tax Section of The Florida Bar, 36 University of Miami Law Review 661 (1982). Co-authored with five other Committee members.

Tax Incentives for Qualified Conservation Contributions, 57 Florida Bar Journal 631 (1983).

A Study of the State and Local Tax Deduction, Prepared for the Congressional Sunbelt Council, September 15, 1985.

The State and Local Tax Deduction: A Preference Whose Time To Go Has Come, 59 Florida Bar Journal 83 (December, 1985). This is a shortened version of the study prepared for the Sunbelt Council.

The Orphan Drug Tax Credit: An Inadequate Response to an Ill-Defined Problem, 6 Am. J. of Tax Policy 135 (1987).

Federal Income Taxation of States, 19 Stetson Law Review 411 (1990).

Improving the Law Review Model: A Case In Point, 44 Journal of Legal Education 6 (1994).

Book review of "Essays on International Taxation," Edited by Herbert A. Alpert and Kess van Raad. Deventer/The Netherlands: Kluwer Law and Taxation Publishers, 1993. Tax Notes, April 18, 1994.

Illusory Intangible Tax Trusts, Comment in the April, 1997 issue of The Florida Bar Journal.

"Just Value" or Just A Value - Florida's Imperial Property Appraiser, 48 Fla. L.Rev. 723 (1997).

Statement of Standards of Tax Practice: Letter to a Former Student, Tax Notes, May 22, 2000 at 1143.

Audit Avoidance Via Intent Modification - Is Fred Corneel Onto Something. . . Or Not?, Tax Notes, July 9, 2001 at 277.

Cases and Materials on Federal Tax Procedure (for graduate tax program), 14th revision, 2002.

Federal Tax Procedure, a text book for use in LL.M. tax programs published in 2004 as part of the LexisNexis Graduate Tax Series. Co-authored with Professors Jerry Borrison and Steven Johnson.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 6:08-cr-231-Orl-28KRS

MIRABILIS VENTURES, INC.,
AEM, INC., and
HOTH HOLDINGS, LLC

## UNITED STATES' NOTICE OF STATEMENT OF FACTS WHICH THE UNITED STATES CONTENDS IT WOULD PROVE AT TRIAL

The United States of America, by A. Brian Albritton, United States Attorney for the Middle District of Florida, hereby files it Notice of Statement of Facts Which the United States Contends It Would Prove at a Trial.

## FACTS

### The Sunshine Companies' Plan

In the summer of 2004, Frank Amodeo ("Amodeo") was introduced to John Burcham ("Burcham"), the Chairman of the Board of Directors of Presidion Corporation, the publicly traded parent company of Presidion Solutions, Inc. ("PSI"). PSI was a Michigan-based holding company for several PEOs that provided comprehensive and integrated resource management services, including payroll services, to small and medium sized companies. Burcham enlisted Amodeo -- to assist in bailing out his struggling company.

In July 2004, Burcham and Craig Vanderburg ("Vanderburg"), President of PSI, further explained that PSI was financially burdened by approximately $5 million in unpaid payroll taxes that had been accrued by certain companies under its control, and by continuing difficulties in maintaining a sufficient asset reserve to keep its worker's

EXHIBIT
ALL-STATE LEGAL

compensation insurance policy in force with its insurance company, First Commercial Insurance Company ("FCIC").

PSI had previously acquired seven Professional Employer Organizations ("PEOs"), which made up PSI's "PEO book of business" (i.e., the contracts PSI had with its PEO clients). In or about May 2001, PSI acquired Sunshine Staff Leasing, Sunshine Companies I, II, III, and IV (collectively referred to as the "Sunshine Companies"). Post-acquisition, these entities did business as Presidion Solutions I, II, II, IV, and V, respectively. After PSI acquired Paradyme in or about January 2002, Paradyme subsequently did business as Presidion Solutions VI. PSI then acquired certain PEO customer contracts from BST, Inc. in or about June 2002.

The clients of the PEOs entered into contracts, or service agreements, with PSI or its subsidiaries. According to the contracts signed by the clients, when PSI or its subsidiaries started providing services to the clients PSI became the statutory employer of its clients' worksite employees under IRC § 3401(d) and assumed the liabilities and responsibilities for paying the wages of the employees and for reporting and paying over to the Internal Revenue Service the payroll taxes of the worksite employees. At the end of a client's payroll cycle, a client would e-mail, fax, or mail the number of hours worked by the worksite employee(s) to PSI. After receiving the information, PSI computed the amount of FICA, Medicare (HITS), Withholding Taxes, Workers' Compensation Insurance, and 401K contributions to be added to the clients' bill, along with PSI's administrative fee. PSI would then e-mail, fax, or mail this information back to the clients, who would either direct debit, mail, or wire the funds to PSI.

At the time that Burcham and Vanderburg commenced negotiations with Amodeo, PSI's publicly traded parent corporation, Presidion Corporation, was preparing for an annual audit. In an attempt to have Presidion Corporation appear more profitable as a publicly traded company, PSI wanted the Sunshine Companies' payroll tax liabilities removed from Presidion Corporation's financial statements.

On October 18, 2004, Craig Vanderburg, on behalf of PSI, signed a "Consultant Agreement" with Amodeo, acting on behalf of AQMI Strategy Corporation ("AQMI"), a corporation which Amodeo created for this purpose. The Consultant Agreement called for AQMI to provide tax advice to PSI for a non-refundable fee in the amount of $150,000.00 and an additional fee of 25% of any tax savings of the company's current payroll tax liability. After payment of the initial $150,000.00, the Consultant Agreement provided that, commencing in January 2005, PSI would pay $75,000.00 per month to AQMI.

During the course of the due diligence investigation, it was discovered that the Sunshine Companies' accrued tax liabilities were actually much larger than had originally been disclosed to Amodeo, amounting to approximately $13 million (including interest, penalties, and taxes) as of October 2004. Amodeo initially concluded that he could achieve the objectives sought by Presidion Corporation by purchasing the Sunshine Companies himself. Amodeo's plan (the "Sunshine Companies Plan") was to have Wellington Capital Group, Inc. ("Wellington"), a Nevada corporation wholly owned by him, purchase the Sunshine Companies from PSI and thereby relieve Presidion Corporation's consolidated financial statements of the Sunshine Companies' accumulated payroll tax liabilities. Amodeo did not have the funds to make the purchase so he had to use AQMI's funds (received from PSI) to make the purchase.

Prior to the sale of the Sunshine Companies' stock to Wellington, the Sunshine Companies would sell all of their client service agreements, subscriber agreements, accounts and notes receivable, bank accounts, and other assets to a PSI subsidiary, Paradyme. After the sale of the Sunshine Companies' stock to Wellington, and after the winding down of the companies, including negotiations with the IRS and the conclusion of several pending courts cases in which the companies were involved, the companies would be administratively dissolved.

Several of the parties involved with or which were to be part of the implementation of the Sunshine Plan, sought legal advice as to the legality of the payroll tax implications of the Sunshine Plan. The Fort Lauderdale law firm of Berman, Kean & Riguera provided legal advice to the parties. Elena Wildermuth, an associate at Berman, Kean & Riguera, provided a legal memorandum regarding these issues ("Wildermuth Memorandum"). While Wildermuth's Memorandum was supportive of the viability of the central objective of the transaction, i.e., ridding the Presidion balance sheet of the Sunshine Companies' liabilities, it also recognized that any individuals who had played a role in the original diversion of the payroll taxes by the Sunshine Companies would remain liable for the taxes under the "100 percent penalty" imposed by IRC § 6672, which imposes liability on individual officers and employees to the extent that they are determined to be "responsible persons" for the collection and payment of the payroll taxes.

<u>The Wildermuth and Flynn Memoranda</u>

The Wildermuth Memorandum provides a relatively broad overview of the statutes and court decisions dealing with the collection and payment of payroll taxes. As set forth in the memorandum, the Internal Revenue Code requires the payment of a

variety of taxes by corporate employers with regard to the earnings of the employees. The employees' income taxes and FICA taxes must be deducted and withheld from the employees' paychecks, and are collectively referred to as "trust fund taxes" to reflect the fact that the employer is essentially acting as an intermediary for the IRS in collecting and paying over these taxes that are being assessed, not against the employer, but against the employees. Employers are required to report the withheld income taxes and the employer and employee portions of FICA taxes on a quarterly basis on Form 941 unless the employer has an annual liability of less than $1,000.00 for FICA and withheld income taxes. In the latter case, only an annual filing using Form 944 is required. The FUTA taxes are reported annually on Form 940. In Florida, the SUTA taxes are reported and paid quarterly on Form UCT-6.

The Wildermuth Memorandum described in detail the legal obligation to hold payroll tax funds for the Internal Revenue Service. The Wildermuth Memorandum also established that § 6672 does not apply to corporations, such as Presidion Corporation, because a corporation is not a "person" as defined in the statute. Consequently, the memorandum devotes little attention to the rules regarding an individual's potential liability under the statute.

In a later dated memorandum from Berman, Kean & Riguera, it was stated that IRC § 6672 provides that any person required to collect, truthfully account for, and pay over any Title 26 tax who willfully attempts in any manner to evade or defeat the payment of the tax shall be subjected to a penalty amounting to 100% of the tax (where there are multiple responsible persons, they are jointly and severally liable for the 100% penalty). This means that separate and apart from corporate liability for the unpaid

taxes, individual officers and employees of a corporation may find themselves personally liable for the unpaid trust fund taxes.

Like the Wildermuth Memorandum, the subsequent memorandum concludes that corporations will not be liable under § 6672 for the Sunshine Companies' unpaid payroll taxes, albeit based on a different rationale, i.e., that corporations, even if they could be construed as "persons" within the ambit of the statute, did not have the necessary responsibility for or control over the payroll tax obligations of the Sunshine Companies to trigger liability under § 6672.

