042105.1

In addition to that, we have an agreement with AFLAC that is unique. AFLAC will agree to subrogate the payments of its employees the benefits to our insurance carriers at coordinating costs, so that we are now going to be able to recover this large deductible range, good chunk of those are under $2,500 in claims. If they have an accident or injury regardless of whether it's on the job, we're going to get reimbursed up to 2,500 br_____ on all those claims. We're going to be able to provide health and Worker's Comp in a much more profitable way than anybody else in the industry. I have the numbers. Health care for one person $250; health care plus one $500, health care for family $750. Best range in the State.

So we are ready to commence that. This meeting has gone well, the Board of Directors is taking the steps, our patent attorneys have already done the filings, we'll commence the insurance program we hope by June. Presidion can now offer health insurance that nobody else can't compete, they just can't compete. That's the change, this is where it's going for us.

There is one other issue that has to do with the medical. Health and the premiums add to the employees _____. People who bring to us the company that takes the health and dental package, which something ABC needs to do, and Mercator needs to think about, and everybody here needs to think about ... the commission structure is designed that they get 2/3 of 1% of the gross payroll of all their employees. When I first did this, one of my CPA friends brought me, in a prior company, a client of his who had about 800 sanitation workers in Minneapolis, [§20] Exhale Environmental, _____, he suddenly realized that his commission which was 1% full _________ was doing, was far more money than he could ever hope to make as a CPA, and as long as he kept getting this commission from me, the 12 years he spent _____ Barnett Bank and not making any money as a CPA would be made up in the _____ blink of an eye and his commission would be his retirement. That what he ______.

_______ independent brokers by July, selling Mirabilis services and the services of all our subsidiaries and I __________ that they know how to sell, ______ a year. We failed twice _____. I tried to recreate my __________ out of a trailer for about 15 minutes a day, but we own the construction company and the staffing company. So they will be up in Georgia working on ____ 10 minutes and making a ton of money, and twice in the last year I failed to do it and that's when Presidion came stumbling across my path and I realized to stop rebuilding the wheel, these guys were there and just had to get them out of the ditch.

If there are no other issues, oh, go ahead Jim ...

[Jim] Just make the legal disclaimer now that I'm not a lawyer, ______, thank you all for coming, but obviously the information presented here is tentative and not definitive, and includes forward-looking statements as to what may or may not come to fruition in the future; is confidential and propriety information, and all of you should not sell or buy or have anyone on your behalf buy or sell in Presidion corporation stock based upon very general information provided here to you. The material that was provided to you is also confidential information for your use during this meeting and I suggest you return that to us, and that would also go a long ways in helping everybody here make sure that this stays internal.

[?] Any there any planned announcements of what we've discussed in this room?

[?] _____ disclaimers _____

[?] Press releases will probably be issued as these deals become more definitive. We will be issuing a 10-K, some of the information will be in there. As a general rule, within 2-3 business days after that

042105.1

information is made public, our insider trade policy provides that that is legally a sufficient amount of time for the marketplace to digest and simulate the information. As far as anything concerning tentative plans with particular clients, those are the things, press releases will be issued as soon as those are absolutely definitive, I guess, and actually, as soon as those press releases are issued, then ...

[?] I just wanted to make sure everybody understood that the time frames being able to do anything ...

[?] None of this should come to fruition yet.

[?] Right, this is just general and forward-looking information.

[?] We will absolutely keep you advised along with the general public. We post our press releases on our webpage immediately as they are listed, so I advise everybody to go and you can actually sign up in our Investor Relations webpage and you can be notified right on your Blackberry or computer the minute we make any FCC filings.

[?] [540] tell 10 friends _______

[?] Just want to make sure everybody's on board with these are all forward-looking statements and please do not buy or sell or trade, hypothecate on this information.

[numerous comments on hypothecate]

[Frank] Along the lines, the Board of Directors need to have a formal meeting to address some issues that begin to move us through this task, because frankly it is one of the circumstances where we are holding ___ of cards and that with a reasonably large stake and we're going to stop right now until we know the company is going forward. And, we have to make a decision to proceed with Presidion as the prime [546] _____ health flagship between now and next week. And that next week we going to ___ the flagship and ____ case we'll close our file on it and we will proceed to do something else. We don't have a reason to that. I don't _____ Board of Directors what I'm actually doing. ___ I'll let you guys meet and if you gentlemen would like to come upstairs and chat for moment ...

[?] Would the relationship between Mirabilis and Presidion be an AK event?