Early IRS Negotiations Over the Sunshine Companies' Tax Liabilities

On January 6, 2005, Amodeo, Richard Berman, Jose Marrero, Daniel Myers, and Hans Beyer attended a meeting at the office of the Plantation, Florida branch of the IRS Collections Division with Revenue Officer Judith Berkowitz. At the meeting, the details of non-payment of taxes by the Sunshine Companies were discussed. Revenue Officer Berkowitz was told at that time that the trust fund portion of the overall tax liability, exclusive of interest and penalties, was believed to be approximately $25 million.

The ensuing months were spent administratively winding down the business of the Sunshine Companies, including concluding pending litigation involving the companies. Many of these lawsuits were handled by Berman's law firm.

There were also additional contacts with Revenue Agent Berkowitz during this time period. On or about April 21, 2005, Jose Marrero met with Revenue Officer Berkowitz, at which time she informed him that the total liabilities for just one of the Sunshine Company entities, Sunshine Staff Leasing, appeared to be in excess of $24 million. She provided Marrero with a list of questions, including asking why no deposits were made during the first quarter of 2005 and whether another company had taken

over the business. She also wanted to know more generally what plans were being made to pay the outstanding liabilities. She gave Marrero until June 1, 2005 to obtain the requested information. According to Marrero's written recollection of the meeting, Revenue Agent Berkowitz appeared "to be very cooperative and flexible at this time." On May 11, 2005, Revenue Agent Berkowitz sent Marrero a fax updating her analysis of the outstanding tax liability for Sunshine Staff Leasing, including penalties and interest which she calculated at that time to total approximately $26 million (this was the liability for just one of the Sunshine Companies). Via e-mail, Marrero subsequently updated Myers on the status of the case, indicating that Revenue Officer Berkowitz "has been very cooperative and understanding so far and I want to keep the relationship very positive and working in our favor." Sometime prior to the June 1st deadline, all of the information Revenue Officer Berkowitz had requested was provided to her, with the exception of certain tax returns that had not been deconsolidated from the Presidion Corporation return and adjusted as of that time. Revenue Agent Berkowitz was also informed that the Sunshine Companies' book of business was now owned by a new subsidiary of Presidion Solutions VI, d/b/a Paradyme, Inc. (discussed more fully below).

Subsequent to the disposition of the Paradyme note, the last remaining assets of the corporations were liquidated and the Sunshine Companies were administratively dissolved in the late summer of 2005.

The final assessment of the Sunshine Companies' tax liabilities, including penalties and interest, was approximately $52 million. Although the IRS has continued to pursue the former principals of the Sunshine Companies for their personal liability under the 100% penalty, it has never asserted liability for the Sunshine Companies' taxes against Presidion Corporation or PSI.

The PBS Plan

On or about January 1, 2005, PSI purchased a South Florida PEO, Professional Benefits Solutions, Inc. (subsequently renamed Presidion Solutions VII, but referred to herein as "PBS"). Immediately thereafter, PSI began reporting all Florida employees under the PBS EIN number. All non-Florida employees were reported under the Paradyme EIN number. As of April 20, 2005, PBS had no federal tax liability. At this point in time, Amodeo was not involved in any of the financial or operating decisions at PBS, and had no involvement in decisions as to how to process the individual employees' payroll. These decisions were made by the management of Presidion Corporation. However, as discussed above, Mirabilis held a substantial minority stake in Presidion until January 2006.

In May 2005, Amodeo was again approached by Vanderburg and Baiers regarding further problems with Presidion Corporation, including a severe shortage of working capital, liabilities (including payroll tax deficiencies) totaling millions of dollars, and of most urgency, the potential cancellation of its workers' compensation insurance policy with FCIC. Amodeo proposed a plan that involved consolidating and settling the Presidion liabilities into one secured claim owed to the IRS.

Amodeo's plan took another turn in July 2005 when he was notified that the Presidion workers' compensation policy with FCIC would be cancelled within days. Moreover, the insurance underwriter that they were negotiating with to take over the policy, Sunz Insurance, refused to do business with Vanderburg or Baiers.

In order to facilitate the PBS Plan and the aforementioned disbursements, Amodeo advised Vanderburg that any and all diverted payroll tax funds be deposited into a PSI account opened by Vanderburg at First Southern Bank in Fort Lauderdale

(the "Reserve account"). Amodeo was given sole signature authority over this account. As the sole signatory on the Master Account, Vanderburg was consequently personally involved in the transfer of the payroll tax funds to the Reserve Accounts. The funds were later disbursed from the Reserve Account by Amodeo for his and the co-conspirators' benefit (unrelated to the payment of payroll taxes). From June 10, 2005 until December 31, 2005, Amodeo and Vanderburg caused to be transferred approximately $64,600,000.00 to the Reserve Account from the Ultimate Master Account.

The parties entered into an Indemnification Agreement whereby PSI promised to pay Mirabilis $50,000,000.00 by December 31, 2005, in return for Mirabilis' agreement to hold PSI harmless for any subsequent claims against the company, up to a maximum of $70,000,000.00. The Agreement was executed by Dr. Pollack as Vice President of Mirabilis and Vanderburg as President of PSI, and ratified by the Mirabilis Board of Directors, which at the time included Edie Curry, Jason Carlson, Dr. Pollack, James Sadrianna, and Bruce Walko.

<u>IRS Negotiations and Related Discussions in Early 2006</u>

At the beginning of 2006, arrangements were made for a January 20th conference with Revenue Officer Berkowitz in Plantation to lay down the groundwork for a formal installment plan to resolve both the Sunshine Companies' payroll tax debt (which at that time was estimated to be $52 million) and now the PBS debt (at that time estimated to be $71 million). This was the first time that Revenue Officer Berkowitz was made aware of the PBS payroll tax liability. Myers checked with Vanderburg to ensure that Vanderburg had properly filed the 941 tax returns for the third and fourth quarters of 2005. Vanderburg initially indicated that they had been prepared by Melanie Levigne,

the Presidion Corporation tax manager, and filed electronically. However, he was unable to produce a signed version. Vanderburg then printed and signed new copies of the tax returns that were mailed to Myers and to Revenue Officer Berkowitz in Plantation, Florida.

AEM's Assumption of Formal Ownership of PBS Book of Business

On or about April 29, 2005, Mirabilis purchased AEM for approximately $125,000.00. At the time of the purchase, AEM was a PEO shell. Amodeo and the other co-conspirators intended to transfer Presidion Solutions' book of business to AEM, because AEM had a better SUTA rate than Paradyme or PBS and because the Presidion Solutions name was tainted in the PEO industry.

On or about January 5, 2006, Paul Glover was hired as CFO of Mirabilis. At the beginning of August 2006, Amar was replaced as President of AEM by Michael Stanley, a C.P.A. who had been the CFO of a large Central Florida staffing company, Workers Temporary Staffing, Inc. ("WTS").

Reflecting the change of ownership, as of January 1, 2006, all funds collected from the PEOs were deposited into an AEM d/b/a Mirabilis HR bank account with Bank of America. Although Sue Schumacher, Presidion's CFO, managed the account, the decisions about the disbursements from the account came from Vanderburg and Amodeo.

From the BOA depository account, the monies were disbursed to various other AEM accounts for the payment of payroll, operating expenses, taxes, etc. Funds used for the acquisition of new business assets would be transferred from the BOA depository account to an account maintained by Mirabilis at SunTrust Bank in Orlando or to Berman's law firm trust account at First Southern Bank in Fort Lauderdale.

Transfers were made from AEM's operating account to PSI's account at SunTrust Bank in Orlando (the "PSI Capital Account") to pay Presidion related expenses and for the purchase of two businesses, WTS and Winpar (a real estate development project based in Nashville, Tennessee purchased for approximately $3 million), both of which provided security for Presidion within the context of the Indemnification Agreement.

AEM submitted a 941 return to the IRS properly showing the tax liability for the first quarter of 2006, the amount that had been paid, and the deficiency remaining. Approximately two-thirds of the taxes had been paid, reflecting the fact that proper collection and payment procedures had been followed for the short period from January 1, 2006 through late February 2006.

Stanley and the Mirabilis Board of Directors decided to continue to operate the PBS book of business pursuant to the pre-existing Management Agreement executed in 2005. AEM retroactively amended the Management Agreement in order to justify the company's control over the PBS book of business through March 31, 2006. The amendment extended the term of the Management Agreement through August 1, 2006. A new 941 was consequently prepared for PBS, which reflected the same tax collection as the 941 Form originally filed for AEM, but differed from that Form in that it showed zero tax deposits with the IRS during the first quarter of 2006.

<u>Disclosure of the Grand Jury Investigation</u>

In the last week of November 2006, Presidion PEO customers began receiving subpoenas from the Orlando office of the U.S. Attorney's Office for the Middle District of Florida relating to PEO tax collections during the 2004-2005 time period. The customers informed AEM of the subpoenas and asked for help in complying with the subpoenas. AEM personnel informed Dan Myers, and both Amar and Myers eventually

informed Amodeo. The key personnel at Mirabilis, including those who had been present since the implementation of the Sunshine Companies Plan, then began to leave the company.

Amodeo's Use of December 2006 Payroll Taxes for Non-Tax Purposes

On or about December 15, 2006, the Directors of Mirabilis met with Amodeo and informed him that they wanted to sell all of the PEOs and discontinue any further involvement with them. Amodeo indicated that he believed he could arrange for a sale of the PEOs to an unrelated company, Paysource, with which Mirabilis had already been in acquisition negotiations. In essence, Amodeo proposed reversing the transaction by having Paysource buy the PEO contracts and then having Mirabilis shareholders buy the stock of Paysource. It was believed that Paysource's note payments on its purchase of the PEOs would provide the necessary funds to allow Mirabilis to meet its ongoing obligations on a much scaled down operation that would no longer include the PEOs. It was also hoped that this would provide some insulation for Mirabilis from liability for the historical unpaid payroll taxes, simply by virtue of the fact that Mirabilis would have retired from the PEO business after learning of the government investigation.