[?] We weren't exposed to all the actual transactions that have occurred, ... ________ ... right now you haven't filed any ____

[Frank] While everybody is here, I will make sure that I issue a letter to you by next Friday that tells where everything has gone _______ or not and we'll give the directions for Nexia and Mirabilis' position ____. With that I thank you all for coming. In September we hope to make a very special event with certain _______

Meeting ended

042105.1

Presidion Meeting - 04/21/2005

ATTENDEES

| | |
|---|---|
| Lynda Goudreau | AQMI Strategy |
| Todd Buchl | Anfinity Capital |
| Karl Leo | Hendricks |
| Robert Gaines | BGaines@Strato.NET |
| Lauren Gaines | |
| Patrick McGee | |
| Kurt Benjamin | MAG Capital |
| Mick Musial | |
| Yann Amar | |
| Larry Childers | |
| Larry Haber | Nexia |
| Fred J. Sandlin | |
| Woody Johnson | Nexia |
| Richard Berman | Counsel for [illegible] |
| Ron Pollack | |
| Jim BAIERS | PRESIDION |
| CRAIG VANDERBURG | PRESIDION |

# AFFIDAVIT OF DANIEL L. MYERS

STATE OF FLORIDA )
COUNTY OF ORANGE )

On this day, appeared before me, the undersigned, duly authorized to administer oaths and take acknowledgements, Daniel L. Myers, after being duly sworn, deposes and says as follows:

1. My name is Daniel L. Myers. I am over the age of 18 and of sound mind. I am familiar with, and have personal knowledge of, certain facts and circumstances surrounding Attorney Richard Berman's representation of Frank L. Amodeo, and Attorney Berman's involvement in the Sunshine Companies Plan and Presidion (PBS) Plan.

2. I have been a Certified Public Accountant since 2002.

3. Mr. Amodeo initially retained me in 2004 to assist with the Sunshine Companies Plan and, subsequently, the Presidion (PBS) Plan.

4. I first met Attorney Berman in 2004. He had been Mr. Amodeo's attorney for several years and continued to act as his primary legal advisor through the end of 2006.

5. Beginning in 2004 and continuing through 2006, I met with the Internal Revenue Service ("IRS") on numerous occasions to discuss matters related to the Sunshine Companies Plan and Presidion (PBS) Plan, particularly the nonpayment of payroll taxes.

6. Attorney Berman was made aware of all matters discussed during my meetings with the IRS, including the nonpayment of payroll taxes.

7. Additionally, throughout 2005 and 2006, Attorney Berman was present in numerous meetings where the Presidion (PBS) Plan was discussed and documented.

ALL-STATE LEGAL EXHIBIT 5

8. The Presidion (PBS) Plan was a strategy to resolve various problems encountered by the Professional Employer Organizations ("PEO") whereby the payroll taxes would be used to fund certain transactions and immediate obligations such as healthcare insurance and worker's compensation insurance. The plan was to use the payroll taxes to get the company stable and once that occurred, the company would then be taken public or sold to another publicly traded entity. The proceeds would then be used to pay off any and all existing tax liability.

9. In or about December of 2005, there was a meeting with all key advisors in Mr. Amodeo's office in which the Presidion (PBS) Plan was discussed and presented by Mr. Amodeo. Specifically, Mr. Amodeo discussed how the payroll tax liability of the Presidion PEOs had increased by approximately $60 million during 2005 in order to pay Presidion's primary creditors (i.e. the workers compensation insurance, secured creditors, etc.). Attorney Berman was present at this meeting. During the entire length of the meeting, as well as subsequent to that meeting, at no time did Attorney Berman express surprise or concern as to the legality of the Presidion (PBS) Plan.

10. After this meeting, Attorney Berman became an officer and director of Mirabilis, the primary recipient of the unpaid payroll taxes of Presidion (PBS) during 2006.

11. On July 20, 2006, Mr. Amodeo, Sharmilla Khanokar (a CPA employed by Rachlin Cohen & Holtz), and I met with Attorney Berman in his firm's Ft. Lauderdale, Florida office to complete preparation of our presentation to the IRS.

12. After meeting with the IRS representatives to discuss a potential final resolution and compromise of the unpaid payroll taxes of Presidion (PBS), we again met with Attorney Berman to discuss the outcome of the meeting.

13. During the two (2) years I worked with Attorney Berman, he never inform ne that the Presidion (PBS) Plan, which included the nonpayment of payroll taxes, could result in personal criminal liability.

FURTHER AFFIANT SAYETH NOT.

Daniel L. Myers

SWORN TO AND SUBSCRIBED before me on the 17th day of August ______, 2009 to certify which witness my hand and seal of office.

Notary Public in and for the State of Florida

Produced as identification Florida Driver's License M-620-172-70-064-0

NOTARY PUBLIC STATE OF FLORIDA
SUSAN R. SCHEIB
MY COMMISSION # DD 594569
EXPIRES: October 8, 2010
Bonded Thru Budget Notary Services

# AFFIDAVIT OF YANIV AMAR

STATE OF FLORIDA )
COUNTY OF DADE )

On this day, appeared before me, the undersigned, duly authorized to administer oaths and take acknowledgements, Yaniv Amar who, after being duly sworn, deposes and says as follows:

1. My name is Yaniv Amar. I am over the age of 18 and of sound mind. I am familiar with, and have personal knowledge of, certain facts and circumstances surrounding Attorney Richard Berman's representation of Frank L. Amodeo, and Attorney Berman's involvement in the Sunshine Companies Plan and Presidion (PBS) Plan, as those plans are further described in Amodeo v. Richard Berman, et al., 9th Judicial Circuit Court Case No.: 2008-CA-31330-0.