One of the problems with this plan was that Mirabilis would have to terminate a significant portion of its workforce, and it then lacked the funds to pay the employees and their health and benefit claims. In order to make payroll for December 15th to January 1st, funds from the PBS trust fund tax collections were used to pay Mirabilis' final payroll and health plan obligations, as well as the health plan obligations of all of the PEO employees.

Total Unpaid Payroll Taxes

It is the position of the government that co-defendants AQMI, PSI and PBS, and Amodeo and other members of the conspiracy, knowingly failed to remit to the Internal Revenue Service payroll taxes totaling in excess of $120,000,000.00.

Hoth Holdings

Defendant Hoth was a Nevada Limited Liability Corporation, which was a 90% owned subsidiary of Mirabilis and was created in December 2005. Hoth acquired commercial property located at 3801 Carolina Ave., Richmond, Virginia in May 2006. Mirabilis provided $1,419,867.37 in funds to facilitate the purchase of the real estate from December 2005 through June 2006 in a series of wire transfers and checks. These funds provided by Mirabilis were recorded on Mirabilis' books initially as a deposit, then as an investment in the real estate, and later corrected to be a receivable from Hoth. Mirabilis obtained these funds from AEM, Inc., Titanium Technologies, Inc., PSI, AQMI, and other companies owned by Mirabilis or Frank Amodeo.

A. LEE BENTLEY, III
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515A

By: *s/ I. Randall Gold*

Assistant United States Attorney
Deputy Chief, Orlando Division
Florida Bar Number 0268062
501 West Church Street, Suite 300
Orlando, Florida 32805
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: randy.gold@usdoj.gov

U.S. v. MIRABILIS VENTURES, INC., et al. Case No. 6:08-cr-231-Orl-28KRS

CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

AEM, INC., d/b/a Mirabilis HR
MIRABILIS VENTURES, INC.
HOTH HOLDINGS, LLC
c/o Richard Lee Barrett, Esquire
18 Wall Street
Orlando, FL 32801

I hereby certify that on June 15, 2010, a true and correct copy of the foregoing document and the notice of electronic filing was sent by U.S. Mail to the following non-CM/ECF participant:

N/A

*s/ I. Randall Gold*
Assistant United States Attorney
Deputy Chief, Orlando Division
Florida Bar Number 0268062
501 West Church Street, Suite 300
Orlando, Florida 32805
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: randy.gold@usdoj.gov

# CONSULTANT AGREEMENT

THIS CONSULTANT AGREEMENT ("Agreement"), dated as of October 18, 2004, is entered into between PRESIDION SOLUTIONS INC., a Florida corporation ("PRESIDION"), and AQMI STRATEGY CORPORATION, a Florida corporation ("CONSULTANT").

WHEREAS, PRESIDION is in the professional employment and business process outsourcing business (the "Business");

WHEREAS, CONSULTANT is in the business of providing consulting services to companies such as PRESIDION and the Business; and

WHEREAS, PRESIDION and CONSULTANT desire to enter into an agreement pursuant to which PRESIDION will retain the services of CONSULTANT, and CONSULTANT will agree to furnish its services to PRESIDION for the provision of certain services for the Business (the "Engagement") as an independent contractor to PRESIDION.

NOW THEREFORE, in consideration of the foregoing premises, and the mutual covenants and agreements contained herein, the parties agree as follows:

1. PURPOSE OF ENGAGEMENT.

(a) PRESIDION agrees to retain CONSULTANT to perform certain services in connection with the Engagement, and CONSULTANT agrees to furnish to PRESIDION such services on the terms and subject to the conditions set forth in this Agreement, all as detailed in addendums to this Agreement executed by both parties from time to time for each individual project (individually, an "Addendum", and collectively, the "Addendums") for services, fees and reimbursable expenses in the form similar to the attached Exhibit "A" (the "Services"). Once an Addendum is executed, the scope of the Services may only be modified upon the mutual

EXHIBIT 2

EXHIBIT 54



RCH-23085

written agreement of the parties by revising the Services specified in the Addendum, which shall continue to be governed by the provisions of this Agreement. In performing the Services, CONSULTANT agrees to provide its own resources, personnel and other materials at its own expense, unless otherwise set forth in the Addendum. PRESIDION may make its facilities, equipment and personnel available to CONSULTANT to the extent necessary to perform the Services as the parties may mutually agree. It is expressly understood that CONSULTANT is an independent contractor of PRESIDION and that CONSULTANT shall use its professional discretion in determining the best means by which to perform the Services.

2. TERM. The term of this Agreement shall begin on the date hereof and shall continue until September 30, 2009.

3. CONSULTANT'S COMPENSATION. During the term of this Agreement, PRESIDION agrees to compensate CONSULTANT, to the extent set forth in each Addendum, in the amounts and at the times identified in such Addendum (the "Compensation").

Payments shall be mailed to:

AQMI Strategy Corporation
2875 South Orange Avenue
Suite 500
Orlando, Florida 32806

Attention: Frank Amodeo

4. OWNERSHIP OF MATERIALS RELATED TO SERVICES. The parties agree that all ideas, know-how, processes, information, drawings, documents, designs, models, inventions, copyrightable material and other tangible and intangible materials authored, prepared, created, made, delivered, conceived or reduced to practice, in whole or in part, by CONSULTANT in the course of providing the Services (collectively, the "Works"), are the sole and exclusive property of PRESIDION and shall be considered works made for hire. In the event

any such Works do not fall within the specifically enumerated works that constitute works made for hire under the United States copyright laws, CONSULTANT hereby irrevocably, expressly and automatically assigns all right, title and interest worldwide in and to such Works to PRESIDION, including, without limitation, all copyrights, patent rights, trade secrets, trademarks, moral rights and all other applicable proprietary and intellectual property rights. If CONSULTANT has any rights to the Works that cannot be assigned to PRESIDION in accordance with the foregoing, CONSULTANT unconditionally and irrevocably: (1) waives the enforcement of such rights; and (2) grants to PRESIDION during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, royalty-free license to reproduce, create derivative works of, distribute, publicly perform and publicly display such Works, by all means now known or later developed, with the right to sublicense such rights through multiple levels of sub licensees. CONSULTANT agrees to render all reasonably required assistance to PRESIDION to protect PRESIDION's rights herein above described. In the event that PRESIDION is unable to secure CONSULTANT's signature on any documents deemed necessary by PRESIDION to carry out the purposes of this paragraph, CONSULTANT hereby irrevocably designates and appoints PRESIDION or its designee(s) as CONSULTANT's agent and attorney-in-fact, which appointment is coupled with an interest, to act for and in CONSULTANT's behalf to execute, verify and file any such documents.

5. <u>COMPLIANCE WITH PRESIDION POLICIES AND BUDGETS</u>. CONSULTANT agrees to perform the Services to the best of CONSULTANT's abilities in accordance with PRESIDION's policies and applicable timetables. CONSULTANT's personnel performing the Services on PRESIDION's premises shall comply with PRESIDION's rules and regulations. Without limiting the foregoing, CONSULTANT shall perform the Services in a timely and professional manner in accordance with applicable professional standards.

6. <u>CONSULTANT'S WARRANTIES</u>. CONSULTANT warrants that:

(a) CONSULTANT's performance of the Services called for by this Agreement, including without limitation, the development and delivery of the Works, does not and shall not violate: (1) any applicable law, rule, or regulation; (2) any contracts with third parties; (3) or any third-party rights in any patent, trademark, copyright, trade secret, or any other proprietary or intellectual property right; and

(b) CONSULTANT has full authority and sufficient right, title, and interest in and to the Works, to grant and convey the rights accorded to PRESIDION under Paragraph 4 hereof;

7. <u>TERMINATION</u>. Either party may terminate this Agreement upon thirty (30) days written notice to the other in the event the other party breaches a material term of this Agreement or an Addendum and fails to cure such breach within the thirty (30) day period.

8. <u>INDEMNIFICATION.</u> CONSULTANT hereby agrees to indemnify, defend and hold harmless PRESIDION and any partner, principal, employee or agent thereof (each of the foregoing being hereinafter referred to individually as an "Indemnified Party") from and against any and all claims, liabilities, losses, expenses (including attorney's fees and legal expenses related to such defense), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against any Indemnified Party for (a) personal injury or property damage to the extent such Liabilities arise out of or result from the negligence or willful misconduct of CONSULTANT; or (b) the obligations of CONSULTANT under this Agreement or their breach. PRESIDION shall promptly notify CONSULTANT of any third party claim subject to indemnification hereunder and CONSULTANT shall, at PRESIDION's option, conduct the

defense or settlement of any such third party claim at CONSULTANT's sole expense and PRESIDION shall cooperate with CONSULTANT in connection therewith.

9. EXCLUSIVITY. During the term of this Agreement, PRESIDION agrees that it will not engage the services of any other individual or company that competes with CONSULTANT or offers services similar to those offered by CONSULTANT, and any such engagement shall be considered a breach of this Agreement.