2. I have known Frank Amodeo since approximately 1999 when I was introduced to him through a mutual friend.

3. I first met Attorney Berman in 2004. He represented Mr. Amodeo at the time and continued to act as his primary legal advisor through the end of 2006.

4. Attorney Berman was retained to assist with the Sunshine Companies Plan, which I had no involvement with, and the Presidion (PBS) Plan.

5. Throughout 2006, Attorney Berman was present in numerous meetings where the Presidion (PBS) Plan was discussed and documented.

6. In late-2005, I was tasked by Mr. Amodeo to provide recommendations as to cost-cutting measures to be implemented at Presidion.



ALL-STATE LEGAL® EXHIBIT 6

7. During the first six (6) months of 2006, I was employed as a consultant tasked to assist with the transition of Presidion's PEO business to AEM, Inc.

8. There were numerous problems during this transition.

9. However, on numerous occasions throughout 2006, I was reassured by Attorney Berman that everything was going fine with Mirabilis and the PEOs.

10. Particularly, in or about July of 2006, I met with Attorney Berman and Mr. Amodeo in Attorney Berman's offices in Ft. Lauderdale. Attorney Berman invited me to the office to await the outcome of Mr. Amodeo's meeting with the IRS. Attorney Berman and I went to meet Mr. Amodeo, his accountants, and others for dinner. My understanding of the meeting was that the taxpayer was to become current on a going forward basis and pay 600K a month towards the past debt. Attorney Berman again reassured me that everything was fine and informed me that I should not have relinquished my interests in Mirabilis when I resigned in June of 2006.

11. Additionally, on or about October 5th, 2006, Mr. Amodeo, Daniel Myers and Attorney Berman interviewed tax controversy attorneys in Attorney Berman's office in Ft. Lauderdale. Prior to the scheduled meetings, Attorney Berman invited me to join the meetings. He thought it might give me some long overdue comfort that everything was fine between the various companies and the IRS. I was again reassured by Attorney Berman that everything was in order with the unpaid tax debt.

FURTHER AFFIANT SAYETH NOT.

Yaniv Amar

SWORN TO AND SUBSCRIBED before me on the 3 day of September ______, 2009 to certify which witness my hand and seal of office.

JASON SAKA
NOTARY PUBLIC - STATE OF FLORIDA
COMMISSION # DD555259
EXPIRES 8/27/2010
BONDED THRU 1-888-NOTARY1

______________________________
Notary Public in and for the State of Florida

## Lawyer Regulation

**Rules Regulating The Florida Bar**

**4 RULES OF PROFESSIONAL CONDUCT**
**4 PREAMBLE**

# *4 PREAMBLE - A LAWYER'S RESPONSIBILITIES*

## PREAMBLE: A LAWYER'S RESPONSIBILITIES

A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice.

As a representative of clients, a lawyer performs various functions. As an adviser, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system. As a negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealing with others. As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others.

In addition to these representational functions, a lawyer may serve as a third-party neutral, a nonrepresentational role helping the parties to resolve a dispute or other matter. Some of these rules apply directly to lawyers who are or have served as third-party neutrals. See, e.g., rules 4-1.12 and 4-2.4. In addition, there are rules that apply to lawyers who are not active in the practice of law or to practicing lawyers even when they are acting in a nonprofessional capacity. For example, a lawyer who commits fraud in the conduct of a business is subject to discipline for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. See rule 4-8.4.

EXHIBIT
ALL-STATE LEGAL
7

In all professional functions a lawyer should be competent, prompt, and diligent. A lawyer should maintain communication

Exhibit 2

© 2005 The Florida Bar

with a client concerning the representation. A lawyer should keep in confidence information relating to representation of a client except so far as disclosure is required or permitted by the Rules of Professional Conduct or by law.

A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

As a public citizen, a lawyer should seek improvement of the law, access to the legal system, the administration of justice, and the quality of service rendered by the legal profession. As a member of a learned profession, a lawyer should cultivate knowledge of the law beyond its use for clients, employ that knowledge in reform of the law, and work to strengthen legal education. In addition, a lawyer should further the public's understanding of and confidence in the rule of law and the justice system, because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority. A lawyer should be mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance. Therefore, all lawyers should devote professional time and resources and use civic influence to ensure equal access to our system of justice for all those who because of economic or social barriers cannot afford or secure adequate legal counsel. A lawyer should aid the legal profession in pursuing these objectives and should help the bar regulate itself in the public interest.

Many of the lawyer's professional responsibilities are prescribed in the Rules of Professional Conduct and in substantive and

procedural law. A lawyer is also guided by personal conscience and the approbation of professional peers. A lawyer should strive to attain the highest level of skill, to improve the law and the legal profession, and to exemplify the legal profession's ideals of public service.

A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Zealous advocacy is not inconsistent with justice. Moreover, unless violations of law or injury to another or another's property is involved, preserving client confidences ordinarily serves the public interest because people are more likely to seek legal advice, and thereby heed their legal obligations, when they know their communications will be private.