10. PRESIDION CONFIDENTIAL INFORMATION. All information, documents, reports, data, records, forms and other materials developed by CONSULTANT for PRESIDION or obtained by or disclosed to CONSULTANT in the course of performing any Services (including, but not limited to, PRESIDION's company records) are the proprietary, confidential and trade secret information of PRESIDION. CONSULTANT will deliver to PRESIDION all tangible forms of such proprietary confidential and trade secret information and all copies thereof (and all other property obtained from or through PRESIDION) when PRESIDION requests the same, or immediately upon termination of this Agreement, whichever occurs earlier. CONSULTANT agrees during the term of this Agreement and thereafter that it will take all steps reasonably necessary to hold PRESIDION's proprietary, confidential and trade secret information in trust and confidence. CONSULTANT shall not use or disclose to any person, firm or entity any proprietary, confidential or trade secret information of PRESIDION, without PRESIDION's express, prior written permission.

11. INDEPENDENT CONTRACTOR. CONSULTANT agrees that CONSULTANT's relationship with PRESIDION is that of an independent contractor and nothing in this Agreement shall be construed as creating a partnership, joint venture or employer-employee relationship. No CONSULTANT employee or agent will be entitled to any of the benefits which PRESIDION may make available to its employees, such as group insurance,

profit-sharing, or retirement benefits. CONSULTANT shall be solely responsible for complying with all applicable local, state and federal laws governing self-employed individuals, including but not limited to obligations such as payment of federal, state and local taxes, social security, disability and other contributions attributable to the rendition of Services hereunder to PRESIDION. CONSULTANT shall indemnify, hold harmless and defend PRESIDION from any and all claims; liabilities, damages, taxes, fines or penalties sought or recovered by any governmental entity, including but not limited to the Internal Revenue Service or any state taxing authority, arising out of CONSULTANT's alleged failure to pay such taxes or make such contributions. Nothing in this Agreement shall be deemed to constitute CONSULTANT or PRESIDION the agent of the other. Neither CONSULTANT nor PRESIDION shall be or become liable or bound by any representation, act or omission whatsoever of the other.

12. ASSIGNABILITY. CONSULTANT shall not assign, subcontract or transfer this Agreement or CONSULTANT's obligations without PRESIDION's express, prior written permission.

13. NOTICES. All notices permitted or required under this Agreement shall be in writing and shall be by personal delivery, a nationally recognized overnight courier service, facsimile transmission or certified or registered mail, return receipt requested. Notices shall be deemed given upon the earlier of actual receipt or one (1) day after deposit with the courier service, receipt by sender of confirmation of electronic transmission or five (5) days after deposit with the U.S. Postal Service. Notices shall be sent to the addresses listed below, or to such other address as either party may specify in writing.

If to PRESIDION: Presidion Solutions, Inc.
755 W. Big Beaver
Suite 1700
Troy, MI 48084

Attention: Mr. Craig Vanderburg

If to CONSULTANT:

AQMI Strategy Corporation
2875 South Orange Avenue
Suite 500
Orlando, Florida 32806

Attention: Frank Amodeo

14. SEVERABILITY. In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, impaired or invalidated, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

15. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflict of laws provisions thereof.

16. INTEGRATION. This Agreement constitutes the entire agreement of the parties hereto and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing. This Agreement may be modified only in writing and shall be enforceable in accordance with its terms when signed by each of the parties hereto.

17. INSURANCE. Throughout the term of this Agreement, CONSULTANT shall maintain workers compensation insurance in the amount required by statute, comprehensive general liability insurance with coverage of at least one million dollars ($1,000,000) for bodily injury, property damage or other losses resulting from CONSULTANT's obligations under this Agreement. CONSULTANT agrees to provide PRESIDION with Certificates of Insurance or

self-insurance evidencing the above coverage and shall provide PRESIDION with prompt written notice of any material change.

18. SURVIVAL. Paragraphs 5, 8, 10, 12, 13, 17, 19 and 20 shall survive the expiration or earlier termination of this Agreement.

19. ATTORNEY'S FEES. In the event any litigation, arbitration, or controversy between the parties hereto arises out of or in connection with this Agreement, the prevailing party in such litigation or controversy shall be entitled to recover from the other party or parties all reasonable attorneys' fees, expenses and suit costs, including those associated with any appellate proceedings or post-judgment collection proceedings.

20. ENFORCEMENT. In the event that any dispute shall occur or any questions shall arise between the parties hereto as to the interpretation of any of the provisions hereof which cannot be resolved by their agreement, then the determination of such dispute shall be first submitted to non- binding mediation, and shall thereafter be resolved by arbitration as provided in this Paragraph 20, and the arbitrators' decision shall be final and binding as between the parties and shall not be subject to appeal. Judgment may be entered on any final, un-appealable arbitration award by any state or federal court having jurisdiction thereof. Notwithstanding the foregoing, in the event any party desires to enforce any provision of this Agreement by injunction or specific performance, or to obtain other equitable relief, such party may seek such relief by commencing a proceeding in a trial court located in Orange County, Florida and shall not be required to arbitrate such dispute. Any arbitration to be carried out under this Paragraph 20 shall be subject to the following provisions:

(a) The party desiring arbitration shall nominate an arbitrator and shall notify the other parties of such nomination. The notice shall set forth a brief description of the matter submitted for arbitration and, if appropriate, the section or clause hereof

pursuant to which such matter is so submitted. The other parties shall, no later than thirty (30) days after receipt of such notice, collectively nominate an arbitrator, and the two (2) arbitrators shall select a third arbitrator (hereinafter called the "Chairman") to act jointly with them (the two arbitrators and the said Chairman collectively hereafter being called the "Arbitrators"). If the Arbitrators shall be unable to agree on the selection of such Chairman, the Chairman shall be designated by a judge of the applicable Florida Court in Orange County in upon an application by any party. The arbitration shall take place in Orlando, Florida and the Chairman shall fix the time and place for the purpose of hearing such evidence and representations as the parties hereto may present and, subject to the provisions hereof, the decision of the Arbitrators in writing shall be binding upon the parties both in respect to procedure and the conduct of the parties during the arbitration procedure and the final determination of the issues therein. The Arbitrators shall be instructed that time is of the essence in proceeding with their determination of the issue or issues at hand. The Arbitrators shall, after hearing any evidence and representations that the parties may submit, render a decision and reduce the same to writing and deliver one (1) copy thereof to each of the parties. The Arbitrator's decisions shall be in the form of approving one or the other of the party's settlement offers with respect to such dispute, as delivered most recently before commencement of the arbitration proceeding, without compromise. The majority of the Arbitrators may determine any matters of procedure for the arbitration not specified herein.

(b) If the parties receiving notice of the nomination of an Arbitrator by the party desiring arbitration fail within the said thirty (30) days to nominate an Arbitrator, the Arbitrator nominated by the party desiring arbitration may proceed alone to determine the dispute in such manner and at such time as he or she shall think fit, and his or her decision shall, subject to the provisions hereof, be binding upon the parties.

(c) To the fullest extent permitted by applicable law, any controversy concerning whether a dispute is an arbitrable dispute or as to the interpretation or enforceability of this Paragraph 20 shall be determined by the Arbitrators. The arbitration proceedings, as well as the fact such proceedings occur, shall be kept confidential by the parties hereto and may only be disclosed to their personal representatives and legal, accounting and other professional advisors or as required by

law and insofar as is necessary to confirm, correct, vacate or enforce the award. In the event of a breach of this provision, the Arbitrators are expressly authorized to assess damages and each of the parties hereto consents to the expansion of the scope of arbitration for such purpose. The pendency of any arbitration under this Paragraph 20 shall not relieve any party hereto of obligations under this Agreement or any of the other agreements related to the transaction contemplated by this Agreement. The designation of a situs or a governing law for this Agreement or the arbitration shall not be deemed an election to preclude application of the *Federal Arbitration Act* if it would be applicable.

(d) Notwithstanding the foregoing, any arbitration may be carried out by a single arbitrator if the parties so agree.

(e) Regarding attorneys' fees for actions or proceedings brought in any arbitration, the attorneys' fees incurred in connection with arbitration shall be apportioned among the parties to the arbitration as the Arbitrators may determine. The fees and other expenses of the arbitration shall be borne equally by PRESIDION and CONSULTANT if they are the sole parties to the arbitration, unless the Arbitrators determine otherwise. No party to the arbitration may seek, and the arbitrators shall not award, consequential, punitive or exemplary damages.

IN WITNESS WHEREOF, the parties hereto have caused to be signed by their duly authorized representatives, as of the day and year first above mentioned.

PRESIDION SOLUTIONS, INC.

By: ______________________
Craig Vanderburg
Its: CEO

AQMI STRATEGY CORPORATION

By: ______________________
Frank Amodeo
Its: President

# EXHIBIT A

## ADDENDUM TO CONSULTANT AGREEMENT

This Addendum to Consultant Agreement is made and entered into this ___day of ________, 200_, between PRESIDION SOLUTIONS INC., a Florida corporation ("PRESIDION"), and AQMI STRATEGY CORPORATION, INC., a Florida corporation ("CONSULTANT").

WITNESSETH:

WHEREAS, PRESIDION entered into a Consultant Agreement with CONSULTANT for certain services, dated October ______, 2004, a copy of which is attached hereto and made a part hereof (the "Consultant Agreement");

WHEREAS, the Consultant Agreement provides that an Addendum shall be executed to provide for the specific Services, Fees and Reimbursable Expenses for each individual project for the Engagement; and

WHEREAS, the parties desire that this document serve as the Addendum for the Consultant Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and obligations herein contained, the parties agree as follows:

1. SERVICES TO BE PROVIDED. CONSULTANT shall provide the following Services for the following individual project (the "Project"):

As certain services are in the nature of intellectual property and once disseminated are not recoverable nor can value bestowed actually be quantified if Presidion terminates this contract after AQMI has publicized AQMI's strategy.

2. FEE PAYABLE. The fee for the Project shall be as follows:

Both parties agree $500,000 plus initial $150,000 is minimum damages. Any fees paid to such date or separately set aside will be considered earned for services rendered and not applied to the $500,000.