In the practice of law conflicting responsibilities are often encountered. Difficult ethical problems may arise from a conflict between a lawyer's responsibility to a client and the lawyer's own sense of personal honor, including obligations to society and the legal profession. The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the rules. These principles include the lawyer's obligation to protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Lawyers are officers of the court and they are responsible to the judiciary for the propriety of their professional activities. Within that context, the legal profession has been granted powers of self-government. Self-regulation helps maintain the legal profession's independence from undue government domination. An independent legal profession is an important force in preserving government under law, for abuse of legal authority is more readily

challenged by a profession whose members are not dependent on the executive and legislative branches of government for the right to practice. Supervision by an independent judiciary, and conformity with the rules the judiciary adopts for the profession, assures both independence and responsibility.

Thus, every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest that it serves.

**Scope:**

The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself. Some of the rules are imperatives, cast in the terms of "shall" or "shall not." These define proper conduct for purposes of professional discipline. Others, generally cast in the term "may," are permissive and define areas under the rules in which the lawyer has discretion to exercise professional judgment. No disciplinary action should be taken when the lawyer chooses not to act or acts within the bounds of such discretion. Other rules define the nature of relationships between the lawyer and others. The rules are thus partly obligatory and disciplinary and partly constitutive and descriptive in that they define a lawyer's professional role.

The comment accompanying each rule explains and illustrates the meaning and purpose of the rule. The comments are intended only as guides to interpretation, whereas the text of each rule is authoritative. Thus, comments, even when they use the term "should," do not add obligations to the rules but merely provide guidance for practicing in compliance with the rules.

The rules presuppose a larger legal context shaping the lawyer's role. That context includes court rules and statutes relating to matters of licensure, laws defining specific obligations of lawyers,

and substantive and procedural law in general. Compliance with the rules, as with all law in an open society, depends primarily upon understanding and voluntary compliance, secondarily upon reinforcement by peer and public opinion, and finally, when necessary, upon enforcement through disciplinary proceedings. The rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules. The rules simply provide a framework for the ethical practice of law. The comments are sometimes used to alert lawyers to their responsibilities under other law.

Furthermore, for purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these rules determine whether a client-lawyer relationship exists. Most of the duties flowing from the client-lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so. But there are some duties, such as that of confidentiality under rule 4-1.6, which attach when the lawyer agrees to consider whether a client-lawyer relationship shall be established. See rule 4-1.18. Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact.

Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process. The rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances as they existed at the time of the conduct in question in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation. Moreover, the rules presuppose that whether discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors, and whether there have been previous violations.

Violation of a rule should not itself give rise to a cause of action

against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty. Nevertheless, since the rules do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of a breach of the applicable standard of conduct.

**Terminology:**

"Belief" or "believes" denotes that the person involved actually supposed the fact in question to be true. A person's belief may be inferred from circumstances.

"Consult" or "consultation" denotes communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question.

"Confirmed in writing," when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent. See "informed consent" below. If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.

"Firm" or "law firm" denotes a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship, or other association authorized to practice law; or lawyers employed in the legal department of a corporation or other organization.

"Fraud" or "fraudulent" denotes conduct having a purpose to deceive and not merely negligent misrepresentation or failure to apprise another of relevant information.

"Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

"Knowingly," "known," or "knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.

"Lawyer" denotes a person who is a member of The Florida Bar or otherwise authorized to practice in any court of the State of Florida.

"Partner" denotes a member of a partnership and a shareholder in a law firm organized as a professional corporation, or a member of an association authorized to practice law.

"Reasonable" or "reasonably" when used in relation to conduct by a lawyer denotes the conduct of a reasonably prudent and competent lawyer.

"Reasonable belief" or "reasonably believes" when used in reference to a lawyer denotes that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.

"Reasonably should know" when used in reference to a lawyer denotes that a lawyer of reasonable prudence and competence would ascertain the matter in question.

"Screened" denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these rules or other law.

"Substantial" when used in reference to degree or extent denotes a material matter of clear and weighty importance.

"Tribunal" denotes a court, an arbitrator in a binding arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency, or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a binding legal judgment directly affecting a party's interests in a particular matter.

"Writing" or "written" denotes a tangible or electronic record of a communication or representation, including handwriting, typewriting, printing, photostating, photography, audio or video recording, and e-mail. A "signed" writing includes an electronic sound, symbol or process attached to or logically associated with a writing and executed or adopted by a person with the intent to sign the writing.

## Comment

### Confirmed in writing

If it is not feasible to obtain or transmit a written confirmation at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. If a lawyer has obtained a client's informed consent, the lawyer may act in reliance on that consent so long as it is confirmed in writing within a reasonable time thereafter.

### Firm

Whether 2 or more lawyers constitute a firm above can depend on the specific facts. For example, 2 practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve. Furthermore, it is relevant in doubtful cases to consider the underlying purpose of the rule that is involved. A group of lawyers could be regarded as a firm for purposes of the rule that the same lawyer should not represent opposing parties in litigation, while it might not be so regarded for purposes of the rule that information acquired by 1 lawyer is attributed to another.