3. REIMBURSABLE EXPENSES. The following reimbursable expenses are associated with the Project, and shall be payable to CONSULTANT upon substantiated invoices or receipts:

4. FORCE AND EFFECT. Except as set forth above, all terms and obligations of PRESIDION and CONSULTANT as set forth in the Consultant Agreement shall remain in full force and effect. Any terms not otherwise defined herein shall have the same meaning as in the Consultant Agreement.

IN WITNESS WHEREOF, the parties have caused this Addendum to be duly executed the day and year first above written.

PRESIDION SOLUTIONS, INC.

By: ______________________
Craig Vanderburg
Its: CEO

AQMI STRATEGY CORPORATION

By: ______________________
Frank Amodeo
Its: President

# ADDENDUM TO CONSULTANT AGREEMENT

This Addendum to Consultant Agreement is made and entered into this 18th day of October, 2004, between **PRESIDION SOLUTIONS, INC.**, a Florida corporation ("PRESIDION"), and **AQMI STRATEGY CORPORATION**, a Florida corporation ("CONSULTANT").

WITNESSETH:

**WHEREAS**, PRESIDION entered into a Consultant Agreement with CONSULTANT for certain services, dated October 18th, 2004, a copy of which is attached hereto and made a part hereof (the "Consultant Agreement");

**WHEREAS**, the Consultant Agreement provides that an Addendum shall be executed to provide for the specific Services, Fees and Reimbursable Expenses for each individual project for the Engagement; and

**WHEREAS**, the parties desire that this document serve as the Addendum for the Consultant Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and obligations herein contained, the parties agree as follows:

1. SERVICES TO BE PROVIDED. CONSULTANT shall provide the following Services to resolve PRESIDION's potential tax controversy (the "Project"):

A. Use its best efforts and the services of its principal, Frank Amodeo, to identify and formulate a Strategy that shall be approved by PRESIDION prior to implementation.

B. Identify and engage attorneys and accountants to represent PRESIDION, subject to PRESIDION'S approval. These parties are to be paid by

# SECURITIES PURCHASE AGREEMENT

AGREEMENT made as of this 8th day of December 2004 by and between Presidion Solutions, Inc., a Florida corporation, whose address is 755 W. Big Beaver Road, Suite 1700, Troy, MI 48084 ("Seller") and Wellington Capital Group, Inc., a Nevada corporation with an office at 20 North Orange Avenue, 14th Floor, Orlando, FL 32801 ("Buyer")

WITNESSETH:

WHEREAS, Seller owns all of the issued and outstanding capital stock of the following Florida corporations (collectively the "Companies" and the "Common Stock"):

| Company | Number of Shares |
|---|---|
| Sunshine Staff Leasing, Inc. | 1,000 |
| Sunshine Companies, Inc. | 100 |
| Sunshine Companies, II, Inc. | 100 |
| Sunshine Companies III, Inc. | 100 |
| Sunshine Companies Inc. IV | 100. |

WHEREAS, Seller desires to sell the Companies, and

WHEREAS, Seller proposes to sell all the shares of the Common Stock to Buyer in a private transaction for an aggregate consideration of Five Hundred Thousand ($500,000) Dollars, and

WHEREAS, Buyer desires to purchase and Seller desires to sell such shares of Common stock on the terms and conditions set forth below,

NOW THEREFORE, in consideration of the foregoing and of the promises, covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which Buyer and Seller hereby acknowledge, Buyer and Seller hereby agree as follows:

## ARTICLE 1
## AGREEMENT TO BUY AND SELL

Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller all of the Company's shares of its Common Stock (the "Shares") for an aggregate consideration of Five Hundred Thousand ($500,000) Dollars (the "Purchase Price"). The Purchase Price is to be paid by Buyer simultaneously with the Closing of this Transaction against prompt delivery to Buyer of Stock Assignments Separate from Certificates representing the Shares of the Common Stock.



EXHIBIT 3

EXHIBIT 61

ARTICLE 2

ACTIONS TO BE TAKEN TO EFFECT THE TRANSACTION

In order to effect the transaction herein, the following events shall occur:

(a) Upon the Closing of this Transaction, Buyer shall transmit the Purchase Price by electronic wire transfer to the account of Seller pursuant to transfer instructions to be provided separately to Buyer.

(b) Seller shall issue and deliver to Buyer the Stock Assignments Separate from Certificates representing the all of the Common Stock in the name of Buyer to its address first mentioned above.

(c) Prior to Closing the Companies shall have assigned all Client Service Agreements, accounts receivables, bank accounts and other mutually agreed upon agreements and causes of action to Paradyme, Inc.

(d) The Closing date shall be set by mutual agreement on or before December 31, 2004.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

(a) Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Florida and has the legal capacity and all necessary corporate authority to carry on its business, own its properties and assets, and enter into and perform this Agreement and to consummate the transactions contemplated hereby.

(b) This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(c) With the exception of the Stock Pledge Agreement attached as Schedule 3(E), the execution and delivery of this Agreement and the performance of the obligations imposed hereunder will not conflict with, or result in a breach by Seller of, any of the terms or provisions of, or constitute a default under the certificate of incorporation or bylaws of Seller, or any indenture, mortgage, deed of trust, or other material agreement or instrument to which Seller is a party, or by which it or any of its properties or assets are bound, or result in a violation of any order, decree, or judgment of any court or governmental agency having jurisdiction over Seller or Seller's properties, will not conflict with, constitute a default under, or result in the breach of, any contract, agreement, or other instrument to which Seller

is a party or is otherwise bound and no consent, authorization or order of, or filing or registration with, any court, governmental, or regulatory authority is required in connection with the execution and delivery of this Agreement and any related agreements or the performance by Seller of its obligations hereunder.

(d) There is no litigation or proceeding pending or, to the best knowledge of Seller, threatened against Seller which would have any material effect on the validity or performance of this Agreement.

(e) The Shares are duly authorized, validly issued, fully paid, and non-assessable.

(f) With the exception of the Stock Pledge Agreement attached as Schedule 3(f), Seller owns the Shares free and clear of all other liens, claims, charges, preemptive rights, and any other encumbrances.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

(a) Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the state of Nevada and has the legal capacity and all necessary corporate authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby.

(b) This Agreement has been duly authorized, executed and delivered by Buyer and constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(c) The execution and delivery of this Agreement and the performance of the obligations imposed hereunder will not result in a violation of any order, decree or judgment of any court or governmental agency having jurisdiction over Buyer or Buyer's properties, will not conflict with, constitute a default under, or result in the breach of, any contract, agreement, or other instrument to which Buyer is a party or is otherwise bound and no consent, authorization or order of, or filing or registration with, any court, governmental, or regulatory authority is required in connection with the execution and delivery of this Agreement and any related agreements or the performance by Buyer of its obligations hereunder.

(d) There is no litigation or proceeding pending or, to the best knowledge of Buyer, threatened, against Buyer, which would have any effect on the validity or performance of this Agreement.

(e) Buyer is aware that the Shares have not been registered under the Securities Act of 1933, as amended (the "Act") and may not be transferred or otherwise disposed of unless

they are subsequently registered under the Act or an exemption from such registration is available. Additionally, Buyer has such knowledge and experience in financial and business matters that Buyer is capable of evaluating the merits and risks of the purchase of the Shares and making an informed investment decision with respect thereto, has evaluated the merits and risks of the purchase of the Shares, and is able to bear the economic risk of purchasing the Shares and can afford the complete loss of the Purchase Price.

(f) Buyer is purchasing the Shares for its own account for investment purposes and not with a view to "distribute" the Shares as that term is defined in the Act.

(g) Buyer has been provided with any and all written information and materials concerning Seller and its business which it has requested and has had the opportunity to conduct and has conducted its own due diligence.

(h) Buyer is an "accredited investor" as the term is defined in the Act, and is sufficiently sophisticated to make informed and educated investment decisions, including the transaction contemplated hereby.

(i) Buyer was not formed for the sole purpose of investing in the Shares herein, and has other substantial business and investments.

## ARTICLE 5
## CONDITION OF SELLER'S OBLIGATIONS HEREUNDER

It shall be a condition to the obligations of Seller to complete the transaction described herein that (i) the representations and warranties of Buyer shall have been and continue to be true and correct on the date hereof and as of the Closing as if made on and as of such date; (ii) the Project as defined in the Consulting Agreement and Addendum dated October 18, 2004 between Seller and AQMI Strategy Corporation shall have been approved by Seller, in writing, and; (iii) the execution and the approval by the parties Board of Directors of the Preferred Stock Purchase Agreement and the Preferred Stock Subscription Agreement between Presidion Corporation and Mirabilis Ventures, Inc.

## ARTICLE 6
## CONDITIONS OF BUYER'S OBLIGATIONS HEREUNDER

The obligations of Buyer to complete the transaction described herein are subject to the satisfaction or written waiver of the following conditions at or before the Closing:

(a) The representations and warranties of Seller shall have been and continue to be true and correct on the date hereof.

(b) Neither Seller, nor any of its direct or indirect affiliates, shall have commenced a voluntary case in bankruptcy, consented to the entry of an order for relief against it in an involuntary bankruptcy case, consented to the appointment of a custodian of it for all or substantially all of its property or made a general assignment for the benefit of its creditors. No court of competent jurisdiction shall have entered an order or decree under applicable bankruptcy laws that is for relief against Seller, or any direct or indirect affiliate in an involuntary bankruptcy case, that appoints a custodian of Seller or any direct or indirect affiliate for all or substantially all of their properties or that orders the liquidation of Seller, or any direct or indirect affiliate.

ARTICLE 7
MISCELLANEOUS

1. Each of Seller and Buyer and Seller agrees to take such actions as are reasonably necessary to carry out the intentions of the parties under this Agreement including, but not limited to, the prompt execution and delivery of any documents reasonably necessary to carry out and perform the terms or intention of this Agreement.