With respect to the law department of an organization, including the government, there is ordinarily no question that the members of the department constitute a firm within the meaning of the Rules of Professional Conduct. There can be uncertainty, however, as to the identity of the client. For example, it may not be clear whether the law department of a corporation represents a subsidiary or an affiliated corporation, as well as the corporation by which the members of the department are directly employed. A similar question can arise concerning an unincorporated association and its local affiliates.

Similar questions can also arise with respect to lawyers in legal aid and legal services organizations. Depending upon the structure of the organization, the entire organization or different components of it may constitute a firm or firms for purposes of these rules.

**Fraud**

When used in these rules, the terms "fraud" or "fraudulent" refer to conduct that has a purpose to deceive. This does not include

merely negligent misrepresentation or negligent failure to apprise another of relevant information. For purposes of these rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform.

**Informed consent**

Many of the Rules of Professional Conduct require the lawyer to obtain the informed consent of a client or other person (e.g., a former client or, under certain circumstances, a prospective client) before accepting or continuing representation or pursuing a course of conduct. See, e.g., rules 4-1.2(c), 4-1.6(a), 4-1.7(b), and 4-1.18. The communication necessary to obtain such consent will vary according to the rule involved and the circumstances giving rise to the need to obtain informed consent. The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives. In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel. A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid. In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and generally a client or other person who is independently

represented by other counsel in giving the consent should be assumed to have given informed consent.

Obtaining informed consent will usually require an affirmative response by the client or other person. In general, a lawyer may not assume consent from a client's or other person's silence. Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter. A number of rules state that a person's consent be confirmed in writing. See, e.g., rule 4-1.7(b). For a definition of "writing" and "confirmed in writing," see terminology above. Other rules require that a client's consent be obtained in a writing signed by the client. See, e.g., rule 4-1.8(a). For a definition of "signed," see terminology above.

**Screened**

This definition applies to situations where screening of a personally disqualified lawyer is permitted to remove imputation of a conflict of interest under rules 4-1.11, 4-1.12, or 4-1.18.

The purpose of screening is to assure the affected parties that confidential information known by the personally disqualified lawyer remains protected. The personally disqualified lawyer should acknowledge the obligation not to communicate with any of the other lawyers in the firm with respect to the matter. Similarly, other lawyers in the firm who are working on the matter should be informed that the screening is in place and that they may not communicate with the personally disqualified lawyer with respect to the matter. Additional screening measures that are appropriate for the particular matter will depend on the circumstances. To implement, reinforce, and remind all affected lawyers of the presence of the screening, it may be appropriate for the firm to undertake such procedures as a written undertaking by the screened lawyer to avoid any communication with other firm personnel and any contact with any firm files or other materials relating to the matter, written notice and instructions to all other firm personnel forbidding any communication with the screened

lawyer relating to the matter, denial of access by the screened lawyer to firm files or other materials relating to the matter, and periodic reminders of the screen to the screened lawyer and all other firm personnel.

In order to be effective, screening measures must be implemented as soon as practicable after a lawyer or law firm knows or reasonably should know that there is a need for screening.

[Revised: 05/22/2006 ]

# Lawyer Regulation

## Rules Regulating The Florida Bar

4 RULES OF PROFESSIONAL CONDUCT
4-1 CLIENT-LAWYER RELATIONSHIP

## *RULE 4-1.1 COMPETENCE*

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

### Comment

#### Legal knowledge and skill

In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.

A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be

© 2005 The Florida Bar

provided through the association of a lawyer of established competence in the field in question.

In an emergency a lawyer may give advice or assistance in a matter in which the lawyer does not have the skill ordinarily required where referral to or consultation or association with another lawyer would be impractical. Even in an emergency, however, assistance should be limited to that reasonably necessary in the circumstances, for ill-considered action under emergency conditions can jeopardize the client's interest.

A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation. This applies as well to a lawyer who is appointed as counsel for an unrepresented person. See also rule 4-6.2.

**Thoroughness and preparation**

Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence. The lawyer should consult with the client about the degree of thoroughness and the level of preparation required as well as the estimated costs involved under the circumstances.

**Maintaining competence**

To maintain the requisite knowledge and skill, a lawyer should keep abreast of changes in the law and its practice, engage in continuing study and education, and comply with all continuing legal education requirements to which the lawyer is subject.

[Revised: 05/22/2006 ]

## Lawyer Regulation

### Rules Regulating The Florida Bar

4 RULES OF PROFESSIONAL CONDUCT
4-1 CLIENT-LAWYER RELATIONSHIP

# *RULE 4-1.2 OBJECTIVES AND SCOPE OF REPRESENTATION*

**(a) Lawyer to Abide by Client's Decisions.** Subject to subdivisions (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation, and, as required by rule 4-1.4, shall reasonably consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify.