2. All costs and expenses incurred in connection with this Agreement and the transaction contemplated hereby shall be paid by the party incurring such costs or expenses, unless otherwise agreed.

3. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida, without regard to conflicts of laws of principles and each party hereby agrees that all performances due and transactions undertaken pursuant to this Agreement shall be deemed to be due or have occurred in Florida, and the exclusive venue and place of jurisdiction for any litigation arising from or related to this Agreement shall be the state or federal courts located in Orange County, Florida.

4. The headings used in this Agreement are for convenience only, do not form a part of this Agreement, and shall not affect in any way the meaning or interpretation of this Agreement.

5. This Agreement may be executed in one or more counterparts which when taken together shall constitute one agreement.

6. This Agreement is intended for the benefit of the parties hereto and is not for the benefit of, nor may any provisions hereof be enforced by, any other person, firm or entity.

7. This Agreement may be amended, modified and supplemented in writing only by the mutual consent of the parties hereto.

8. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be

assigned by any of the parties hereto without the prior written consent of the other party, and any attempts to do so without the consent of the other party shall be void and of no effect.

9. In the event either party breaches the terms of this Agreement, the non-breaching party shall be entitled to the recovery of its attorney's fees and other professional costs and fees incurred in enforcing its rights hereunder.

10. This writing constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter contained herein. Neither party is relying on any representation or statement not contained in this writing. This Agreement supercedes and cancels any prior agreements relating to the subject matter contained herein.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement of six (6) pages as of the date first written above.

Presidion Solutions, Inc. ("SELLER")

By: ________________
Craig A. Vanderburg, Pres. and CEO

Wellington Capital Group, Inc. ("BUYER")

By: ________________

Name: Frank Amodeo

Title: Authorized Agent

042105.1

# Nexia Strategy Corporation

20 North Orange Avenue, Suite 1400
Orlando, Florida 32801
321.293.9300 (telephone) / 321.293.9342 (facsimile)

## MEETING MINUTES

Presidion
Solutions

DATE: April 21, 2005 @ 1:00 PM

RE: OPEN STRATEGIC PLANNING

ATTENDEES:
Craig A. Vanderburg, Presidion
Fred J. Sandlin
James E. Baiers, Presidion
Karl Leo, for Hendricks
Kurt Benjamin, MAG Capital
Larry Childres
Larry Habers, Esq., General Counsel for Nexia
Lauran Gaines
Lynda Goudreau, Nexia
Mick Musial
Patrick McGee, Esq., for Gaines
Richard Berman, Esq., Counsel for Mirabilis
Robert Gaines
Robert Pollack, M.D., Nexia
Todd Buehl, Amfinity Capital
Woody Johnson, Nexia
Yaniv Amar

MINUTES:

Frank Amodeo opened meeting by stating that there were to be no discussion of this beyond the room, but notified everyone since each has some stake in the matter. Frank gave instructions to the IRS to close the corporate case so Presidion is off the hook, he will conduct a 4180 interview meeting, which he will do the first week of June, which is a formal ________. The IRS letter will be circulated to everyone (we want to get to the market in a discrete manner) that will tell everyone that the IRS collection from the primary taxpayer is no longer viable and they will begin to pursue collateral obligations. Primarily indications to them is that the responsible person consists of Vanderburg, Baiers and Burcham, and inquiry will be to them only. They will be given appropriate



EXHIBIT
4

Exhibit D

042105.1

forms to complete in preparation and Frank will visit with the IRS. Frank wants to offer IRS $4M in cash, which is believed to exceed their net worth. If the IRS accepts, great. Alternatively, we will offer to offset $28M in tax credits now held by Sunshine's parents or sisters. If accepted as a non-litigation matter, we will also commit that two years from now or sometime in that period, if dreams for Presidion come to fruition, we will sell stock _____ from individuals or from company equivalent to pay the $28M in cash, ____ compromise the tax credits back to ______. And use the tax credits as originally required.

However, should the IRS not agree to cooperate, then to insulate the third parties, we are completely certain that in the 11th Circuit and in the USA, there is no question in any jurisdiction that bankruptcy courts have authority to override the Tax Code. We have already taken Sunshine Company, Inc. (one with least tax liability) and begun to merge it with a Chapter 11 case that's been pending for a long time. We have a very favorable debtor's judge who once sanctioned the IRS computer for sending out a letter after a bankruptcy was filed. The question is how can we get the Sunshine case before the judge. They are completely unrelated, we are causing Sunshine Companies to merge with Debtor, KVN. If the IRS does not cooperate, we will bankrupt the other four Sunshine entities and consolidate the case .... Then Frank will contribute the $28M tax credits to the case and under Section 535 of the Tax Code (I believe) it is an automatic offset between the claimant who owes the estate money and the debt from the estate [44] _____. The United States is considered one person for bankruptcy purposes and the taxes wash out. ~~This is in effect how we are protecting the individuals,~~ in addition to the individuals other people who may be deemed liable. We do not believe, except for some officers who sign checking accounts, anyone else would be liable under Section 6672, which is a traditional responsible party. We are, however, suspicious that the IRS would if the first three individuals are skewered, they will begin to look for conveyances that could be recovered (alot of shareholders of the company were paid a lot of money for their business). Most of that paperwork was done correctly because they had good attorneys and we've reviewed; but we're certain they don't want to go that road and we don't think you have to. Part of your not having to is a good shot that Presidion is worth exactly what we say it is.

The upside for Presidion and what we want to do, as discussed with Frank and Jim and Fred and Bob, et al, we want to convert Presidion into a business development cooperation; separate merger and acquisition plan from operations, make operations state-based (which is why we're not relying on _____ Insurance Company and have plenty of room to spread out Management and decrease Management's salaries. We think the compensation level of the Operating Officers is too high. We will also be able to try out different systems, which we think are essential to complete the mergers. If [62] _____ long-term benefits for what the technology people tell us, that's wonderful; but Scorpio is the main driver in the industry right now, so you better have a Scorpio facility to process or a merger will not work, but will look like it was done in the past.

Business development corporations have a wonderful advantage according to our research [65] because _____ appraisal price on an effective PEO is about $3500 per worksite employee. Because we can mark to market all the subsidiaries quarterly, we will be able to dramatically increase the price and value of the parent company and we move faster to NASDAQ. We want to be NASDAQ by next year.

Here's what we bring to the table under this process with the new Presidion:

Issue #1: We need to talk to Hendricks along the line of our offer because we do not want Paradigm exposed to any unnecessary litigations – need a real deal.

042105.1

Issue #2: Make sure Executive Management in Troy, which will include a new temporary CFO independent of all these people and not from the PEO industry, will be put in place. The Board of Directors have been doing some research and have some recommended candidates and will be insisted to hire an independent eye. Also, our standard policy of providing all shareholders with regular reports on the transactions will be implemented. Originally it was not done because it was envisioned as an invasive consulting case as opposed to being our prime portfolio entity. So they will be on the same set of rules as every other affiliate has to play, we make sure our partners know what's going on all the time. If we sink, we sink together and at least you'll know it's coming.

We bring to the table, which should hopefully help turn the stock around in the next few weeks. Hopefully, next Tuesday of next week, Frank will close the deal for Mirabilis to acquire the Roadhouse Grills. Immediately upon that happening, [89] ______ and ______ Simms, who will begin to sign up the 4,400 full-time employees. So, we have a sales broker not encumbered by contract with a competitor who desperately wants to leave them, we have met with him and his counsel, we have gone through all the issues, and are sitting back waiting for tax announcements and that the old regime running Presidion, not that it's gone, just changed, and with him will come a couple-hundred-million book of business, plus the competitor will fail because they will not be able to stay their existing business without this book; he is not encumbered by any non-covenants. We have an individual who will hopefully serve on our Advisory Board who has 4 or PEOs currently lined up to be acquired in stock and no transactions, who have $85M in liability that need to be extinguished, which will result in considerable fees for the Nexia Strategy firm (and by the way, in this case, what's good for us is good for Presidion); and will also result in a tremendous flow of business over to Presidion ... easy business, they don't have to buy this business like that had to buy Hendricks, Gains & ______, this business will come over incidental to the transaction and being paid out as commissions, [94] ______.

We also have ___________ and a great relationship with the Senior Advisors to dollar troops. For six months, they have been wanting to sign up to Presidion as their PEO with $550M of business, which we have not been able to take on because we could not supply national insurance. ______ transfer and we like the honor to write that national insurance. At the same time our insurance companies about to come online. As our insurance companies come online, we will put them in each and every state, with first-dollar policies for this PEO. That will be a welcome change for the Regulators, because first-dollar policies are what the PEOs need. Right now, the PEOs (Presidion included) are just getting raked over the coals. Put up a whole bunch of money, pay all the claims, and you pay 30-40% of the Workers Comp premium for nothing ... [102] feasible circumstance right .... Other than Presidion going out of business, this transfer has first of all no exposure, [103] ____ so send claims down here next month. A stupid arrangement ... it got started so Fred could build a thing from his garage, but the days in which you can build cottage PEO companies are over and it's not going to happen anymore.

So we want to implement this now. We would like to quadruple Presidion's business by the end of the year, and we think we can do that with primarily organic growth with a complete overlay of the [106] ____ acquisitions and ______ really easy because these guys want to get out ______ that are hard to do, there is no other game in town.