**(b) No Endorsement of Client's Views or Activities.** A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities.

**(c) Limitation of Objectives and Scope of Representation.** If not prohibited by law or rule, a lawyer and client may agree to limit the objectives or scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent in writing. If the attorney and client agree to limit the scope of the representation, the lawyer shall advise the client regarding applicability of the rule prohibiting communication with a represented person.

**(d) Criminal or Fraudulent Conduct.** A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows or reasonably should know is criminal or fraudulent.

© 2005 The Florida Bar

However, a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of the law.

## Comment

### Allocation of authority between client and lawyer

Subdivision (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. Within those limits, a client also has a right to consult with the lawyer about the means to be used in pursuing those objectives. At the same time, a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so. A clear distinction between objectives and means sometimes cannot be drawn, and in many cases the client-lawyer relationship partakes of a joint undertaking. In questions of means, the lawyer should assume responsibility for technical and legal tactical issues but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected. Law defining the lawyer's scope of authority in litigation varies among jurisdictions. The decisions specified in subdivision (a), such as whether to settle a civil matter, must also be made by the client. See rule 4-1.4(a)(1) for the lawyer's duty to communicate with the client about such decisions. With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client as required by rule 4-1.4(a)(2) and may take such action as is impliedly authorized to carry out the representation.

On occasion, however, a lawyer and a client may disagree about the means to be used to accomplish the client's objectives. The lawyer should consult with the client and seek a mutually acceptable resolution of the disagreement. If such efforts are unavailing and the lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation. See

rule 4-1.16(b)(4). Conversely, the client may resolve the disagreement by discharging the lawyer. See rule 4-1.16(a)(3).

At the outset of a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation. Absent a material change in circumstances and subject to rule 4-1.4, a lawyer may rely on such an advance authorization. The client may, however, revoke such authority at any time.

In a case in which the client appears to be suffering mental disability, the lawyer's duty to abide by the client's decisions is to be guided by reference to rule 4-1.14.

**Independence from client's views or activities**

Legal representation should not be denied to people who are unable to afford legal services or whose cause is controversial or the subject of popular disapproval. By the same token representing a client does not constitute approval of the client's views or activities.

**Agreements limiting scope of representation**

The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. When a lawyer has been retained by an insurer to represent an insured, for example, the representation may be limited to matters related to the insurance coverage. A limited representation may be appropriate because the client has limited objectives for the representation. In addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives. Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent, or which the client regards as financially impractical.

Although this rule affords the lawyer and client substantial

latitude to limit the representation if not prohibited by law or rule, the limitation must be reasonable under the circumstances. If, for example, a client's objective is limited to securing general information about the law the client needs in order to handle a common and typically uncomplicated legal problem, the lawyer and client may agree that the lawyer's services will be limited to a brief consultation. Such a limitation, however, would not be reasonable if the time allotted was not sufficient to yield advice upon which the client could rely. In addition, a lawyer and client may agree that the representation will be limited to providing assistance out of court, including providing advice on the operation of the court system and drafting pleadings and responses. If the lawyer assists a pro se litigant by drafting any document to be submitted to a court, the lawyer is not obligated to sign the document. However, the lawyer must indicate "Prepared with the assistance of counsel" on the document to avoid misleading the court which otherwise might be under the impression that the person, who appears to be proceeding pro se, has received no assistance from a lawyer. If not prohibited by law or rule, a lawyer and client may agree that any in-court representation in a family law proceeding be limited as provided for in Family Law Rule of Procedure 12.040. For example, a lawyer and client may agree that the lawyer will represent the client at a hearing regarding child support and not at the final hearing or in any other hearings. For limited in-court representation in family law proceedings, the attorney shall communicate to the client the specific boundaries and limitations of the representation so that the client is able to give informed consent to the representation.

Regardless of the circumstances, a lawyer providing limited representation forms an attorney-client relationship with the litigant, and owes the client all attendant ethical obligations and duties imposed by the Rules Regulating The Florida Bar, including, but not limited to, duties of competence, communication, confidentiality and avoidance of conflicts of

interest. Although an agreement for limited representation does not exempt a lawyer from the duty to provide competent representation, the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. See rule 4-1.1.

An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and law. For example, the client may not be asked to agree to representation so limited in scope as to violate rule 4-1.1 or to surrender the right to terminate the lawyer's services or the right to settle litigation that the lawyer might wish to continue.

**Criminal, fraudulent, and prohibited transactions**

A lawyer is required to give an honest opinion about the actual consequences that appear likely to result from a client's conduct. The fact that a client uses advice in a course of action that is criminal or fraudulent does not, of itself, make a lawyer a party to the course of action. However, a lawyer may not assist a client in conduct that the lawyer knows or reasonably should know to be criminal or fraudulent. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity.

When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See rule 4-1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of

the fact of withdrawal and to disaffirm any opinion, document, affirmation, or the like. See rule 4-1.1.

Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary.

Subdivision (d) applies whether or not the defrauded party is a party to the transaction. For example, a lawyer must not participate in a transaction to effectuate criminal or fraudulent avoidance of tax liability. Subdivision (d) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise. The last sentence of subdivision (d) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities.