The other thing, we had a lunch meeting with Mercator. Craig invites me up there and we're sitting with Mercator and Terry Lancaster having a little chat, Kurt gives story and history, I acted pretty impressed, he's very experienced and he knows this world, sitting there .... I look at him and say "you and all your guys are far more experienced and knowledgeable than I am by the way, you've got to fly over to Orlando because I need to teach you how to run your business. I thought poor Craig was going to die, but he just read a whole bunch of companies that must have 10,000 employees, and

042105.1

I asked him how many of them were Presidion employees? He hadn't used our model, we force the business where we want it to be. Same thing with _____.

You guys have tremendous market powers and Forbes ad does wonderful, and we need to get you back on board on the team and we need to build up Presidion's numbers. We'll structure deals to make sure Presidion and/or Mirabilis buys out the position until such time on a regular basis, until such time as, ... like Fred, if Fred ever says stop sending out the $40K a month, we'll stop sending it to you and you can start selling your ___ stock _____ difficult. But it's very important to us too. There alot of people who will start calling Fred and Bobbie, so you can tell them that you won't necessarily have dinner at Presidion, but that you like the way the company is going now. That's what people have to hear because they need to not be afraid to join us and we need to know that with $2B in sales, we're NASDAQ ready, we make a lot of money.

Now my friend, Yaniv, will constantly remind to avoid my manic state because even if we even make 2% on $2B on sales, that's $40M in profit that would be distributable to the shareholders. Frankly, if we issued a dividend in that amount of money, everybody would want to hold onto the stock for awhile. It's really just about money. The legacy should be over. We're still going to have a few issues that are going to trail through but they are relatively small compared to what we've gone through and that was the purpose for bringing everybody here. Why I did this was 1) I wanted to make a _____ announcement everybody at once because ________ breathe a little bit of a sigh of relief right now; 2) I wanted to make sure everybody knew that everybody at the table is on the same team. No matter what happened in the past, that's water under the bridge, at least for the moment. We now have the ability to do this. What I said yesterday was accurate. Craig and Jim, a whole bunch of people laughed at Craig behind his back about filing all those press releases ... they were wrong, because it is those press releases that have gotten us to the point where we actually have a clean entity, which is where we are able to put this new business in. So let's see what happens in the next few weeks, ... we start announcing new organic growth. I watched Fred's _____ face a few minutes ago because he knows this business. We announced that we have 4,400 employees coming from Roadhouse, two weeks later we announced that we are picking up a couple hundred million maybe from a Detroit PEO that's in trouble or a Georgia PEO that's in trouble, then we announce $550M in business from Dollar Tree, and in yesterday's meeting was an individual who really didn't fit. He is a Domino's franchisee with about seven stores, who is also on their committee to be meeting here in Orlando in June to try to work out a problem with providing insurance and coverage for all their employees. He met with Presidion last to begin to sign up his employees so we could give him a good feel as .... That meeting we can go make a presentation ourselves, nobody else will be there, and hopefully he can speak that we do a really good job of providing service and coverage because there are a whole bunch of pizza drivers out there who need it. That's what the business is about.

We would like to, from this time forward, make sure we are much open with the shareholders. I don't blame anybody for what happened in the past, but we are going to stop it now. Regular continuous communication so we set the standard of corporate governance. We are going to recommend to the Board of Directors in a little that they create an Advisory Committee with some relatively distinguished individuals in the industry to review best practices and make recommendations to screen acquisitions, to frankly, to be a marketing and PR device as ___ to the trade and to potential candidates for acquisition. We already have the legal structure in place. All the employees of Presidion actually reside inside of two different entities: one is Perpetual Benefits Solution, which is Florida; and the other is Paradigm, which is in the other states. So we want to continue to mirror that model and that will give a chance for officers to have a title, like the gentleman from this other competitor wants to be Vice President in charge of Sales. He can be Vice President in charge of Sales in Florida and his goal is to get 100,000 employees in five years time. My real goal is 30 months, but

042105.1

everybody ought know the official goal is five years time. And that will be the goal of all the operating officers in all the states. _____ through 100,000 employees and get it done within five years time, because then we're really big company. It will give us a chance to select from a whole pool of talent that we've now had a chance to see and train to eventually head the company up at the upper Executive levels.

I am going to make available to anybody else who wants it also the transcript from yesterday's meeting. It may help fill in some pieces for the people who were not present. So in the last minute we weren't going to tape it, but they taped it because they thought it might be, in Mr. Holtz' suggestion at the end, that people introduce themselves was something I had not thought of, but which proved to be a very good recommendation. It gave everybody a flavor for the human capital in the room during that meeting. We will make ______.

I am now open to questions.

[Kirk] I've been talking with Craig and I think it's highly imperative the company make a commitment to form an IRPR firm and I think we're on the right track there [[161]] ______ small-cap NASDAQ company that might make an exception for Presidion based on relationships. Are you going to use Kirkpatrick Lockhart to convert this public vehicle into a BDC? What I would like to do is, there are some very specialized security firms that could attempt to do it.

[Frank] James Sadrianna, I anticipate will come on as Chief Operating Officer for Nexia on June 6, he is an expert in BDCs now, he wouldn't try to convert it himself, but I will certainly have him call you, Kirk, and talk about who should handle that process. I don't know how complicated it is and it's outside my expertise. I do know he knows because he's been CFO for ______ now and they've all been clean, _____ may escape scrutiny the BDCs tend to get. [[168]] ______ notes and have somebody who is at least reasonably familiar with the field and interview a law firm and find out who the experts are to make the conversion.

[____] There may be a lot of people in this room who now all about what BDCs are ... I have to confess that _____ 20 years as a lawyer, ________________ BDC operations acquire an entity without holding an entity for two years, extend it out as a separate public company. ______ Electron ______ ______, first company I've heard of that _____________ five years ___________

[Frank] It does something else though, it allows us to mark the stock to market. If we buy this at $800K _____ Perpetual Benefits Solution's subsidiary ... A privately-held company ... as soon as we have it reappraised, the stock on Presidion's books will not go to the new value. No income tax _____ recognized but not realized gain on the transaction so the multiples are there, but we are able to accelerate the value to the future ...

[Question] What's the treatment of the increase in value, is that treated as book income over the amount of the purchase of the tax? [Frank] Capital gains. [Question] So it's treated as capital-gain income on the books, but not recognized for tax purposes until [[182]] ______. So a BDC is a post-section of series of laws in IRSD that are _____ based on _____ control_____ businesses _______.

[Frank] Our purpose is really , it was more than anything else, create a holding company, because what we want to do is, we have a certain issue that will need to be addressed in the next few months. The IRS is going to be watching us very closely, key management in place, although we had a big problem last year. _____ got out there's a way that nobody foresaw, so one of the elements is that this gives us a checks-and-balances and makes sure the tax deposits are paid. I can tell that we're 17 weeks in a row right on the money. Craig had to do a whole bunch of juggling to make that happen.

042105.1

And that's very helpful in getting a corporate case closed. If we were behind this quarter, the IRS [? - you mean tax payments?] tax payments are on the money right now. This, however, will give the IRS officers who can't conceive of the magnitudes in number, they've created a step-unit in Miami to handle Amodeo cases at the moment, which the largest one ______. Even that special unit is a little leery of this transaction. They made us go out and get a post office box in a particular jurisdiction so that all the cases will automatically be assigned there from now on.

[?] When you build credibility with that group and you prove to them you do what you say you're going to do, it makes it so much easier on the next _____. .... North Korea ...

What this allows us to do is to keep same management ________, there's a whole new tier of responsible officers down here at the subsidiary level who have to make those deposits or they are personally liable. So you don't have to worry that we have somehow left these individuals who might choose to backslide from their recent rehabilitation. And that's an incidental benefit to the structure.

The other thing is that all state laws are different and all insurance companies are state-by-state, it is a much easier process to pave all the rules to a particular set of legal infrastructure.

[Karl Leo to Frank] Are you an officer of, obviously you don't have a _____, are you personally an officer of Presidion?

[Frank] No, right now I am President of Sunshine as scary as that may be.

[Karl Leo] In your tax strategy, if you don't mind me asking a question or two, when you convert the business firm, there were active books [204] ____________, in that quarter and you lose that business to the new entity, what is the IRS' inquiry about that?

[Frank] Standard trade practice. At the end of each year, CEOs typically move companies among siblings because contracts are terminable on 30-day notice or at will, and it is generally considered to be unemployment tax shopping ________. At it not been standard practice, it would have potentially been _______, but because it was standard practice, contracts were terminable on relatively short notice ... no way to recover the transaction.

[Karl] Do you view it as a practice to transfer all the ______?

[Frank] Oh yes, absolutely, that is the standard practice in the industry. Everybody does it all the time.

[Karl] Was the tax rate at the shell's ____ transfer ____?

[Frank] Yes, much better. Million dollar savings by moving the business to PBS.

[Karl] You chose [209] _______

_____________ it's a transfer to a superior shell _______ or entity ...

[Frank] And it was newly purchased one, too, so it was an even better event.

[Karl] What happened to the shell ______, ____ I won't call it a shell, _______ ... on the Paradigm entities that came from Hendricks, how do they feature into the tax strategy, if at all, they may not have been affected at all by ____.

[Frank] I think, Paradigm was pretty much _____ because we didn't have to adjust it.

[?] ... there are four Paradigm-related entities?

[?] Just one,

[?] PBS, ADS is the parent, and one subsidiary, which is the Paradigm

[?][216] _____________ out of Florida business

[?] How many worksite employees does that entity have?

[?] 1,900.

[Karl] Could you elaborate, Frank, at least for my benefit on the insurance sources that you are bringing online and how that's going to affect the Presidion ______?