If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law or if the lawyer intends to act contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct. See rule 4-1.4(a)(5).

[Revised: 05/22/2006 ]

# Lawyer Regulation

## Rules Regulating The Florida Bar

4 RULES OF PROFESSIONAL CONDUCT
4-1 CLIENT-LAWYER RELATIONSHIP

## *RULE 4-1.7 CONFLICT OF INTEREST; CURRENT CLIENTS*

**(a) Representing Adverse Interests.** Except as provided in subdivision (b), a lawyer shall not represent a client if:

(1) the representation of 1 client will be directly adverse to another client; or

(2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

**(b)** Notwithstanding the existence of a conflict of interest under subdivision (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing.

**(c) Explanation to Clients.** When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

**(d) Lawyers Related by Blood or Marriage.** A lawyer related to

© 2005 The Florida Bar

another lawyer as parent, child, sibling, or spouse shall not represent a client in a representation directly adverse to a person who the lawyer knows is represented by the other lawyer except upon consent by the client after consultation regarding the relationship.

**(e) Representation of Insureds.** Upon undertaking the representation of an insured client at the expense of the insurer, a lawyer has a duty to ascertain whether the lawyer will be representing both the insurer and the insured as clients, or only the insured, and to inform both the insured and the insurer regarding the scope of the representation. All other Rules Regulating The Florida Bar related to conflicts of interest apply to the representation as they would in any other situation.

## Comment

### Loyalty to a client

Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person, or from the lawyer's own interests. For specific rules regarding certain conflicts of interest, see rule 4-1.8. For former client conflicts of interest, see rule 4-1.9. For conflicts of interest involving prospective clients, see rule 4-1.18. For definitions of "informed consent" and "confirmed in writing," see terminology.

An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation. See rule 4-1.16. Where more than 1 client is involved and the lawyer withdraws because a conflict arises after representation, whether the lawyer may continue to represent any of the clients is determined by rule 4-1.9. As to whether a client-lawyer relationship exists or, having once been established, is continuing, see comment to rule 4-1.3 and scope.

As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client's or another client's interests without the affected client's consent. Subdivision (a)(1) expresses that general rule. Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients. Subdivision (a)(1) applies only when the representation of 1 client would be directly adverse to the other and where the lawyer's responsibilities of loyalty and confidentiality of the other client might be compromised.

Loyalty to a client is also impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Subdivision (a)(2) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.

### Consultation and consent

A client may consent to representation notwithstanding a conflict. However, as indicated in subdivision (a)(1) with respect to representation directly adverse to a client and subdivision (a)(2) with respect to material limitations on representation of a client, when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide

representation on the basis of the client's consent. When more than 1 client is involved, the question of conflict must be resolved as to each client. Moreover, there may be circumstances where it is impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and 1 of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent.

**Lawyer's interests**

The lawyer's own interests should not be permitted to have adverse effect on representation of a client. For example, a lawyer's need for income should not lead the lawyer to undertake matters that cannot be handled competently and at a reasonable fee. See rules 4-1.1 and 4-1.5. If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. A lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed interest.

**Conflicts in litigation**

Subdivision (a)(1) prohibits representation of opposing parties in litigation. Simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by subdivisions (a), (b), and (c). An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party, or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than 1 co-defendant. On the other hand, common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the

requirements of subdivision (c) are met.

Ordinarily, a lawyer may not act as advocate against a client the lawyer represents in some other matter, even if the other matter is wholly unrelated. However, there are circumstances in which a lawyer may act as advocate against a client. For example, a lawyer representing an enterprise with diverse operations may accept employment as an advocate against the enterprise in an unrelated matter if doing so will not adversely affect the lawyer's relationship with the enterprise or conduct of the suit and if both clients consent upon consultation. By the same token, government lawyers in some circumstances may represent government employees in proceedings in which a government agency is the opposing party. The propriety of concurrent representation can depend on the nature of the litigation. For example, a suit charging fraud entails conflict to a degree not involved in a suit for a declaratory judgment concerning statutory interpretation.

A lawyer may represent parties having antagonistic positions on a legal question that has arisen in different cases, unless representation of either client would be adversely affected. Thus, it is ordinarily not improper to assert such positions in cases pending in different trial courts, but it may be improper to do so in cases pending at the same time in an appellate court.

**Interest of person paying for a lawyer's service**

A lawyer may be paid from a source other than the client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty to the client. See rule 4-1.8(f). For example, when an insurer and its insured have conflicting interests in a matter arising from a liability insurance agreement and the insurer is required to provide special counsel for the insured, the arrangement should assure the special counsel's professional independence. So also, when a corporation and its directors or employees are involved in a controversy in which they have conflicting interests, the corporation may provide funds for separate legal representation of the directors or

employees, if the clients consent after consultation and the arrangement ensures the lawyer's professional independence.