[Frank] We have, for sometime we really began to deal with Presidion we had been in the process of acquiring insurance companies, we have a patented IT that I'll be glad to talk to about in a second but it really relatively unique. We couldn't get through most of the states because it looked like the companies were insuring themselves, and that's just not legal. So we decided instead of fighting that fight, just go buy insurance companies. We had a very old qualified shell because it doesn't have any business, but does have certificates in 11 states, sitting there [225] _____________ group since November. Our problem has been looking for operators, and we recently came across individuals, one of these will be referred by us, that have considerable experience in the industry, including having sat on the Governor's Board for Insurance Fraud the last couple years. And we have entered into an agreement with him to operate our insurance company. Today they are able to pretty much convince us that they would be able to get within nine weeks through the Department of Insurance the right to have a single-customer book of business, this being Presidion. They would be on the right Presidion-only business of that book. We hope to expand that obviously beyond the Presidion, but that's quite an accomplishment even to get the Regulators to say grace over the terms of the idea.

[Karl] What kind of statutory capital would this business have or if not sufficient, what kind of capital will it have ___?

[Frank] $8B ... It has $5.5M now, ...

[Karl] $8B ... statutory capital you need, and what premium level will you be _____ for the Presidion business _____?

[?] We'll going to evaluate that and decide how much ____ we initially write. As you know, we currently ___ about, in May _______, in our annual premium we write about $30M worth of premium with First Commercial Insurance Company today. And then we also write about another $1M worth of annual premium with Providence Casualty Company. It had been essential that the difference is, without boring everybody, the large book sort of stuff is with First Commercial and then all of our non-______ stuff is with Providence. Very feasibly we will probably, this hasn't been determined final, but what will we'll probably do is look to move a substantial amount of the Florida premium base, probably somewhere in the area of 50-60% of that annual premium to the carrier initially. And what that does is it benefits the company in that it allows, we have stacked up collateral and capital at First Commercial, they have [238] guaranteed to run out of that exposure, and then what we'll need to do is start building some with the new carrier. This will allow a smoother

transition. We'll actually look to reduce our collateral requirements with First Commercial by moving some of that exposure and hopefully shift some of that capital requirements away from First Commercial to the new carrier.

[?][240] _______

[?] The actual studies .... What I'm implying is that by reducing the future obligations, by reducing the book essentially we're going to bleed out the future obligations of that fail, and as that comes down, you're going to reduce your collateral requirements for the period.

[?] So you don't see that immediate need ....

[?] We'll start seeing that within the first 12 months, but the goal is you don't want to put the burden of the entire $30M _____ and strain them and at the same time have requirements with First Commercial so they're _____ dual hit.

[?] If the collateral is now furnished to support the First Commercial program still the letters of credit we know about for ...

[?] Largely the collateral of First Commercial is cash, which has been a long history, that's been converted to mostly cash, so that you have several million dollars of collateral on hand at First Commercial.

[Frank?] If that is one of our perspectives in terms, would the investment model change? If we're going to invest in cash, [248] we now realize the better place to invest in the insurance company as opposed to the operating entity, and the operating entities should be cash, should be self-sustaining cash-flow wise except for the fact that it would be ingrained in Presidion's case because of the short amortization of the acquisitions and not because of the heightened cash collateral requirements of the insurance.

[Frank?] We have over $5M _____ of the insurance companies, you have a right to _________ $20M _______.

_______ [Frank] _______ we are comfortable with the unseasoned carrier.

[Karl ?] _____ Would the insurance company controlled by, how would that be ...?

[Frank] The insurance company is owned by Mirabilis and there will be some outside shareholders. One of the things we will do is because we preferred to have all our partners interest alike, we will probably give to some of the members of this table an interest in Mirabilis preferred and give them an option to acquire more. This way the network works, everybody wins, and it also gives everybody an incentive to keep sending business to them. So, that their proposal has been completed and this evening we meet with officers and should be able to make it official. The pace for the last couple days has caused us to cancel the meeting so _____ alienating people too much _____. But we would like to see all the primary Presidion shareholders become equity holders in Mirabilis at the same time with no charge to them. There is a way in which the value gets created for that, and I'll show you in the formula. But it is [259] _____, there's no money out-of-pocket; it does, however, make sure you know that if the insurance companies work or if we ask Presidion to set up a sinking fund to support our investment and it brings a whole bunch of employees, you [260] _______. Let me explain that, that's one of the very important elements to us.

042105.1

[?] ______________

[Frank] We've given out some of the Mirabilis notebooks to some of the individuals ... if some of you didn't get it, let me give it to you. The chart will be helpful in explaining what takes place. The Hayes Development deal is the best example. We spent a lot of time and money building an optimization model. What happened in Hayes Development is the following: [265] We're going to invest $800K in equity in this condominium conversion project, the hot thing in Florida. In the first year, we generate $4.1M in profit to our subsidiaries or our affiliates because of that $800K investment. Presidion is going to get all the employees, Beacon is going to write the _______, _____ is going to act as the general contractor, we make a whole bunch of money, not even including what the return on investment for the project is.

What we require of our affiliates is to create a sinking fund on that original investment. So in this case, we would probably go to everybody and say, "Look, we want you to take an interest in your growth process and put them away until the aggregated gross profits of equally under $1K. This way, if the real estate project fails, we have a principal guaranty in place to the main fund to repay it; if the project succeeds, everybody takes the profit, it's just ______. But it's easy business, there is no need to go out and market or sell it as long as you can give your partner a better price, little bit so they don't think you're taking advantage of the relationship, you've got the business. It's a last look to right of first refusal.

And we just have a whole bunch of companies now that will be doing that. We need Presidion to participate. The other arrangement that is coming up that's very important to us is ______ analyst's tale, is we develop relationships with some temporary CFO firms, they are sitting out there right now in companies that can't afford to pay the consultants to do the work. So what we want to do is we want to finance that consulting service. One of these companies of 896 employees, and they don't want to pay this guy $12,000 a month to do the consulting. It is _____ Parkers. So we've agreed that if they switch their employees in Presidion, we'll pay the $12,000 a month. Plus, we're going to pay a whole bunch of other tidbits that come with it. We have agreed in Galaxy Nutritional Foods, that are public and would like to go private, they use the investment bank of our choice we're about to buy into, and they switch their employees over to Presidion, we'll let them pay the investment banking fees and arrears ______. But we are probably going to have $8-10K in real costs in that, and we would expect Presidion, being the beneficiary affiliate, would set aside that money out of the proceeds that it otherwise would not have gotten to pay for those services.

That's why Presidion is important to us, because every company has people, people are recurring regular costs, and so we can provide lots of other services as long as there's no deferred charge, as long as they use our staffing company, and we make that cash flow [282] _______. And that's really the core of the model. And that's why we needed Presidion to cooperate and that's why I needed everybody here so I can tell you that, because we are going to benefit Presidion, and we're going to make Presidion much more profitable and much larger for considerably less cost than any of the competitors out there. I assure you there's nobody out there with the scope of interest that we have, and there's nobody in the world using the model but us.

We've also, if we come out of here as a united front, I met with the Oasis' owners, HIG, pretty decent fund out of Palm Beach a couple weeks ago. There are very much in this business only for making dollars. They do not like public entities, they do not want to be a public entity, they would love to be able to sell Oasis to us for something about 50% above the private multiple, which they believe is 4 times operating cash flow right now, although the public multiples are 16. They said if we were NASDAQ quality, that they would probably be able to do a complete stock exchange, no cash. They

have a wonderful plan. There will be a whole bunch of people who then follow suit if we get there faster, we just have to be united to get there faster.

[Fred?] I haven't talked to many people, but who I've talked to recently are very impressed with the way _____ direction it's going, and the _____ and services have improved.

[?] muffled conversation

[Frank] The other thing is only the _____ independent brokers, [???] ________, you remember Mike Barbee at all? Mike Barbee once had a website ________ that would allow people to submit their employees and he was bidding them out to different PEOs, it was awhile back, he has 5,000 feet on the street from Moms & Pops who would like to go, I was very much expecting that if would have been here, he would have started it to talk to you. There are a couple other people that he knows I want to _____ from another company, but until we were ready, it wasn't time to do it yet. We want to start circulating among these independent reps _________. ___________ has laid over as a master deal for us now. If we are successful, we'll just bring in a whole bunch of independent brokers under that deal. This was an _____ asking Presidion _____ and Presidion can screen them out more discretely. But that deal would cover paying lifetime commissions, people bring _____, and we have a big advantage coming because our benefits program is something dramatically different than anything anybody else has seen.

Here's what we expect to do, first of all let me tell you about the basic benefits. When people become a Presidion employee, here in the next few months or currently, we're going to give them a cell phone with 250 free minutes (we hope they use more than 250 because then we start to make a profit). That 250 we also gather a tremendous amount of information from those phone users, we expect the data will be worth more money than our calls from the cell phones.

Second year, we are going to buy a chain of jewelry stores and we're going to give a $500 gift certificate so the employee of Presidion can go to the _____ jewelry store and buy jewelry and use it as cash. We again hope they'll spend more than $500 so we make a profit, but they don't have to. And if they aren't near one of the seven stores, they can call them up on the website and order over the Internet.

The third year, you get a $2K vacation.

The fourth year they can go one of our seven automobile dealerships and buy a new automobile. Negotiate the best price you can on whatever lines we carry, then call up the dealership, turn in your certificate that you're a three-year employee and get $3,000 off.

Next comes the home. Of course, you have to use our construction company, but if you want to build a new home, we're going to give you $15-20K as a down payment, Countrywide Mortgage will accept it as a down payment, and we'll build you a new home.

In year ten, you get $25K off a franchise fee and $100K investment in your franchise if you or some member of your family wants to go independent. We are going to lock the employees in like we are a gift ?. This also locks their employers in. It's going to be real hard to go to your employees and say "Going to get a new employer next, we're going to switch PEOs next month," and they're going to say "Well, what about the diamond ring I'm buying for my spouse." I have had construction workers and that will be a big deal to them, it will be very hard to switch.