**Other conflict situations**

Conflicts of interest in contexts other than litigation sometimes may be difficult to assess. Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that actual conflict will arise, and the likely prejudice to the client from the conflict if it does arise. The question is often one of proximity and degree.

For example, a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other, but common representation is permissible where the clients are generally aligned in interest even though there is some difference of interest among them.

Conflict questions may also arise in estate planning and estate administration. A lawyer may be called upon to prepare wills for several family members, such as husband and wife, and, depending upon the circumstances, a conflict of interest may arise. In estate administration the identity of the client may be unclear under the law of some jurisdictions. In Florida, the personal representative is the client rather than the estate or the beneficiaries. The lawyer should make clear the relationship to the parties involved.

A lawyer for a corporation or other organization who is also a member of its board of directors should determine whether the responsibilities of the 2 roles may conflict. The lawyer may be called on to advise the corporation in matters involving actions of the directors. Consideration should be given to the frequency with which such situations may arise, the potential intensity of the conflict, the effect of the lawyer's resignation from the board, and the possibility of the corporation's obtaining legal advice from

another lawyer in such situations. If there is material risk that the dual role will compromise the lawyer's independence of professional judgment, the lawyer should not serve as a director.

**Conflict charged by an opposing party**

Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation. In litigation, a court may raise the question when there is reason to infer that the lawyer has neglected the responsibility. In a criminal case, inquiry by the court is generally required when a lawyer represents multiple defendants. Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment. See scope.

**Family relationships between lawyers**

Rule 4-1.7(d) applies to related lawyers who are in different firms. Related lawyers in the same firm are also governed by rules 4-1.9 and 4-1.10. The disqualification stated in rule 4-1.7(d) is personal and is not imputed to members of firms with whom the lawyers are associated.

**Representation of Insureds**

The unique tripartite relationship of insured, insurer, and lawyer can lead to ambiguity as to whom a lawyer represents. In a particular case, the lawyer may represent only the insured, with the insurer having the status of a non-client third party payor of the lawyer's fees. Alternatively, the lawyer may represent both as dual clients, in the absence of a disqualifying conflict of interest, upon compliance with applicable rules. Establishing clarity as to the role of the lawyer at the inception of the representation avoids misunderstanding that may ethically compromise the lawyer. This is a general duty of every lawyer undertaking representation of a client, which is made specific in this context due to the desire to minimize confusion and inconsistent expectations that may arise.

### Consent confirmed in writing or stated on the record at a hearing

Subdivision (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing or clearly stated on the record at a hearing. With regard to being confirmed in writing, such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. See terminology. If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. See terminology. The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing.

[Revised: 05/22/2006 ]

## Lawyer Regulation

**Rules Regulating The Florida Bar**

**4 RULES OF PROFESSIONAL CONDUCT**
**4-1 CLIENT-LAWYER RELATIONSHIP**

# *RULE 4-1.8 CONFLICT OF INTEREST; PROHIBITED AND OTHER TRANSACTIONS*

**(a) Business Transactions With or Acquiring Interest Adverse to Client.** A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, except a lien granted by law to secure a lawyer's fee or expenses, unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

**(b) Using Information to Disadvantage of Client.** A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these rules.

**(c) Gifts to Lawyer or Lawyer's Family.** A lawyer shall not solicit any substantial gift from a client, including a testamentary gift, or prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift unless the lawyer or other recipient of the gift is related to the client. For

© 2005 The Florida Bar

purposes of this subdivision, related persons include a spouse, child, grandchild, parent, grandparent, or other relative with whom the lawyer or the client maintains a close, familial relationship.

**(d) Acquiring Literary or Media Rights.** Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation.

**(e) Financial Assistance to Client.** A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

**(f) Compensation by Third Party.** A lawyer shall not accept compensation for representing a client from one other than the client unless:

(1) the client gives informed consent;

(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3) information relating to representation of a client is protected as required by rule 4-1.6.

**(g) Settlement of Claims for Multiple Clients.** A lawyer who represents 2 or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or nolo contendere pleas, unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include

the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.

**(h) Limiting Liability for Malpractice.** A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement. A lawyer shall not settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

**(i) Acquiring Proprietary Interest in Cause of Action.** A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

(1) acquire a lien granted by law to secure the lawyer's fee or expenses; and

(2) contract with a client for a reasonable contingent fee.

**(j) Representation of Insureds.** When a lawyer undertakes the defense of an insured other than a governmental entity, at the expense of an insurance company, in regard to an action or claim for personal injury or for property damages, or for death or loss of services resulting from personal injuries based upon tortious conduct, including product liability claims, the Statement of Insured Client's Rights shall be provided to the insured at the commencement of the representation. The lawyer shall sign the statement certifying the date on which the statement was provided to the insured. The lawyer shall keep a copy of the signed statement in the client's file and shall retain a copy of the signed statement for 6 years after the representation is completed. The statement shall be available for inspection at reasonable times by the insured, or by the appropriate disciplinary agency. Nothing in the Statement of Insured Client's Rights shall be deemed to augment or detract from any substantive or ethical duty of a